**HAHN & HESSEN LLP**
Gilbert Backenroth
Stephen J. Grable
Steven R. Aquino
488 Madison Avenue
New York, New York  10022
Telephone: 212-478-7200
Fax: 212-478-7400

*Attorneys for Suffern Partners LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RS OLD MILL, LLC,<br><br>               Debtor. | Case No. 17-22218 (RDD)<br><br>Chapter 11 |
| RS OLD MILL, LLC,<br><br>               Plaintiff,<br><br>   - against -<br><br>SUFFERN PARTNERS LLC,<br>BRIDGEWATER CAPITAL PARTNERS<br>LLC, ISAAC GENUTH, MARK YUNGER<br>a/k/a "MARK JUNGER," GOLDIE<br>REISMAN, MOSES REICHMAN, RS OLD<br>MILLS RD LLC., DAVID<br>FLEISCHMANN, THOMAS<br>LANDRIGAN, and CPIF LENDING, LLC,<br><br>               Defendants. | Adversary No. 19-8243 (RDD)<br><br>**DECLARATION OF ISAAC LEFKOWITZ IN SUPPORT OF EMERGENCY MOTION BY SUFFERN PARTNERS LLC TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS TO SUFFERN, *NUNC PRO TUNC*, AND FOR OTHER RELATED RELIEF** |

     **ISAAC LEFKOWITZ**, pursuant to 28 U.S.C. § 1746, hereby declares that the

following is true and correct:

1.      I am the CEO of Suffern Partners LLC ("Suffern"), a party-in-interest in the above Chapter 11 proceeding involving RS Old Mill, LLC ("Debtor") (the "Chapter 11 Case") and a defendant in the Debtor's proposed adversary proceeding (the "Adversary Proceeding").  As such, I am fully familiar with the facts set forth below, which are true to the best of my personal knowledge or based upon the documents I have reviewed in connection with this matter.  I am authorized by Suffern to provide this Declaration.

2.      I respectfully submit this Declaration in support of Suffern's motion (a) approving the sale of substantially all of the assets of Debtor to Suffern, *nunc pro tunc*, to September 1, 2017, (b) dismissing the Chapter 11 Case, and (c) dismissal and/or abstention as to all claims asserted in Debtor's proposed Adversary Proceeding Complaint.

3.      Suffern's primary asset is a large piece of property, consisting of approximately 162 acres of land and several hundred thousand square feet of improvements thereon, located in Rockland County, New York (the "Premises"), which it acquired for $30 million in September 2017 through a transaction structured and effectuated by Debtor.

4.      Suffern's interest in purchasing the Premises dates back to late 2016, at or about the time that Debtor executed a contract of sale with Novartis Corporation ("Novartis") to purchase the Premises for $18 million (the "Sale Agreement").  The day after Debtor executed the Sale Agreement, Debtor agreed to assign its right to buy the Premises to a third-party entity called RS Old Mills Rd LLC ("Old Mills Rd") for $25 million.  Thereafter, on December 16, 2016, Old Mills Rd agreed to sell the Premises to Suffern for $30 million once it had acquired it from Debtor.  True and correct copies of these agreements are attached hereto as Exhibits A and B, respectively.

5.     Ultimately, Debtor was unable to close on the Premises in a timely manner because of its inability to secure financing.  Nevertheless, after the deadlines in the agreements passed, Suffern ultimately agreed to secure funding for the Premises and pay $30 million, a $12 million premium over the price in the Sale Agreement.

6.     Prior to closing on the Premises, Suffern sought and obtained a $33 million loan from CPIF Lending, LLC ("CPIF") to finance the acquisition.  In order to make the Premises an income generator, Suffern has undertaken efforts to find tenants for the Premises, which houses a complex pharmaceutical manufacturing facility that is exceedingly costly to maintain.  These efforts were stopped, however, when Debtor filed the proposed Adversary Proceeding against Suffern and a number of other defendants in an attempt to avoid its sale of the Premises – a transaction that generated $12 million for Debtor.  I understand that the proposed Adversary Proceeding concerns a dispute among Debtor's principals over their alleged rights to Debtors' equity.  Such dispute is unrelated to Suffern.

7.     The proposed Adversary Proceeding has, in effect, created a cloud on Suffern's title to the Premises which is preventing Suffern from leasing the property.  This, in turn, is causing significant damage to Suffern in the form of the monthly carrying costs on the Premises, which, including debt service on the CPIF loan, utilities, taxes, and other costs, exceed $1 million per month.

8.     Accordingly, Suffern is seeking this Court's approval of Debtor's sale of the Premises to Suffern on an emergency basis so that it can promptly resume its efforts to lease and develop the Premises.

9.     I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information, and belief.

DATED:      New York, New York
            April 19, 2019

_____
            **ISAAC LEFKOWITZ**

# **EXHIBIT A**

**THIS AGREEMENT OF ASSIGNMENT** (this **"Agreement"**) entered into this 29 day of **November, 2016** between **RS OLD MILL LLC, ("Assignor")** and  **RS OLD MILLS RD LLC,** having an address at 62 Rutledge Street, Suite 112, Brooklyn,  NY 11249 **("Assignee").**

# WITNESSETH

WHERES, a Purchase and Sale Agreement ("Contract") dated November 28, 2016 was entered into between **NOVARTIS CORPORATION ("Seller"), and ASSIGNOR** as purchaser (the "Contract"), covering the purchase and sale of certain lands located in the Village of Suffern and Village of Montebello, Town of Ramapo, County of Rockland, State of New York, described by metes and bounds on Schedule A annexed hereto as **Exhibit "D"** (the **"Premises");** and

WHEREAS, Assignor is desirous of transferring to Assignee and Assignee is desirous of acquiring from Assignor all of the right, title and interest of Assignor in and to the Contract conditioned on the terms set forth herein.

## NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

1.    Assignor represents the following: (a) annexed hereto and made a part hereof as Exhibit **"A"** is a true copy of the Contract, inclusive of all exhibits and attachments, except that the price and all parties have been redacted -therefrom, which Contract has not been modified; (b) the Contract will be in full force and effect; (c) Assignor has not heretofore assigned, mortgaged, pledged nor transferred its interest in the Contract nor the  Downpayment thereunder; (d) Assignor is currently the sole owner and holder of the interest of Purchaser under the Contract; (e) the Downpayment under the Contract **("Contract Deposit")** was deposited into Seller's attorney's escrow account; (f) Assignor has, pursuant to the Contract, the authority to assign the Contract to Assignee.

2.    Assignee shall have the right to exercise all rights of Assignor under the Contract and to take any and all action permitted to be taken by Assignor under the Contract with respect to the Premises, with Assignor's prior written consent, which shall not be unreasonably withheld, delayed or conditioned, and which shall be deemed given if Assignor does not respond in writing to any particular request with five (5) business days (which may be delivered via email from Assignee's attorney to Assignor's attorney, to _____

3.    As a condition to Assignee's obligation to close  hereunder ,  the foregoing representations of Assignor shall be true and correct as of the date hereof and of the closing. In addition, Assignee shall not be obligated to close if Assignor is not in compliance with any of the covenants set forth herein as of closing.

4.      Conditioned upon the terms of this Agreement being met, Assignor hereby agrees to sell and assign to Assignee all of its right, title and interest in and to the Contract, including the Contract Deposit deposited thereunder, for and in consideration of the payment by Assignee to Assignor of the Assignment Price (as hereinafter defined) which includes the price to be paid by Assignor to Seller under the Contract.

5.      **The Assignment Price** payable to Assignor shall mean the sum of **TWENTY FIVE MILLION AND 00/100 Dollars** ($25,000,000.00) The Assignment Price shall be paid as follows: (a) The sum of **One Hundred Twenty Five Thousand and 00/100 Dollars** ($125,000.00) Dollars (the "Deposit" or the "Assignment Deposit" by wire transfer subject to collection delivered to and to be held in escrow by Mark J. Nussman & Associates PLLC ("Escrow Agent"), within one (1) business day after the execution of this Agreement of Assignment, and (b) the sum of **TWENTY FOUR MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND and 00/100 Dollars** ($24,875,000.00) in cash or good unendorsed certified, bank or wire as instructed by Assignor herein on the delivery by **Seller** of the Deed to the Premises to Assignee (or its permitted assignee or designee). The Assignment of Price shall be paid at the closing, said sum to be divided between Seller and Assignor in accordance with instructions to be given by Assignor and shall be so paid by Assignee at closing, it being understood that Assignor shall instruct Assignee to pay the balance of the purchase price under the Contract to Seller or as Seller may direct, and the remaining funds to be delivered to Assignor as the Assignor shall direct. Additionally, Assignee shall reimburse Assignor at the closing for any amounts made as down payment under the Contract.

6.      Upon the closing, Assignee shall assume all of the obligations of Assignor (as the Purchaser) under the Contract except for all payment of the cash portion of the purchase price thereunder, it being understood that Assignor shall make this payment from the balance of the Assignment Price being paid to it by Assignee at the closing.

7.      In the event that any check deposited hereunder is not honored on presentment for payment, or if Assignee defaults in paying the balance of the Assignment Price, or any portion thereof, as hereinabove provided, then as Assignor's sole right and remedy in such event, all sums theretofore paid by Assignee together with all interest, if any, shall be retained by Assignor and same shall constitute liquidated damages. In such event this Agreement of Assignment shall be null and void and neither party shall have any further claim against the other and Assignor may acquire the Premises from Seller. The instruments of assignment in the possession of _____, shall be returned to Assignor and upon such return, this Agreement of Assignment shall be null and void and neither party shall have any further claim against the other.

8.      In the event that title to the Premises or the assignment contemplated hereby does not close in accordance with the terms hereof for any reason other than the default of Assignee, then Assignee shall be entitled as Assignee's sole remedy to the return of the Deposit given hereunder, and upon such return, this Agreement of Assignment shall be void and neither party shall have any further claim against the other.

9.      If, for reasons other than Assignee's default, Seller shall fail or refuse to perform the obligations of Seller, Assignee's sole remedy shall be entitlement to a return of the Deposit deposited hereunder with Escrow Agent. Upon the return of such sum, the parties shall be released of all liability to and rights against the other and this Agreement shall be null and void.

10.      Assignor is to use its best efforts to procure direct conveyance from the present owner to Assignee at the closing, so as to vest title to the Premises in Assignee. If, however, for any reason other than the default of Assignee, title should not be conveyed pursuant to the terms hereof and the Contract, or if any of the matters and things herein represented should prove to be inaccurate, then Assignee shall be entitled to the return of the Deposit, and there shall be no further liability of any nature whatsoever by and between either of the parties hereto, except for the return of said funds and, upon such payment, this Agreement shall be deemed null and void. If, however, there shall be any defect in title, or erroneous statement or representation made herein, Assignee shall have the option to accept such title and/or performance of this Agreement as Assignor may procure and/or deliver.

11.      At the closing, Assignee will execute all documents called for under the Contract, and will make all adjustments and payments required to be made by Assignor, as though Assignee were the original purchaser.

12.      This Agreement is contingent on the Assignee being ready, willing and able to close on or before March 21, 2017. Should Assignee fail to meet this March 21th deadline, this Agreement shall be deemed null and void. In such event this Agreement of Assignment shall be null and void and neither party shall have any further claim against the other and Assignor may acquire the Premises from Seller.

13.      The closing hereunder shall take place on or before the expiration of ten (10) days from Assignee's receipt of written notice from Assignor.

14.      Assignor agrees to assign to Assignee as part of this Agreement, any interest in any air rights, development rights or other such rights associated with this property and as set forth in the annexed underlying contract.

15.      Except as set forth herein, any notice required or permitted to be given hereunder pursuant to this Agreement of Assignment shall be sent bey certified or registered mail, return receipt requested or reputable overnight "mail" delivery service, in either instance, with an additional copy by facsimile transmission, as follows:

TO ASSIGNOR:      Samuel Lowinger, Esq.
Mark J. Nussbaum & Associates PLLC
225 Broadway, 39th Floor
New York, New York 10007
Phone: (212) 344-8000

TO ASSIGNEE:    Samuel T. Zand
2917 Ave k Suite 103
Brooklyn N.Y. 11210
(718)258-1100
Samuel@zandlawoffices.com

16.    The acceptance of a deed by Assignee shall be deemed to be full performance of and discharge of every agreement and obligation on the part of Assignor to be performed pursuant to the provisions hereof, except those, if any, which are specifically stated to survive consummation of this transaction.

17.    Assignor and Assignee shall cooperate regarding the exercise of all rights of the purchaser under the Contract. Copies of all communications sent to or received after the date hereof from Seller, shall be transmitted to the attorney for Assignee no later than one **(1)** business day after receipt by Assignor or its attorney, as applicable. Assignor shall deliver copies of all correspondence between Assignor and Seller, including e-mails between the attorneys for Assignor and Seller, and Assignor shall advise Assignee promptly of all notices Assignor receives pertaining to the Contract.

**18.**    For so long as this Agreement of Assignment is in effect, Assignor hereby agrees that it shall not, without obtaining the prior written consent of Assignee: (a) grant any approval or consent to take any other action with respect to the Contract or the Premises; or (b) modify, amend, waive the benefit of any provision of the Contract. Assignor is authorized, at its option, to send a written notice to Seller advising Seller of the existence of this Agreement of Assignment and of the terms of this Article, however, Assignee shall not be permitted to do so and such act shall be considered a default hereunder. **Assignee hereunder or any representative or affiliate of Assignee shall not contact, discuss the existence of this Agreement or the sale and or purchase of the Premises with the Seller or any of their affiliates. Breach of this Paragraph shall be an incurable default of this Agreement and Assignee will forfeit its Contract Deposit.**

19.    Assignor shall not be under any obligation to expend any monies or to commence any suit at law or in equity in order to clear title or in order to compel the performance of the Contract by Seller.

20.    At the closing of title, Assignor shall deliver to Assignee any and all documents dealing with the operation of the Premises which the Assignor receives from Seller pursuant to the terms of the Contract.

21.    At the Closing, Assignee shall execute all documents called for under the Contract and shall make all adjustments and payments required to be made by Assignor as Purchaser under the Contract as though Assignee were the original named purchaser thereunder.

22.    Assignee acknowledges that the Transfer Forms signed at Closing will reflect the consideration being paid by the Assignee to the Seller pursuant to the terms of the Contract. Assignee agrees to execute said Transfer Forms. The additional considerations being paid by the Assignee above the consideration set forth in said forms reflects the consideration for the assignment of the Contract and thus not reflected in the Form which Assignee will execute but

which will be reflected in a second Form that Assignor and Assignee will execute. Assignor agrees to pay at closing any additional transfer taxes due under the New York State Transfer Tax Laws required to be paid as a result of the assignment of the Contract to Assignee and to indemnify and save Assignee harmless from and against any of the foregoing and any cost, claim and expense (including reasonable attorney's fees) incurred by Assignee by reason of non-payment of the aforementioned additional transfer taxes due, if any. This paragraph shall survive the closing.

23.    Assignee may not assign its rights hereunder without the prior written consent of Assignor, which consent may be withheld for any reason or for no reason. Notwithstanding the foregoing to the contrary, Assignee may, prior to the closing, assign all of its right, title and interest in and to this Agreement, including its interest in the Deposit, to an entity which one or more of the principals of Assignee will own (directly or indirectly) and/or control. Assignor shall notify the Seller of such assignment prior to closing to effectuate the transfer of title to the Premises to such entity to enable all closing documents to be prepared in the name of such entity.

24.    Escrow Agent shall hold the Deposit in accordance with the terms set forth on **Exhibit "B",** attached hereto.

25.    Escrow Agent shall not be liable for any act done or omitted by it in good faith, or for anything which it may in good faith do or refrain from doing in connection with its duties as escrow agent. Escrow Agent is authorized to rely upon any written, notarized document reasonably believed by it to be signed by the parties hereto.

26.    The parties hereby agree to indemnify and hold harmless Escrow Agent from and against any loss, cost or damage incurred by it, including, without limitation, reasonable attorneys' fees in connection with this this Escrow Agreement and the Agreement, or arising from its duties as escrow agent (except in the case of gross negligence or willful misconduct).

27.    Assignor has executed an Assignment of Contract (the "Assignment Instrument") reflecting this transaction, in the form attached hereto as Exhibit **"C",** which shall be held in escrow by Escrow Agent pending payment of the foregoing sums; upon payment at closing, the Assignment Instrument will be delivered by the Escrow Agent to the Assignee.

28.    Assignor shall cooperate with Assignee in obtaining access to the Premises as set forth in the Contract and exercise all of Purchaser's rights and remedies.

29.    This Agreement of Assignment contains the entire understanding arrived at between the parties and all prior discussions and negotiations are merged herein. This Agreement of Assignment may not be modified nor terminated, except by an instrument in writing, signed by the party or parties sought to be charged thereby.

30.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

31.    This Agreement and all rights hereunder shall be construed in accordance with and governed by the laws of the State of New York.

32.    This Agreement may be executed in counterparts and a copy, fax or email of signatures shall be deemed as originals.

33.    Parties agree not to disclose that it has entered into this Agreement or any of the terms and conditions of this Agreement to any third party, except that Parties may disclose such information to its attorneys, accountants, prospective investors, provided such parties agree in writing to comply with the confidentiality provisions. Purchaser acknowledges that any information furnished to Purchaser with respect to the Property is and has been so furnished on condition that Parties maintain the confidentiality thereof. Except as provided above, Purchaser shall hold in strict confidence any of the information in respect of the Transaction.

**IN WITNESS WHEREOF,** the parties have executed this Assignment of Contract as of the date first above written.


ASSIGNOR:                                          ASSIGNEE:

**RS OLD MILL, LLC**                              **RS OLD MILLS RD LLC**

By: _____          By: _____

Name: Yehuda Salamon                      Name: Avrohom Kaufman

# EXHIBIT B

# Contract of Sale

### Between

## RS OLD MILLS RD LLC ("Seller")

### and

## SUFFERN PARTNERS LLC ("Purchaser")

### dated December 16, 2016

### Premises:

| | |
|---|---|
| Street Address: | 25 Old Mill Road |
| City/Town: | Village of Suffern, Town of Ramapo |
| County: | Rockland |
| State: | New York |
| Block: | 55-22 – Lot: 1.01 |
| Block: | 55-37 – Lot: 1-31 |
| Block: | 55.06 – Lot: 1-1 |
| | (Montbello) |

## SCHEDULES

Schedule A.   DESCRIPTION OF PREMISES ............................................................ A-1

Schedule B.   PERMITTED EXCEPTIONS.................................................................B-1

Schedule C.   PURCHASE PRICE .............................................................................C-1

CONTRACT OF SALE ("Contract") dated December 16, 2016 between RS OLD MILLS RD, LLC a Delaware Limited Liability Company ("Seller") and SUFFERN PARTNERS LLC ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

### Section 1.    Sale of Premises and Acceptable Title

§1.01.          Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; and (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building (collectively, the "Premises").  For purposes of this contract, "appurtenances" shall include all right, title and interest of Seller, if any, in and to (i) streets, easements, rights-of-way and vehicle parking rights used in connection with the Premises; (ii) any strips or gores of land between the Land and abutting or adjacent properties; (iii) the Service Contracts (as hereinafter defined); (iv) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Premises in Seller's possession, whether or not stored, managed or contained on computer software or hardware; (v) all operating manuals and books, data and records regarding the Premises and its component systems in Seller's possession; (vi) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Premises or the fixtures, machinery or equipment included in this sale to the extent that they may be transferred or assigned; (vii) all warranties or guaranties, if any, applicable to the Premises, to the extent such warranties or guaranties are assignable; (viii) all tradenames, trademarks, servicemarks, logos, copyrights and good will relating to or used in connection with the operation of the Premises and (ix) air rights and development rights.  This sale also includes all trade fixtures and all equipment, machinery, materials, supplies and other personal property attached or appurtenant to the Building or located at and used in the operation or maintenance of the Land or Building to the extent same are owned by Seller or any affiliate of Seller (the "Personal Property").

§1.02.          Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions").

### Section 2.    Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons

§2.01.          Purchaser shall pay Seller the purchase price ("Purchase Price") as set forth below:

(a)       on the signing of this contract, by Purchasers check payable to the Escrowee (as hereinafter defined) subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 2.01 (c) of this contract (the Downpayment):

**$2,500,000.00**

(b)      balance at Closing in accordance with paragraph 2.02:

**$27,500,000.00**

(c)      Downpayment in Escrow.  (i) Riverside Abstract having an address at 3839 Flatlands Avenue Suite 208 Brooklyn, NY 11234 (Escrowee) shall hold the Downpayment for Sellers account in escrow in a segregated bank account, until closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph.  Escrowee shall hold the Downpayment in a non-interest-bearing account for the benefit of the parties.  If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon.  If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law.  The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request.  At Closing, the Downpayment shall be paid by Escrowee to Seller.  If for any reason, Closing does not occur and either party gives Notice to Escrowee demanding payment of the Downpayment, Escrowee shall give prompt Notice to the other party of such demand.  If Escrowee does not receive Notice of objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment.  If Escrowee does receive such Notice of objection within such 10-day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court.  However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser.  Upon such deposit or other disbursement in accordance with the terms of this paragraph.  Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(ii)      The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.  Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorney's fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of the Escrowee.

(iii)      Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(iv)    Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(v)    Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

§2.02.    Except for the Downpayment (hereinafter defined), all monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or (b) official bank checks drawn by any such banking institution, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of $2,500.00 shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available federal funds to an account designated by Seller not less than three business days prior to the Closing.

§2.03.    If Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or if Seller fails to deliver the certification of non-foreign status required under §10.01(k), or if Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to ten percent (10%) thereof and shall at Closing remit the withheld amount with Forms 8288 and 8288A (or any successor forms) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing as herein provided is less than ten percent (10%) of the Purchase Price, Purchaser shall have the right to terminate this contract. The right of termination provided for in this §2.03 shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

### Section 3.    The Closing

§3.01.    Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on or about July 21, 2017 at the law offices of Cohen, LaBarbera & Landrigan, LLP, 40 Matthews Street, Suite 203, Goshen, New York 10924. This contract is subject to the Purchaser being ready, able and willing to Close on or before July 21, 2017. In the event that Purchaser is unable to meet this obligation or in any event that this Closing does not occur then this contract shall be null and void and neither party shall have any claim against the other.

### Section 4.    Representations and Warranties of Seller

Seller represents and warrants to Purchaser that as of Closing:

§4.01.    Seller is the sole owner of the Premises and has not granted any option to purchase the Premises or any right of first refusal or right of first offer to purchase the Premises.

§4.02.          There are no pending proceedings or appeals to correct or reduce the assessed valuation of the Premises.

§4.03.          To Seller's knowledge no incinerator, compactor, boiler or other burning equipment on the Premises is being operated in violation of applicable law.  If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.04.          To Seller's knowledge, no assessment payable in annual installments, or any part thereof, has become a lien on the Premises.

§4.05.          Seller is not a "foreign person" as defined in the Code Withholding Section.

§4.06.          Seller is a Limited Liability Company that has been duly organized and is in good standing under the laws of the state of Delaware.

§4.07.          Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby.  The person signing this contract on behalf of Seller is authorized to do so.  Assuming this contract has been duly authorized, executed and delivered by each of the other party(ies) to this contract, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

§4.08.          None of Seller's other representations or warranties shall survive the Closing.  No claim for a misrepresentation or breach of warranty of Seller shall be actionable or payable if the breach in question results from or is based on a condition, state of facts or other matter which was known to Purchaser prior to the Closing.  Seller shall have no liability to Purchaser for any misrepresentation or breach of warranty of Seller.

Except where limited specifically to the date of this contract or other date, the representations and warranties made by Seller in this contract are made as of the date of execution and delivery of this contract, and except as otherwise set forth in §6.05, shall be deemed restated and shall be true and accurate on the Closing Date.

**Section 5.     "As Is" Condition, No Representations Not Expressly Set Out in Contract, Representations and Warranties of Purchaser and Remedies in the Event of Default**

§5.01.          Purchaser acknowledges that:

(a)     Purchaser has inspected or has had an opportunity to inspect the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01 and Section 7, shall accept the Premises "as is" and in their

present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any such change in condition. Seller shall not be liable for any latent or patent defects in the Premises.

(b)    Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or verbally.

§5.02.        Purchaser represents and warrants to Seller that:

(a)    The funds comprising the Purchase Price to be delivered to Seller in accordance with this contract are not derived from any illegal activity.

(b)    Purchaser has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and the transaction contemplated hereby. The person signing this contract on behalf of Purchaser is authorized to do so. Assuming this contract has been duly authorized, executed and delivered by each of the other party(ies) to this contract, this contract and all obligations of Purchaser hereunder are the legal, valid and binding obligations of Purchaser, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)    The execution and delivery of this contract and of any note and Purchase Money Mortgage required hereunder and the performance of its obligations hereunder by Purchaser will not conflict with any provision of any law or regulation to which Purchaser is subject or any agreement or instrument to which Purchaser is a party or by which it is bound or any order or decree applicable to Purchaser, and will not result in the creation or imposition of any lien on any of Purchaser's assets or property which would materially and adversely affect the ability of Purchaser to carry out the terms of this contract. Purchaser has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Purchaser of this contract.

(d)    Purchaser is a Limited Liability Company that has been duly organized and is in good standing under the laws of the state of its formation.

(e)    To Purchaser's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser

which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this contract.

(f)   Purchaser is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Purchaser is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

§5.03   The remedies in the event of a default under this contract are as follows:

(a) The parties mutually acknowledge that in the event that the Seller is unable to convey good and insurable title, the sole obligation of the Seller shall be to refund the Purchaser's down payment made herein, without interest. Upon making of such refund, this contract shall wholly cease and terminate and neither party shall have any further claim against the other by reason of this contract including but not limited to Purchaser having no claim for specific performance. The Seller shall not be required to bring any action or proceeding or otherwise to incur any expenses to render the title to the premises insurable.

(b) The parties mutually acknowledge that if the Purchaser should default in closing title or under any other term or condition of this Contract, it may be impossible to determine Seller's actual damages. Accordingly, if the Purchaser shall default, whether such default be willful or otherwise, the Seller shall have the option to retain any and all funds previously paid by the Purchaser pursuant to this agreement as liquidated damages. In the event Seller elects to retain the down payment, both parties shall be relieved and released of and from any further liabilities hereunder, and Purchaser expressly releases any lien Purchaser may have against the property. Further, in the event of any default by Purchaser in closing title, the Seller is authorized to place the premises back on the market free and clear of any claim which the Purchaser may have against the premises.

## Section 6.   Seller's Obligations as to Leases

§6.01.   Unless otherwise provided in a schedule attached to this contract, Seller shall not, between the date of this contract and the Closing, without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed: (a) amend, renew or extend any Lease in any respect, except to the extent required by law or by the express terms of such Lease; (b) grant a written lease to any person or entity occupying space without a Lease (except as required by law); (c) terminate any lease or Tenancy except by reason of a default by the tenant thereunder; (d) consent to the assignment of a Lease or subletting by any tenant except as required by the terms of the applicable Lease or by law or (e) permit anyone to use or occupy any space pursuant to an oral agreement except pursuant to the Tenancies.

§6.02.   Unless otherwise provided in a schedule attached to this contract, Seller shall not, between the date of this contract and the Closing, permit the occupancy of, or enter into

any new lease, occupancy agreement or license agreement for, space in the Building which is presently vacant or which may hereafter become vacant, without first giving Purchaser written notice of the identity of the proposed tenant, occupant or licensee, together with (a) either a copy of the proposed lease, occupancy agreement or license agreement, or a summary of the terms thereof in reasonable detail and (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof.

If Purchaser objects to such proposed lease, occupancy agreement or license agreement and notifies Seller of its objection within seven business days after receipt of Seller's notice, or such lease, occupancy agreement or license agreement constitutes a Related Transaction, Seller shall not enter into the proposed lease, occupancy agreement or license agreement. If this applies and the prospective tenant, licensee or occupant would have commenced paying rent or a license fee prior to the Closing Date if Purchaser had not objected, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, (A) the rent, additional rent and other charges that would have been payable under the proposed lease, occupancy agreement or license agreement from the date on which the tenant's, occupant's or licensee's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the Reletting Expenses (hereinafter defined), as amortized over the period commencing on the proposed rent commencement date of such lease or agreement and ending on the proposed expiration date of such lease or agreement and apportioned as of the Closing Date. The "Reletting Expenses" shall equal the amount of the brokerage commission, any construction allowance or other monetary payment to be made to the proposed tenant, occupant or licensee, and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease, occupancy agreement or license agreement to prepare the premises for the tenant's, occupant's or licensee's occupancy.

If Purchaser does not so notify Seller of its objection to a proposed lease, occupancy agreement or license agreement or consents to same and if such lease or agreement does not involve a Related Transaction, Seller shall have the right to enter into the proposed lease, occupancy agreement or license agreement with the tenant, occupant or licensee identified in Seller's notice. If Seller enters into such lease or agreement and Seller has reasonably incurred out-of-pocket expenses in connection with such transaction, including brokerage commissions, reasonable legal fees, and/or fix up costs (the "Leasing Expenses"), then:

1. If the new tenant or occupant is not required to commence paying, and does not pay, rent until after the Closing Date, Purchaser shall reimburse Seller at the Closing for all the Leasing Expenses and Seller shall pay to the appropriate parties the Leasing Expenses, which obligation shall survive the Closing; but

2. If the new tenant or occupant commences paying rent prior to the Closing Date, Purchaser shall pay Seller at Closing the unamortized portion of the Leasing Expenses. The Leasing Expenses shall be amortized over a period commencing on the rent commencement date under such lease or agreement and ending on the expiration date of such lease or agreement (not

taking into account any renewal or extension rights), and the unamortized portion shall be determined as of the Closing Date. Seller shall pay to the appropriate parties the Leasing Expenses, which obligation shall survive the Closing.

If Seller fails to pay the Leasing Expenses as required by this Section, Seller shall indemnify and hold harmless Purchaser from all loss, cost, expense, liability, and damages, including reasonable attorneys' fees, Purchaser may incur by reason of such failure, which indemnification obligation shall survive Closing.

§6.03.        If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract.

§6.04.        Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent.

§6.05.        Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

### Section 7.    Responsibility for Violations

§7.01.        Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing shall be removed or complied with by Seller and Seller shall pay any fines or penalties imposed by reason of any such violations. If such removal or compliance or payment of fines or penalties, as applicable, has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost, including the reasonable fees of Purchaser's attorney, architect and expediter, to effect or complete such removal or compliance and any penalties imposed for non-compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract if (a) Purchaser's institutional lender reasonably refuses to provide financing by reason thereof or (b) the Building is a multiple dwelling and either (i) such violation is rent impairing and causes rent to be unrecoverable under Section 302-a of the Multiple Dwelling Law or (ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.

§7.02.        If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of

§7.01 shall exceed $400,000, Seller shall have the right to cancel this contract, unless Purchaser elects to accept title to the Premises subject to all such violations or liens with no reduction of the Purchase Price.

§7.03.          Seller's failure to remove or fully comply with any violations which a tenant unaffiliated with Seller is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title or a breach of Seller's obligations under this Section 7.  Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's institutional lender reasonably refuses to provide financing by reason of a violation described in this Section, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract.

§7.04.          If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

### Section 8.     Destruction, Damage or Condemnation

§8.01.          Damage by Casualty.

(a)     Damage Not in Excess of [$400,000].  If, prior to the Closing, there shall occur damage to the Premises caused by fire or other casualty which would cost less than [$400,000] (the "Casualty Threshold") to repair, as reasonably determined by an engineer selected by Seller and reasonably satisfactory to Purchaser, and such fire or other casualty does not adversely affect the lobby, building-wide systems, or common areas and the continued operation of the balance of the Premises not damaged then Purchaser shall not have the right to terminate this contract by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of the insurance proceeds payable on account of any such fire or casualty, shall deliver to Purchaser any such proceeds actually paid to Seller, and shall afford to Purchaser at Closing a credit against the balance of the Purchase Price in an amount equal to any deductible.  If the limit of Seller=s insurance policy with respect to a casualty at the Premises is less than the cost of restoration, then Buyer shall be entitled to a further reduction in the Purchase Price in an amount equal to the difference between the cost of restoration and the limit of such insurance policy (less the deductible).   The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

(b)     Damage in Excess of [$400,000].  If prior to the Closing there shall occur damage to the Premises caused by fire or other casualty which would cost an amount equal to the Casualty Threshold or more to repair, as reasonably determined by an engineer selected by Seller and reasonably satisfactory to Purchaser, or the damage affects the lobby, building-wide systems, or common areas or the continued operation of the balance of the Premises not damaged then Purchaser may elect to terminate this contract by notice given to Seller and Escrowee within ten (10) days after Seller has given Purchaser notice that

such damage occurred, or at the Closing, whichever is earlier, upon which termination, Escrowee shall deliver the Downpayment to Purchaser, this contract shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for those obligations and liabilities that are expressly stated to survive termination of this contract. If Purchaser does not elect to terminate this contract, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of the insurance proceeds payable on account of any such fire or casualty, shall deliver to Purchaser any such proceeds or awards actually paid to Seller, and shall afford to Purchaser at Closing a credit against the balance of the Purchase Price in an amount equal to any deductible. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

(c)     Seller agrees not to repair any damage to the Premises (other than emergency repairs) without Purchaser's prior written consent and not to incur Reimbursable Amounts totaling in the aggregate in excess of [$400,000 without Purchaser's prior written consent. Purchaser shall have the right to participate in any discussions, claims adjustments or settlements with insurance companies regarding any damage to the Premises.

(d)     The term "<u>Reimbursable Amounts</u>" shall mean costs and expenses actually and reasonably incurred by or for the account of Seller in connection with fire or other casualty for (x) compliance with governmental ordinances, orders or requirements of any governmental department, agency or bureau having jurisdiction of the Premises, (y) safeguarding the Premises or any part thereof, including any protective restoration or (z) emergency repairs made by or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carrier).

§8.02.          <u>Condemnation</u>. If after the execution and delivery of this contract and prior to Closing, any proceedings are instituted by any governmental authority which shall relate to the proposed taking of all or any portion of the Premises by eminent domain, or if any such proceedings are pending on the date of execution and delivery of this contract, or if all or any portion of the Premises is taken by eminent domain after the date of this contract and prior to the Closing, Seller shall promptly notify Purchaser in writing no later than two business days after Seller's receipt of any notification or the date of Closing, whichever occurs earlier. Purchaser shall thereafter have the right and option to terminate this contract by giving written notice to Seller and Escrowee within thirty (30) days after receipt by Purchaser of the notice from Seller or on the Closing Date, whichever is earlier. If the Closing Date was scheduled to occur after the institution of such proceeding, the Closing Date shall be deemed adjourned in order that Purchaser shall have its full thirty-day period within which to determine whether or not to proceed with Closing. If Purchaser timely terminates this contract, Purchaser shall be entitled to receive the Downpayment from Escrowee and this contract shall thereupon be terminated and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those obligations and liabilities that are expressly stated to survive termination of this contract. If Purchaser does not elect to terminate this contract, the parties hereto shall proceed to the Closing and at the Closing, Seller shall assign to Purchaser all of its right, title and interest in all awards in connection with such taking and shall pay to Purchaser any

award paid to Seller with respect to such taking.  Purchaser shall have the right to participate in discussions or proceedings with any governmental authority relating to the proposed taking of any portion of the Premises.

§8.03.        The provisions of this Section 8 shall survive the Closing.

**Section 9.    Covenants of Seller**

Seller covenants that between the date of this contract and the Closing:

§9.01.        Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty or fee by the then owner of the Premises upon not more than 30 days' notice.

§9.02.        No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.03.        Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

§9.04.        Seller shall allow Purchaser or Purchaser's representatives access to the Premises and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

§9.05.        Seller shall operate the Premises in substantially the same manner as the Premises are being operated on the date of this contract.

**Section 10.    Seller's Closing Obligations**

§10.01.        At the Closing, Seller shall deliver the following to Purchaser:

(a)        A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

(b)        A schedule of all security deposits and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an institutional lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.

(c)        A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

(d)    All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

(e)    An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in the Service Contracts, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

(f)    To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

(g)    Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies, or other returns against persons or entities whose names are the same as or similar to Seller's name, to omit the rights of parties who are no longer in possession and to limit the exception for tenants and occupants to those having "rights as tenants only".

(h)    (1) Checks to the order of the appropriate officers or the Title Company in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority or the Title Company unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (2) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury, and (3) Form RP-5217.  Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

(i)    An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

(j)    If Seller is a partnership or limited liability company, the written consent of the partners or members to the extent required by the partnership agreement or operating agreement and delivery of a certificate executed by the general partner of any partnership or by the manager (if any) or a member of a limited liability company, attaching true and complete copies of the organizational documents of Seller and affirming that the sale and conveyance of title comply with the requirements of such organizational documents (or of the applicable statute, if any).

(k)    Possession of the Premises in the condition required by this contract.

(l)    A blanket assignment, without recourse or representation, of all Seller's right, title and interest, if any, to all contractors', suppliers', materialmen's and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Premises on the Closing Date and a true and complete copy of each thereof.

(m)    A certificate of Seller confirming that the warranties and representations of Seller set forth in this contract are true and complete on and as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Seller's representations and warranties under §4).

(n)    Upon request of Purchaser, a bill of sale transferring to Purchaser the Personal Property free and clear of all liens and encumbrances except, if applicable, for the lien of the holder of the Existing Mortgage.

(o)    Any other documents required by this contract to be delivered by Seller.

### Section 11.    Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01.    Pay to Seller (and/or to Seller's designee(s) provided Seller shall have given notice to Purchaser of the name(s) of such designee(s) not less than five days prior to Closing) by check, or wire transfer immediately available federal funds to Seller (and/or such designee(s)), the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under §12 and any other credits or adjustments provided in this contract.

§11.02.    Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.01(c).

§11.03.    Duly complete and sign all required real property transfer tax returns and all tax reports (such as RP-5217), and cause all such returns, reports and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.04.    Deliver to Seller a certificate confirming that the warranties and representations of Purchaser set forth in this contract are true and complete as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Purchaser's representations and warranties under §5).

§11.05.    Deliver any other documents required by this contract to be delivered by Purchaser.

### Section 12.    Apportionments

§12.01.    The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    prepaid rents and Additional Rents (as defined in §12.03) and revenues, if any, from telephone booths, vending machines and other income-producing agreements to the extent collected;

(b)    real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises,

apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(c)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes, as shown on the invoices of Seller's supplier;

(d)    charges under transferable Service Contracts or permitted renewals or replacements thereof;

(e)    permitted administrative charges, if any, on tenants' security deposits;

(f)    Reletting Expenses under §6.02, if any; and

If on the Closing Date the Premises shall be affected by an assessment which is or may become payable in annual installments, all installments allocable to the period following the Closing Date shall be Purchaser's responsibility.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation shall be promptly corrected, which obligation shall survive the Closing.

Any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

Real estate tax refunds, abatements and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§12.02.    If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred; (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other parry, which obligation shall survive the Closing.

§12.03.    If any tenants are required to pay percentage rent, escalation or pass-through charges for real estate taxes, operating expenses, or other charges, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and

Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing. If any tenant is or becomes entitled to a refund of overpayments of Additional Rent which are attributable in whole or in part to any period prior to the Closing, Seller shall pay to Purchaser an amount equal to the amount of such refund attributable to any such period within ten days after notice from Purchaser, which obligation shall survive the Closing.

### Section 13.    Title, Remedies for Purchaser's Default, Procedure on Termination of Contract by Purchaser

§13.01.        Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or, if Purchaser's obligation to close is conditioned on the issuance of a loan commitment, until the expiration date of any written commitment of Purchaser's institutional lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title (other than Permitted Exceptions) noted in such title report and any other defects or objections (other than Permitted Exceptions) which may be disclosed on or prior to the Closing Date.

§13.02.        Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's institutional lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's institutional lender reasonably refuses to accept such insurance in lieu of actual payment and, discharge, Seller shall have the right, in lieu of payment and discharge, to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.03.        Notwithstanding anything to the contrary contained herein, if Purchaser shall default in the performance of its obligations under this contract, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain, subject, however, to Seller's rights under this agreement.

§13.04.        If (a) Purchaser shall have grounds under this contract for refusing to consummate the purchase provided for herein, or (b) Purchaser or Seller terminates this contract pursuant to a provision that refers to this Section, the sole liability of Seller shall be to refund the

Downpayment to Purchaser. Upon the giving of the termination notice and Seller's refund of the Downpayment, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under this agreement.

### Section 14.    Broker

§14.01.            Seller and Purchaser mutually represent and warrant that they have not dealt with any broker in connection with this transaction.  The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

### Section 15.    Notices

§15.01.            All notices under this contract shall be in writing and shall be delivered personally with receipt acknowledged or shall be sent by (i) prepaid certified mail, or (ii) prepaid nationally recognized overnight courier for next business day delivery with receipt acknowledged, or (iii) legible facsimile transmission (with copy acknowledged), in each case addressed to Seller or Purchaser at their addresses listed above and shall otherwise have given notice as herein provided.  Notice sent by certified mail shall be deemed received on the third business day following mailing.  Notice sent by overnight courier shall be deemed received on the first business day following delivery to the overnight courier.  Notices sent by facsimile transmission shall be deemed received on the date received (or, if the date of receipt is not a business day, on the first business day following date of receipt).  Notices under this contract may not be given by e-mail or other electronic system.  Any notice under this contract may be given by the attorneys of the respective parties who are hereby authorized to do so on their behalf.

### Section 16.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations

§16.01.            Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02.            The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

### Section 17.    Miscellaneous Provisions

§17.01.            (a) Purchaser shall not assign this contract or its rights hereunder without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion.  No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee.  The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

(b)     If Seller or Purchaser is or may in the future be under contract with a qualified intermediary for the purpose of effecting a tax-deferred exchange in accordance with Section 1031 of the Internal Revenue Code of 1986, as amended, each party consents to the assignment of this contract to such intermediary. Each party shall cooperate with the other and with the qualified intermediary to accomplish such exchange and shall perform any acts and execute any and all documents reasonably necessary to assist in such exchange, provided that neither party shall be required to accept title to any property other than the Premises, expend any additional amounts of money above those amounts for which it is obligated under this contact or extend the Closing Date, and Seller's time to close under this contract shall not be reduced. Seller and Purchaser shall each defend, indemnify and hold the other harmless from and against expenses, costs and damages of any kind (including reasonable attorneys' fees) suffered by either resulting from the performance of, or failure to perform, any acts of cooperation necessitated by this Section.

§17.02.          There is no financing contingency in this agreement.

§17.03.          This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.04.          This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§17.05.          The captions in this contract are inserted for convenience of reference only and in no way, define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§17.06.          This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.07.          This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§17.08.          As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§17.09.          This contract may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall be one instrument.

§17.10.          The Parties agree that their interests under this Agreement shall not be assignable.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

Seller: RS OLD MILLS RD LLC:


_____
Avrohom Kaufman


Purchaser: SUFFERN PARTNERS LLC


_____
Goldie Reisman

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $2,500,000.00, by check subject to collection, to be held in escrow pursuant to §2.01(c).

_____

## Schedule A

## DESCRIPTION OF PREMISES

**(to be attached separately and to include tax map designation)**

## Schedule B

## PERMITTED EXCEPTIONS

1.     Zoning and subdivision laws, regulations and ordinances and landmark, historic or wetlands designations, which are not violated by the existing structures or present use thereof.

2.     Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.     Unpaid installments of assessments not due and payable on or before the Closing Date; and real estate taxes that are a lien but are not yet due and payable.

4.     Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants.

7.     Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises or interferes with the existing use of the Premises.

8.     Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

9.     Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

10.     Any state of facts that an accurate survey would disclose, provided that such facts do not render title uninsurable without additional premium or charge or is a Permitted Exception.  For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title uninsurable or unmarketable, and Purchaser shall accept title subject thereto.

## Schedule C

## PURCHASE PRICE

The Purchase Price shall be paid as follows:

| | | |
|---|---|---|
| (a) | By check subject to collection, the receipt of which is hereby acknowledged by Seller (the Downpayment): | $ 2,500,000.00 |
| (b) | By check or checks delivered or wire transfers of federal funds to Seller or Seller's designee(s) or the holder of any Existing Mortgage being assigned pursuant to §2.04 at the Closing in accordance with the provisions of §2.02: | $ |
| (c) | By acceptance of title subject to the following Existing Mortgage(s): _____ | $ |
| (d) | By execution and delivery to Seller by Purchaser or its assignee of a note secured by a Purchase Money Mortgage on the Premises: | $ |
| (e) | Total Purchase Price: | $30,000,000.00 |

E-1