**HAHN & HESSEN LLP**
Gilbert Backenroth
Stephen J. Grable
Steven R. Aquino
488 Madison Avenue
New York, New York 10022
Telephone: 212-478-7200
Fax: 212-478-7400

*Attorneys for Suffern Partners LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 17-22218 (RDD) |
| RS OLD MILL, LLC, | Chapter 11 |
| Debtor. | |

| | |
|---|---|
| RS OLD MILL, LLC, | Adversary No. 19-8243 (RDD) |
| Plaintiff, | |
| - against - | ***DECLARATION OF DAVID FLEISCHMANN IN SUPPORT OF EMERGENCY MOTION BY SUFFERN PARTNERS LLC TO APPROVE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS TO SUFFERN, NUNC PRO TUNC, AND FOR OTHER RELATED RELIEF*** |
| SUFFERN PARTNERS LLC, BRIDGEWATER CAPITAL PARTNERS LLC, ISAAC GENUTH, MARK YUNGER a/k/a "MARK JUNGER," GOLDIE REISMAN, MOSES REICHMAN, RS OLD MILLS RD LLC., DAVID FLEISCHMANN, THOMAS LANDRIGAN, and CPIF LENDING, LLC, | |
| Defendants. | |

**DAVID FLEISCHMANN**, pursuant to 28 U.S.C. § 1746, hereby declares that the

following is true and correct:

1.      I am an attorney licensed to practice in the State of New York and former real estate counsel to Suffern Partners LLC ("Suffern"), a party-in-interest in the above Chapter 11 proceeding involving RS Old Mill, LLC ("Debtor") (the "Chapter 11 Case") and a defendant in the Debtor's proposed adversary proceeding (the "Adversary Proceeding"). As such, I am fully familiar with the facts set forth below, which are true to the best of my personal knowledge or based upon the documents I have reviewed in connection with this matter. I am authorized by Suffern to provide this Declaration.

2.      I respectfully submit this Declaration in support of Suffern's motion (a) approving the sale of substantially all of the assets of Debtor to Suffern, *nunc pro tunc,* to September 1, 2017, (b) dismissing the Chapter 11 Case and (c) dismissal and/or abstention as to all claims asserted in Debtor's proposed Adversary Proceeding Complaint.

3.      I previously represented Suffern in connection with its purchase in about September of 2017, of approximately 162 acres of land and a 585,000-square-foot pharmaceutical manufacturing facility in Rockland County, New York (the "Premises").

4.      I understand that Debtor had initiated the Chapter 11 Case in order to protect itself from the risk of losing its right pursuant to an agreement (the "Sale Agreement"), dated as of November 28, 2016, under which Debtor agreed to pay Novartis Corporation ("Novartis") $18 million for the Premises. Debtor assumed the Sale Agreement, and the Court ultimately ordered that the closing on Debtor's purchase of the Premises take place on or before August 17, 2017.

5.      However, Debtor apparently was unable to close on financing for the amount due and owing to Novartis on the Premises before the Court's deadline. Pursuant to the

2

Sale Agreement, at the time Debtor owed Novartis approximately $15.5 million, representing the balance of the purchase price and other closing and administrative costs.

6.     Accordingly, Suffern offered to secure and provide funding for Debtor's purchase of the Premises and, in the process, buy it from Debtor for $30 million. Debtor agreed. Under the deal that Debtor structured and given certain limitations imposed by the Sale Agreement, Debtor structured a deal whereby it was to convey the Premises to a third party entity, RS Old Mills Rd, LLC ("Old Mills Rd"), which would then immediately re-convey the Premises to Suffern. The multi-transaction structure reflected an arm's-length, negotiated deal for significant consideration, and was structured by Debtor to ensure it could meet the requirements of the Sale Agreement.

7.     Suffern negotiated and obtained a $33 million loan from CPIF Lending, LLC ("CPIF") for its acquisition of the Premises. True and correct copies of the promissory note and mortgage between Suffern and CPIF are attached hereto as Exhibits A and B, respectively. I acted as Suffern's real estate counsel in connection with its procurement of the loan from CPIF, which continued to be represented by Cassin & Cassin LLP. CPIF's loan to Suffern was heavily documented and, like Debtor's agreement to sell the Premises to Suffern, was negotiated at arm's length. A true and correct copy of my post-closing correspondence with counsel for CPIF, enclosing and describing more than 30 loan documents executed in connection with CPIF's loan to Suffern, is attached hereto as Exhibit C. In addition, both CPIF and Suffern sought and obtained title insurance on the Premises in the amount of $33 million and $30 million, respectively.

8.     CPIF and Suffern also selected an escrow agent, Riverside Abstract, LLC ("Riverside"), for Suffern's purchase of the Premises. On September 1, 2017, CPIF, Suffern,

3

and Riverside executed an escrow agreement (the "Escrow Agreement") in advance of the

closing on CPIF's loan to Suffern. A true and correct copy of the Escrow Agreement and

the accompanying closing statement are attached hereto as Exhibits D and E, respectively.

In the Escrow Agreement, CPIF represented that it had deposited $33 million in escrow with

Riverside for disbursement pursuant to the instructions laid out therein. *See id.* Under those

instructions, Riverside was to distribute the balance due and owing under the Sale

Agreement ($15,940,324.51) to Novartis through its escrow agent, Commonwealth Land

Title Insurance Company, and $13,763,840.88 to Debtor's real estate counsel, Cohen,

LaBarbera & Landrigan, LLP, for the $12 million balance due to Debtor for Suffern's

purchase of the Premises and other administrative costs.

9.      With the funding in place Debtor and Novartis closed on the Premises on

September 6, 2017. Novartis had previously executed a deed to the Premises in Debtor's

favor on September 1, 2017, and, in accordance with the parties' earlier agreement, Debtor,

through its managing member, executed a deed for the Premises to Old Mills Rd, which

immediately conveyed the property to Suffern. True and correct copies of these deeds are

attached hereto as Exhibits F, G, and H, respectively. Thereafter, at Debtor's instruction and

pursuant to the terms of the Escrow Agreement, I understand that more than $12 million

was distributed to Debtors' real estate counsel, Cohen, LaBarbera & Landrigan, LLP.

10.     The closing on CPIF's loan to finance Suffern's — and Debtor's — purchase

of the Premises took place under significant time pressures. I understand that Novartis

had declared Debtor in default under the Sale Agreement for failing to close by the Court's

August 17, 2017 deadline and Debtor risked losing its $2.5 million security deposit on —

and its entire right to buy — the Premises. Moreover, the transaction involved a significant

commercial loan that needed to be, and was, properly negotiated, documented, and reviewed by counsel.

11.    I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information, and belief.

DATED:    New York, New York
          April 18, 2019

_DAVID FLEISCHMANN_

# <u>EXHIBIT A</u>

COPY

## AMENDED, RESTATED AND CONSOLIDATED PROMISSORY NOTE

$33,000,000.00

New York, New York
September 6, 2017

This **AMENDED, RESTATED AND CONSOLIDATED PROMISSORY NOTE** is made and entered into as of September 6, 2017, by and between **SUFFERN PARTNERS LLC**, a New York limited liability company ("**Rockland County Borrower**") and **NORTH 14TH STREET REALTY ASSOCIATES LLC**, a New York limited liability company ("**Kings County Borrower**"), collectively, maker (the Rockland County Borrower and the Kings County Borrower, jointly and severally, as co-borrowers, individually and collectively (as the context may require), and together with their permitted successors and assigns shall hereinafter be referred to as "**Borrower**" or collectively, as "**Borrowers**") and **CPIF LENDING, LLC**, a Washington limited liability company, as lender, having an address at 1910 Fairview Avenue East, Suite 200, Seattle, Washington 98102 (together with its successors and/or assigns collectively, "**Lender**").

### PRELIMINARY STATEMENTS:

**WHEREAS**, Lender is the holder and Rockland County Borrower is the obligor under those certain notes listed on **Schedule A-1** annexed hereto and made a part hereof (the "**Existing Rockland County Notes**") and Borrowers agree that there are no offsets, setoffs or counterclaims against payment of said amounts due under the Existing Rockland County Notes; and

**WHEREAS**, Lender is the holder and Kings County Borrower is the obligor under those certain notes listed on **Schedule A-2** annexed hereto and made a part hereof (the "**Existing Kings County Notes**"; together with the Existing Rockland County Notes shall individually and collectively (as the context may require) be referred to as the "**Existing Notes**") and Borrowers agree that there are no offsets, setoffs or counterclaims against payment of said amounts due under the Existing Kings County Notes; and

**WHEREAS**, the total outstanding principal indebtedness on the date hereof evidenced by the Existing Rockland County Notes is **TWENTY-TWO MILLION AND NO/100 DOLLARS ($22,000,000.00)**; and

**WHEREAS**, the total outstanding principal indebtedness on the date hereof evidenced by the Existing Kings County Notes is **ELEVEN MILLION AND NO/100 DOLLARS ($11,000,000.00)**; and

**WHEREAS**, each Borrower and Lender desire to combine, consolidate, amend and restate the terms and conditions of the Existing Notes in their entirety, in the manner hereinafter set forth, and to replace the Existing Notes with this Amended, Restated and Consolidated Promissory Note (as the same may be amended, supplemented, restated, replaced or otherwise modified from time to time, this "**Note**").

**NOW THEREFORE**, by each Borrowers execution and delivery of this Note and Lender's acceptance of such delivery from Borrowers, this Note is deemed to amend, modify, consolidate and replace the Existing Notes, and the Existing Notes are restated in their entirety to read as follows:

The Existing Notes are hereby consolidated, modified and restated in their entirely so that all of the terms and conditions contained in the Note shall supersede and control the terms and conditions of the Existing Notes and that together they shall hereafter constitute but one note represented by this Note. Borrowers hereby assume all of the obligations and agreements of the Existing Notes.

{01307007;11}

This Note does not extinguish the outstanding indebtedness evidenced by the Existing Notes or discharge or release the existing mortgages securing the indebtedness of the Existing Notes or any other security, and the parties do not intend this Note to be a substitution or novation of the original indebtedness or instruments securing the same.

FOR VALUE RECEIVED, Borrowers, hereby unconditionally promise to pay, in lawful money of the United States of America, to the order of Lender, having its office at 1910 Fairview Avenue East, Suite 200, Seattle, Washington 98102, or such other place as Lender may designate in writing from time to time, the principal sum of **THIRTY-THREE MILLION AND NO/100 DOLLARS ($33,000,000.00)** (the "**Loan**"), with interest on the unpaid principal balance at the rate provided below. This Note is secured by, among other things, the Mortgage (as defined below) and the other Loan Documents described in Section 5 below.

1.      **Loan Proceeds and Interest**.

1.1      **Interest.** Interest shall accrue on the unpaid principal balance of this Note from the Disbursement Date (as hereinafter defined in Section 2 below) through the Maturity Date (as hereinafter defined in Section 2 below), at an interest rate equal to eleven percent (11%) per annum. Interest shall be calculated (i) initially, from the period commencing on and including the Disbursement Date and ending on and including the last day of the month in which the Disbursement Date occurs, and (ii) thereafter, for any specified Payment Date including the Maturity Date, the period commencing on and including the first (1st) day of the calendar month and ending on and including the last day of such calendar month.

1.2      **Insurance/Real Estate Tax Reserve.** The Loan amount stated above includes (i) twelve (12) months of real estate tax payments for the Rockland County Property (as defined in the Loan Agreement) totaling Three Hundred Seventy-Five Thousand and No/100 Dollars ($375,000.00) (the "**Initial Tax Deposit**") and (ii) $0.00 for payment of insurance premiums next coming due for the insurance policies insuring the Properties and which are required to be obtained and maintained by Borrower pursuant to the terms set forth in the Loan Documents (the "**Initial Insurance Deposit**"), which Initial Tax Deposit and Initial Insurance Deposit shall each be deposited into a reserve account held, controlled and maintained by Lender (the "**Insurance/Tax Reserve**"). In addition, commencing on November 1, 2017 and continuing on each Payment Date (as hereinafter defined) until the Maturity Date, Borrower shall deposit with Lender (a) one-twelfth of the real estate taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such real estate taxes for each Property at least ten (10) days prior to delinquency and (b) one-twelfth of the insurance premiums that Lender estimates will be payable for the renewal of the coverage afforded by the insurance policies for each Property required pursuant to the Loan Documents upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such insurance premiums for each Property at least thirty (30) days prior to the expiration of the insurance policies. Lender will hold back the Initial Tax Deposit and Initial Insurance Deposit from the Loan proceeds, and, so long as there is no "Event of Default," as that term is defined below, Lender will apply the funds held in the Insurance/Tax Reserve pursuant to Section 2.5 below. In the event that Lender reasonably determines that the amount of funds set aside for the Insurance/Tax Reserve are insufficient, or this Note is extended pursuant to Section 2.6 below, Borrower shall, within five (5) days of written request from Lender, deliver to Lender, in immediately available funds, such amounts as reasonably determined by Lender in order to adequately fund the Insurance/Tax Reserve. In addition to the remedies set forth in Section 2.5 below, upon the occurrence of an Event of Default that has not been cured, Lender may apply all funds in the Insurance/Tax Reserve to the payment of costs of collection and related expenses (if any), unpaid interest and/or principal in Lender's sole discretion. Lender makes no representation or warranty to Borrower that the

funds in the Insurance/Tax Reserve will be sufficient to pay all real estate taxes and insurance premiums in each instance when due.

      1.3    **Capital Expenditure Reserve.** Lender will hold back an amount equal to One Million and No/100 Dollars ($1,000,000.00) from the Loan proceeds as a "**Capital Expenditure Reserve,**" to be made available to Borrower from time to time in order to (i) facilitate and reimburse Borrower for any entitlement process in relation to the Rockland County Property, (ii) reimburse Borrower for soft costs associated with the pre-development of the Rockland County Property and (iii) to reimburse Borrower for or pay for any capital improvements made to the Rockland Property and approved by Lender in Lender's reasonable discretion. Borrower will be reimbursed for such entitlement, soft costs and capital expenditure costs after providing Lender with (1) subject to the provisions set forth below, sufficient evidence, including without limitation, invoices, detailing the costs and expenses incurred in connection with obtaining the necessary entitlements or for the labor and/or materials required for any such soft costs or capital improvements for the benefit of the Rockland Property, which evidence must be satisfactory to Lender in its reasonable discretion and such other information and items set forth below in this Section 1.3. Lender shall make disbursements (but not more than twice per month) from the Capital Expenditure Reserve for the cost of capital improvements, softs costs for the pre-development of the Rockland County Property and/or to entitle the Rockland County Property for its intended use which costs are incurred by Borrower upon satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (a) Borrower shall request in writing from Lender such disbursement for payment at least ten (10) business days prior to the date on which Borrower requests payment be made, which request shall specify the capital improvements, soft costs or entitlement costs to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (b) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; and (c) Lender shall have received (i) an officer's certificate from Borrower (A) stating that the items to be funded by the requested disbursement are capital improvements, soft costs or costs associated with an entitlement process, and a description thereof, (B) stating that all capital improvements, softs costs and/or entitlement costs to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable laws, (C) identifying each person or entity that supplied materials or labor in connection with the capital improvements, soft costs or entitlements to be funded by the requested disbursement, (D) stating that each such person or entity has been paid in full or will be paid in full upon such disbursement, (E) stating that the capital improvements, soft costs and/or costs of entitlement to be funded have not been the subject of a previous disbursement, and (F) stating that all previous disbursements of Capital Expenditure Reserve funds have been used to pay the previously identified capital improvements, soft costs or costs of entitlement, (ii) a copy of any license, permit or other approval by any governmental authority required in connection with the capital improvements, soft costs or entitlements and not previously delivered to Lender, (iii) for requests in excess of $10,000 for a single item, lien waivers or other evidence of payment satisfactory to Lender and releases from all parties furnishing materials and/or services in connection with the requested payment, (iv) at Lender's option, a title search for the applicable Property indicating that the applicable Property is free from all liens, claims and other encumbrances not previously approved by Lender, and (v) such other evidence as Lender shall reasonably request to demonstrate that the work, labor and materials to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower, provided, that, with respect to Capital Expenditure Reserve funds for soft costs with respect to pre-development of the Rockland County Property, such funds shall only be disbursed to Borrower as a reimbursement for funds already paid by Borrower for such soft costs. Lender shall make disbursements as requested by Borrower on a monthly basis in increments of no less than $5,000 per disbursement. Lender may require an inspection of the applicable Property at Borrower's expense prior to making a monthly disbursement in order to verify completion of improvements in excess of $25,000 for which reimbursement is sought. Upon the occurrence of an Event of Default, Lender may apply all funds in the Capital Expenditure Reserve to the payment of costs of collection and related expenses

{01307007;11}

(if any), unpaid interest and/or principal in Lender's sole discretion. Lender makes no representation or warranty to Borrower that the funds in the Capital Expenditure Reserve will be sufficient to pay all of the costs and expenses related to the completion of the entitlement process in relation to the applicable Property. No Capital Expenditure Reserve funds shall be disbursed to Borrower for capital expenditures incurred in connection with the Kings County Property unless Lender consents to such disbursement request, which consent shall not be unreasonably withheld.

      1.4   **Interest Reserve.** The Loan amount stated above includes eleven (11) months of monthly interest payments, totaling Two Million Four Hundred Eighty-Seven Thousand Eight Hundred Thirty-Three and 33/100 Dollars ($2,487,833.33) (the "**Interest Reserve**"). Lender will hold back the Interest Reserve from the Loan proceeds and, so long as there is no continuing Event of Default, Lender will apply funds in the Interest Reserve on a monthly basis, commencing on the first Payment Date and continuing up to and including the Eleventh (11th) Payment Date, to the interest payments required to be made by Borrowers pursuant to Section 2.1 hereof. Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default, Lender may apply all funds in the Interest Reserve to the payment of costs of collection and related expenses (if any), unpaid interest and/or principal in Lender's sole discretion. Lender makes no representation or warranty to Borrowers that the funds in the Interest Reserve will be sufficient to pay all interest charges when due.

      1.5   **TILC Reserve.** (a)    Borrower shall deposit with Lender an amount equal to Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) which shall be held back from loan proceeds on the date hereof as a "**TILC Reserve**," to be made available to Borrower from time to time in order to reimburse the Rockland County Borrower for or pay for tenant improvements and leasing commissions with respect to newly executed leases at the Rockland County Property, which tenant improvement and leasing commission costs shall be disbursed by Lender pursuant to the provisions set forth below in this Section 1.5. In addition to the required deposit set forth above, each Borrower shall deposit into the TILC Reserve any lease termination or rejection payments or payments made by tenants at the Property in connection with any modification of such tenant's lease at any Property.

      (b)    Notwithstanding anything to the contrary contained in this Section 1.5 and subject to the disbursement provisions set forth in Section 1.5(c)(1) below, without Lender's prior written consent, no disbursement of funds from the TILC Reserve shall exceed $15 per rentable square feet for any lease demising space at the Rockland County Property (such $15 rentable square feet amount shall hereinafter be referred to as the "**Total Allocated TILC Allowance**"); provided, however, in the event the Rockland County Borrower does not utilize the entire Total Allocated TILC Allowance for the specified lease giving rise to the applicable disbursement of TILC Reserve funds, then any balance of the Total Allocated TI Allowance shall be added to any future disbursements from the TILC Reserve for any other tenants at the Rockland County Property whose lease requires the Rockland County Borrower to pay for tenant improvements and leasing commissions (by way of example and for informational purposes only, in the event Rockland County Borrower signs a lease with a tenant for 10,000 rentable square feet at the Rockland County Property and Rockland County Borrower utilizes $10 per square foot for tenant improvements and leasing commissions for such tenant's demised space in accordance with such tenant's lease totaling $100,000 for tenant improvements and leasing commissions, then Rockland County Borrower shall be entitled to utilize the $5 per square foot difference for tenant improvements and leasing commissions on other leases demising space at the Rockland County Property in addition to the $15 per square foot allocated for tenant improvements and leasing commissions for such other tenant's lease without the prior written consent of Lender but subject in all respects to the disbursement provisions set forth below in Section 1.5(c)(1)). In addition, and notwithstanding the above provisions in this Section 1.5(b), any lease demising space at the Rockland County Property that has a duration to expiration of less than five (5) years or has base rental amounts that are not substantially equal to market rents at the time in question shall require the prior written consent of Lender with respect to any

disbursement of TILC Reserve funds for tenant improvements and leasing commissions for such tenant's demised space. In the event, Borrower has entered into a lease at the Rockland County Property that requires payments for tenant improvements and leasing commissions that exceed the Total Allocated TILC Allowance and Lender does not consent to such additional tenant improvement and leasing commission costs over and above the Total Allocated TILC Allowance, then prior to Lender releasing or disbursing any funds from the TILC Reserve for such tenant's demised space, Borrower shall first be required to pay the difference between the total tenant improvement and leasing commission costs due for such tenant's demised space and the Total Allocated TILC Allowance.

(c)(1)   Lender shall make disbursements (but not more than once per month) from the TILC Reserve in accordance with each respective tenant's lease demising space at the Rockland County Property which funds shall be utilized for the cost of tenant improvements and leasing commissions for the Rockland County Property provided Borrower satisfies each of the following conditions with respect to each such disbursement in addition to any requirements for the utilization of such funds for tenant improvements and leasing commissions set forth in such tenant's applicable lease: (a) Borrower shall request in writing from Lender such disbursement for payment at least ten (10) business days prior to the date on which Borrower requests such payment be made, which request shall specify the tenant improvements or leasing commissions to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (b) on the date such request is received by Lender and on the date such payment is to be made, no Event of Default shall exist and remain uncured; and (c) Lender shall have received (i) an officer's certificate from Borrower (A) stating that the items to be funded by the requested disbursement are tenant improvements and/or leasing commissions required to be made pursuant to the applicable tenant's lease at the Rockland County Property, and a description thereof, (B) stating that all tenant improvements and leasing commissions to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable laws, (C) identifying each person or entity that supplied materials or labor in connection with the tenant improvements to be funded by the requested disbursement, (D) stating that each such person or entity has been paid in full or will be paid in full upon such disbursement, (E) stating that the tenant improvements or leasing commissions to be funded have not been the subject of a previous disbursement, and (F) stating that all previous disbursements of TILC Reserve funds have been used to pay the previously identified tenant improvements or leasing commissions, as applicable, (ii) a copy of any license, permit or other approval by any governmental authority required in connection with the tenant improvements and not previously delivered to Lender, (iii) for requests in excess of $10,000 for a single item, lien waivers or other evidence of payment satisfactory to Lender and releases from all parties furnishing materials and/or services in connection with the requested payment, (iv) at Lender's option, a title search for the applicable Property indicating that the such Property is free from all liens, claims and other encumbrances not previously approved by Lender, and (v) such other evidence as Lender shall reasonably request to demonstrate that the work, labor and materials to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Lender shall make disbursements as requested by Borrower on a monthly basis in increments of no less than $5,000 per disbursement. Lender may require an inspection of the applicable Property at Borrower's expense prior to making a monthly disbursement in order to verify completion of improvements in excess of $25,000 for which reimbursement is sought. Upon the occurrence of an Event of Default, Lender may apply all funds in the TILC Reserve to the payment of costs of collection and related expenses (if any), unpaid interest and/or principal in Lender's sole discretion. Lender makes no representation or warranty to Borrower that the funds in the TILC Reserve will be sufficient to pay all of the costs and expenses related to the completion of the applicable tenant improvements or leasing commissions in relation to the Rockland County Property. Notwithstanding anything to the contrary contained herein, Lender's written approval shall be required for any disbursement of funds from the TILC Reserve for any leases demising space at any Property to Affiliates (as defined in the Loan Agreement) of Borrower. Upon the full repayment of the Loan by Borrower, any funds held in the TILC Reserve shall be released to Borrower.

{01307007;11}

(2)    Notwithstanding anything to the contrary contained herein and provided no Event of Default has occurred and is continuing, solely upon (i) the sale by the Kings County Borrower of the Kings County Property (as defined in the Loan Agreement) and the release of the Lender's lien of the Mortgage from the Kings County Property pursuant to, and in accordance with, Section 10 of the Loan Agreement and (ii) Borrower's additional deposit of $3,500,000.00 into the TILC Reserve pursuant to the provisions set forth in Section 10 of the Loan Agreement, Lender shall release up to a total $3,500,000.00 of TILC Reserve funds maintained in the TILC Reserve in the following amounts and upon satisfaction by Borrower of the following conditions:

(a)    Upon the NOI (as hereinafter defined) for the Property equaling or exceeding $2,000,000.00 based on tenant's at the Property that are in full occupancy of their demised premises and paying full unabated rent under such tenant's lease for at least six (6) full months (or two (2) full months for national tenant's that have an investment grade rating from Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies or Moody's Investors Service, Inc.), Lender shall release to Borrower a total of $2,000,000.00 (which $2,000,000.00 shall be net of any prior disbursements from the TILC Reserve) from the TILC Reserve provided there is sufficient funds in the TILC Reserve to disburse such funds to Borrower and there is no legal impediment to Lender's disbursing such funds to Borrower; and

(b)    Upon the NOI for the Property equaling or exceeding $3,500,000.00 based on tenant's at the Property that are in full occupancy of their demised premises and paying full unabated rent under such tenant's lease for at least six (6) full months (or two (2) full months for national tenant's that have an investment grade rating from Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies or Moody's Investors Service, Inc.), Lender shall release to Borrower a total of $1,500,000.00 (which shall be net of any prior disbursements from the TILC Reserve) from the TILC Reserve (for a total of $3,500,000.00 after taking into account the disbursement contemplated by subclause (2)(a) above and such amount shall be net of any prior disbursements from the TILC Reserve), provided there is sufficient funds in the TILC Reserve to disburse such funds to Borrower and there is no legal impediment to Lender's disbursing such funds to Borrower.

For purposes of this Section 1.5 the following terms shall have the following meanings:

"**GAAP**" shall mean generally accepted accounting principles in the United States of America.

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP (or such other accounting method reasonably acceptable to Lender it being acknowledged by Lender that a cash basis of accounting, an accrual basis of accounting or federal income tax basis of accounting are all deemed reasonably acceptable for purposes hereof), derived from the ownership and operation of the Rockland County Property from whatever source during such period, including, but not limited to, rents from tenants that have a lease that has a term to expiration of at least five (5) years or more (provided, however, Lender shall count thirty percent (30%) of the rental income from any lease at the Rockland County Property toward Gross Income for Operations for leases at the Rockland County Property with a term to expiration of three (3) years or more but less than five (5) years) that are in occupancy, open for business and paying full contractual rent without right of offset or credit, utility charges, escalations, forfeited security deposits, interest (if any) on credit accounts and on funds held in Reserve Accounts, business interruption or other loss of income or rental insurance proceeds, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the leases of any nature including reimbursements for common area maintenance charges but excluding (i) rents from month-to-month tenants or tenants that have not been in occupancy and paying full unabated rent for at least six (6) months, from tenants during a free rent period or from tenants that are included in any bankruptcy action, (ii) sales, use and occupancy or

other taxes on receipts required to be accounted for by Borrower to any governmental authority, (iii) refunds and uncollectible accounts, (iv) proceeds from the sale of furniture, fixtures and equipment, (v) insurance proceeds and condemnation awards (other than business interruption or other loss of income insurance), and (vi) any disbursements to Borrower from any of the Reserve Accounts.

"**Operating Expenses**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP (or such other accounting method reasonably acceptable to Lender it being acknowledged by Lender that a cash basis of accounting, an accrual basis of accounting or federal income tax basis of accounting are all deemed reasonably acceptable for purposes hereof), of whatever kind relating to the operation, maintenance and management of the Rockland County Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, Taxes, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Lender, and other similar costs, but excluding depreciation, debt service, capital expenditures, tenant improvements and leasing commissions and contributions to any of the Reserve Accounts.

"**NOI**" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

### 1.6    **Intentionally Omitted**.

1.7    **Reserve Accounts**. Nothing contained herein, including, without limitation, the existence of the Insurance/Tax Reserve, the Capital Expenditure Reserve, the TILC Reserve or the Interest Reserve, shall release any Borrower, any Guarantor or any other obligor, of any obligation to make payments under this Note and the other Loan Documents strictly in accordance with the terms set forth herein and therein, in this regard, without limiting the generality of the foregoing, should the amounts contained in any of the aforementioned Reserve Accounts not be sufficient to pay in full the requisite monthly installments and other payments due in connection with the Loan Documents. Each Borrower shall be responsible for timely paying such deficiency of any such amount due after written notice from Lender of such deficiency. Except as set forth below, any interest payable on monies maintained in such reserve accounts shall accrue for the benefit of Lender. Except as set forth below, all Reserve Accounts shall be non-interest bearing accounts; provided, however, if Lender or any Servicer elects in its sole and absolute discretion to keep or maintain any fund in a Reserve Account or any funds deposited therein in an interest bearing account, all interest earned or accrued thereon shall be for the account of and be retained by Lender or any Servicer. Notwithstanding the foregoing, the funds maintained in the TILC Reserve shall be held in an interest bearing account selected by Lender (or Lender's servicer) and such interest shall be for the benefit of Borrower and be added to the funds held and maintained in the TILC Reserve and be utilized for the purposes set forth in Section 1.5 hereof. Each Borrower shall be responsible for the payment of all taxes on such interest income generated from the funds in the TILC Reserve. Lender shall not be responsible and shall have no liability whatsoever for the rate of return earned or losses incurred on any funds in a Reserve Account. Each Borrower (i) hereby grants to Lender a first priority security interest in all Reserve Accounts and any and all monies now or hereafter deposited in each Reserve Account as additional security for payment and performance of all of the obligations secured by the Mortgage and the other Loan Documents and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Reserve Accounts and any funds held and maintained therein, including, without limitation, filing or authorizing Lender to file UCC-1 financing statements and continuations thereof. Until expended or applied in accordance herewith, the funds in the Reserve Accounts shall constitute additional security for Borrower's obligations under the Loan Documents.

{01307007;11}

1.8   **Loan Balance.** Lender will deduct all commitment Fees, closing expenses, and other fees, costs and expenses due to Lender under the Loan Documents, pursuant to the Agreed Closing Statement. The remaining proceeds will then be disbursed to Borrower.

1.9   **Closing Statement.** Lender and Borrower will agree to a final Closing Statement (the "**Agreed Closing Statement**"), which will set forth the allocation of funds, payment of interest, payment of Commitment Fees, and other funds, fees, costs and expenses due to Lender or required to paid pursuant to the Loan Agreement between Lender and Borrower of even date herewith (as the same may be amended, modified, extended, or supplemented from time to time, the "**Loan Agreement**").

2.   <u>Payments by Borrower.</u>

2.1   **Interest Payments.** This Loan will be interest only until the Maturity Date. Interest shall be due and payable, without any right of offset, counterclaim or reduction, via wire transfer, as follows: (a) from and after the Disbursement Date (for purposes of this Note, the "**Disbursement Date**" shall be the date on which disbursement of loan proceeds occurs, which date is September 6, 2017), all accrued and unpaid interest, plus any then due applicable late payment charges or default interest shall be paid on the first day of each calendar month commencing on November 1, 2017, and (c) Borrower shall make monthly payments of interest only (calculated using the applicable interest rate described in <u>Section 1.1</u> hereof or Section 2.6 hereof, as applicable) on the then outstanding principal balance of the Loan commencing on November 1, 2017 and continuing for each month during the term of the Loan until the Maturity Date (defined in <u>Section 2.2</u> below).  Each payment shall be due and payable on the first (1st) day of each calendar month (each a "**Payment Date**"), commencing on the first day of the second calendar month (which month is November 1, 2017) following the Disbursement Date and continuing on the first day of each calendar month thereafter until the Maturity Date.  For purposes of making payments hereunder, but not for purposes of calculating interest periods described in <u>Section 1.1</u> hereof, if the day on which such payment is due is not a business day, then amounts due on such date shall be due on the immediately preceding business day.  Provided no Event of Default is continuing, Lender shall cause to be paid all such amounts due under this Section 2.1 from the Interest Reserve pursuant to and in accordance with Section 1.4 hereof and provided (i) there are sufficient funds in the Interest Reserve for Lender to make such payments and (ii) there is no legal impediment restricting Lender from making such payments.

2.2   **Maturity Date.** The entire indebtedness evidenced by this Note, if not sooner paid, shall be due and payable on April 1, 2019 (the "**Maturity Date**"; as such Maturity Date may be extended pursuant to <u>Section 2.6</u> below), subject to the extension described in <u>Section 2.6</u> of this Note. This Note will not be paid in full until all fees (including, without limitation, any prepayment fees), charges and interest are paid to Lender, and such fees, charges and interest will be added to the principal sum due under this Note and secured by the Mortgage on or immediately before the Maturity Date.

2.3   **Payment Priority and Details.** All payments under this Note shall be first applied to interest, costs, expenses, fees, prepayment charges or fees, delinquencies or any other fees due under this Note or any Loan Document, and then to principal.  Early payments will not relieve Borrower of any other obligations under this Note or the Loan Documents, as they are defined in <u>Section 5</u> below. If Borrower makes a payment on the Loan which is later dishonored, a fee in the amount of Two Hundred Fifty Dollars ($250.00) or such greater amount incurred by Lender will be charged, in addition to any other fees, costs and expenses due under the Loan Documents.  All payments shall be made by Borrower according to the following wire instructions:

Account Name:        Cohen Financial

{01307007;11}

- 8 -

| Bank Name: | PNC Bank, N.A. (Pittsburgh, PA) |
| | Payment Lockbox 773295 (CF General) |
| Bank Address: | 3295 Solutions Center, Chicago, IL 60677-3002 |
| Bank ABA #: | 043000096 |
| Bank Acct #: | 1025481829 |
| Reference #: | 330160439 |

2.4    **Interest Calculation.** With respect to any applicable period, interest on the then outstanding principal balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on the applicable interest rate (or the Default Interest rate, as applicable) and a three hundred sixty (360) day year by (c) the then outstanding principal balance of the Loan.

2.5    **Insurance and Real Estate Taxes.** Lender will hold back from the Loan proceeds sufficient funds to pay twelve (12) months of real estate taxes when such real estate taxes are due so Lender shall pay such real estate taxes directly to the applicable taxing authority. In addition, Borrowers shall commence making monthly deposits into the Insurance/Tax Reserve in order to accumulate sufficient funds for Lender to pay the annual insurance premiums on the insurance policies required pursuant to the terms set forth in the Mortgage. Borrowers will promptly provide to Lender all notices and written materials relating in any way to such taxes or insurance premiums that become due. Failure to comply with this <u>Section 2.5</u> will be an Event of Default hereunder, and Lender will be entitled to add any payments made by Lender for such taxes or insurance premiums paid by Lender to the principal balance of this Note.

2.6    **Extension.** Provided that all of the Extension Conditions have been satisfied and complied with in full by each Borrower, upon not less than thirty (30) days advance written notice to the Lender before the Maturity Date, Borrowers may elect to extend the term of the Loan for up to two (2) additional periods of six (6) months each. Upon the valid extension of the Loan in accordance with this Section, the Maturity Date shall be extended (i) first until October 1, 2019 (the "**First Extension Period**") and (ii) then until April 1, 2020 (the "**Second Extension Period**"; the First Extension Period together with the Second Extension Period shall hereinafter be collectively identified as the "**Extension Period**"). For the purposes of this Note, the term "**Extension Conditions**" means, collectively, for each Extension Period: (a) Borrower shall have notified Lender in writing not less than thirty (30) days prior to (1) the Maturity Date (with respect to the First Extension Period) and (2) the end of the First Extension Period (with respect to the Second Extension Period), of Borrower's intention to extend the Maturity Date of the Loan; (b) there shall be no continuing Event of Default; (c) Borrower shall have paid to Lender an extension fee equal to one percent (1%) of the then outstanding principal balance of the Loan for each Extension Period; (d) Borrower shall have deposited with Lender a total of four (4) months of interest payments (calculated by Lender utilizing the interest rate required under this Note for the applicable Extension Period and the then outstanding principal balance of the Loan) to be held in the Interest Reserve which shall be disbursed in accordance with the provisions set forth in <u>Sections 1.4</u> hereto, which represents a total of four (4) months of interest on the Loan which shall become due under this Note during the Extension Period and (e) Borrower shall have deposited with Lender a total of six (6) months of real estate taxes and insurance premiums to be held in the Insurance/Tax Reserve, to be disbursed in accordance with the provisions set forth in <u>Sections 1.2</u> hereto, which represents a prepayment of all estimated taxes and insurance premiums to become due under this Note during the Extension Period. During each of the Extension Periods interest on this Note shall accrue at the rate of Eleven Percent (11%) per annum, and all other provisions of this Note, except as specifically modified in this Section, shall govern the Extension Period.

2.7    **Exit Fee.** Upon any repayment or prepayment of the Loan, Borrowers shall pay to Lender on the date of such repayment or prepayment the Exit Fee. Upon any acceleration of the Loan, Borrower shall immediately pay to Lender on account of the Exit Fee the amount by which (i) one percent (1%) of the original aggregate amount of principal theretofore advanced by Lender (whether or not theretofore repaid) principal exceeds (ii) the total amount of Exit Fees theretofore paid by Borrower pursuant to this <u>Section 2.7</u>. All Exit Fees hereunder shall be deemed to be earned by Lender upon the funding of the Loan. The term "**Exit Fee**" shall mean, in connection with any repayment or prepayment of principal, a non-refundable fee to Lender equal to 1.0% of the outstanding principal balance of the Loan being repaid or prepaid at such time.

3.    <u>**Prepayment.**</u> Borrower agrees that all Commitment Fees, loan fees and all other pre-paid finance charges or fees are fully earned as of the Disbursement Date. This Note is subject to a prepayment premium as follows. If Borrower prepays (including, without limitation, a prepayment as a result of an Event of Default and subsequent acceleration of the indebtedness due under the Note) the outstanding principal balance evidenced by the Note in full prior to the ninth (9th) Payment Date, Lender will be entitled to immediate payment of all interest due up to, and including, the ninth (9th) Payment Date in addition to all other fees, charges, expenses or payments that are due under this Note or any of the Loan Documents. Subject to the immediately subsequent sentence with respect to Borrower's prepayment of the Loan during the Extension Period, after the ninth (9th) Payment Date up to the First Extension Period, Borrower may prepay the Loan with no premium, penalty or other fee. From and after the commencement of the First Extension Period, if Borrower prepays the outstanding principal balance evidenced by the Note in full prior to the fourth (4th) Payment Date in the First Extension Period, Lender will be entitled to immediate payment of all interest due up to, and including, the fourth (4th) Payment Date in the First Extension Period. From and after the fourth (4th) Payment Date in the First Extension Period up to the Second Extension Period, Borrower may prepay the Loan with no premium, penalty or other fee. From and after the commencement of the Second Extension Period, if Borrower prepays the outstanding principal balance evidenced by the Note in full prior to the fourth (4th) Payment Date in the Second Extension Period, Lender will be entitled to immediate payment of all interest due up to, and including, the fourth (4th) Payment Date in the Second Extension Period. From and after the fourth (4th) Payment Date in the First Extension Period up to the final Maturity Date, Borrower may prepay the Loan with no premium, penalty or other fee. Borrower shall only be permitted to prepay the Loan in full and no in part.

4.    <u>**Late Charges; Default Interest Rate; Savings Clause.**</u> (a) If any monthly payment (other than the principal payment required on the Maturity Date) is not made by Borrowers within three (3) days of the due date, Borrower shall pay to Lender an additional late charge equal to ten percent (10%) of the amount of the payment then due to defray the overhead expenses of Lender incident to the delay, among other reasons. Acceptance of such late charge by Lender shall in no event constitute a waiver of the default with respect to the overdue amount, and shall not prevent Lender from exercising any of the other rights and remedies available to Lender under any Loan Documents. Further, the default interest rate under this Note will be fifteen percent (15%) per annum "**Default Interest**"). Borrower acknowledges that the increased interest rate and the late payment charge provided for herein reflect, among other things, the fact that the Loan will have become a substantially greater credit risk given its default status and that Lender is entitled to additional compensation for such risk and all such interest shall be payable by Borrower upon demand by Lender. Borrower also agrees and acknowledges that the increase in the otherwise applicable interest rate and (if applicable) the late payment charge are a reasonable forecast of such additional compensation for anticipated and actual harm incurred by Lender, and that such harm cannot be estimated with certainty or without difficulty. The increase in the otherwise applicable interest rate and (if applicable) the late payment charge are imposed as liquidated damages for the purpose of defraying Lender's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the exercise by Lender of any rights and remedies hereunder, under the

Loan Documents or under applicable law, and any fees and expenses of any attorneys Lender may employ.

(b)     Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrowers and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, changed or received on the indebtedness evidenced by the Note and as provided for herein or in the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan (the "**Maximum Legal Rate**") or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrowers to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

5.     **Loan Documents; Security.**  This Note and the Loan it evidences pertain to Borrower's interest in the real property located at 25 Old Mill Road, Suffern, New York 10901, 19 Hemion Road, Montebello, New York 10901, Route 59, Suffern, New York 10901, 200 North 14th Street a/k/a 2 Berry Street, Brooklyn, New York 11249 and 4-6 Berry Street, Brooklyn, New York 11249 (collectively, the "**Property**").  This Note is secured or otherwise supported by, among other documents, the following documents of even date herewith (as each such document may be amended, modified, supplemented or extended from time to time):

(a)     Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Mortgage**");

(b)     Assignment of Leases and Rents (the "**Assignment of Leases**");

(c)     Loan Agreement (the "**Loan Agreement**");

(d)     Security Agreement (the "**Security Agreement**");

(e)     Guaranty Agreement executed by **GOLDIE REISMAN**, an individual, as Guarantor thereunder (the "**Guaranty**");

(f)     Payment and Carry Guaranty Agreement executed by **GOLDIE REISMAN**, an individual (the "**Payment Guaranty**");

(g)     Environmental Indemnity regarding the Property (the "**Indemnity**");

(h)     Two (2) Pledge and Security Agreements given by the respective members of each Borrower (collectively, the "**Pledge Agreement**");

(i)     Assignment of Agreements, Licenses, Permits and Contracts (the "**Assignment of Agreements**");

(j)     UCC-1 Financing Statements regarding the Property and other collateral; and

(k)   Any other documents or instruments Lender deems necessary in its sole discretion.

This Note, the Mortgage, the Assignment of Leases, the Loan Agreement, the Security Agreement, the Guaranty, the Payment Guaranty, the Indemnity, the Pledge Agreements and all other related instruments and documents, as the same may be amended from time to time, are collectively referred to herein as the "**Loan Documents**." The "Collateral" to secure this Note shall include, without limitation: (1) all of Borrower's interests in the Property as stated in the Mortgage; (2) all of the rights to the rents, cash proceeds, and profits of the Property, as stated therein and in any other Loan Documents; (3) all assets of the Borrower; and (4) 100% of the direct equity interests in each Borrower which shall be secured by the Pledge Agreements. All such security documents are subject to all of the terms hereof to the extent necessary to enforce this Note. If there is a conflict among any of the Loan Documents, the most favorable construction for Lender shall be applied.

6.   **Events of Default.** "Event of Default," wherever used herein, means any one of the following events (whether it shall be involuntary or be pursuant to or affected by operation of law), without any notice or cure, except as specifically set forth below:

6.1   **Failure to Make Payment.** Borrower's failure to make any payment of principal, interest or any reserve deposit required pursuant to Sections 1.2 through 1.5 hereof when such payment is due hereunder or any other payment within five (5) days after the date when such payment is due hereunder or under any of the other Loan Documents.

6.2   **Event of Default under Loan Documents.** The occurrence of any event of default under any other of the Loan Documents, or any other agreement, pledge, security agreement, indemnity, financing statement or other document executed in connection with this Note or the Loan evidenced hereby, or any breach of the terms of this Note, that is not cured within any applicable cure periods set forth in such Loan Documents. Borrower and Lender agree that it is intended that all Loan Documents be fully cross-defaulted and (subject to the Carve-Out Provision of the Mortgage) cross-collateralized.

6.3   **False or Misleading Statements.** If any representation or warranty made by Borrower, or Guarantor to Lender in any of the Loan Documents or any financial statement delivered to Lender proves to have been false in any material respect as of the time when made or given, including without limitation at the time of any disbursement of loan proceeds or any closing, whether or not that representation or disclosure is expressly set forth in any of the Loan Documents.

6.4   **Intentionally Omitted.**

6.5   **Insolvency or Liquidation.** If a receiver, trustee, liquidator or custodian is or will be appointed for Borrower, or Guarantor, or if Borrower, or Guarantor have made or will make a general assignment for the benefit of creditors, or if Borrower, or Guarantor admit in writing the inability to pay its debts as they become due, or will file, or have filed against any of them, any petition under federal bankruptcy law or under any other state or federal law providing for the relief of debtors, or the commencement of any other proceeding under any bankruptcy or insolvency or similar laws by or against Borrower or Guarantor (even if involuntary). Notwithstanding the foregoing, if the proceeding under any bankruptcy or insolvency or similar laws by or against Borrower or Guarantor is involuntary, such event shall not be an Event of Default, provided the proceeding is discharged within sixty (60) days after filing.

6.6   **Default on Unrelated Debt; Suspension of Business.** If Borrower, or Guarantor: (a) materially default under a provision of an agreement with a third party, and in the case of

Guarantor, such default could have a material adverse effect on Guarantor's financial condition as reasonably determined by Lender, (b) voluntarily suspend transaction of business, (c) does not generally pay debts as they become due or mature, or (d) if the indebtedness under any such agreement is accelerated.

6.7    **Judgment or Attachments.**  If there is entered against Borrower, or Guarantor a judgment that materially affects the business or financial condition of Borrower, or Guarantor, or the Property, or if a tax lien, any other lien (other than a lien or easement consented to by Lender in writing), levy, writ of attachment, garnishment, execution, judicial seizure of any property of Borrower, or Guarantor, or similar item or action, is or will be issued against any portion of the Collateral, and which remains unpaid, unstayed on appeal, undischarged, unbonded, or undismissed for sixty (60) days after it was issued.

6.8    **Intentionally Omitted.**

6.9    **Additional Encumbrances or Title Defects.**  If Borrower mortgages, hypothecates, liens, otherwise encumbers or pledges the Property or any assets of Borrower, without the prior written consent of Lender, such act shall constitute a default hereunder.  Allowing any other title defect to be created or to continue to exist after discovery shall also constitute a default unless expressly permitted by the terms of the Loan Documents or otherwise consented to in writing by Lender.

6.10    **Dissolution or Termination.**  The dissolution or termination of Borrower or if Borrower's business ceases to exist.

6.11    **Change in Control; Conveyance.**  If Borrower, or its business is sold or merged, or if the Property is sold, transferred or otherwise conveyed, without Lender's prior written consent or if any direct or indirect equity in Borrower is transferred, sold, conveyed or pledged without Lender's prior written consent unless such transfer is expressly permitted pursuant to the terms set forth in the Loan Agreement.

6.12    **Termination of Agreements.**  If any Borrower, or Guarantor terminates or attempts to terminate any instrument with or in favor of Lender that was entered into or delivered in connection with the Loan.

6.13    **Event Affecting Any Guarantor.**  If any Guarantor, endorser, surety, or accommodation party of any of the indebtedness evidenced by this Note dies or becomes incompetent, or revokes or disputes the validity of or liability under any guaranty of the indebtedness evidenced by this Note.  In the event of the death or incompetency of any Guarantor, Lender, at its sole option, may, but shall not be required to, permit such Guarantor's estate or living trust, as applicable, to assume unconditionally the obligations arising under the Guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default, caused by such death or incompetency.

7.    **Remedies; Default Interest.**

7.1    Upon the occurrence of an Event of Default, Lender may pursue any remedy available at law or in equity or under any Loan Document, without notice, demand or presentment.  In the event of any Event of Default, (a) the entire principal balance hereof and all accrued interest shall, at the sole option of Lender, without notice, bear interest at the interest rate set forth in Section 4 of this Note (or the Maximum Legal Rate if that is less) from the date of the Event of Default until the default is cured, (b) the entire principal balance hereof and all accrued interest shall immediately become due and payable at the sole option of Lender, without notice, and (c) Lender's obligations, if any, to make any advances

{01307007;11}

- 13 -

under this Note, will, at Lender's option, immediately terminate. Lender's failure to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent Event of Default.

7.2    If any amounts are due to any Borrower or Guarantor (or any of their affiliates) from Lender for any reason, Lender may set off such amounts in order to satisfy a default or any amounts due from Borrower under this Note.

## 8.    **Intentionally Omitted**.

9.    **Collection Expenses.**  Borrower shall reimburse Lender on demand for all reasonable legal fees and other costs and expenses incurred in collecting, investigating or enforcing this Note and the other Loan Documents, and protecting or realizing on any collateral.  Such fees, costs and expenses shall include those incurred with or without suit, those incurred at or in preparation for any trial, appeal and any proceedings under any present or future federal bankruptcy act or state receivership law, or any post-judgment collection proceedings.

10.    **Waivers.**  Except as provided above, Borrower waives all notices otherwise required by law, including without limitation presentment, protest, demand for payment, acceleration, intent to accelerate, notice of protest, notice of demand, dishonor, non-payment of this Note, and any other notice and defense due to extensions of time or other indulgence of or by Lender or to any substitution or release of collateral.

11.    **Credit Review.**  Lender may, from time to time and at any time, with reasonable prior notice to Borrower, review Borrower's and Guarantor's creditworthiness and the basis for Lender's credit accommodations to Borrower.  Borrower and its principals and affiliates will execute the necessary authorization and other documents to complete this process.  In connection with any such review, Borrower will furnish and will cause Guarantor to furnish Lender with any information regarding Borrower's or Guarantor's financial condition and business operations that Lender requests. This may include without limitation financial statements, tax returns, lists of assets and liabilities, agings of accounts receivable and payable, rent rolls, equipment lists, budgets, and forecasts.

12.    **Miscellaneous.**

12.1    **Governing Law; Jurisdiction.**  This Note shall be governed by, and construed, applied and enforced in accordance with, the laws of the State of New York applicable to contracts made and intended to be performed entirely therein.  Except as otherwise directed by Lender from time to time, Borrower agrees to make all payments to Lender at Lender's office in Seattle, Washington and to furnish to Lender at Lender's office in Seattle, Washington, all further notices, certificates, instruments and documents required or permitted to be furnished by Borrower under this Note and the other Loan Documents.  Borrower authorizes any action brought to enforce Borrower's and/or any Guarantor's obligations to be instituted and prosecuted in any state or federal court in the State of New York, in Lender's sole discretion.  Borrower authorizes Lender to elect the court at Lender's sole discretion, but Lender may enforce an Order, judgment, decree or directive form such legal proceedings in any jurisdiction.

12.2    **Notices.**  Any notice under this Note shall be to the address noted below for Borrower, or in the introductory paragraph above for Lender, or such other address as may be designated in writing, and shall be deemed to have been given on the date delivered in the case of personal delivery or, if mailed by certified mail, return, receipt request, three (3) days after the postmark thereof, or via e-mail upon transmission at the e-mail address below (provided, that no error message is received by the

sender and provided that a copy of the notice is sent by a commercial courier on the same day for next business day delivery). Lender's e-mail address is billym@columbiapacific.com. Any notice to Borrower will also be deemed notice to Guarantor, and vice versa.

12.3 **Joint and Several Liabilities.** If Borrower consists of two or more persons, each person executing this Note as Borrower shall be jointly and severally liable for all obligations of Borrower hereunder.

12.4 **Company Authority.** The persons executing this Note below hereby warrant that they have the authority to do so on behalf of Borrower and were duly authorized to do so by Borrower.

12.5 **Further Acts.** Time is of the essence. Borrower agrees to take all further actions and execute any additional documents necessary to further the intent and purpose of this Note, and shall also cause its principals and Guarantor to do the same.

12.6 **Construction.** Any terms not defined herein shall be given the meaning attributed to them in the Business Loan Agreement. The parties hereto have participated jointly in the negotiation and drafting of this Note. In the event an ambiguity or question of intent or interpretation arises, this Note shall be construed as if drafted jointly by the parties and shall not be interpreted for or against either party.

12.7 **Severability.** If any provision of this Note conflicts with applicable law, such conflicts shall not affect other provisions hereof which can be given effect without the conflicting provision, and to this end the provisions hereof are declared to be severable and all remaining provisions shall continue in full force and effect.

12.8 **Captions and Headings.** The captions and headings of the paragraphs and articles of this Note are for convenience only and are not to be used to interpret or define the provisions hereof.

12.9 **Definitions.** As used herein: the term "Borrower" means the Borrower herein named. The term "Lender" means the Lender herein named, together with any subsequent owner or holder of the Note or any interest therein, including pledgees, assignees and participants. Any reference to "days" herein shall mean calendar days. Capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

12.10 **Survival; Binding Effect.** This Note shall be binding upon and enforceable against Borrower, Guarantor, and their respective legal representatives, heirs, executors, administrators, successors, assigns, principals, managers and affiliates, and shall inure to the benefit of and may be enforced by Lender and any of Lender's successors, assigns or affiliates.

12.11 **Assignments.** Lender may assign, pledge or otherwise transfer this Note or any of its rights and powers under this Note without notice, with all or any of the obligations owing to Lender by Borrower, and in such event, the assignee shall have the same rights as if originally named herein in place of Lender. Borrower may not assign this Note or any benefit accruing to it hereunder without the express prior written consent of the Lender.

12.12 **WAIVER OF JURY TRIAL. LENDER AND BORROWER HEREBY KNOWINGLY AND VOLUNTARILY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY DISPUTE, WHETHER IN CONTRACT,**

{01307007;11}

- 15 -

TORT, OR OTHERWISE ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR
INCIDENTAL TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR OTHER
INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN
CONNECTION WITH THIS NOTE OR THE RELATED TRANSACTIONS.  BORROWER
HEREBY ACKNOWLEDGES AND AGREES THAT NEITHER THE LENDER NOR ANY
PERSON ACTING ON BEHALF OF THE LENDER HAS OR HAVE MADE ANY
REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY
WAY TO MODIFY OR NULLIFY ITS EFFECT.

12.13    **Intentionally Omitted.**

12.14    **Exculpation.**  Section 8 of the Loan Agreement is hereby incorporated herein by reference
as though fully set forth herein.

[Signature on following Page]

BY SIGNING THIS NOTE, BORROWER ACKNOWLEDGES READING, UNDERSTANDING AND AGREEING TO ALL OF THE PROVISIONS OF THE NOTE AND RECEIPT HEREOF, AND BORROWERS ACKNOWLEDGE LIABILITY FOR PAYMENT OF ALL AMOUNTS OWING UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS AND AGREES THAT LENDER DOES NOT HAVE TO FORECLOSE ITS MORTGAGES OR ANY OTHER COLLATERAL BEFORE DEMANDING FULL PAYMENT FROM BORROWERS.

BORROWER:

SUFFERN PARTNERS LLC, a
New York limited liability company

By:   RSOM CORP., a
      New York corporation, its Managing Member

By: _____
Name:   Goldie Reisman
Title:   President

Address:        Suffern Partners LLC
                202 Grandview Avenue
                Monsey, New York 10950
                Attention: Goldie Reisman
Email Address:  goldie.reisman.sterling@gmail.com

With a copy to:  Law Offices of David Fleischmann P.C.
                2233 Nostrand Avenue, 3rd Floor
                Brooklyn, New York 11210
                Attention: David Fleischmann, Esq.
Email Address:  David@dfleischmann.com


[SIGNATURES CONTINUE ON FOLLOWING PAGE]


Novartis Campus – Loan No. 330161456

BORROWER:

**NORTH 14TH STREET REALTY ASSOCIATES LLC,** a
New York limited liability company

By: _Goldie Reisman_

Name:        Goldie Reisman
Title:        Managing Member

Address:        North 14th Street Realty Associates LLC
                202 Grandview Avenue
                Monsey, New York 10950
                Attention: Goldie Reisman
Email Address:        goldie.reisman.sterling@gmail.com


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

Novartis Campus – Loan No. 330161456

**CPIF LENDING, LLC**, a Washington limited liability company, holder of the Original Notes, signs below to acknowledge its consent to the terms of this Amended, Restated and Consolidated Promissory Note.

**LENDER:**

**CPIF LENDING, LLC, a**
Washington limited liability company

By: CPIF Holdings, LLC, its manager

   By: Columbia Pacific Income Fund II, L.P., its manager

     By: Columbia Pacific Income Fund II GP, LLC, its general partner

       By: Columbia Pacific Advisors, LLC, its manager

         By:
         Name:
         Title:  ALEX WASHBURN
             MANAGER

## SCHEDULE A-1

### EXISTING ROCKLAND COUNTY NOTES

Promissory Note made by Suffern Partners LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $22,000,000.00.

{01307007;11}

## SCHEDULE A-2

### EXISTING KINGS COUNTY NOTES

1.   Mortgage Note made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., in favor of Simplex Inc., dated August 20, 2001 in the original principal amount of $499,980.00.

2.   Replacement Promissory Note made by North 14th Street Realty Associates LLC, to Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $500,020.00.

3.   Consolidated Secured Mortgage Note made by North 14th Street Realty Associates LLC in favor of Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $1,000,000.00.

4.   Gap Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC dated October 9, 2007 in the original principal amount of $1,579,716.08.

5.   Consolidated Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC, dated October 9, 2007 in the original principal amount of $2,500,000.00.

6.   Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $400,000.00.

7.   Amended and Restated Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $2,900,000.00.

8.   Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $122,229.95.

9.   Consolidated Mortgage Loan Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $2,900,000.00

10.   Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated April 8, 2016 in the original principal amount of $2,345,109.58.

11.   Consolidated Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A., dated April 8, 2016 in the original principal amount of $5,000,000.00.

12.   Gap Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company, dated September 6, 2017 in the original principal amount of $6,160,630.94.

13.   Amended, Restated and Consolidated Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $11,000,000.00.

# <u>EXHIBIT B</u>

**SUFFERN PARTNERS LLC** and **NORTH 14TH STREET REALTY ASSOCIATES LLC,**
collectively, as mortgagor (collectively, Borrower)

to

**CPIF LENDING, LLC**, as mortgagee (Lender)

**AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES
AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

| | |
|---|---|
| Dated: | As of September 6, 2017 |
| Location: | Novartis Pharmaceutical Campus<br>25 Old Mill Road<br>Suffern, New York 10901<br>Section: 55.22, Block 1, Lot 1 |
| and: | 19 Hemion Road<br>Montebello, New York 10901<br>Section: 55.6, Block 1, Lot 1 |
| and: | Route 59<br>Suffern, New York 10901<br>Section: 55.37, Block 1, Lot 31 |
| County: | Rockland |
| Location: | 200 North 14th Street a/k/a 2 Berry Street<br>Brooklyn, New York 11249<br>Block 2279, Lot 15 |
| and: | 4-6 Berry Street<br>Brooklyn, New York 11249<br>Block 2279, Lot 24 |
| County: | Kings |

PREPARED BY AND UPON
RECORDATION RETURN TO:
CASSIN & CASSIN LLP
711 Third Avenue, 20th Floor
New York, New York 10017
Attention:  Recording Department

**THIS MORTGAGE DOES NOT ENCUMBER REAL PROPERTY PRINCIPALLY IMPROVED
OR TO BE IMPROVED BY ONE OR MORE STRUCTURES CONTAINING IN THE
AGGREGATE NOT MORE THAN SIX (6) RESIDENTIAL DWELLING UNITS HAVING
THEIR OWN SEPARATE COOKING FACILITIES.**

{01312538;4}

**AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES
AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

THIS AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF
LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as the same may be
amended, modified, supplemented, extended and spread from time to time, this "**Mortgage**") is made as
of September 6, 2017, by **SUFFERN PARTNERS LLC**, a New York limited liability company
("**Rockland County Borrower**"), having an address at 202 Grandview Avenue, Monsey, New York
10950 and **NORTH 14TH STREET REALTY ASSOCIATES LLC**, a New York limited liability
company ("**Kings County Borrower**"), having an address at 202 Grandview Avenue, Monsey, New
York 10950 (Rockland County Borrower and Kings County Borrower, jointly and severally, as co-
borrowers, individually and collectively (as the context may require), and together with their permitted
successors and assigns shall hereinafter be referred to as "**Borrower**" or "**Borrowers**"), collectively, as
mortgagor, for the benefit of **CPIF LENDING, LLC**, a Washington limited liability company
("**Lender**"), as mortgagee, whose mailing address is 1910 Fairview Avenue East, Suite 200, Seattle,
Washington 98102.

**W I T N E S S E T H :**

**WHEREAS**, this Mortgage is given to secure a loan (the "**Loan**") in the principal sum of
**$33,000,000.00** pursuant to that certain Loan Agreement dated as of the date hereof between
Borrowers and Lender (as the same may be amended, restated, replaced, supplemented or otherwise
modified from time to time, the "**Loan Agreement**") and evidenced by that certain Amended,
Restated and Consolidated Promissory Note dated the date hereof made by Borrowers, jointly and
severally, to Lender (such Note, together with all extensions, renewals, replacements, restatements or
modifications thereof being hereinafter referred to as the "**Note**");

**WHEREAS**, Lender is the holder of the mortgages listed on Schedule A-1 annexed hereto
and made a part hereof (the "**Existing Rockland County Mortgages**") and the notes (the "**Existing
Rockland County Notes**") secured thereby which are listed on Schedule B-1 annexed hereto and
made a part hereof and that there are no offsets, setoffs or counterclaims against payment of said
amounts due under the Existing Rockland County Notes;

**WHEREAS**, Lender is the holder of the mortgages listed on Schedule A-2 annexed hereto
and made a part hereof (the "**Existing Kings County Mortgages**"; together with the Existing
Rockland County Mortgages shall individually and collectively (as the context may require) be
referred to as the "**Existing Mortgages**") and the notes (the "**Existing Kings County Notes**"; together
with the Existing Rockland County Notes shall individually and collectively (as the context may
require) be referred to as the "**Existing Notes**") secured thereby which are listed on Schedule B-2
annexed hereto and made a part hereof and that there are no offsets, setoffs or counterclaims against
payment of said amounts due under the Existing Kings County Notes;

**WHEREAS**, the Existing Notes were combined, consolidated and restated by the Note given
by Borrowers to Lender simultaneously herewith in evidence of the Loan, with interest from the date
hereof at the rates set forth in the Note, such interest and the principal amount thereof to be payable in
accordance with the terms and conditions provided in the Note and Loan Agreement;

{01312538;4}

**WHEREAS**, Borrowers desire to secure the payment of the Debt and the performance of all of their obligations under the Note, the Loan Agreement and the other Loan Documents; and

**WHEREAS**, Borrowers and Lender desire (a) to combine, consolidate and modify the liens of the Existing Mortgages, so as to create solely one lien covering the Property (as hereinafter defined), and (b) to restate the terms and conditions of the Existing Mortgages in their entirety in the manner hereinafter set forth;

**WHEREAS**, this Mortgage is given pursuant to the Loan Agreement and Note, and payment, fulfillment, and performance by Borrowers of their obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement, the Note, and that certain Assignment of Leases and Rents of even date herewith made by Borrowers in favor of Lender delivered in connection with this Mortgage (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Assignment of Leases**"), including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Mortgage (the Loan Agreement, the Note, this Mortgage, the Assignment of Leases and all other documents evidencing or securing or otherwise setting out conditions, covenants, representations and/or remedies in favor of the Lender in connection with the funding of the Debt (including all additional mortgages, deeds of trust, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the "**Loan Documents**").

**NOW THEREFORE**, in consideration of the making of the Loan and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Borrower hereby agrees, covenants, represents and warrants with and to Lender as follows:

The Existing Mortgages are hereby consolidated, modified and restated in their entirety, and the liens of the Existing Mortgages, as so consolidated are hereby amended, modified and restated so that all of the terms and conditions contained in this Mortgage shall supersede and control the terms and conditions of the Existing Mortgages (it being agreed that the execution of this Mortgage shall not impair the lien created by the Existing Mortgages) and that together they shall hereafter constitute but one mortgage and one lien represented by this Mortgage securing the amount of the Loan plus interest, and creating a single lien on the Property. Borrowers hereby assume all of the obligations and agreements of the Existing Mortgages and the notes or bonds secured thereby.

This Security Instrument does not extinguish the outstanding indebtedness evidenced by the Existing Notes or discharge or release the Existing Mortgages securing the indebtedness of the Existing Notes or any other security, and the parties do not intend this Mortgage to be a substitution or novation of the original indebtedness or instruments securing the same.

Each Borrower hereby irrevocably mortgages, grants, transfers, conveys and assigns to Lender, with power of sale for the benefit and security of Lender, all of Borrowers' present and future estate, right, title, claim, and interest, either in law or in equity, in and to the following property ("**Property**"):

(a)    The real property ("**Realty**") described in <u>Exhibit A</u>, and all existing and future rights to the alleys, streets and roads adjoining or abutting the Realty;

{01312538;4}

3

(b)    All present and future easements, access, air and development rights, minerals and oil, gas and other hydrocarbon substances, royalties, water, water rights and water stock, and all other rights, hereditaments, privileges, permits, licenses, franchises and appurtenances belonging or in any way appertaining to the Realty;

(c)    All present and future buildings, improvements and tenements located on the Realty ("**Improvements**");

(d)    All present and future fixtures and articles of property attached to, or used or adapted for use in the ownership, development, operation or maintenance of the Realty and Improvements (whether such items are leased, owned, or subject to any title-retaining or security instrument), including without limitation all heating, cooling, air-conditioning, ventilating, refrigerating, plumbing, generating, power, lighting, laundry, maintenance, incinerating, lifting, cleaning, fire prevention and extinguishing, security and access control, cooking, gas, electric and communication fixtures, equipment and apparatus; all engines, motors, conduits, pipes, pumps, tanks, ducts, compressors, boilers, water heaters and furnaces; all ranges, stoves, disposers, refrigerators and other appliances; all escalators and elevators, baths, sinks, cabinets, partitions, mantels, built-in mirrors, window shades, blinds, screens, awnings, storm doors, windows and sash; all carpeting, underpadding, floor covering, panelling, and draperies; and all shrubbery and plants. All such items shall be deemed part of the Realty and not severable wholly or in part without material injury to the freehold;

(e)    All present and future rents, revenues, issues, profits and income from the Realty or the Improvements, and all present and future leases and other agreements for the occupancy or use of all or any part of the Realty and Improvements, including without limitation all cash or security deposits, advance rentals and deposits or payments of similar nature, and all guarantees of tenants' or occupants' performance under such leases and agreements;

(f)    All present and future tangible personal property ("**Personal Property**") used in connection with the ownership, development, operation or maintenance of the Realty and Improvements, including without limitation all furniture, furnishings, equipment, and supplies;

(g)    All present and future intangible personal property used in connection with the ownership, development, operation or maintenance of the Realty, Improvements, and Personal Property, including without limitation, all permits, licenses and franchises, contract rights (including without limitation architectural, engineering, consulting, and management contracts), accounts receivable, escrow accounts, insurance policies, deposits, instruments, documents of title, general intangibles, business records and the exclusive right to the use of trade names;

(h)    All present and future materials, supplies, and other goods, wherever located, whether in the possession of Borrower, warehouseman, bailee, or any other person, purchased for use in the construction, operation or furnishing of the Improvements, together with all documents, contract rights, and general intangibles relating thereto;

(i)    All present or future site plans, plats, architectural plans and specifications, work drawings, surveys, engineering reports, test borings, market surveys, and other work products relating to the Realty and Improvements;

{01312538;4}

4

(j)      All present or future agreements relating to any of the Property, construction contracts relating to the Improvements, together with all performance, payment, completion or other surety bonds in connection with or related to any such construction contracts which are transferable by Borrower;

(k)      All present and future contracts and policies of insurance which insure any of the Realty, buildings, structures or improvements on the Realty, or any fixtures or personal property thereon, against casualty and theft, and all monies and proceeds and rights thereto which may become payable by virtue of any insurance contracts or policies and all condemnation awards with respect to any taking or exercise of eminent domain by any governmental authority with respect to all or any portion of the Property;

(l)      Any good faith deposit or other deposit paid to any potential lender on the Property; and

(m)      All products and proceeds of the foregoing.

The following obligations are secured by this Mortgage (collectively the "**Secured Obligations**"):

i.      Payment of the sum of **THIRTY-THREE MILLION AND NO/100 DOLLARS ($33,000,000.00)**, or so much thereof as may be advanced, with interest thereon, according to the terms and provisions of that certain Amended, Restated and Consolidated Promissory Note dated as of the date hereof and given by Borrowers, jointly and severally, to the order of Lender (as the same may be renewed, modified, amended, supplemented and extended from time to time, the "**Note**").

ii.      Payment of all sums advanced to protect the security of this Mortgage, together with interest thereon as herein provided;

iii.      Payment of all other sums which are or which may become owing under the "Loan Documents" (defined below) or which may be advanced by Lender pursuant to the Loan Documents;

iv.      The performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined below); and

v.      Performance of all of Borrower's other obligations under the Loan Documents.

For purposes of this Mortgage, (x) the term "**Loan Documents**" means the Note, this Mortgage, that certain Loan Agreement, dated as of the date hereof and entered into between Borrowers and Lender (as the same may be modified, amended, supplemented and extended from time to time, the "**Loan Agreement**"), that certain Assignment of Leases and Rents, dated as of the date hereof and entered into between Borrowers and Lender (as the same may be modified, amended, supplemented and extended from time to time, the "**Assignment of Leases**"), that certain Pledge and Security Agreement whereby the members of each Borrower pledge a total of 100% of their direct equity interests in each Borrower to Lender as additional collateral for the Loan and all other amounts due by Borrower pursuant to the terms set forth in the Loan Documents (each such member, a "**Pledgor**") for the benefit of Lender (the "**Pledge Agreement**") and all other documents and instruments securing and/or evidencing the Loan (except the following documents shall not be considered Loan Documents for purposes hereof, (i) the Environmental Indemnity made by Goldie Reisman (the "**Guarantor**") and Borrowers for the benefit of

{01312538;4}

5

Lender (the "**Environmental Indemnity**"), (ii) the Guaranty Agreement made by Guarantor for the benefit of Lender (the "**Guaranty Agreement**"), and (iii) the Payment and Carry Guaranty Agreement given by Guarantor for the benefit of Lender (the "**Payment Guaranty**"), and any and all modifications, extensions, renewals and replacements thereof, and (y) the term "**Transaction Documents**" means the Loan Documents together with the Environmental Indemnity, the Guaranty Agreement, and the Payment Guaranty, and any and all modifications, extensions, renewals and replacements thereof.

Notwithstanding anything to the contrary expressed or implied in this Mortgage or in any other Transaction Document, in no event shall the Secured Obligations be deemed to include, or any assignment of, lien upon or security interest in any real property or estate for years therein made or created pursuant to this Mortgage or any other Transaction Document be deemed to secure, (a) any debts, liabilities or obligations of any kind on the part of any Indemnitor pursuant to the Environmental Indemnity or (b) any debts, liabilities or obligations of any kind on the part of any guarantor or other surety (including, but not limited to, any Guarantor or any Pledgor) pursuant to any guaranty or other suretyship obligation (including, but not limited to, any of the Guaranty Agreement, the Payment Guaranty or the Pledge Agreement). This paragraph is sometimes referred to in one or more of the Transaction Documents as the "**Carve-Out Provision**."

BORROWER HEREBY REPRESENTS, WARRANTS, COVENANTS AND AGREES AS FOLLOWS:

### SECTION 1.    TITLE AND USE.

**1.1    Warranty of Title.**  Each Borrower covenants and agrees that:  (i) Borrower is lawfully seized of the estate hereby conveyed and has full right and power to grant, mortgage, convey and assign the Property, (ii) the Property is free from liens, encumbrances, exceptions and other charges of any kind whatsoever, except for the exceptions listed in Lender's title insurance policy insuring this Mortgage or exceptions otherwise approved in writing by Lender (each a "**Permitted Exceptions**"), (iii) no other liens or encumbrances, whether superior or inferior to this Mortgage, shall be created or suffered to be created by Borrower without the prior written consent of Lender, (iv) no default on the part of Borrower or any other person exists under any of the Permitted Exceptions and all of the Permitted Exceptions are in full force and effect and in good standing, without modification, (v) none of the Permitted Exceptions will be modified by Borrower without Lender's prior written consent, (vi) Borrower shall fully comply with all the terms of the Permitted Exceptions and shall deliver to Lender a copy of all notices delivered in connection with the Permitted Exceptions, (vii) Lender has the right to contact the other parties to the Permitted Exceptions to confirm the status thereof, and Borrower from time to time shall, at the request of Lender, request of such parties a certificate confirming such information regarding the Permitted Exceptions as Lender may request, and (viii) Borrower shall forever warrant and defend the Property unto Lender against all claims and demands of any other person whatsoever, subject only to non-delinquent taxes and assessments and the Permitted Exceptions.  In the event any action or proceeding is commenced that questions Borrower's title or the interest of Lender under this Mortgage, Borrower shall defend the action and hold Lender harmless at Borrower's expense.  Borrower may be the nominal party in such proceeding, but Lender shall be entitled to participate and be represented in the proceeding by counsel of Lender's choice, and Borrower shall deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

{01312538;4}

      **1.2**    <u>**Non-Agricultural Use; Commercial Loan.**</u>  Each Borrower represents and warrants to the Lender that none of the Property is presently, or will be during the term of the Loan, used for agricultural or farming purposes.  The Loan secured by this Mortgage is a commercial loan for the acquisition of the Property.

      **1.3**    <u>**Hazardous Materials.**</u>  Each Borrower has made certain representations, warranties and covenants regarding hazardous materials and environmental matters in the Environmental Indemnity, and Borrower shall comply with the aforesaid covenants regarding hazardous materials and environmental matters.

## SECTION 2.    <u>BORROWER'S COVENANTS.</u>

      **2.1**    <u>**Payment and Performance of Secured Obligations.**</u>  Borrowers shall pay when due all sums which are now or which may become owing under the Note and the Loan Agreement, and shall pay and perform all other Secured Obligations in accordance with their terms.

      **2.2**    <u>**Payment of Taxes, Utilities, Liens and Charges.**</u>

          (a)    <u>Taxes and Assessments</u>.  Except as the same may otherwise be paid pursuant to <u>Section 3</u>, Borrower shall pay directly to the payee thereof when due all Taxes (as defined in the Loan Agreement) and assessments (including without limitation, non-governmental levies or assessments such as maintenance charges, owner association dues or charges, or fees, levies or charges resulting from covenants, conditions or restrictions) levied, assessed or charged against or with respect to the Property or this Mortgage.  Upon request, Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph and all receipts evidencing such payments.

          (b)    <u>Utilities</u>.  Borrower shall pay when due all utility charges and assessments for services furnished to the Property.

          (c)    <u>Labor and Materials</u>.  Borrower shall pay when due the claims of all persons supplying labor or materials to or in connection with the Property.

          (d)    <u>Liens and Charges</u>.  Borrower shall promptly discharge any lien, encumbrance, or other charge, whether superior or inferior to this Mortgage, which may be claimed against the Property.

          (e)    <u>Taxes, Assessments and Other Charges Imposed on Lender</u>.  If, at any time after the date of this Mortgage, any law is enacted or changed (including any interpretation thereof) which subjects Lender to any increase in any tax (except federal, state or local income taxes), assessments, or other charge, in any form measured by or based on any portion of the indebtedness secured by this Mortgage, Borrower shall pay such increased amount to Lender on demand; provided that if any such payment would be unlawful, Lender may declare all accrued interest and the entire principal balance of the Note immediately due and payable, in which case no prepayment premium pursuant to Section 3 of the Note shall be payable.

          (f)    <u>Right to Contest</u>.  Notwithstanding anything set forth in this <u>Section 2.2</u>, so long as no Event of Default shall occur hereunder, Borrower shall have the right to contest the amount or validity in whole or in part of any Taxes, lien, encumbrance or other charge against the Property by

{01312538;4}

appropriate administrative or judicial proceedings conducted in good faith and with due diligence, in which event Borrower, upon written notice to Lender, may defer payment of any such Taxes, lien, encumbrance or other charge, so long as (i) Borrower shall have provided Lender with evidence satisfactory to Lender that such proceedings shall operate to prevent the sale of the Property or any portion thereof, or the imposition of any penalties on Borrower or the Property; (ii) neither the Property nor any part thereof will, by reason of such postponement or deferment, be in danger of being forfeited or lost; (iii) before the date such Taxes, lien, encumbrance or other charge becomes delinquent, Borrower shall provide Lender with such security as Lender may reasonably require to insure payment thereof and prevent any forfeiture or loss of the Property or any part thereof; and (iv) on a final determination of such contest, which is not appealable or is not being appealed, Borrower shall pay the amount of the Taxes, lien, encumbrance or other charge if and when due, and prior to the imposition of any penalties or delinquent interest.

    **2.3**    <u>**Insurance.**</u>

        (a)    <u>Coverages Required</u>.  Borrowers shall keep the following insurance coverages in effect with respect to the Property:

        (1)    An "All-Risk" hazard insurance policy on the Property, which during the construction of the Improvements, if applicable, shall be in a Builder's All-Risk Form.  Such insurance shall name Lender as loss payee on a Form 438-BFU or acceptable equivalent attached to the policy, shall be in an amount not less than one hundred percent (100%) of the full replacement cost of the Improvements and any other improvements on the Property, and shall contain such endorsements and coverages as Lender may reasonably require.  In addition, no deductible payable under the foregoing policy shall exceed $25,000.00.

        (2)    A flood insurance policy in the maximum amount available, as required by the Flood Disaster Protection Act of 1973, if the Property is located in an area designated by the United States Department of Housing and Urban Development as a special flood hazard area (Flood Zone A or V).  The policy shall name Lender as loss payee on a Form 438-BFU or acceptable equivalent attached to the policy.

        (3)    A commercial general liability insurance on an Occurrence Based policy with respect to the Property insuring against claims of bodily injury, death or property damage (combined single limit form), in an amount not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate, naming Lender as an additional insured, plus umbrella or excess liability coverage in an amount not less than Twenty Million Dollars ($20,000,000).  If this insurance policy covers multiple locations the general aggregate limit must apply per location.

        (4)    Insurance against such similar or other hazards, casualties, liabilities and contingencies, in such forms and amounts, as Lender may from time to time reasonably require.

        (5)    Loss of rental value insurance and/or business interruption insurance, as follows:  If all or any portion of the Property is rented or leased, loss of rental value insurance in an amount equal to twelve (12) months' aggregate gross rents from the Property as is so occupied.  If all or any portion of the Property is occupied by Borrower, business interruption insurance in an amount

{01312538;4}

8

equal to twelve (12) months' net income from such portion of the Property as is so occupied. The amount(s) of such coverage(s) shall be subject to adjustment, from time to time at Lender's request, to reflect changes in the rental and/or income levels during the term of the Loan.

(6)     An environmental liability insurance policy (the "**Environmental Insurance Policy**") issued by Beazley Insurance with a $25,000,000.00 loss limit and a $100,000.00 deductible covering the period from the Closing Date to and including the first anniversary of the Closing Date. Borrower shall renew the Environmental Insurance Policy each year during the term of the Loan at least ten (10) business days prior to the expiration of such Environmental Insurance Policy.

Any blanket insurance Policy shall be subject to Lender approval and shall otherwise provide the same protection as would a separate insurance policy insuring only the Property in compliance with the provisions of this Section 2.3 (any such blanket policy, an "**Acceptable Blanket Policy**"). To the extent that the insurance policies set forth in this Section 2.3 are maintained pursuant to an Acceptable Blanket Policy that covers more than one location within a one thousand foot radius of the Property (the "**Radius**"), the limits of such Acceptable Blanket Policy must be sufficient to maintain coverages as set forth in Section 2.3(a) for the Property and any and all other locations combined within the Radius that are covered by such blanket policy calculated on a total insured value basis.

(b)     Policies. Each insurance policy will be issued by a company and in a form reasonably acceptable to Lender. All insurance shall be written on policies with an AM Best rating of at least A-, VII or better. All required policies will provide for at least thirty (30) days' written notice to Lender prior to the effective date of any cancellation or material amendment, which term shall include any reduction in the scope or limits of coverage, except ten (10) days prior notice of cancellation for non-payment of premiums. Borrower shall furnish to Lender (i) within five days of request from Lender, the original of each required insurance policy, or (ii) a certified copy thereof together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. As security for the Secured Obligations, Borrower hereby assigns to Lender all required insurance policies (to the extent assignable), together with all proceeds thereof, rights thereto and all unearned premiums returnable upon cancellation; provided, however, Lender acknowledges and agrees that any proceeds from the commercial general liability insurance policy shall be utilized to solely pay the claims under such insurance policy, and need not be paid directly to Lender.

(c)     Payment; Renewals. Borrower shall promptly furnish to Lender all renewal notices relating to insurance policies. Except as the same may otherwise be paid under Section 3, Borrower shall pay all premiums on insurance policies directly to the carrier. At least fifteen (15) days prior to the expiration date of each such policy, Borrower shall furnish to Lender a renewal policy in a form acceptable to Lender, together with evidence that the renewal premium has been paid.

(d)     Application of Insurance Proceeds. Any proceeds received by Lender in connection with the Property shall be deposited in an interest-bearing account with interest accruing for the benefit of Borrower. In the event of any loss, Borrower shall give prompt written notice thereof to the insurance carrier and Lender. Subject to the terms set forth in the Loan Agreement, Borrower hereby authorizes Lender as Borrower's attorney-in-fact to make proof of loss, to adjust and compromise any claim, to commence, appear in and prosecute, in Lender's or Borrower's name, any action relating to any

{01312538;4}

9

claim, and to collect and receive insurance proceeds; provided, however, that Lender shall have no obligation to do so. Lender shall apply any insurance proceeds received by it hereunder first to the payment of the costs and expenses incurred in the collection of the proceeds and then, other than proceeds from the commercial general liability insurance policy, in its absolute discretion and without regard to the adequacy of its security, to:

        (1)     The payment of the Secured Obligations, whether then due and payable or not. Any such application of proceeds to principal on the Note shall be without imposition of any prepayment fee otherwise payable under the Note, but shall not extend or postpone the due dates of the installment payments under the Note, or change the amounts thereof; or

        (2)     The reimbursement of Borrower, under Lender's prescribed disbursement control procedures, for the cost of restoration or repair of the Property. Lender may, at its option, condition the reimbursement on Lender's approval of the plans and specifications of the reconstruction, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage completion of construction, application of payments and satisfaction of liens as Lender may reasonably require.

Except to the extent that insurance proceeds are applied to payment of the Secured Obligations, nothing herein contained shall be deemed to excuse Borrower from restoring, repairing or maintaining the Property as provided in Section 2.4, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient in amount.

        (e)     Transfer of Title.  If the Property is sold pursuant to Section 7 or if Lender otherwise acquires title to the Property, Lender shall have all of the right, title and interest of Borrower in and to any insurance policies (other than the Acceptable Blanket Policy with respect to commercial general liability coverage) and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

**2.4**     **Preservation and Maintenance of Property; Right of Entry.**

        (a)     Preservation and Maintenance.  Borrowers shall (i) not commit or suffer any waste or permit any impairment or deterioration of the Property, (ii) not abandon the Property, (iii) restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Lender may reasonably approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (iv) keep the Property, including Improvements, fixtures, equipment, machinery and appliances thereon, in good condition and repair and shall replace fixtures, equipment, machinery and appliances of the Property when necessary to keep such items in good condition and repair, and (v) generally operate and maintain the Property in a commercially reasonable manner.

        (b)     Alterations.  None of the Improvements shall be structurally altered, removed or demolished, in whole or in part, without Lender's prior written consent, nor shall any fixture or chattel covered by this Mortgage and adapted to the use and enjoyment of the Property be removed at any time without like consent unless actually replaced by an article of equal suitability which is owned by Borrower free and clear of any lien or security interest.

{01312538;4}

(c)    <u>Right of Entry</u>. Lender is hereby authorized to enter the Property, including the interior of any structures, at reasonable times and after at least twenty-four (24) hours prior written notice (except in the event of an emergency in which case no prior notice is required, or as otherwise permitted by Borrower) for the purpose of inspecting the Property to determine Borrower's compliance with this paragraph.

2.5    <u>Parking</u>.  If any part of the automobile parking areas included within the Property is taken by condemnation, and before the parking areas are diminished for any other reason, Borrower shall take all actions as are necessary to provide parking facilities in kind, size and location to comply with all governmental zoning and other regulations and all leases.  Before making any contract for substitute parking facilities, Borrower shall furnish to Lender satisfactory assurance of completion thereof free of liens and in conformity with all government zoning and other regulations.  This Mortgage shall constitute a first lien on all such substitute parking facilities.

2.6    <u>Use of Property</u>.  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body, and all other covenants, conditions and restrictions applicable to the Property, and pay all fees and charges in connection therewith.  Unless required by applicable law or unless Lender has otherwise agreed in writing, Borrower shall not allow changes in the use for which all or any part of the Property was intended at the time this Mortgage was executed without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.  Borrower shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

2.7    <u>Condemnation</u>.  Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking (including without limitation any change in the grade of the Property), whether direct or indirect, of the Property or part thereof or interest therein, and Borrower shall appear in and prosecute any such action or proceeding unless otherwise directed by Lender in writing. Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower, to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any such condemnation or other taking, and to settle or compromise any claim in connection with such condemnation or other taking.  All awards, payments, damages, direct, consequential and otherwise, claims, and proceeds thereof, in connection with any such condemnation or other taking, or for conveyances in lieu of condemnation, are hereby assigned to Lender, and all proceeds of any such awards, payments, damages or claims shall be paid to Lender. Lender shall apply any such proceeds in the manner and upon the terms and conditions set forth in <u>Section 2.3(d)</u> above relating to the application of insurance proceeds.

2.8    <u>Protection of Lender's Security</u>.  Borrower shall give notice to Lender of and shall appear in and defend any action or proceeding that may affect the Property, the interests of Lender therein, or the rights or remedies of Lender under the Loan Documents.  If any such action or proceeding is commenced, or Borrower fails to perform any obligation under the Loan Documents, Lender may, at its option, make any appearances, disburse any sums, make any entries upon the Property, and take any actions as may be necessary or desirable to (i) protect or enforce the security of this Mortgage, (ii) remedy Borrower's failure to perform its obligations under the Loan Documents (without waiving such default by Borrower), or (iii) otherwise protect Lender's interests.  Borrower shall pay all losses, damages, fees, costs, and expenses incurred by Lender in taking such actions, including without limitation reasonable legal fees.

{01312538;4}

11

**2.9    Reimbursement of Lender's Expenses.**  All amounts disbursed by Lender pursuant to Section 2.8 or any other provision of this Mortgage, with interest thereon, shall be additional indebtedness of Borrower secured by this Mortgage.  All such amounts shall be immediately due and payable and bear interest from the date of disbursement at the lesser of the then applicable interest rate under the Note, or the maximum rate permitted by law.

**2.10    Books and Records, Financial Statements.**  Borrower shall keep and maintain at Borrower's address stated above, or such other place as Lender may approve in writing, books of accounts and records adequate to reflect correctly the results of the operation of the Property, and copies of all written contracts, leases and other instruments which affect the Property.  Such books, records, contracts, leases and other instruments shall be subject to examination, inspection and copying at any reasonable time by Lender upon at least twenty-four (24) hours prior written notice, or as otherwise permitted by Borrower.  During the term of the Loan, Borrower shall provide to Lender, in form satisfactory to Lender, the financial information required by Lender pursuant to the terms set for the in the Loan Agreement.  Furthermore, during the term of the Loan (at any time that Lender is not maintaining a reserve for the payment of Taxes pursuant to the terms of the Note or pursuant to Section 3.1 below), Borrower shall provide to Lender within twenty (20) days after the due date, evidence of the payment of any and all real estate taxes due and payable in connection with the Property.  The obligations set forth in this Section 2.10 shall survive and apply until any and all monetary obligations that Borrower, any guarantor or any related entity of Borrower or any guarantor owes to Lender, now existing or hereafter arising, whether related to the Loan, the Loan Documents or otherwise, have been satisfied in full.

**SECTION 3.    RESERVES.**  Subject to the provisions regarding reserves as set forth in the Note and the other Loan Documents:

**3.1    Deposits.**  Subject to the terms set forth in Section 1.2 of the Note, Borrower shall deposit on the dates required by Lender a sum equal to (i) the Taxes and special assessments due or to become due in connection with the Property, and (ii) the premiums due or to become due on insurance policies as may be required under this Mortgage.  Lender may require Borrower to deposit with Lender, in advance, upon not less than thirty (30) days prior written notice, such other sums for other taxes, assessments, premiums, charges and impositions in connection with Borrower or the Property as Lender reasonably deems necessary to protect Lender's interests ("**Other Impositions**").  Such sums for Other Impositions shall be deposited in a lump sum or in periodic installments, at Lender's option.  If required by Lender, Borrower shall promptly deliver to Lender all bills and notices with respect to any taxes, assessments, premiums and Other Impositions.  Lender shall not be required to pay Borrower any interest, earnings or profits on any sums deposited with Lender.  All sums deposited with Lender under this Section 3.1 are hereby pledged as security for the Secured Obligations.

**3.2    Application of Deposits.**  All such deposited sums shall be held by Lender and applied in such order as Lender elects to pay such Taxes, assessments, premiums and Other Impositions or, upon any Event of Default, may be applied in whole or in part, to the Secured Obligations.  The arrangement provided for in this Section 3 is solely for the added protection of Lender and entails no responsibility on Lender's part beyond the allowing of due credit, without interest, for the sums actually received by it.  Upon any assignment of this Mortgage by Lender, any funds on hand shall be turned over to the assignee and any responsibility of Lender with respect thereto shall terminate.  Each transfer of the Property in accordance with Section 4 below shall automatically transfer to the transferee all rights of Borrower with

{01312538;4}

respect to any funds deposited hereunder. Upon payment in full of the Secured Obligations, Lender shall promptly refund to Borrower the remaining balance of any deposits then held by Lender.

**3.3    Adjustments to Deposits.** If the total deposits held by Lender exceeds the amount deemed necessary by Lender to provide for the payment of such Taxes, assessments, premiums and Other Impositions, such excess may, provided there is no Event of Default or any event which would constitute an Event of Default if not cured within the time allowed, be credited by Lender on the next due installment or installments of such deposits. If at any time the total deposits held by Lender are less than the amount deemed reasonably necessary by Lender to provide for the payment of such taxes, assessments, premiums and Other Impositions, Borrower shall promptly deposit the deficiency with Lender after receipt of written demand from Lender.

## SECTION 4.    RESTRICTIONS ON TRANSFER OR ENCUMBRANCE.

**4.1    Prohibition on Transfer.** (a)    Subject to the Permitted Transfers (as hereinafter defined) described in clause (b) below, neither the Property nor any part thereof or interest therein shall be encumbered, sold (by contract or otherwise), conveyed, pledged, or otherwise transferred by Borrower; nor shall there be any change in (i) the ownership or Control (as such term is defined in the Loan Agreement) of any of Borrower's stock if Borrower is a corporation, (ii) the ownership or Control of any membership interest if Borrower is a limited liability company, (iii) the ownership or Control of any general partnership interest in Borrower if Borrower is a partnership, (iv) the ownership or Control of any beneficial interest in Borrower if Borrower is not otherwise a natural person or persons, and (v) the ownership or control of any stock, any general partnership interest, membership interests or any other beneficial interest in any corporation, partnership, limited liability company or other entity that has a direct or indirect ownership interest in Borrower. Any such action without Lender's prior written consent shall be deemed to increase the risk of Lender, and shall constitute an automatic Event of Default. Lender shall be entitled, at its option, to declare immediately due and payable all of the Secured Obligations secured by this Mortgage, and exercise any other rights and remedies that it may have under this Mortgage or the other Loan Documents. Lender may, in its sole discretion, consent to any such action subject to such terms and conditions as Lender may require, in its sole discretion. In such event Lender shall not be required to release the original obligor or any other party liable for the Secured Obligations.

(b)    Notwithstanding anything to the contrary contained in Section 4.1(a) hereof, the following Transfers (so long as any such Transfer satisfies all of the below conditions in this Section 4.1(b)) (each a "**Permitted Transfer**") shall be permitted hereunder:

(i)    Provided no Event of Default shall then exist, a transfer of direct or indirect interests in Borrower (other than a transfer of Principal's interest in Borrower or any direct or indirect interest in Principal) shall be permitted without Lender's consent provided that:

(A)    Borrower and Principal (as defined in the Loan Agreement) shall continue to be a Single Purpose Bankruptcy Remote Entity;

(B)    such transfer shall not cause the transferee (other than to Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds forty-nine percent (49%);

{01312538;4}

13

(C)      (1) after giving effect to such a transfer pursuant to this clause (i), Borrower shall continue to be Controlled by Guarantor and (2) such Transfer shall not result in a change of the day to day management and operations of the Property, Borrower or Principal; and

(D)      if such transfer would cause the transferee (other than Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), (x) such transferee is reasonably approved by Lender and (y) Borrower shall provide to Lender thirty (30) days prior written notice thereof.

(ii)      provided no Event of Default shall then exist, a transfer of any direct or indirect interest in Borrower (other than a Transfer of Principal's interest in Borrower or any direct or indirect interest in Principal) related to or in connection with the estate planning of such transferor to (1) an immediate family member of such interest holder (or to partnerships or limited liability companies Controlled solely by one or more of such family members) or (2) a trust established for the benefit of such immediate family member, provided that:

(A)      Borrower shall provide to Lender thirty (30) days prior written notice thereof;

(B)      such Transfer shall not otherwise result in a change of Control of Borrower or change of the day to day management and operations of the Property;

(C)      each of Borrower and Principal shall continue to be a Special Purpose Bankruptcy Remote Entity;

(D)      if such transfer would cause the transferee (other than Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), such transferee is reasonably approved by Lender; and

(E)      (1) after giving effect to such a transfer pursuant to this clause (ii), Borrower shall continue to be Controlled by Guarantor and (2) such Transfer shall not result in a change of the day to day management and operations of the Property, Borrower or Principal.

In connection with any Permitted Transfer, to the extent a transferee (other than a passive investor that does not Control Borrower; provided, however, Lender in all instances will still be permitted to run OFAC and Patriot Act searches on such passive investors which searches shall be reasonably satisfactory to Lender) shall own ten percent (10%) or more of the direct or indirect ownership interests in Borrower immediately following such transfer (provided such transferee owned less than ten percent (10%) of the direct or indirect ownership interests in Borrower as of the Closing Date), Borrower shall deliver (and Borrower shall be responsible for any reasonable out of pocket costs and expenses in connection therewith), customary searches reasonably requested by Lender in writing (including credit, judgment, lien, litigation, bankruptcy, criminal and watch list) reasonably acceptable to Lender with respect to such transferee.  In addition and except as provided for above in this Section 4.1(b), in connection with any Permitted Transfer, Principal shall remain the managing member of Borrower.

**SECTION 5.   <u>UNIFORM COMMERCIAL CODE SECURITY AGREEMENT</u>.**
{01312538;4}

14

**5.1    Grant to Lender.** This Mortgage constitutes a security agreement pursuant to the Uniform Commercial Code with respect to (a) any of the Property which, under applicable law, is not real property or effectively made part of the real property by the provisions of this Mortgage; and (b) any and all other property now or hereafter described on any Uniform Commercial Code Financing Statement naming Borrower as Debtor and Lender as Secured Party and affecting property in any way connected with the use and enjoyment of the Property (any and all such other property constituting "**Property**") for purposes of this Mortgage. Borrower hereby grants Lender a security interest in all property described in clauses (a) and (b) above as security for the Secured Obligations. For purposes of this Mortgage, the term "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York or, if and to the extent applicable, any other relevant jurisdiction.

**5.2    Fixture Filing.** This Mortgage shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code with respect to all of the Property consisting of goods that are or are to become "fixtures" (as that term is defined in Section 9102 of the Uniform Commercial Code) related to the real property described in this Mortgage, upon being filed for record in the real estate records of the county in which such fixtures are or are to be located. With respect to said fixture filing, (a) the name of each debtor is Suffern Partners LLC and North 14th Street Realty Associates LLC, (b) the name of the secured party is CPIF Lending, LLC, (c) the collateral covered hereby includes goods that are or are to become "fixtures" (as that term is defined in Section 9102 of the Uniform Commercial Code) related to the real property described in this Mortgage, and (d) the debtor is the record owner of, or otherwise has an interest of record in, the real property described in this Mortgage. Information concerning the security interest herein granted may be obtained at the addresses of the debtor (Borrower) and the secured party (Lender) as set forth in the first paragraph of this Mortgage.

**5.3    Status of Borrower; Financing Statements.** Each Borrower's exact legal name is correctly set forth on the signature page of this Mortgage. Each Borrower is an organization of the type specified in the introductory paragraph of this Mortgage. Each Borrower is incorporated in or organized under the laws of the state specified in the introductory paragraph of this Mortgage. Borrower will not cause or permit any change to be made in its name, identity or corporate, company or partnership structure (including, for this purpose, its jurisdiction of organization) unless the Borrower shall have notified Lender in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Lender for the purpose of further perfecting or protecting the lien and security interest of Lender in the Property. Each Borrower's principal place of business and chief executive office, and the place where Borrower keeps its book and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writing, plans, specifications and schematics concerning the Property, has been for the preceding four months (or less if for the entire existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Mortgage (unless Borrower notifies Lender of any change in writing at least thirty (30) days prior to the date of such change). If Borrower is an individual, Borrower's principal residence has been for the preceding four months and will continue to be the address of the principal residence of Borrower set forth at the end of this Mortgage (unless Borrower notifies Lender of any change in writing at least thirty (30) days prior to the date of such change). Rockland County Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is 5183694. Kings County Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is 2240110. Each Borrower shall promptly notify Lender of any change of its organizational identification number. If Borrower does not now have an organizational identification number and

{01312538;4}

15

later obtains one, Borrower shall promptly notify Lender of such organizational identification number. Borrower agrees that Lender may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. Borrower hereby authorizes Lender (and Lender's representatives and agents) to file financing statements (and amendments thereto) relating to the Property. The form and substance of any financing statement filed with respect to this Mortgage shall be as Lender, in its sole discretion, may determine. Borrower shall pay all costs of filing such financing statements and any extensions, continuations, renewals, amendments and releases thereof, and shall pay all costs and expenses of any record searches for financing statements which Lender may require.

**5.4    Lender's Rights and Remedies.**  With respect to the property subject to the foregoing security interest, Lender shall have all the rights and remedies (i) of a secured party under the Uniform Commercial Code, and (ii) as provided by law.  In exercising its remedies, Lender may proceed against the items of real property and any items of personal property separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies.  Upon demand by Lender following an Event of Default hereunder, Borrower shall assemble any items of personal property and make them available to Lender at the Property.  Lender shall give Borrower at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such Property or of the time of or after which any private sale or any other intended disposition is to be made.  Any person permitted by law to purchase at any such sale may do so.  Such Property may be sold at any one or more public or private sales as permitted by applicable law.

## SECTION 6.    ASSIGNMENT OF RENTS AND LEASES; LEASES OF PROPERTY; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.

**6.1    Assignment of Rents and Leases.**  As part of the consideration for the Secured Obligations, and not as additional security therefor, Borrower hereby absolutely and unconditionally assigns and transfers to Lender all right, title and interest of Borrower in and to: (a) any and all present and future leases, subleases, and other agreements for the occupancy or use of all or any part of the Property, and any and all extensions, renewals and replacements thereof (**"Leases"**); (b) all cash or security deposits, advance rentals and deposits of a similar nature under the Leases; (c) any and all guarantees of tenants' or occupants' performances under any and all Leases; and (d) all rents, issues, profits and revenues (**"Rents"**) now due or which may become due or to which Borrower may now or shall hereafter become entitled or may demand or claim (including Rents coming due during any redemption period), arising or issuing from or out of any and all Leases, including without limitation minimum, additional, percentage and deficiency rents and liquidated damages.

**6.2    Collection of Funds.**  (a) It is intended by Borrower that this Mortgage constitute a present, absolute assignment of the Leases, Rents, any lease guaranties and bankruptcy claims, and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 6.2, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents, as well as any sums due under any lease guaranties.  Borrower shall hold the Rents, as well as all sums received pursuant to any lease guaranty, or a portion thereof sufficient to discharge all current sums due on the Secured Obligations, in trust for the benefit of Lender for use in the payment of such sums; provided, however, that so long as an Event of Default is not then continuing, and Borrower is in compliance with its obligations under the Loan Documents, Borrower may make distributions and/or pay

{01312538;4}

16

dividends pursuant to the express terms set forth in the applicable organizational documents to its partners and members. Upon or at any time after the occurrence of an Event of Default, the license granted to Borrower above shall automatically be revoked and Lender shall immediately be entitled to possession of all Rents and all sums due under any lease guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving any Event of Default, without regard to the adequacy of the security for the Secured Obligations, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto, and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and, either with or without taking possession of the Property, in its own name, demand, sue for or otherwise collect and receive all Rents and all sums due under all lease guaranties, including, without limitation, those past due and unpaid (with all such Rents and all sums due under any lease guaranties to be deposited with Lender), with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper. In addition, upon the occurrence of an Event of Default, Lender, at its option, may (1) complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any lease guaranties (with all such Rents and all sums due under any lease guaranties to be deposited with Lender), and/or (3) either (i) require Borrower to pay monthly in advance to Lender or to any receiver appointed to collect the Rents the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in the possession of Borrower, or (ii) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise. The provisions set forth in this Section 6.2 shall be in all instances subject to the rights of tenants under their respective executed Leases.

(b)    Pursuant to the terms of the DACA (as defined in the Loan Agreement), Lender shall immediately be entitled to possession of all Rents from the Property as the same become due and payable, including without limitation Rents then due and unpaid. Borrower hereby expressly authorizes and directs all present and future tenants of the Property to pay any and all Rents due Borrower pursuant to the Leases directly to Lender or such nominee as Lender may designate. Borrower agrees any tenants who make payments directly to Lender or its designee after receipt of such a notice are hereby expressly relieved of any and all duty, liability or obligation to Borrower in respect of all payments so made. Lender may exercise, in Lender's or Borrower's name, all rights and remedies available to Borrower with respect to collection of Rents. Nothing herein contained shall be construed as obligating Lender to perform any of Borrower's obligations under any of the Leases. To the extent that any Rents are delivered to Borrower, all such Rents shall be held by Borrower as trustee for the benefit of Lender only.

**6.3    Borrower's Representations and Warranties.**    Borrower hereby represents and warrants to Lender that Borrower has not executed and will not execute any other assignment of said Leases or Rents, that Borrower has not performed and will not perform any acts and has not executed and will not execute any instrument which would prevent Lender from exercising its rights under this Section 6, and that at the time of execution of this Mortgage there has been no anticipation or prepayment of any of the Rents of the Property for more than one (1) month prior to the due dates thereof. Borrower shall

{01312538;4}

17

execute and deliver to Lender such further assignments of Rents and Leases of the Property as Lender may from time to time reasonably request.

**6.4    Leases of the Property.**    Borrower shall comply with and observe Borrower's obligations as landlord under all Leases and will do all that is necessary to preserve all Leases in force and free from any right of counterclaim, defense or set off. Borrower shall furnish Lender with executed copies of all Leases now existing or hereafter made and all Leases hereafter entered into will be on a form and in substance satisfactory to Lender, in its sole discretion. At such time as Borrower intends to enter into a new Lease, Borrower shall submit the prospective Lease to Lender for its review and approval; such approval, or Lender's disapproval with respect to any specific terms, shall be provided to Borrower within ten (10) business days following the date on which any prospective Lease is submitted to Lender. If Lender has not responded within ten (10) business days of Borrower's request for approval, Lender's approval will be deemed given in accordance with and pursuant to, the terms set forth in the Loan Agreement. All commercial Leases will specifically provide that the tenant attorns to any person succeeding to the interest of Borrower upon any foreclosure of this Mortgage or conveyance in lieu thereof, provided that Lender does not disturb the tenant's rights under the Lease so long as the tenant is not in default thereunder; such attornment shall be in such form as Lender may approve and shall provide that the tenant shall not have the right of set off or defense to payment of rents for any event or act that occurred prior to such successor obtaining title to Borrower's interest except to the extent such event or act is continuing at the time such successor obtains such title. The tenant shall also agree to execute such further evidences of attornment within ten (10) days of Lender's request. Without Lender's written consent, Borrower shall not (i) collect or accept payment of any Rents more than one (1) month prior to the due dates thereof; (ii) modify or surrender any Lease; (iii) modify the obligations of any tenant or other occupant of the Property under any Lease; or (iv) request or consent to the subordination of any commercial Lease to any lien subordinate to this Mortgage. Borrower shall have the right to terminate Leases at the Property.

**6.5    Lender in Possession; Appointment of Receiver.**    Upon any Event of Default hereunder, Lender may, in person, by agent or by a court-appointed receiver, regardless of the adequacy of Lender's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof in the same manner and to the same extent as Borrower could do the same, including without limitation the execution, enforcement, cancellation and modification of Leases, the collection of all Rents of the Property, the removal and eviction of tenants and other occupants, the making of alterations and repairs to the Property, and the execution and termination of contracts providing for management or maintenance of the Property, all on such terms as are deemed best by Lender to protect the security of this Mortgage. From and after the occurrence of any such Event of Default, if any owner of the Property shall occupy the Property or part thereof such owner shall pay to Lender in advance on the first day of each month a reasonable rental for the space so occupied, and upon failure so to do Lender shall be entitled to remove such owner from the Property by any appropriate action or proceedings. Following an Event of Default hereunder, Lender shall be entitled (regardless of the adequacy of Lender's security) to the appointment of such receiver, Borrower hereby consenting to the appointment of such receiver. Said receiver may serve without bond and, if permitted by law, may be Lender or an employee of Lender. The receiver shall have, in addition to all the rights and powers permitted under applicable law, all the rights and powers granted to Lender in this Section 6. Lender or the receiver shall be entitled to receive a reasonable fee for so managing the Property.

{01312538;4}

**6.6**    **Application of Rents.**  All Rents collected by Lender shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the Rents, including without limitation reasonable attorneys' fees, receiver's fees, premiums on receiver's bonds, costs of maintenance and repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Borrower under the Leases, and then to the Secured Obligations, or in such other order as Lender may determine in its sole discretion.  Lender or the receiver shall be liable to account only for those Rents actually received.  Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Property by reason of anything done or left undone by Lender under this Section.

**6.7**    **Deficiencies.**  To the extent, if any, that the costs of taking control of and managing the Property, collecting the Rents, and discharging obligations and liabilities of Borrower under the Leases, exceed the Rents of the Property, the excess sums expended for such purposes shall be indebtedness secured by this Mortgage.  Such excess sums shall be payable upon demand by Lender and shall bear interest from the date of disbursement at the greater of the default rate under the Note, or the maximum rate permitted by law.

**6.8**    **Lender Not Mortgagee in Possession.**  Nothing herein shall constitute Lender a "mortgagee in possession" prior to its actual entry upon and taking possession of the Property.  Entry upon and taking possession by a receiver shall not constitute possession by Lender.

**6.9**    **Enforcement.**  Lender may enforce this assignment without first resorting to or exhausting any other security or collateral for the Secured Obligations.

## SECTION 7.    EVENTS OF DEFAULT.

**7.1**    **Events of Default.**  The occurrence of any one or more of the following shall constitute an Event of Default hereunder:

(a)    The failure by Borrower to keep, perform, or observe any covenant, condition or agreement on the part of Borrower in any of Section 2.2 and Section 2.3 of this Mortgage, which failure continues for five (5) days after notice from Lender to Borrower.

(b)    The failure by Borrower to keep, perform or observe any covenant, condition or agreement on the part of Borrower in this Mortgage, other than as set forth in clause (a) above, which failure continues for more than thirty (30) days after the earlier of the date on which Borrower knew of such failure or the date that Borrower received notice from Lender of such failure; provided, however, in the case of a default of a covenant, condition or agreement which is capable of cure but cannot reasonably be cured within such thirty (30) day period, and provided Borrower shall have given Lender a written undertaking to, and shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional thirty (30) days; and provided further that if a different notice or grace period is specified under the Note (or elsewhere in this Mortgage) after which such particular breach will become an Event of Default, the specific provision elsewhere in this Mortgage or in the Note shall control.

(c)    The occurrence of an "Event of Default" under and as defined in the Note, or an event of default under the Loan Agreement or any of the other Loan Documents.

{01312538;4}

19

(d)     The failure by Borrower to keep, perform or observe any covenant, condition or agreement on the part of Borrower within any applicable notice and cure period in the Environmental Indemnity.

(e)     An unauthorized lien or encumbrance unless within twenty (20) days of written notice by Lender to Borrower of the existence of such claim, lien or encumbrance Borrower (a) obtains a release and satisfaction of such lien, claim of lien, judgment or encumbrance, or (b) provides Lender with a bond (or other security) acceptable to Lender in the amount to be determined by Lender in its commercially reasonable discretion. If Borrower does not post the bond or other security reasonably satisfactory to Lender within said twenty (20) days, Lender, at its option, may pay such lien, claim of lien, judgment or other encumbrance against the Property and Borrower shall reimburse Lender, on demand, for any such disbursement made. Lender's rights under this paragraph shall not be affected by any claim of Borrower that the lien, judgment or encumbrance is invalid, it being understood that the decision of the Lender to pay or withhold is to be made by Lender in its sole discretion, subject only to Borrower's right to provide a bond or other security satisfactory to Lender as provided above.

(f)     Any violation or default of the terms and provisions set forth in Section 4 hereof.

(g)     The failure by Borrowers to keep, perform, or observe any covenant, condition or agreement on the part of Borrowers in <u>Section 2.1</u> of this Mortgage.

**7.2     <u>Acceleration Upon Default; Additional Remedies.</u>**  Upon any Event of Default, Lender may, at its option and without notice to or demand upon Borrower, exercise any one or more of the following actions:  (a) declare all the Secured Obligations immediately due and payable; (b) bring a court action to enforce the provisions of this Mortgage or any of the other Loan Documents; (c) foreclose this Mortgage as a mortgage in any judicial foreclosure action permitted under applicable law; (d) cause any or all of the Property to be sold under the power of sale granted by this Mortgage in any manner permitted by applicable law; (e) elect to exercise its rights with respect to the Leases and the Rents; (f) exercise any or all of the other rights and remedies under this Mortgage and the other Loan Documents; and/or (g) exercise any other right or remedy available under law or in equity. To the extent permitted by law, every right and remedy provided in this Mortgage or afforded by law or equity or any other agreement between Lender and Borrower, and may be exercised concurrently, independently or successively, in any order whatsoever.  Lender may exercise any of its rights and remedies at its option without regard to the adequacy of its security.

**7.3     <u>Exercise of Power of Sale.</u>**  For any sale under the power of sale granted by this Mortgage, Lender shall record and give all notices required by law and then, upon the expiration of such time as is required by law.  If the Property includes several lots or parcels, Lender in its discretion may designate their order of sale or may elect to sell all of them as an entirety.  The Property, real, personal and mixed, may be sold in one parcel.  Any person permitted by law to do so may purchase at any sale.  Upon any sale, Lender will execute and deliver to the purchaser or purchasers a deed or deeds conveying the Property sold, but without any covenant or warranty, express or implied, and the recitals in the Lender's deed showing that the sale was conducted in compliance with all the requirements of law shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchasers and encumbrances for value.

{01312538;4}

20

**7.4    Application of Sale Proceeds.** The proceeds of any sale under this Mortgage shall be applied in the following manner: (a) first to the payment of the costs and expenses of the sale; including without limitation legal fees and disbursements, title charges and transfer taxes, and payment of all expenses; (b) second to the payment of all sums expended by Lender under the terms of this Mortgage and not yet repaid, together with interest on such sums from date of disbursement at the applicable interest rate under the Note from time to time or the maximum rate permitted by applicable law if that is less; and (c) third to the payment of all other Secured Obligations in any order that the Lender chooses; and (d) the remainder, if any, to the person or persons legally entitled to it.

**7.5    Waiver of Order of Sale and Marshalling.** Borrower waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Borrower, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

**7.6    Non-Waiver of Defaults.** The entering upon and taking possession of the Property, the collection of Rents or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the Property, and the application or release thereof as herein provided, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

**7.7    Expenses During Redemption Period.** If this Mortgage is foreclosed as a mortgage and the Property sold at a foreclosure sale pursuant to such judicial proceeding, the purchaser may during any redemption period allowed, make such repairs or alterations on the Property as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof. Any sums so paid together with interest thereon from the time of such expenditure at the greater of the default rate under the Note, or the maximum rate permitted by law, shall be added to and become a part of the amount required to be paid for redemption from such sale.

**7.8    Foreclosure Subject to Tenancies.** Lender shall have the right at its sole option to foreclose this Mortgage subject to the rights of any tenant or tenants of the Property.

**7.9    Evasion of Prepayment Terms.** If any Event of Default has occurred, a tender of payment of the indebtedness secured hereby at any time prior to or at a judicial or non-judicial foreclosure sale of the Property by Borrower, or anyone on behalf of Borrower, shall constitute an evasion of any prepayment terms of the Note, if any, and shall constitute a voluntary prepayment thereunder, and any such tender shall include any prepayment premium required under the Note, if any.

**7.10    Lender's Expenses.** Borrower shall pay all of Lender's expenses incurred in any efforts to enforce any terms of this Mortgage, whether or not any suit is filed, including without limitation legal fees and disbursements, foreclosure costs and title charges. All such sums, with interest thereon, shall be additional indebtedness of Borrower secured by this Mortgage. Such sums shall be immediately due and payable and shall bear interest from the date of disbursement at the greater of the default rate under the Note, or the maximum rate permitted by law.

**SECTION 8.    GENERAL.**

{01312538;4}

**8.1**   **No Offset.**   Borrower's obligation to timely pay and perform all obligations under the Note, this Mortgage and the other Loan Documents shall be absolute and unconditional and shall not be affected by any event or circumstance; including without limitation any setoff, counterclaim, abatement, suspension, recoupment, deduction, defense or any other right that Borrower or any guarantor may have or claim against Lender or any other person or entity. The foregoing shall not constitute a waiver of any claim or demand which Borrower or any guarantor may have in damages or otherwise against Lender or any other person or entity; provided that Borrower shall maintain a separate action thereon.

**8.2**   **Application of Payments.**   Except as applicable law or this Mortgage may otherwise provide and notwithstanding anything to the contrary in the Note, Lender may apply all payments received by Lender under the Note or this Mortgage in the following order of priority:  (a) Lender's expenses incurred in any efforts to enforce any terms of this Mortgage; (b) interest payable on advances made to protect the security of this Mortgage; (c) principal of such advances; (d) amounts payable to Lender by Borrower under Section 3 for reserves; (e) interest and late charges payable on the Note; (f) principal of the Note; and (g) any other Secured Obligations in such order as Lender, at its option, may determine; provided, however, that Lender may, at its option, apply any such payments received to interest on or principal of the Note prior to applying such payments to interest on and principal of advances made to protect the security of this Mortgage.

**8.3**   **Reconveyance.**   Upon payment of all sums secured by this Mortgage, Lender shall surrender this Mortgage and all notes evidencing indebtedness secured by this Mortgage. Lender shall reconvey at Borrower's expense the Property without warranty to the person or persons legally entitled thereto. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals therein of any matters or facts shall be conclusive proof of the truthfulness thereof. Such person or persons shall pay Lender's reasonable costs incurred in so reconveying the Property.

**8.4**   **Intentionally Omitted.**

**8.5**   **Lender's Powers.**   Without affecting the liability of any person for payment or performance of the Secured Obligations or any of Lender's rights or remedies, Lender, at its option, may extend the time for payment of the indebtedness secured hereby or any part thereof, reduce payment thereon, release anyone liable on any of said indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of the indebtedness, release the lien of this Mortgage on any part of the Property, take or release other or additional security, release or reconvey or cause to be released or reconveyed all or any part of the Property, or consent to the making of any map or plat of the Property, consent to the granting of any easement or creating any restriction on the property, or join in any subordination or other agreement affecting this Mortgage or the lien or charge hereof. Borrower shall pay Lender a reasonable service charge, together with such title insurance premiums and reasonable attorneys' fees as may be incurred at Lender's option, for any such action if taken at Borrower's request.

**8.6**   **Subrogation.**   Lender shall be subrogated for further security to the lien, although released of record, of any and all encumbrances discharged, in whole or in part, by the proceeds of the Note or any other indebtedness secured thereby.

**8.7**   **Limitation on Interest and Charges.**   The interest, fees and charges under the Loan Documents shall not exceed the maximum amounts permitted by any applicable law. If any such interest,

{01312538;4}

22

fee or charge exceeds the maximum, the interest, fee or charge shall be reduced by the excess and any excess amounts already collected from Borrower shall be refunded. Lender may refund such excess either by treating the excess as a prepayment of principal under the Note or by making a direct payment to Borrower. If Lender elects to treat the excess as a prepayment of principal, Borrower shall not be obligated to pay any prepayment premium required under the Note. The provisions of this paragraph shall control over any inconsistent provision in the Loan Documents.

**8.8** **Additional Documents; Power of Attorney.** Borrower, from time to time, shall execute, acknowledge and deliver to Lender upon request, and hereby irrevocably appoints Lender its attorney-in-fact to execute, acknowledge, deliver and if appropriate file and record, such security agreements, assignments for security purposes, assignments absolute, financing statements, affidavits, certificates and other documents, in form and substance satisfactory to Lender, as Lender may request in order to perfect, preserve, continue, extend or maintain the assignments herein contained, the lien and security interest under this Mortgage, and the priority thereof; provided, however, Lender will not exercise its power of attorney granted here until an Event of Default has occurred or Lender has given Borrower written notice of the need for Borrower to execute, acknowledge and deliver the items recited above and Borrower has failed to take such action within five business days of receipt of such written notice from Lender. Borrower shall pay to Lender upon request therefor all costs and expenses incurred in connection with the preparation, execution, recording and filing of any such document.

**8.9** **Waiver of Statute of Limitations.** To the full extent Borrower may do so, Borrower hereby waives the right to assert any statute of limitations as a defense to the enforcement of the lien of this Mortgage or to any action brought to enforce the Note or any other obligation secured by this Mortgage.

**8.10** **Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy, and no waiver by Lender of any particular default shall constitute a waiver of any other default or of any similar default in the future. Without limiting the generality of the foregoing, the acceptance by Lender of payment of any sum secured by this Mortgage after the due date thereof shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Mortgage, nor shall Lender's receipt of any awards, proceeds or damages under <u>Sections 2.3</u> and <u>2.7</u> hereof operate to cure or waive Borrower's default in payment of sums secured by this Mortgage.

**8.11** **Modifications and Waivers.** This Mortgage cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought.

**8.12** **Notice.** Any notice to Borrower under this Mortgage shall be to the address noted above or such other address as may be designated by Borrower in writing so long as such notice is given in accordance with the notice provisions in the Loan Documents.

**8.13** **Governing Law; Severability; Captions.** This Mortgage shall be governed by the laws of the State of New York applicable to contracts made and intended to be performed entirely therein. If

{01312538;4}

23

any provision or clause of this Mortgage conflicts with applicable law, such conflicts shall not affect other provisions or clauses hereof which can be given effect without the conflicting provision, and to this end the provisions hereof are declared to be severable. The captions and headings of the paragraphs and articles of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

**8.14    Definitions.** As used herein: the term "Borrower" means the Borrower herein named, together with any subsequent owner of the Property or any part thereof or interest therein; and the term "Lender" means the Lender herein named, together with any subsequent owner or holder of the Note or any interest therein, including pledgees, assignees and participants.

**8.15    Successors and Assigns; Joint and Several Liability; Agents.** This Mortgage shall bind and inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, administrators, executors, successors and assigns. Each person executing this Mortgage as Borrower shall be jointly and severally liable for all obligations of Borrower hereunder. In exercising any rights hereunder or taking actions provided for herein, Lender may act through its respective employees, agents or independent contractors as authorized by Lender.

**8.16    Time.** Time is of the essence in connection with all obligations of Borrower herein.

**8.17    Estoppel Certificate.** Borrower shall, within fifteen (15) days of a written request from Lender and at no charge to Lender, furnish Lender or any other party designated by Lender with a written statement, duly acknowledged, setting forth the sums secured hereby and any right of set-off, counterclaim or other defense that may exist with regard to the Secured Obligations.

**8.18    Intentionally Omitted.**

**8.19    Intentionally Omitted.**

**8.20    WAIVER OF JURY TRIAL.** BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS MORTGAGE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

**SECTION 9.    STATE SPECIFIC PROVISIONS.**

{01312538;4}

9.1     **Principles of Construction**.  In the event of any inconsistencies between the terms and conditions of this Article 9 and the terms and conditions of this Mortgage, the terms and conditions of this Article 9 shall control and be binding.

9.2     **Certain Matters Relating to the Laws of the State of New York**.  Notwithstanding any provision hereof or of any other Loan Document to the contrary, the following provisions shall apply:

(a)     **Section 254 of the RPL**.  In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

(b)     **Section 291-f of the RPL**.  In addition to any other right or remedy contained herein or in any other Loan Document, Lender shall have all of the rights against lessees of the Property or any part thereof as are set forth in Section 291-f of the Real Property Law of New York.

(c)     **Trust Fund**.  Pursuant to Section 13 of the Lien Law of New York, Borrower shall receive the advances secured hereby and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any improvement before using any part thereof for any other purpose.  Borrower shall comply strictly with Section 13-f of the Lien Law of New York.

(d)     **Commercial Property**.  Borrower represents and warrants that this Mortgage does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential dwelling units having their own separate cooking facilities.

(e)     **Transfer Tax Provisions**.  (i) Borrower covenants and agrees that, in the event of a sale of the Property or other Transfer, it will duly complete, execute and deliver to Lender contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate transfer taxes (collectively, "**Transfer Taxes**") by reason of such sale or other Transfer or recording of the deed evidencing such sale or other Transfer.

(ii)     Borrower shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Transfer, and in default thereof Lender may pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage.  The provisions of this Section shall survive any Transfer and the delivery of the deed in connection with any Transfer.

(f)     **Maximum Principal Amount**.  NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS SECURITY INSTRUMENT AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS U.S. **$33,000,000.00** PLUS ALL INTEREST PAYABLE UNDER THE NOTE

{01312538;4}

AND ALL AMOUNTS EXPENDED BY LENDER AFTER DEFAULT BY BORROWER: (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE MORTGAGED PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS SECURITY INSTRUMENT; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE SECURITY INSTRUMENT PROPERTY AND UPHOLDING THE LIEN OF THIS SECURITY INSTRUMENT, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS SECURITY INSTRUMENT, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, TOGETHER WITH INTEREST ON ALL OF THE FOREGOING AMOUNTS AT THE DEFAULT RATE (AS DEFINED IN THE LOAN AGREEMENT); PROVIDED HOWEVER, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS THAT IS ATTRIBUTABLE TO THE KINGS COUNTY PROPERTY (AS DEFINED IN THE LOAN AGREEMENT) FOR PURPOSES OF ENFORCING THIS MORTGAGE IS $11,000,000.00.

(g)     **Covenants in Addition to RPL**.  All covenants hereof shall be construed as affording to Lender rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable laws.

(h)     **Non-Judicial Foreclosure**.  If an Event of Default shall occur hereunder, Lender may elect to sell the Property or any part thereof by exercise of the power of foreclosure or of sale granted to Lender by Article 13 of the Real Property Actions and Proceedings Law of the State of New York (the "**RPAPL**").  In such case, Lender may commence a civil action to foreclose this Security Instrument pursuant to and in accordance with Article 13 of the RPAPL.

[Signature on following Page]

Dated as of the day and year first written above.

**BORROWER:**

**SUFFERN PARTNERS LLC,** a
New York limited liability company

By:   **RSOM CORP.,** a
New York corporation, its Managing Member

By:   _Goldie Reisman_
Name:   Goldie Reisman
Title:   President

Address:          Suffern Partners LLC
                  202 Grandview Avenue
                  Monsey, New York 10950
                  Attention: Goldie Reisman
Email Address:    goldie.reisman.sterling@gmail.com

With a copy to:   Law Offices of David Fleischmann P.C.
                  2233 Nostrand Avenue, 3rd Floor
                  Brooklyn, New York 11210
                  Attention: David Fleischmann, Esq.
Email Address:    David@dfleischmann.com

**ACKNOWLEDGMENT**

STATE OF NEW YORK        )
                         : ss.:
COUNTY OF Sullivan       )

        On the 31 day of August, in the year 2017, before me, the undersigned personally appeared **GOLDIE REISMAN,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

ELISHEVA BASCH
Notary Public State of NY
No. 01BA6055777
Qualified in Kings County
Comm. Expires 3/5/20__

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

Novartis Campus – Loan No. 330161456

BORROWER:

**NORTH 14TH STREET REALTY ASSOCIATES LLC**, a
New York limited liability company

By: _Goldie Reisman_
Name:     Goldie Reisman
Title:     Managing Member

Address:     North 14th Street Realty Associates LLC
              202 Grandview Avenue
              Monsey, New York 10950
              Attention: Goldie Reisman
Email Address:     goldie.reisman.sterling@gmail.com

With a copy to:     Law Offices of David Fleischmann P.C.
              2233 Nostrand Avenue, 3rd Floor
              Brooklyn, New York 11210
              Attention: David Fleischmann, Esq.
Email Address:     David@dfleischmann.com

## ACKNOWLEDGMENT

STATE OF NEW YORK    )
                       : ss.:
COUNTY OF _Sullva_   )

On the _31_ day of August, in the year 2017, before me, the undersigned personally appeared **GOLDIE REISMAN**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____     ELISHEVA BASCH
Signature and Office of individual     Notary Public State of NY
taking acknowledgment          No. 01BA6055777
                               Qualified in Kings County
                               Comm. Expires 3/5/20_19_

### [SIGNATURES CONTINUE ON FOLLOWING PAGE]

Novartis Campus – Loan No. 330161456

**CPIF LENDING, LLC,** a Washington limited liability company, holder of the Original Mortgages, signs below to acknowledge its consent to the terms of this Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing.

**LENDER:**

**CPIF LENDING, LLC,** a
Washington limited liability company

By:    CPIF Holdings, LLC, its manager

    By:    Columbia Pacific Income Fund II, L.P., its manager

        By:    Columbia Pacific Income Fund II GP, LLC, its general partner

            By:    Columbia Pacific Advisors, LLC, its manager

                By:
                Name:    **ALEX WASHBURN**
                Title:    **MANAGER**

**ACKNOWLEDGMENT**

STATE OF Washington )
                           : ss.:
COUNTY OF    King )

    On the 21 day of August, in the year 2017, before me, the undersigned personally appeared Alex Washburn , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


Signature and Office of individual
taking acknowledgment

YASAMINE FIROOZI
Notary Public
State of Washington
My Appointment Expires Jul 30, 2020

Novartis Campus – Loan No. 330161456

## EXHIBIT "A"

### LEGAL DESCRIPTION

**Parcels I-II:**
BEGINNING at a point in the westerly right-of-way of Hemion Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

{01312538;4}                         Exh. A-1

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF EGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel I: 25 Old Mill Road, Suffern, NY 10901.

Designated as Section 55.06, Block 1, Lot 1, Rockland County, and also known as Parcel II: 19 Hemion Road, Montebello, NY 10901.

**Parcel III**

ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo, County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section 55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;

    a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
    b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;

    1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;
    2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09 feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;

    1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
    2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the Southerly right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel III: Route 59, Suffern, NY 10901.

**Parcel IV:**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings,
City and State of New York, bounded and described as follows:

Beginning at a corner formed by the intersection of the southerly side of North 14th Street with the westerly side
of Berry Street;

RUNNING THENCE southerly along the westerly side of Berry Street, 24 feet 6 inches;

THENCE westerly parallel with North 14th Street and through a party wall, 99 feet 6 inches;

THENCE southerly parallel with Berry Street and through a party wall, 50 feet 6 inches;

THENCE westerly parallel with North 14th Street, 6 inches;

THENCE southerly parallel with Berry Street, 25 feet;

THENCE westerly parallel with North 14th Street, 125 feet;

THENCE northerly parallel with Berry Street, 100 feet to the southerly side of North 14th Street;

THENCE easterly along the southerly side of North 14th Street, 225 feet to place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 15, Kings County, and also known as 200 North 14th Street, Brooklyn, NY 11249.

**Parcel V:**
All that certain lot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings,
City and State of New York, bounded and described as follows:

BEGINNING at a point on the northwesterly side of of Berry Street, distant 24 feet 6 inches southwesterly from the corner formed by the northwesterly side of Berry Street and the southwesterly side on North 14th Street;

RUNNING THENCE northwesterly parallel with North 14th Street and part of the distance through a party wall, 99 feet 6 inches;

THENCE southwesterly parallel with Berry Street and part of the distance through a party wall, 50 feet 6 inches;

THENCE southeasterly parallel with North 14th Street, 99 feet 6 inches to the northwesterly side of Berry Street; and

THENCE northeasterly along the northwesterly side of Berry Street, 50 feet 6 inches to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 24, Kings County, and also known as 4-6 Berry Street, Brooklyn, NY 11249.

## SCHEDULE A-1

### EXISTING ROCKLAND COUNTY MORTGAGES

1.       Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Suffern Partners LLC, as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded with the County Clerk of Rockland County (the "**County Clerk**") in the original principal amount of $22,000,000.00.

{01312538;4}

**SCHEDULE A-2**

EXISTING KINGS COUNTY MORTGAGES

1.      Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

        Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.     Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.     Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

        Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.     Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

        Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgagee dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08.

3A.     Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates

{01312538;4}

LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

3B.     Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

3C.     Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

3D.     Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN 2010000139922.

The lien of the consolidated mortgage identified in 3A above was thereafter spread to Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North 14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of $400,000.00.

4A.     Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single consolidated lien in the amount of $2,900,000.00.

4B.     Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November 27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.     Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming a single consolidated lien in the amount of $2,900,000.00.

{01312538;4}

6.       Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement given by North 14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00

The above Mortgages 1, 2, 3, 4, 5 and 6, were further assigned pursuant to that certain Assignment of Mortgage from TD Bank, N.A., a national banking association, as assignor to CPIF Lending, LLC, a Washington limited liability company, as assignee dated September 6, 2017 and intended to be recorded in the Register's Office, with a current unpaid principal balance of $4,839,369.06.

7.       Gap Mortgage made by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office in the original principal amount of $6,160,630.94.

7A.       Which Mortgages 1, 2, 3, 4, 5, 6 and 7 were amended, restated and consolidated by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office forming a single lien in the amount of $11,000,000.00.

Which lien of the consolidate mortgage identified in 7A above, was thereafter spread to Block 1, Lot 1 and Lot 31 located in the City of Suffern, County of Rockland, New York by Spreader Agreement by and among North 14th Street Realty Associates, Suffern Partners LLC and CPIF Lending, LLC dated September 6, 2017 and intended to be recorded with the County Clerk (as hereinafter defined).

{01312538;4}

## SCHEDULE B-1

### EXISTING ROCKLAND COUNTY NOTES

1. Promissory Note made by Suffern Partners LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $22,000,000.00.

## SCHEDULE B-2

### EXISTING KINGS COUNTY NOTES

1.      Mortgage Note made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., in favor of Simplex Inc., dated August 20, 2001 in the original principal amount of $499,980.00.

2.      Replacement Promissory Note made by North 14th Street Realty Associates LLC, to Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $500,020.00.

3.      Consolidated Secured Mortgage Note made by North 14th Street Realty Associates LLC in favor of Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $1,000,000.00.

4.      Gap Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC dated October 9, 2007 in the original principal amount of $1,579,716.08.

5.      Consolidated Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC, dated October 9, 2007 in the original principal amount of $2,500,000.00.

6.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $400,000.00.

7.      Amended and Restated Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $2,900,000.00.

8.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $122,229.95.

9.      Consolidated Mortgage Loan Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $2,900,000.00

10.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated April 8, 2016 in the original principal amount of $2,345,109.58.

11.      Consolidated Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A., dated April 8, 2016 in the original principal amount of $5,000,000.00.

12.      Gap Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company, dated September 6, 2017 in the original principal amount of $6,160,630.94.

{01312538;4}

13.    Amended, Restated and Consolidated Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $11,000,000.00.

# 255 AFFIDAVIT

## (Amended, Restated and Consolidated Mortgage)

STATE OF NEW YORK    )
                             : ss.:
COUNTY OF SULLIVAN    )

The undersigned, collectively, the borrower hereunder ("**Mortgagor**"), being duly sworn, deposes and says that he is familiar with the following facts:

1.    That the mortgages set forth on EXHIBIT "A" hereto securing the aggregate principal amount of **$33,000,000.00** owned or held by **CPIF LENDING, LLC**, a Washington limited liability company ("**Mortgagee**"), were duly recorded as set forth in EXHIBIT "A", and that all mortgage recording tax payable thereon has been paid.

2.    That an Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Mortgage**"), dated as of September 6, 2017 by and between Mortgagor and Mortgagee is being tendered herewith for recording in the Office of the City Register, County of Kings and in the Office of the County Clerk, County of Rockland, State of New York and that no mortgage recording tax is payable thereon.

3.    That the Mortgage herewith submitted for recording does not create or secure any new or further indebtedness other than the principal indebtedness or obligation secured by, or which under any contingency may be secured by the mortgages described in Paragraph 1 hereof.

4.    That this affidavit is being made pursuant to Section 255 of the Tax Law of the State of New York for the purpose of claiming exemption from any additional tax on recording of the Mortgage being submitted herewith.

## [NO FURTHER TEXT ON THIS PAGE]

{01313790;1}

MORTGAGOR:

**SUFFERN PARTNERS LLC**, a
New York limited liability company

By:   **RSOM CORP.,** a
      New York corporation, its Managing Member

By: _Goldie Reisman_
Name:      Goldie Reisman
Title:      President

Sworn to before me this
3 1 day of August, 2017

NOTARY PUBLIC

ELISHEVA BASCH
Notary Public State of NY
No. 01BA3055777
Qualified in Kings County
Comm. Expires 3/5/20___

MORTGAGOR:

**NORTH 14TH STREET REALTY ASSOCIATES LLC,** a
New York limited liability company

By: _Goldie Reisman_
Name:      Goldie Reisman
Title:      Managing Member

Sworn to before me this
8 1 day of August, 2017

NOTARY PUBLIC

ELISHEVA BASCH
Notary Public State of NY
No. 01BA3055777
Qualified in Kings County
Comm. Expires 3/5/20___

Novartis Campus – Loan No. 330161456

## EXHIBIT "A"

### (Schedule of Mortgages)

## MORTGAGE A – AS TO KINGS COUNTY PROPERTY

1.      Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.    Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.    Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.    Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgagee dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08

3A.    Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

3B.    Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

3C.    Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

3D.    Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN 2010000139922.

The lien of the consolidated mortgage identified in 3A above was thereafter spread to Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North 14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of $400,000.00.

4A.    Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single consolidated lien in the amount of $2,900,000.00.

4B.    Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November 27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.    Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming a single consolidated lien in the amount of $2,900,000.00.

6.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement given by North 14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18,

2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00

The above Mortgages 1, 2, 3, 4, 5 and 6, were further assigned pursuant to that certain Assignment of Mortgage from TD Bank, N.A., a national banking association, as assignor to CPIF Lending, LLC, a Washington limited liability company, as assignee dated September 6, 2017 and intended to be recorded in the Register's Office, with a current unpaid principal balance of $4,839,369.06.

7.      Gap Mortgage made by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office in the original principal amount of $6,160,630.94.

7A.     Which Mortgages 1, 2, 3, 4, 5, 6 and 7 were amended, restated and consolidated by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office forming a single lien in the amount of $11,000,000.00.

Which lien of the consolidate mortgage identified in 7A above, was thereafter spread to Block 1, Lot 1 and Lot 31 located in the City of Suffern, County of Rockland, New York by Spreader Agreement by and among North 14th Street Realty Associates, Suffern Partners LLC and CPIF Lending, LLC dated September 6, 2017 and intended to be recorded with the County Clerk (as hereinafter defined.)

## MORTGAGE B – AS TO ROCKLAND COUNTY PROPERTY

1.      Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Suffern Partners LLC, as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded with the County Clerk of Rockland County (the "**County Clerk**") in the original principal amount of $22,000,000.00.

## CONSOLIDATION OF MORTGAGES A AND B

Which above MORTGAGE A and MORTGAGE B, were consolidated, amended and restated pursuant to that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing by Suffern Partners LLC and North 14th Street Realty Associates LLC, collectively as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office and with the County Clerk forming a single consolidated lien in the amount of $33,000,000.00

# **<u>EXHIBIT C</u>**

# CASSIN & CASSIN LLP

711 THIRD AVENUE
NEW YORK, NEW YORK 10017

————

212-972-6161

———

CASSINLLP.COM

September 22, 2017

<u>**VIA FEDERAL EXPRESS (718) 650-6090**</u>

Law Offices of David Fleischmann P.C.
2233 Nostrand Avenue, 3rd Floor
Brooklyn, New York 11210
Email address: David@dfleischmann.com

> Re:   **CPIF LENDING, LLC**, a
>  Washington limited liability company ("**Lender**") with
>  **SUFFERN PARTNERS LLC**, a
>  New York limited liability company and
>  **NORTH 14TH STREET REALTY ASSOCIATES LLC**, a
>  New York limited liability company (collectively, "**Borrower**")
>  Novartis Pharmaceutical Campus
>  25 Old Mill Road, Suffern, New York, 19 Hemion Road, Montebello, New York,
>  Route 59, Suffern, New York 10901 and
>  200 North 14th Street a/k/a 2 Berry Street, Brooklyn, New York 11249 and
>  4-6 Berry Street, Brooklyn, New York 11249
>  **$33,000,000.00** Commercial Mortgage Loan (the "**Loan**")

Dear David:

I enclose herewith the following original loan documents (unless otherwise noted) with regard to the above-referenced loan which closed on September 6, 2017:

1.  Copy of Gap Promissory Note in the amount of $6,160,630.94 (Kings County Borrower);

2.  Duplicate original Gap Mortgage (Kings County Property) (original sent for recording);

3.  Copy of Amended, Restated and Consolidated Promissory Note in the amount of $11,000,000.00 (Kings County Borrower);

4.  Duplicate original Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing with 255 Affidavit (Kings County Property) (original sent for recording);

5.  Copies of UCC-1 Financing Statements (County and State) (Kings County Property) (originals sent for recording);

6.  Copy of Promissory Note in the amount of $22,000,000.00 (Rockland County Borrower);

7.  Duplicate original Mortgage, Assignment of Leases and Rents, Security Agreement and

CASSIN & CASSIN LLP

Law Offices of David Fleischmann P.C.
September 22, 2017
Page 2

        Fixture Filing (Rockland County Property) (original sent for recording);

8.     Copies of UCC-1 Financing Statements (County and State) (Rockland County Property) (originals sent for recording);

9.     Duplicate original Spreader Agreement with 255 Affidavit;

10.     Copy of Amended, Restated and Consolidated Promissory Note in the amount of **$33,000,000.00** (both Borrowers);

11.     Loan Agreement;

12.     Duplicate original Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing with 255 Affidavit (both Properties) (original sent for recording);

13.     Duplicate original Assignment of Leases and Rents with 255 Affidavit (original sent for recording);

14.     Copies of UCC-1 Financing Statements (New York Secretary of State and Rockland/Kings County, New York Filings (originals sent for recording);

15.     Pledge and Security Agreement including Acknowledgment of Agreement of Limited Liability Company attached (Rockland County Borrower);

16.     Copies of two (2) Certificates for Limited Liability Company Interests in Suffern Partners LLC;

17.     Copy of UCC-1 Financing Statement (New York Secretary of State) (Pledge) (Goldie Reisman and RSOM Corp) (original sent for recording);

18.     Pledge and Security Agreement including Acknowledgment of Agreement of Limited Liability Company attached (Kings County Borrower);

19.     Copies of two (2) Certificates for Limited Liability Company Interests in North 14th Street Realty Associates LLC;

20.     Copy of UCC-1 Financing Statement (New York Secretary of State) (Pledge) (Goldie Reisman and Mozes Reisman) (original sent for recording);

21.     Guaranty Agreement;

22.     Payment and Carry Guaranty Agreement;

23.     Environmental Indemnity Agreement;

24.     Lockbox – Deposit Account Control Agreement (KeyBank National Association);

25.     Borrower's Certificate (Rockland County Borrower);

26.     Copy of Certificate of Independent Director (Rockland County Borrower);

27.     Borrower's Certificate (Kings County Borrower);

28.     Copy of Certificate of Independent Director (Kings County Borrower);

29.     Assignment of Agreements, Licenses, Permits and Contracts;

30.     Borrower's Affidavit (Recycled Entity) (Kings County Borrower);

{01308714;3}

CASSIN & CASSIN LLP

Law Offices of David Fleischmann P.C.
September 22, 2017
Page 2

31.    Security Agreement;

32.    Post Closing Agreement;

33.    Form W-9 (Rockland County Borrower);

34.    Form W-9 (Kings County Borrower); and

35.    Copy of Closing Escrow Agreement including settlement statement and final pro-forma
       title no. RANY-27660 of Old Republic National Title Insurance Company.

Should you have any questions, please do not hesitate to contact me at (212) 798-0165.

Very truly yours,

Jennifer Maldonado
Legal Assistant

Enclosures

# <u>EXHIBIT D</u>

# CASSIN & CASSIN LLP

711 THIRD AVENUE
NEW YORK, NEW YORK 10017

———

212-972-6161

———

CASSINLLP.COM

## <u>CLOSING ESCROW AGREEMENT</u>

September 1, 2017

**BY ELECTRONIC MAIL**

Riverside Abstract, LLC, as authorized agent of
Old Republic National Title Insurance Company ("**Escrow Agent**")
3839 Flatlands Avenue, Suite 208
Brooklyn, New York
Attention: Asher Rendler
Telephone No.: 718-252-4200
Facsimile No.: <u>718-252-4226</u>
E-Mail: arendler@rsabstract.com

Re:   Riverside Abstract, LLC Commitment No. RSANY-27660 dated August 17, 2017 (the "**Commitment**"); with respect to a certain **$33,000,000.00** mortgage loan (the "**Loan**") to be made by **CPIF LENDING, LLC**, a Washington limited liability company ("**Lender**") to **SUFFERN PARTNERS LLC**, a New York limited liability company ("**Rockland County Borrower**") and **NORTH 14TH STREET REALTY ASSOCIATES LLC**, a New York limited liability company ("**Kings County Borrower**"; together with Rockland County Borrower, jointly and severally, as co-borrowers, individually and collectively (as the context may require), and together with their permitted successors and assigns shall hereinafter be referred to as "**Borrower**" or "**Borrowers**"), with respect to property located at 25 Old Mill Road, Suffern, New York 10901, 19 Hemion Road, Montebello, New York 10901 and Route 59, Suffern, New York 10901 (the "**Rockland County Property**") and 200 North 14th Street, Brooklyn, New York 11249 and 4-6 Berry Street, Brooklyn, New York 11249 (the "**Kings County Property**"; together with the Rockland County Property, individually and collectively and as more particularly described on Exhibit A of the Commitment shall be referred to as the "**Property**")

Ladies and Gentlemen:

This letter (this "**Agreement**") shall constitute an escrow agreement and an agreement to issue the Policy (as hereinafter defined) among Lender, Borrower and Escrow Agent in connection with the Loan.

1.   <u>Delivery of Documents</u>. Each of the following documents relating to the closing of the Loan (collectively, the "**Documents for Recordation**") have been previously or will be delivered to Escrow Agent under separate cover, all of which are undated, fully executed, completed (except to the extent required to be completed by Escrow Agent pursuant to the express terms of this Agreement) and where appropriate, acknowledged:

CASSIN & CASSIN LLP

A.    One (1) deed or similar conveyance deed executed by seller, in favor of Borrower conveying fee simple title to the Property to Borrower (the "**Deed**");

B.    GAP Mortgage given by Kings County Borrower to Lender to be recorded with the Kings County Recorder's Office (the "**GAP Mortgage**"

C.    Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by Kings County Borrower to Lender, together with two (2) 255 Affidavits to be recorded with the Kings County Recorder's Office (the "**Kings County Mortgage**";

D.    Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by Rockland County Borrower to Lender to be recorded with the Rockland County Recorder's Office (the "**Rockland County Mortgage**");

E.    Spreader Agreement given by Kings County Borrower and Rockland County Borrower in favor of Lender, together with two (2) 255 Affidavits, to be recorded with the Rockland County Recorder's Office (the "**Spreader Agreement**");

F.    Two (2) Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by each Borrower to Lender, together with four (4) 255 Affidavits, one to be recorded with the Rockland County Recorder's Office and one to be recorded with the Kings County Recorder's Office (collectively, the "**Consolidated Mortgage**");

G.    Two (2) Assignment of Leases and Rents given by each Borrower to Lender, together with four (4) 255 Affidavits, one to be recorded with the Rockland County Recorder's Office and one to be recorded with the Kings County Recorder's Office (collectively, the "**Assignment of Leases**"); and

H.    Two (2) UCC-1 Fixture Filings showing each Borrower, as debtor, and Lender, as secured party, one to be recorded with the Rockland County Recorder's Office and one to be recorded with the Kings County Recorder's Office (collectively, the "**UCC**").

*Please be advised that one (1) Personalty UCC-1 Financing Statement showing each Borrower, collectively, as debtor, and Lender, as secured party will be filed with the Office of the Secretary of State, State of New York, by UCC Direct Services.*

*Please be advised that one (1) Pledge UCC-1 Financing Statement showing the Kings County Borrower, as debtor, and Lender, as secured party with be filed with the Office of the Secretary of State, State of New York, by UCC Direct Services.*

{01308709;5}

CASSIN & CASSIN LLP

*Please be advised that one (1) Pledge UCC-1 Financing Statement showing the Rockland County Borrower, as debtor, and Lender, as secured party with be filed with the Office of the Secretary of State, State of New York, by UCC Direct Services.*

Concurrently with the funding of the Loan and the satisfaction of the Closing Conditions (as hereinafter defined) (the "**Closing**"), Escrow Agent shall take possession of all of the Documents for Recordation and deliver them in accordance with the provisions of this Agreement.

2.      <u>Conditions to Closing</u>.   The following are Lender's conditions to closing the Loan (collectively, the "**Closing Conditions**"):

A.      Escrow Agent has received a final, completed copy of the mortgage loan closing statement (the "**Closing Statement**"), as confirmed by Scott Schneider, of Lender, which Escrow Agent shall attach hereto as <u>Exhibit A</u> hereto.

B.      With respect to the Kings County Property, Escrow Agent shall have received all other documents necessary to record and/or file, as the case may be, the applicable Documents for Recordation, including, without limitation, assignment documents of the existing mortgages in recordable form, any releases of liens necessary to issue the Policy and the undersigned shall have received copies of the underlying notes and mortgages set forth on <u>Schedule 1</u> attached hereto and made a part hereof (the "**Underlying Notes and Mortgages**").

C.      Escrow Agent (i) has received by wire transfer the amount of loan funds (the "**Loan Funds**") indicated on the Closing Statement attached hereto as <u>Exhibit A</u>, (ii) has received from Borrower the balance, if any, of funds sufficient to cover all costs, expenses, entitlements and disbursements set forth on said Closing Statement (the "**Borrower Funds**"), (iii) has sufficient funds that may be required pursuant to Paragraph 7 hereof, if applicable, and (iv) is prepared immediately to disburse said funds in accordance with the Closing Statement.

D.      Escrow Agent is unconditionally and irrevocably committed to issue to Lender an ALTA Loan Policy of Title Insurance with respect to the property described in Exhibit A of the Commitment (the "**Policy**"), which Policy:

(1)      shall be effective as of the date and time of the Closing;

(2)      shall show the named insured as "CPIF Lending, LLC, a Washington limited liability company, its successors and assigns;"

(3)      shall provide coverage in the amount of the Loan;

(4)      shall show title to the fee interest in the Property vested in the applicable Borrower;

CASSIN & CASSIN LLP

(5)    shall contain a legal description identical to the legal description *attached to the Mortgage* as Exhibit A thereto;

(6)    shall insure the Consolidated Mortgage to be a valid first lien on each Property pursuant to the pro forma policy attached hereto as Exhibit B (the "**Pro-Forma Policy**");

(7)    shall incorporate all handwritten changes, if any, marked on the Pro-Forma Policy attached hereto as Exhibit B, to which Escrow Agent and Lender have agreed and all of the endorsements attached to the Pro-Forma Policy with all blanks completed and all corrections made as indicated; and

(8)    shall reference all Documents for Recordation either in Schedule A or as subordinate items in Part 2 of Schedule B.

Each page of the Policy and each endorsement attached thereto must reflect the correct Policy Number.  Further, each endorsement to the Policy must be signed and dated.

E.    Escrow Agent is unconditionally prepared to follow the instructions set forth in Paragraph 3 below.

F.    Escrow Agent has received written or telephonic authorization to carry out the instructions set forth in Paragraph 3 below from the following individuals:

(1)    on behalf of Lender:  either Dax Scharfstein, Esq. or William Cassin, Esq. of Cassin & Cassin LLP, Scott Schneider of Lender (collectively, the "**Lender Notice Parties**"); and

(2)    on behalf of Borrower: Goldie Reisman or David Fleischmann, Esq., Esq. of Borrower (collectively, the "**Borrower Notice Parties**").

3.    Closing. (a) Escrow Agent's Closing Obligations. Unless otherwise instructed by any of the persons listed in Paragraph 2.F.(1) above, when all of the foregoing Closing Conditions have been fully met, Escrow Agent shall, in the following order:

A.    date each of the Documents for Recordation the date of the Closing and funding of the Loan, fill in any other blanks in the Documents for Recordation and attach any exhibits to the Documents for Recordation, all as instructed by the Lender Notice Parties; and then

B.    disburse the Loan Funds and the Borrower Funds in the manner specified in the Closing Statement; and then

C.    as a Gap Closing is hereby authorized, record and/or file with the Rockland County Recorder's Office and with the Kings County Recorder's Office, the Deed for the Rockland County Property, the Gap

CASSIN & CASSIN LLP

Mortgage, the Kings County Mortgage, the Rockland County Mortgage, the Spreader Agreement, each Consolidated Mortgage, each Assignment of Leases, and each UCC (marked for the applicable county recording), in such records in that order; and then

D.    give the confirmation required in Paragraph 4 hereof;

E.    and then (but not later than thirty (30) days after disbursing the Loan Funds and the Borrower Funds), deliver the Policy. The Policy should be sent via overnight courier to:

Dax Scharfstein, Esq.
Cassin & Cassin LLP
711 Third Avenue, 20th Floor
New York, New York 10017

Escrow Agent's recordation of any of the Documents for Recordation or disbursement of any funds delivered to Escrow Agent hereunder shall constitute Escrow Agent's unqualified, unconditional and irrevocable agreement to issue the Policy as set forth herein. All title insurance premiums, recording fees, escrow fees, real estate, mortgage, recordation and transfer taxes and other closing costs are to be paid by Borrower, and Escrow Agent's disbursement of any funds delivered to Escrow Agent hereunder shall evidence Escrow Agent's receipt of all such premiums, fees and other costs. Promptly after the Closing, Escrow Agent agrees to file as and when required by law any Form 1099 necessitated by the consummation of the Loan.

(b)    Recording Information. The Escrow Agent will undertake to obtain the actual recorded copies of the Documents for Recordation at the time of recordation or, if unavailable, the recording information for the Documents for Recordation. Such recorded Documents for Recordation or recording information (to be set forth on the form attached hereto as Exhibit D-1 and Exhibit D-2) shall be forwarded to the attention of Dax Scharfstein, Esq. at Cassin & Cassin LLP within two (2) days after receipt by the Escrow Agent. If such information is not obtainable at the time of recordation, you shall deliver to Dax Scharfstein, Esq. of Cassin & Cassin LLP the recorded Documents for Recordation within two (2) days after your actual receipt thereof and the recording information (on the form attached hereto as Exhibit D-1 and Exhibit D-2) no later than thirty (30) days after the date of the Closing.

(c)    Gap Closing. If all of the Closing Conditions are otherwise satisfied, but Escrow Agent shall not be able to record or file the Documents for Recordation as set forth above prior to the time indicated by (or on behalf of) Borrower and Lender as the desired time for the Closing, any of the Lender Notice Parties may authorize Escrow Agent to cause the Closing to occur by disbursing the Loan Funds and the Borrower Funds in the manner specified in the Closing Statement notwithstanding the fact that the Documents for Recordation have not been recorded or filed (such a closing, a "**Gap Closing**"); provided that Escrow Agent shall issue the Policy to be effective as of the date and time of such Gap Closing (and shall re-date the Policy upon the recording of the Mortgage as of the date of the recording of the Mortgage). In order for Escrow Agent to issue title insurance covering the period between the Gap Closing and the time the Mortgage is recorded, Borrower hereby agrees to execute and deliver to Escrow Agent any affidavit or indemnity reasonably requested by Escrow Agent for such purpose. If a Gap Closing shall be authorized as provided herein, Escrow Agent shall cause the Documents for Recordation to be recorded and filed as provided in Paragraphs 3(a)C. above as soon as possible thereafter but in no event later than three (3) business days following the Gap Closing.

{01308709;5}

CASSIN & CASSIN LLP

(d)  **IF A PROBLEM ARISES.**  ESCROW AGENT SHALL IMMEDIATELY CONTACT ONE OF EACH OF THE LENDER NOTICE PARTIES AND THE BORROWER NOTICE PARTIES IF, FOLLOWING ESCROW AGENT'S RECEIPT OF THE AUTHORIZATION DESCRIBED IN PARAGRAPH 3 ABOVE, ESCROW AGENT CANNOT COMPLY WITH ANY OF THE FOREGOING INSTRUCTIONS. FURTHERMORE, IF AFTER BEING ADVISED THAT A WIRE TRANSFER OF FUNDS TO THE ESCROW AGENT HAS BEEN MADE BY LENDER, ESCROW AGENT HAS NOT RECEIVED SUCH WIRED FUNDS WITHIN ONE HOUR THEREAFTER, ESCROW AGENT WILL IMMEDIATELY CONTACT A LENDER NOTICE PARTY.

(e)  Investment of Funds.  If, for any reason, Loan Funds are invested by Escrow Agent prior to the Closing, Loan Funds shall be invested pursuant to written investment instructions executed by Lender and delivered to Escrow Agent together with an executed Form W-9.  All income from the investment of Loan Funds will be promptly paid to Lender following the Closing (or, if the Loan does not close, such income will be paid to Lender together with the return of the Loan Funds); provided that such income shall be credited against the interest payable by Borrower pursuant to Paragraph 6 below.  All income from the investment of Borrower Funds (after deducting any disbursements and closing costs required to be paid by Borrower), will be for the account of Borrower and promptly paid to Borrower following the Closing (or, if the Loan does not close, such income will be paid to Borrower together with the return of the Borrower Funds).

4.  Confirmation.  Immediately after the occurrence of the events set forth in Paragraphs 3(a)A through 3(a)D above, Escrow Agent shall email or telecopy written confirmation that the Closing has occurred to one of each of the Lender Notice Parties and the Borrower Notice Parties, which written confirmation shall set forth the date and time of recording of the Documents for Recordation and, if available, the recording information of each Document for Recordation.  If the recording information is not immediately available, Escrow Agent shall deliver such information in accordance with Paragraph 3(b) hereof.  In addition, within two (2) Business Days following Closing, the Escrow Agent shall telecopy to Lender Notice Parties, a copy of all checks or confirmation of wire transfers evidencing the disbursement of funds in accordance with the terms and conditions of this Agreement.

5.  Return of Documents.  The original Documents for Recordation are to be returned after the recording thereof via overnight courier to:

> Dax Scharfstein, Esq.
> Cassin & Cassin LLP
> 711 Third Avenue, 20th Floor
> New York, New York 10017

6.  Interest.  By its execution of this Agreement below, Borrower agrees that, from and after the date upon which the Loan Funds are placed on the wire by Lender (regardless of the actual date of the Closing), the full amount of the Loan thereupon shall be deemed to be disbursed to Borrower and evidenced by the Promissory Note executed by Borrower in evidence of the Loan (the "**Note**") and shall bear interest at the rate provided in the Note and the Loan Agreement (as defined in the Note); provided, however, that Borrower's obligations under the Note shall arise only when such funds are disbursed to or for the benefit of Borrower, and should the Loan fail to close for any reason, interest shall remain due and payable by Borrower as provided in the Note only through the date on which the Loan Funds are returned to Lender.

{01308709;5}

CASSIN & CASSIN LLP

7.    Real Property Taxes.  Escrow Agent will, prior to disbursing funds hereunder, make sure that there are no outstanding taxes or assessments which will not be paid off pursuant to the wiring instructions attached to the Closing Statement.  In addition, Escrow Agent will make sure that sufficient loan proceeds are held by the Escrow Agent for any taxes or assessments which, if not paid by Borrower within sixty (60) days after the closing, would result in a penalty, fine or interest being owed. Escrow Agent shall make such payment promptly on behalf of Borrower, and in any event prior to the time a penalty, fine or interest is incurred.  After such payment is made, any excess funds held for the purpose of making the aforesaid payment may be paid to Borrower.

8.    Escrowed Loan Documents.  Concurrently herewith, Borrower is delivering to Lender or its agents (which may include Lender's counsel or a custodian acting on its behalf) fully executed and where appropriate, acknowledged original counterparts of each of the documents listed on Exhibit C attached hereto, including, without limitation, duplicate original counterparts of each of the Documents for Recordation (collectively, the "**Loan Documents**").  The Loan Documents shall be held by Lender in escrow pending the Closing (Borrower acknowledges that while Lender is holding the Loan Documents in escrow, it may transfer possession thereof to its agents on its behalf).  The Loan Documents shall be deemed to be delivered from Borrower to Lender upon the Closing.  If the Closing shall not occur for any reason, Lender will return (or will cause to be returned) the Loan Documents to Borrower.

9.    Notices.  Except as otherwise expressly provided herein, any notice, consent, approval, request, demand, document or other communication which any party is required or may desire to give, deliver or make to any other party pursuant to this Agreement shall be in writing, and may be personally delivered or given or delivered by United States registered or certified mail, return receipt requested, by overnight delivery service (e.g., Federal Express), or by telecopied transmission addressed as follows:

Lender Notice Parties:

CPIF Lending, LLC
Fairview Avenue East, Suite 200
Seattle, Washington 98102
Attention: Billy Meyer
E-Mail:  billym@columbiapacific.com

Cassin & Cassin LLP
711 Third Avenue, 20th Floor
New York, New York 10017
Attention: Dax Scharfstein, Esq.
Telephone: (212) 798-0129
E-Mail: dscharfstein@cassinllp.com

Borrowers Notice Parties:

Suffern Partners LLC
202 Grandview Avenue
Monsey, New York 10950
Attention: Goldie Reisman
Email Address:  goldie.reisman.sterling@gmail.com

North 14th Street Realty Associates LLC

CASSIN & CASSIN LLP

202 Grandview Avenue
Monsey, New York 10950
Attention: Goldie Reisman
Email Address:  goldie.reisman.sterling@gmail.com

With a copy to:

Law Offices of David Fleischmann P.C.
2233 Nostrand Avenue, 3rd Floor
Brooklyn, New York 11210
Attention: David Fleischmann, Esq.
Email: David@dfleischmann.com

Escrow Agent:

Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, New York 11234
Attention:  Asher Rendler
Telephone No.: 718-252-4200
Facsimile No.: 718-252-4226
E-Mail: arendler@rsabstract.com

Any party may designate a different address for itself by notice similarly given.  Any notice, demand or document shall be deemed to have been given upon actual delivery or attempted delivery, provided such attempted delivery is made on a business day.  Notices hereunder may be given by an attorney for a party hereto.

10.    Amendments.  This Agreement may not be changed, modified, supplemented or terminated, nor may any of the obligations of Lender, Borrower or Escrow Agent hereunder be waived, except by an instrument executed by the party hereto which is or will be affected by the terms of such instrument.

11.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

12.    Governing Law.  This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York and without the aid of any canon, custom or rule of law requiring construction against the party causing this Agreement to be drafted.

13.    Duties of Escrow Agent.  Escrow Agent agrees to act in good faith in accordance with the terms of this Agreement. If Escrow Agent shall receive any notice from any party hereto objecting to the disposition of any of the documents, funds or other property escrowed pursuant to this Agreement, unless it shall receive written instructions to the contrary executed by Lender and Borrower, Escrow Agent shall return all such documents, funds (as to any funds, Escrow Agent shall have no liability or responsibility for any lost interest or penalty for early withdrawal) and other escrowed property to the party who delivered such to Escrow Agent, whereupon Escrow Agent's obligations as escrow agent hereunder shall be deemed fulfilled and Escrow Agent thereupon shall have no further obligations to any other party.  Escrow Agent shall not be liable hereunder for any error in judgment,

{01308709;5}

CASSIN & CASSIN LLP

mistake of fact or law or act done or omitted in good faith, except to the extent of Escrow Agent's gross negligence or willful misconduct.

14.   <u>Wire Transfers</u>. Escrow Agent will receive by wire transfer the Loan Funds, and Escrow Agent will receive from Borrower the Borrower Funds, if any.   Each such wire transfer will be effectuated in accordance with the wiring instructions incorporated in the Closing Statement.   Provided Escrow Agent initiates each of the wire transfers contemplated by the Closing Statement (and described in the endnotes thereto) in accordance with this Agreement and the Closing Statement, Escrow Agent shall not be liable for any act or omission of any other financial institution or other person or entity in connection with such wire transfers, nor shall Escrow Agent have any liability for any loss of funds or interest thereon, including, without limitation, special, consequential, indirect or incidental damages, regardless of whether any such claim is based on contract or tort or whether the likelihood of such damage was known to Escrow Agent.   In no event shall damages exceed interest at a rate equal to the Federal Funds rate, adjusted daily, for the number of days that such funds are unavailable. Borrower shall indemnify and hold harmless Escrow Agent, its successors or assigns, from any loss, liability and cost incurred as a result of any incorrect information supplied in connection with such wire transfers.

[Remainder of Page Intentionally Blank]

{01308709;5}

CASSIN & CASSIN LLP

Please acknowledge Escrow Agent's receipt of the Documents for Recordation and confirm Escrow Agent's agreement to comply with the foregoing instructions by signing the attached copy of this Agreement in the space provided below and returning it to me.

Very truly yours,

Cassin & Cassin LLP, as Counsel for Lender
on behalf of Lender

By: _____
Dax Scharfstein

AGREED TO AND ACCEPTED:

ESCROW AGENT:

**RIVERSIDE ABSTRACT, LLC**

By:_____
Name:  Asher Rendler
Title:

Please acknowledge Escrow Agent's receipt of the Documents for Recordation and confirm Escrow Agent's agreement to comply with the foregoing instructions by signing the attached copy of this Agreement in the space provided below and returning it to me.

Very truly yours,

Cassin & Cassin LLP, as Counsel for Lender
  on behalf of Lender

By: _____
    Dax Scharfstein

AGREED TO AND ACCEPTED:

ESCROW AGENT:

**RIVERSIDE ABSTRACT, LLC**

By: _____
Name: Asher Rendler   ELLIOT ____
Title:   CONNOR

CASSIN & CASSIN LLP

*[Signatures continued from previous page]*

**BORROWER:**

**SUFFERN PARTNERS LLC,** a
New York limited liability company

By:   **RSOM CORP.,** a
      New York corporation, its Managing Member

By: _____
Name:        Goldie Reisman
Title:        President


**NORTH 14TH STREET REALTY ASSOCIATES LLC,** a
New York limited liability company

By: _____
Name:        Goldie Reisman
Title:        Managing Member

CASSIN & CASSIN LLP

## EXHIBIT A

**Mortgage Loan Closing Statement**

**RIVERSIDE ABSTRACT**
(Lexington Tower)
212 Second Street, Suite 502
Lakewood, New Jersey 08701
Telephone: (718) 252-4200 Fax: (718) 252-4226

| File No. | RANY-27660 | | |
|---|---|---|---|
| Premises | Parcel I: 25 Old Mill Road | | |
| | Parcel II: 19 Hemion Road | | |
| | Parcel III: Route 59 | | |
| | 200 North 14th Street | | |
| | 4-6  Berry Street | | |
| Sellers | RS Old Mill, LLC | Purchaser | Suffern Partners LLC |
| Seller Counsel | Cohen, LaBarbera & Landrigan LLP | Purchaser Counsel | Law Offices of David Fleischmann P.C. |
| Lender | CPIF LENDING, LLC & W Financial Fund, LP | | |
| Lender Counsel | Cassin & Cassin LLP | | |
| Closing Date | September 6, 2017 | | |

### SETTLEMENT STATEMENT

| Transaction Summary | Contract Price | $ | 30,000,000.00 | |
|---|---|---|---|---|
| | | | | |
| | Down Payment | | | |
| | Equity Received By Seller | $ | 12,500,000.00 | |
| Loan | New Loan Amount | $ | 33,000,000.00 | |
| | | | | |
| Loan Related Fees | | | | |
| | Lender Origination Fee | $ | 660,000.00 | |
| | Environmental Insurance Cost | $ | - | |
| | Reserve TILC | $ | 2,500,000.00 | |
| | Reserve Capital Expenditure | $ | 1,000,000.00 | |
| | Reserve Real Estate Taxes | $ | 375,000.00 | |
| | Reserve Insurance | $ | | |
| | Reserve Interest | | $2,487,833.33 | |
| | Stub Interest | | $262,166.67 | |
| | Lender Due Diligence Expense | $ | 11,000.00 | |
| | Borrower Deposit | $ | (95,000.00) | |
| | | | - | |
| | Total Retained Funds | $ | 7,201,000.00 | |
| | | | | |
| | Net Wire to Title | $ | 25,799,000.00 | |

| | Description | Payee | Paid by Purchaser | Paid by Seller |
|---|---|---|---|---|
| Closing Adjustments | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Payoffs | | | | |
| | | TD Bank | $   4,858,054.29 | | Good Through 09/06/2017 |
| | | | | |
| Miscellaneous Charges | | | | |
| | Title Fees | Riverside Abstract | $   1,338,936.72 | $   149,298.72 |
| | ECBs | Riverside Abstract | | $   97,500.00 |
| | Closer | Alan Hirsch | | $   750.00 |
| | | Key Bank, National Association | $   750.00 | |
| | Borrower Legal Fees | Law Offices of David Fleischmann, P.C. | $   40,000.00 | |
| | | Reiss Sheppe LLP | $   48,500.00 | |
| | | Watermark Associates Broker Fee | $281,714.11 | $   48,285.89 |
| | Environmental Insurance Cost | IM Insurance Brokerage Inc | $   503,864.42 | |
| | Boiler & Machinery Incl Trial Tax/ Fee | IM Insurance Brokerage Inc | $   9,283.00 | |
| | Liability Incl Trial/ Tax / Fee | IM Insurance Brokerage Inc | $   20,565.00 | |
| | Property Incl Trial/ Tax/ Fee | IM Insurance Brokerage Inc | $   258,725.79 | |
| | Umbrella Incl Trial/ Tax/ Fee | IM Insurance Brokerage Inc | $   25,400.00 | |
| | | IM Insurance Brokerage Inc Credit | $   (130,000.00) | |
| | | Casssin & Cassin | $   125,000.00 | |
| | | Law Office Of Shaul C. Greenwald, Esq. | $   25,000.00 | |
| | | Corporation Service Company | $   4,000.00 | |
| | | Elie Basch | $   400.00 | |
| | | Vcorp Services, LLC | $   390.00 | |
| | | Bridgewater Capital Partners LLC | $   56,250.00 | |
| | | Bridgewater Capital Partners LLC | $   70,000.00 | |
| | | Commonwealth Land Title | | $   15,940,324.51 |
| | | Cohen, LaBarbera & Landrigan, LLP | | $   13,763,840.88 |
| TOTAL SETTLEMENT CHARGES PAID: | | | $   7,536,833.33 | $   30,000,000.00 |
| NET AMOUNT DUE FROM PURCHASER: | | | $   (762,166.67) | |
| NET PROCEEDS TO SELLER DISBURSED AS BELOW: | | | | $   - |

9/15/2017 11:44 AM

CASSIN & CASSIN LLP

## **EXHIBIT B**

**Marked Pro-Forma Policy**

**Riverside Abstract, LLC**
as Agent for
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE A**

<u>Name and Address of Title Insurance Company:</u>
**Old Republic National Title Insurance Company**
**400 Post Avenue, Suite 310**
**Westbury, NY 11590**

Title No.:  **RANY-27660**
Policy No.:  **PROFORMA**

Address Reference:   **Parcel I: 25 Old Mill Road, Suffern, NY**
**Parcel II: 19 Hemion Road, Montebello, NY 10901**
**Parcel III: Route 59, Suffern, NY 10901**
**Parcel IV: 200 North 14th Street Brooklyn, NY**
**Parcel IV: 4-6 Berry Street, Brooklyn, NY**

Amount of Insurance: **$33,000,000.00**

Date of Policy:   **Date of closing**

1.     Name of Insured:

**CPIF LENDING, LLC, a Washington limited liability company, its successors and assigns as they may appear**

2.     The estate or interest in the land which is encumbered by the insured mortgage is:

Fee Simple

3.     Title to the estate or interest in the land is vested in:

**As to Parcels I-III: Suffern Partners LLC, a New York limited liability company**
**As to Parcels IV-V:**
**North 14th Street Realty Associates LLC, a New York limited liability company**

4.     The insured mortgage and assignments thereof, if any, are described as follows:

**See Mortgage Schedule attached hereto and made a part hereof.**

5.     The land referred to in this Policy is described as follows:

**See Schedule A Description, attached hereto and made a part hereof.**

Issued by:
**Riverside Abstract, LLC**
3839 Flatlands Avenue, Suite 208, Brooklyn, NY 11234
T: 718-252-4200   F: 718-252-4226

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**LEGAL DESCRIPTION**

Title No.:   **RANY-27660**
Policy No.:   **PROFORMA**

<u>Parcels I-II:</u>
BEGINNING at a point in the westerly right-of-way of Hemion Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

## LOAN POLICY
## LEGAL DESCRIPTION

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF EGINNING.

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**LEGAL DESCRIPTION**

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel I: 25 Old Mill Road,
Suffern, NY 10901.

Designated as Section 55.06, Block 1, Lot 1, Rockland County, and also known as Parcel II: 19 Hemion Road,
Montebello, NY 10901.

**Parcel III**
ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo,
County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the
following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map
Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section
55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;
   a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
   b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of     BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;
   1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;
   2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly right-of-
way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09
feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;
   1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
   2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the     Southerly
right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00
feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel III: Route 59, Suffern,
NY 10901.

Loan Policy

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**LEGAL DESCRIPTION**

**Parcel IV:**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

Beginning at a corner formed by the intersection of the southerly side of North 14th Street with the westerly side of Berry Street;

RUNNING THENCE southerly along the westerly side of Berry Street, 24 feet 6 inches;

THENCE westerly parallel with North 14th Street and through a party wall, 99 feet 6 inches;

THENCE southerly parallel with Berry Street and through a party wall, 50 feet 6 inches;

THENCE westerly parallel with North 14th Street, 6 inches;

THENCE southerly parallel with Berry Street, 25 feet;

THENCE westerly parallel with North 14th Street, 125 feet;

THENCE northerly parallel with Berry Street, 100 feet to the southerly side of North 14th Street;

THENCE easterly along the southerly side of North 14th Street, 225 feet to place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 15, Kings County, and also known as 200 North 14th Street, Brooklyn, NY 11249.

**Parcel V:**

All that certain lot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northwesterly side of of Berry Street, distant 24 feet 6 inches southwesterly from the corner formed by the northwesterly side of Berry Street and the southwesterly side on North 14th Street;

RUNNING THENCE northwesterly parallel with North 14th Street and part of the distance through a party wall, 99 feet 6 inches;

THENCE southwesterly parallel with Berry Street and part of the distance through a party wall, 50 feet 6 inches;

THENCE southeasterly parallel with North 14th Street, 99 feet 6 inches to the northwesterly side of Berry Street; and

THENCE northeasterly along the northwesterly side of Berry Street, 50 feet 6 inches to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 24, Kings County, and also known as 4-6 Berry Street, Brooklyn, NY 11249.

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE B**
**Part I**
**EXCEPTIONS FROM COVERAGE**

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  All taxes for the year 2017 and subsequent years not yet due and payable

2.  Covenants, restrictions, easements, leases and agreements of record, etc., more fully set forth herein:
   **a. Covenants, Easements or Agreements of record set forth in Deed dated April 21, 1971** *otherwise disturbed* **in whole or in part made by Maurice J. Palizza, Inc. recorded May 3, 1971 in Liber 889, Page 588 (Affects Parcel II)**
   *Policy affirmatively insures the Insured that (i) there are no violations of the covenants and restrictions therein contained and that a future violation will not result in a forteiture or reversion of title and (ii) that there are no condition or right of re-entry under which the insured mortgage can be cut-off, subordinated or in part*

   **b. Grant of Right of Way dated September 25, 1968 made by Ge1irude Conklin recorded September 27, 1968 in Liber 849, Page 402 (Affects Parcel II)**
   *Policy affirmatively insures the Insured that (i) there are no violations of the covenants and restrictions therein contained and that a future violation will not result in a forteiture or reversion of title and (ii) that there are no condition or right of re-entry under which the insured mortgage can be cut-off, subordinated or in part*

   **c. Grant of Right of Way dated December 10, 1981 made by Ciba-Geigy Corporation recorded January 20, 1982 in Liber 1068, Page 181 (Affects Parcel III) and dated November 11, 1976 made by Ciba-Geigy Corporation recorded November 17, 1976 in Liber 984, Page 737 (Affects Parcel III), also dated April 7, 1969 made by Geigy Chemical Corporation recorded April 18, 1969 in Liber 858, Page 95 (Affects Parcels I-III)**
   *Policy affirmatively insures the Insured that (i) there are no violations of the covenants and restrictions therein contained and that a future violation will not result in a forteiture or reversion of title and (ii) that there are no condition or right of re-entry under which the insured mortgage can be cut-off, subordinated or in part*

   **d. (Affects Parcels I-III) Notices of Appropriation made under File Number 2951952 and recorded in**
   **(i) Liber 574, Page 81**
   Policy affirmatively insures the insured that no portion of the improvements lie within the affected area and an award in condemnation will not be reduced by reason there of
   **(ii) Liber 581, Page 581**
   Policy affirmatively insures the insured that no portion of the improvements lie within the affected area and an award in condemnation will not be reduced by reason there of
   **(iii) Liber 593, page 328**
   Policy affirmatively insures the insured that no portion of the improvements lie within the affected area

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE B**
**Part I**
**EXCEPTIONS FROM COVERAGE**

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

and an award in condemnation will not be reduced by reason there of
**(iv) Liber 616, Page 207**
Policy affirmatively insures the insured that no portion of the improvements lie within the affected area
and an award in condemnation will not be reduced by reason there of
*Policy affirmatively insures the Insured that (i) there are no violations of the covenants and
restrictions theren contained and that a future violation will not result in a forfeiture or reversion
of title and (ii) that there are no condition or right of re-entry under which the insured mortgage
can be cut-off, subordinated or in part*

**e. Sewer Agreement in Liber 4805 Cp 355 (Affects Parcels IV & V)**

*Policy affirmatively insures the Insured that (i) there are no violations of the covenants and
restrictions theren contained and that a future violation will not result in a forfeiture or reversion
of title and (ii) that there are no condition or right of re-entry under which the insured mortgage
can be cut-off, subordinated or in part*

**f. Use of drainage pipe set forth in deed in Liber 719, Page 987**

*Policy affirmatively insures the Insured that (i) there are no violations of the covenants and
restrictions theren contained and that a future violation will not result in a forfeiture or reversion
of title and (ii) that there are no condition or right of re-entry under which the insured mortgage
can be cut-off, subordinated or in part*

3.      **Parcels I and II, when taken together, and Parcel III are not contiguous parcels.** Policy will not insure
(a) access between Parcels I and II and Parcel III or (b) the right to use any lands
separating Parcels I and II from Parcel III (i.e., the underpass below the railroad tracks
located between Parcel III and Parcels I and II).

*NOTE:* Although the following deeds refer to said underpass, the Erie Railroad/Erie
Lackawanna Railroad was not a party to said instmments:
Deed recorded in Liber 756, Page 940
Deed recorded in Liber 276, Page 151
Deed recorded in Liber 719, Page 987

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE B**
**Part I**
**EXCEPTIONS FROM COVERAGE**

Title No.: **RANY-27660**
Policy No.: **PROFORMA**

4.     Survey dated August 17, 2017, made by  discloses the following:

Multi-story masonry and steel office and manufacturing facility building with 1 - story brick pump house, steel tank and parking areas on the west. Two story steel manufacturing facility building with parking and water tank to the southeast.
Two steel buildings and sanitary pump house in southerly end of premises.
Private road and bridge in the northeasterly end of premises.

| | |
|---|---|
| **Northerly Line** | Chain link fences vary with parts of record line. |
| | Dense vegitation and heavy shadows along and near parts of record line. |
| | NYS Thruway appropriation along Old Mill Road and record line. |
| | Setback along record line. |
| **Easterly Line** | Private roads traverse record line onto Hemion Road. |
| | Setback along record line. |
| | One foot wall varies with part of record line. |
| **Southerly Line** | Dense vegitation and heavy shadows straddle parts of record line. |
| | Interior roads vry with parts of record line. |
| | Underpass running below RR tracks under part of record line. |
| | Chain link fence varies with part of record line. |
| | Setback along record line. |
| **Westerly Line** | Chain link fence up to 3.8 feet east of part of record line. |
| | Building and tanks of property on the west, near record line. |
| | Fence along and near set back line on west and northwest. |
| | Setback along record lines. |

Loan Policy insures against monetary loss to the insured mortgagee occasioned by the forced removal of encroachments/projections set forth in the survey reading above.



**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE B**
**Part I**
**EXCEPTIONS FROM COVERAGE**

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

5.     Survey dated August 17, 2017, made by Paul J. Petretti, P.E., L.S., CFM discloses the following:

Vacant land/ingress and egress

| | |
|---|---|
| **Northerly Line** | Underpass below RR tacks, under record line. |
| **Easterly Line** | 20 foot easement along and west of record line. |
| **Southerly Line** | No encroachments or encumbrances. |
| **Westerly Line** | No encroachments or encumbrances. |

Note for Loan Policy Only:
Loan Policy insures against monetary loss to the insured mortgagee occasioned by the forced removal of encroachments/projections set forth in the survey reading above.



Loan Policy

**Riverside Abstract, LLC**
**as Agent for**
**Old Republic National Title Insurance Company**

**LOAN POLICY**
**SCHEDULE B**
**Part I**
**EXCEPTIONS FROM COVERAGE**

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

6.   Survey dated September 11, 2007, and last updated on August 14, 2017, made by Douglas Carlyle Ian
     Land Surveying PC discloses the following:

     One story brick and concrete building with roof garden.

| | |
|---|---|
| **Northerly Line** | Independent walls abut record line. |
| **Easterly Line** | Cellar doors up ro 5'-3" upon the street bed of Berry Street. |

Projections onto Berry Street:

| | | |
|---|---|---|
| Bench/Box - 2'-2" | Letter - 0'-4" | Vent Pipe - 0'-4 1/2" |
| Camera - 0'-6" | Lights - 2'-0" | Window Guard - 0'-2" |
| Metal Support - 2'-0" | Oil Pipe - 0'-3 1/2" | Window Sills - 0'-1" |
| Door Gate - 1'-2 1/2" | Trim - 0'-2" | Electric Box - 1'-6" |

| | |
|---|---|
| **Southerly Line** | Independent walls abut part of record line. |
| **Westerly Line** | Independent walls along record line. |

Note for Loan Policy Only:
Loan Policy insures against monetary loss to the insured mortgagee occasioned by the forced removal of
encroachments/projections set forth in the survey reading above.

# Old Republic National Title Insurance Company

**LOAN POLICY
SCHEDULE B
Part II**

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest.

1.   Assignment of Leases and Rents made from Suffern Partners LLC to CPIF Lending, LLC dated_____, to be duly recorded with the Rockland County Clerk, New York.

2.   UCC between Suffern Partners LLC and CPIF Lending, LLC to be duly recorded with the Rockland County Clerk, New York.

3.   Assignment of Leases and Rents from North 14th Street Realty Associates LLC to CPIF Lending, LLC dated_____, to be duly recorded with the City Register if Kings County, New York

4.   UCC between North 14th Street Realty Associates LLC to CPIF Lending, LLC to be duly recorded with th City Register if Kings County, New York



# Old Republic National Title Insurance Company

### LOAN POLICY
### MORTGAGE SCHEDULE

Title No.:   **RANY-27660**
Policy No.:  **PROFORMA**

## MORTGAGE A – AS TO PARCELS IV AND V

1.    Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

    Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.   Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.   Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

    Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.   Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

    Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgage dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08

3A.   Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

3B.   Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

# Old Republic National Title Insurance Company

## LOAN POLICY
## MORTGAGE SCHEDULE
## CONTINUED

3C.   Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

3D.   Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN 2010000139922.

The lien of the consolidated mortgage identified in 3A above was thereafter spread to Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North 14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.   Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of $400,000.00.

4A.   Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single consolidated lien in the amount of $2,900,000.00.

4B.   Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November 27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.   Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.   Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming a single consolidated lien in the amount of $2,900,000.00.

6.   Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement given by North 14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00.

The above Mortgages 1, 2, 3, 4, 5 and 6, were further assigned pursuant to that certain Assignment of Mortgage from TD Bank, N.A., a national banking association, as assignor to CPIF Lending, LLC, a Washington limited liability company, as assignee dated August ___ and intended to be recorded in the Register's Office, with a current unpaid principal balance of $4,839,369.06.

7.   Gap Mortgage made by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated August ___, 2017 and intended to be recorded in the Register's Office in the original principal amount of $6,160,630.94.

# Old Republic National Title Insurance Company

### LOAN POLICY
### MORTGAGE SCHEDULE
### CONTINUED

7A. Which Mortgages 1, 2, 3, 4, 5, 6 and 7 were amended, restated and consolidated by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated August ___, 2017 and intended to be recorded in the Register's Office forming a single lien in the amount of $11,000,000.00.

Which lien of the consolidate mortgage identified in 7A above, was thereafter spread to Block 1, Lot 1 and Lot 31 located in the City of Suffern, County of Rockland, New York by Spreader Agreement by and among North 14th Street Realty Associates, Suffern Partners LLC and CPIF Lending, LLC dated August ___, 2017 and intended to be recorded with the County Clerk (as hereinafter defined.)

**MORTGAGE B – AS TO PARCELS I-III**

1.    Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Suffern Partners LLC, as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated August ___, 2017 and intended to be recorded with the County Clerk of Rockland County (the "**County Clerk**") in the original principal amount of $22,000,000.00.

**AS TO PARCELS I-V**

1.    Which above MORTGAGE A, as spread and MORTGAGE B, were consolidated, amended and restated pursuant to that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing by Suffern Partners LLC and North 14th Street Realty Associates LLC, collectively as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated August ___, 2017 and intended to be recorded in the Register's Office and with the County Clerk forming a single consolidated lien in the amount of $33,000,000.00.



# ENVIRONMENTAL PROTECTION LIEN ENDORSEMENT

**Attached to:**
Policy No.:   PROFORMA
Order No.:   RANY-27660



## OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

The Policy insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

    (a)    any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

    (b)    any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

        Section 1307 of the Public Health Law

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the amount of insurance.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____ President

Attest _____ Secretary

# TIRSA ENDORSEMENT 9

**Attached to:**
Policy No.:   PROFORMA
Order No.:   RANY-27660



**★ OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Policy insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  The existence, at Date of Policy, of any of the following:

    (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

    (b) Unless expressly excepted in Schedule B:

        (1) Present violations on the land of any enforceable covenants, conditions or restrictions, and any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

        (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

        (3) Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.

        (4) Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

        (5) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.  Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the insured, provided the violation results in:

    (a) invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

    (b) loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

3.  Damage to existing improvements, including lawns, shrubbery or trees;

    (a) which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

    (b) resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

4.  Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.

5. Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and 5, the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.   Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____ President

Attest _____ Secretary

TIRSA Endorsement 9 (Restrictions, Encroachments, Minerals) (10/17/98) NY (5/1/07)

RANY-27660

# ACCESS ENDORSEMENT

**Attached to:**
Policy No.:   PROFORMA
Order No.:   RANY-27660


## OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from Old Mill Road, 19 Hemion Road, (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____   President

Attest _____   Secretary

RANY-27660

# ACCESS ENDORSEMENT

**Attached to:**
Policy No.:    LX-11911147
Order No.:    RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from North 14th Street, Berry Street (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____  President

Attest _____  Secretary

RANY-27660

## LAND SAME AS SURVEY ENDORSEMENT

**Attached to:**
Policy No.:    PROFORMA
Order No.:    RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Company hereby assures the Insured that said Land is the same as that delineated on the plat of a survey made by  designated PS&S, Jaroslava Vonder Project # 00388-0690, dated 8/17/2017.

The Company hereby insures said Assured against loss which said Assured shall sustain in the event said assurances herein shall prove to be incorrect.

The total liability of the Company under said policy and any endorsement therein shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the Conditions thereof to pay.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____ President

Attest _____ Secretary

## LAND SAME AS SURVEY ENDORSEMENT

**Attached to:**
Policy No.:   LX-11911147
Order No.:    RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Company hereby assures the Insured that said Land is the same as that delineated on the plat of a survey made by  designated Carlyle Ian Douglas, dated 9/11/2007 re-dated 8/14/2017  Project # RANY-27660,.

The Company hereby insures said Assured against loss which said Assured shall sustain in the event said assurances herein shall prove to be incorrect.

The total liability of the Company under said policy and any endorsement therein shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the Conditions thereof to pay.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____  President

Attest _____  Secretary

PROFORMA

# MORTGAGE TAX ENDORSEMENT

**Attached to:**
Policy No.:    PROFORMA
Order No.:    RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Policy insures the owner of the indebtedness secured by the insured mortgage(s) against loss or damage which may be sustained by reason that all mortgage recording taxes required to be paid on the insured mortgage(s) have not been paid.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.   Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____    President

Attest _____    Secretary

# STANDARD NEW YORK LOAN POLICY

**Attached to:**
Policy No.:   PROFORMA
Order No.:   RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

1.   Covered Risk Number 2(c) is deleted if the Land is improved by other than a 1-4 family dwelling or is vacant land.

2.   Exclusion Number 7 is deleted, and the following is substituted:

   8.   Any lien on the Title for real estate taxes, assessments, water charges or sewer rents imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.   This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

3.   Covered Risk Number 11 is deleted, and the following is substituted:

   11.   The lack of priority of the lien of the Insured Mortgage upon the Title

      (a)   as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor or materials furnished prior to the Date of Policy, and which has now gained or which may hereafter gain priority over the lien of the Insured Mortgage; and

      (b)   over the lien of any assessments for street improvements under construction or completed at Date of Policy.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.   Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
*A Stock Company*
*400 Second Avenue South, Minneapolis, Minnesota 55401*
*(612) 371-1111*

By                                                    President

Attest                                                Secretary

## MULTIPLE TAX PARCEL ENDORSEMENT

**Attached to:**
Policy No.:   PROFORMA
Order No.:   RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Policy insures against loss or damage which the insured may sustain by reason that the land described in Schedule A is not assessed for real estate tax purposes as separate tax lots which, when taken together, include no land other than that described in Schedule A.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____  President

Attest _____  Secretary

# WAIVER OF ARBITRATION

**Attached to:**
Policy No.:   PROFORMA
Order No.:    RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The policy is amended by deleting therefrom:

(A)    If this endorsement is attached to an ALTA Loan Policy:  Condition 13.

(B)    If this endorsement is attached to an ALTA Owner's Policy:  Condition 14.

(C)    If this endorsement is attached to a TIRSA Owner's Extended Protection Policy:  Condition 12.

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____  President

Attest _____  Secretary

# CONTIGUITY ENDORSEMENT

**Attached to:**
Policy No.:   LX-11911147
Order No.:   RANY-27660



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

The Policy insures against loss or damage which the Insured may sustain by reason that the land described in the Policy as Parcels 392607-055-022-0001-001-000-0000, 392607-055-022-0001-001-000-0000 are not contiguous to each other along their common boundary line(s).

This endorsement is made a part of the Policy and is subject to all of the terms and provisions thereof and of any other endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the Policy and any other endorsements, nor does it extend the effective date of the Policy and any other endorsements, nor does it increase the face amount thereof.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY
A Stock Company
400 Second Avenue South, Minneapolis, Minnesota 55401
(612) 371-1111

By _____   President

Attest _____   Secretary

CASSIN & CASSIN LLP

## EXHIBIT C

### List of Loan Documents

1.    Amended, Restated and Consolidated Promissory Note;

2.    Loan Agreement;

3.    Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing;

4.    UCC-1 Financing Statements (State and County);

5.    Assignment of Leases and Rents;

6.    Guaranty Agreement;

7.    Payment and Carry and Guaranty Agreement;

8.    Environmental Indemnity Agreement;

9.    Lockbox - Deposit Account Control Agreement;

10.   Pledge and Security Agreement (Rockland County Borrower);

11.   Pledge and Security Agreement (Kings County Borrower);

12.   Certificate of Limited Liability Company Interests in Rockland County Borrower;

13.   Certificate of Limited Liability Company Interests in Kings County Borrower;

14.   Assignment of Agreements, Licenses, Permits and Contracts; and

15.   Security Agreement.

CASSIN & CASSIN LLP

## EXHIBIT D-1

### Recording Information

Lender (as set forth on recorded documents): CPIF Lending, LLC
Property Name: N/A
Property Address: 25 Old Mill Road, Suffern, New York 10901, 19 Hemion Road, Montebello,
New York 10901 and Route 59, Suffern, New York 10901
Title Number: RANY-27660
County: Rockland
Full Name of Recording Office: County Clerk of Rockland County, New York

(Bracketed items may not be relevant to a particular transaction)

1.      Mortgage:

        Date Recorded:
        Book:
        Page:

2.      Assignment:

        Date Recorded:
        Book:
        Page:

3.      County UCC-1 Financing Statement:

        Date Recorded:
        Book:
        Page:

{01308709;5}

CASSIN & CASSIN LLP

## **EXHIBIT D-2**

### **Recording Information**

Lender (as set forth on recorded documents): CPIF Lending, LLC
Property Name: N/A
Property Address: 200 North 14th Street a/k/a 2 Berry Street, Brooklyn, New York and 4-6 Berry
Street, Brooklyn, New York
Title Number: RSANY-27660
County: Kings
Full Name of Recording Office: Office of the City Register, County of Kings, New York

(Bracketed items may not be relevant to a particular transaction)

4.      Mortgage:

        Date Recorded:
        Book:
        Page:

5.      Assignment:

        Date Recorded:
        Book:
        Page:

6.      County UCC-1 Financing Statement:

        Date Recorded:
        Book:
        Page:

{01308709;5}

CASSIN & CASSIN LLP

## SCHEDULE 1

### Underlying Notes and Mortgages

UNERLYING NOTES

1.      Mortgage Note made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., in favor of Simplex Inc., dated August 20, 2001 in the original principal amount of $499,980.00.

2.      Replacement Promissory Note made by North 14th Street Realty Associates LLC, to Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $500,020.00.

3.      Consolidated Secured Mortgage Note made by North 14th Street Realty Associates LLC in favor of Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $1,000,000.00.

4.      Gap Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC dated October 9, 2007 in the original principal amount of $1,579,716.08.

5.      Consolidated Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC, dated October 9, 2007 in the original principal amount of $2,500,000.00.

6.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $400,000.00.

7.      Amended and Restated Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $2,900,000.00.

8.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $122,229.95.

9.      Consolidated Mortgage Loan Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $2,900,000.00

10.     Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated April 8, 2016 in the original principal amount of $2,345,109.58.

11.     Consolidated Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A., dated April 8, 2016 in the original principal amount of $5,000,000.00.

UNDERLYING MORTGAGES

1.   Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's

CASSIN & CASSIN LLP

Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.    Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.    Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.    Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgagee dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08

3A.    Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

3B.    Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

3C.    Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

CASSIN & CASSIN LLP

3D.     Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN 2010000139922.

        The lien of the consolidated mortgage identified in 3A above was thereafter spread to Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North 14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of $400,000.00.

4A.     Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single consolidated lien in the amount of $2,900,000.00.

4B.     Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November 27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.     Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming a single consolidated lien in the amount of $2,900,000.00.

6.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

        Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement given by North 14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00

# EXHIBIT E

Law Offices of David Fleischmann P.C.

2233 Nostrand Avenue, 3rd Floor | Brooklyn, NY 11210 | P: 718.650.6090 | F: 718.504.7835

**Closing Statement**

| | | |
|---|---|---|
| PREMISES | 25 Old Mill Rd, 19 Hemion Rd, Route 59, 200 N 14 St, 4-6 Berry St NY | CLOSING LOCATION: Via escrow |
| PURCHASER | Suffern Partners LLC | CLOSING DATE: 9/6/2017 |
| PURCHASER'S ATTORNEY | Law Offices of David Fleischmann, PC | CLOSING TIME: n/a |
| SELLER | RS Old Mill LLC | TITLE COMPANY: Riverside |
| SELLER'S ATTORNEY | Cohen, LaBarbera & Landrigan LLP | NEW LENDER: CPIF LENDING, LLC & W Financial Fund, LP |
| | | NEW LENDERS ATTORNEY: Cohen, LaBarbera & Landrigan LLP |

**CREDITS DUE SELLER:**

| | | |
|---|---|---|
| Purchase Price | $ | 30,000,000.00 |
| Total Due Seller | $ | 30,000,000.00 |

**BALANCE DUE SELLER** $ 30,000,000.00

**BALANCE PAID AS FOLLOWS:**

| | | | |
|---|---|---|---|
| Commonwealth Land Title-Seller | $ | (15,940,321.51) | *wire should have been $3 more |
| Cohen, LaBarbera & Landrigan LLP-Seller | $ | (13,763,840.88) | |
| Watermark Associates | $ | (48,285.89) | |
| Riverside Abstract-seller bill | $ | (149,298.72) | |
| Riverside Abstract-seller bill | $ | (97,500.00) | |
| Alan Hirsch-seller title closer | $ | (750.00) | |
| | $ | (29,999,997.00) | |

**The Transaction:**

**Loan Amount** **$33,000,000.00**

**LOAN AMOUNT DISBURSED AS FOLLOWS:**

| | | |
|---|---|---|
| Lender Origination Fee | $ | 660,000.00 |
| Reserve TILC | $ | 2,500,000.00 |
| Reserve Capital Expenditure | $ | 1,000,000.00 |
| Reserve Real Estate Taxes | $ | 375,000.00 |
| Reserve Interest | $ | 2,487,833.33 |
| Stub Interest | $ | 262,166.67 |
| Lender Due Diligence Expense | $ | 11,000.00 |
| Borrower Deposit | $ | (95,000.00) |
| Interest Reserve taken in error | $ | 262,166.67 |
| Net Loan Amount wired to Riverside | $ | 25,536,833.33 |
| | $ | 33,000,000.00 |

**Purchasers Expenses:**

| | | | |
|---|---|---|---|
| TD Bank | $ | 4,858,054.29 | |
| Riverside Abstract | $ | 1,298,578.20 | (=title bill-56,250 credit +recording fees) |
| Key Bank, National Association | $ | 750.00 | |
| Legal Fee -David Fleischmann | $ | 40,000.00 | |
| Legal Fee-Reiss Sheppe LLP | $ | 48,500.00 | |
| Watermark Associates | $ | 281,714.11 | |
| IM Insurance Brokerage Inc | $ | 687,838.21 | |
| Casssin & Cassin | $ | 125,000.00 | |
| Law Office Of Shaul C. Greenwald, Esq. | $ | 25,000.00 | |
| Entity Fees | $ | 4,000.00 | |
| Title Closer-Eli Basch | $ | 400.00 | |
| Vcorp Services, LLC | $ | 390.00 | |
| Cullen and Dykman (attorney for TD Bank) | $ | 4,600.00 | |
| Bridgewater Capital Partners LLC | $ | 126,250.00 | |
| Total Expenses | $ | 7,501,074.81 | |

# <u>EXHIBIT F</u>

Paul Piperato, County Clerk
Sandra Maria Street, Suite 160
New City, NY 10956
(845) 638-5070

## Rockland County Clerk Recording Cover Sheet

**Received From :**
FRONTIER ABSTRACT & RESEARCH SERVICES
30 WEST BROAD STREET   SUITE 100
IRVING PLACE  /  CITY HALL
ROCHESTER, NY  14614

**Return To :**
FRONTIER ABSTRACT & RESEARCH SERVICES
30 WEST BROAD STREET   SUITE 100
IRVING PLACE  /  CITY HALL
ROCHESTER, NY  14614

**Method Returned :** ERECORDING

**First GRANTOR**

NOVARTIS CORP

**First GRANTEE**

RS OLD MILL LLC

**Index Type :** Land Records
**Instr Number :** 2017-00029310
**Book :**                    **Page :**

**Type of Instrument :** Deed
**Type of Transaction :** Deed Other
**Recording Fee :**                $386.00

**Recording Pages :**                17

The Property affected by this instrument is situated in Ramapo, in the County of Rockland, New York

| Real Estate Transfer Tax | |
|---|---|
| **RETT # :** | 920 |
| **Deed Amount :** | $18,000,000.00 |
| **RETT Amount :** | $72,000.00 |
| | |
| **Total Fees :** | $72,386.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was recorded in the Clerk's office for Rockland County, New York

On (Recorded Date) : 09/14/2017

At (Recorded Time) : 7.44.00 AM

*Paul Piperato*

Paul Piperato, County Clerk

# NOVARTIS CORPORATION
# GRANTOR

## TO

# RS OLD MILL, LLC
# GRANTEE

## BARGAIN AND SALE DEED
### WITH COVENANT AGAINST GRANTOR'S ACTS

**Dated:  as of September 1, 2017**

**Property known as:**

| Parcel A: | Parcel B: | Parcel C: |
|---|---|---|
| **25 Old Mill Road**<br>**Suffern, New York** | **19 Hemion Road**<br>**Montebello, New York** | **Route 59**<br>**Suffern, New York** |
| **County: Rockland**<br>**Village: Suffern**<br>**Section: 55.22**<br>**Block: 1**<br>**Lot: 1** | **County: Rockland**<br>**Village: Montebello**<br>**Section: 55.06**<br>**Block: 1**<br>**Lot: 1** | **County: Rockland**<br>**Village: Suffern**<br>**Section: 55.37**<br>**Block: 1**<br>**Lot: 31** |

**Record and Return to:**

**Cohen, LaBarbera & Landrigan, LLP**
**40 Matthews Street, Suite 203**
**Goshen, New York 10924**
**Attention:  Thomas C. Landrigan, Esq.**

{11305441:8}

**BARGAIN AND SALE DEED
WITH COVENANTS AGAINST GRANTORS ACTS**

**THIS INDENTURE**, made as of the 1st day of September, 2017,

**BETWEEN**

**NOVARTIS CORPORATION** (successor by name-change to CIBA-GEIGY CORPORATION, successor by name-change to GEIGY CHEMICAL CORPORATION), a New York corporation, having an address at c/o Novartis Pharmaceuticals Corporation, One Health Plaza, East Hanover, New Jersey 07936 (the "Grantor"), and **RS OLD MILL, LLC**, a Delaware limited liability company, having an address at 17 Lime Kiln Road, Suffern, New York 10901 (the "Grantee");

**WITNESSETH**, that the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, the heirs or successors and assigns of the Grantee forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Villages of Suffern and Montebello, Town of Ramapo, County of Rockland, State of New York, as more fully described on Schedule A, annexed hereto.

**SAID PREMISES** being designated as (i) Tax Map Section 55.22, Block 1 Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York (ii) Tax Map Section 55.06, Block 1 Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York and (iii) Tax Map Section 55.37, Block 1 Lot 31, Village of Suffern, Town of Ramapo, Rockland County, New York.

**SAID PREMISES** being and intended to be the same premises described in the deeds to Grantor (or its predecessors, as applicable) from (i) Robert L. Smith, as executor of the Estate of Henry L. Smith under the last will and testament of Henry L. Smith, deceased, by Executor's Deed dated September 22, 1975, and recorded in the Office of the Rockland County Clerk (the "Office") on September 29, 1975 in Liber 968, Page 34; (ii) Maurice J. Palizza, Inc. by Deed dated April 21, 1971 and recorded in the Office on May 3, 1971 in Liber 889, Page 588; (iii) 8 J's Incorporated by Deed dated May 17, 1966 and recorded in the Office on April 29, 1971 in Liber 889, Page 384; (iv) Robert J. McMaster by Deed dated August 13, 1965 and recorded in the Office on August 30, 1965 in Liber 796, Page 892; (v) Church of the Sacred Heart by Deed dated October 24, 1960 and recorded in the Office on November 7, 1960 in Liber 724, Page 347; (vi) Robert W. Prier and Belle Zeck, as Trustees for Gwenn Mayer, Janice Mayer and Felicia Mayer, pursuant to a Trust Agreement dated November 6, 1959 by Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 991; (vii) Henry Mayer and Sidney Mayer, as Executors and Trustees of the Estate of Gustav Mayer, deceased, and Milton Klein as Trustee under the Last Will and Testament of Gustav Mayer, deceased, by Executor's

{11305441:8}

Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 987; and (viii) Society of the Holy Child Jesus by Deed dated February 4, 1963 and recorded in the Office on February 8, 1963 in Liber 756, Page 940.

**SAID PREMISES ARE CONVEYED SUBJECT TO THE FOLLOWING RESTRICTIVE PROVISIONS AS TO THE USE OF SAID PREMISES**: Residential uses of any kind or nature are prohibited on, over or under the premises conveyed herein including, without limitation, single family dwellings, multi-family dwellings and mobile home dwellings and related facilities such as schools and other educational institutions and child care facilities of any kind. For avoidance of doubt, any and all uses of the premises conveyed herein are restricted to uses which are commercial or industrial and under no circumstances residential. The forgoing prohibition and restriction shall run with the land. The foregoing restriction shall be enforceable solely and exclusively by Grantor or any of the parent, subsidiary or affiliates of Grantor or any of the respective successors or assigns of any of the foregoing.

**TOGETHER** with all right, title, and interest, if any, of the Grantor in and to any streets and roads abutting the above described premises to the center line thereof; **TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to said premises; **TO HAVE AND TO HOLD** the premises herein granted unto the Grantee, the heirs or successors and assigns of the Grantee forever.

**AND** the Grantor covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid and except as set forth in any documents of record as of the date hereof.

**AND** the Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for the conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**AND** the Grantor is conveying the premises in the ordinary course of business.

**[Remainder of Page Intentionally Left Blank; Signature Page to Follow]**

**[Signature Page to Bargain and Sale Deed]**

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed as of the date first above written.

                                        **GRANTOR**

                                        NOVARTIS CORPORATION,
IN PRESENCE OF:                         a New York corporation


                                        By: _____
                                             Name: Craig Osten
                                           \ Title: Vice President & Treasurer


State of New Jersey          :
                             : ss:
County of Morris         :


On the 31st day of August, 2017, before me, the undersigned, personally appeared CRAIG OSTEN personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signatures on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance in the City/Town of EAST HANOVER in the State of NEW JERSEY.


                    _____
                    Notary Public

                         Jean M. Gallagher
                          Notary Public
                         State of New Jersey
                    Commission Expires  5/28/18

<u>SCHEDULE A TO BARGAIN AND SALE DEED</u>

**Parcel A**

ALL that certain plot, piece or parcel of land and premises, situate, lying and being in Suffern, Rockland County, New York, and being shown on map entitled "Map of lands to be conveyed by Charles A. Pace, Suffern, New York, Scale 1" – 60', May 1939", made by Frederick Washburn, Surveyor, and duly filed in the Office of the Clerk of the County of Rockland, at New City, Rockland County, New York, and being more fully bounded and described as follows:

BEGINNING at a point in the southerly line of premises of one Haeussler, at a post distant 28.4 feet easterly from the southwesterly corner of said Haeussler's premises as shown on said map, and running thence (1) in a westerly direction along the southerly line of said Haeussler's premises, 28.4 feet to an iron pipe standing in the southeasterly corner of premises of J.A. Martin, as shown on said map, and running thence (2) in a general westerly direction along the southerly line of said Martin's premises, on a course South 67 degrees 18 minutes West, 287.6 feet to an iron pipe; thence (3) on a course South 50 degrees 39 minutes West, 317.5 feet to an iron pipe in the southerly line of premises of Suffern Land Co.; thence (4) on a course South 58 degrees 26 minutes West, 200 feet to an iron pipe standing in the southerly line of premises of said Suffern Land Co.; thence (5) on a course South 31 degrees 34 minutes East, passing through an Oak tree near the southerly side of a private road running through said premises, 336 feet to an iron pipe in the center line of a brook as shown on said map; thence (6) through the center line of said brook on a course North 56 degrees 32 minutes East, 277 feet to a point, thence (7) still through the center line of said brook on a course North 42 degrees East, 204 feet to a point; thence (8) still through the center line of said brook on a course North 40 degrees 10 minutes East, 68 feet; thence (9) still through the center line of said brook, on a course North 44 degrees East, 193 feet to a point; thence (10) still through the center line of said brook on a course North 8 degrees 08 minutes East, 134.5 feet to the southwest corner of the east abutment of a bridge over said brook, as shown on said map; and thence (11) on a course North 21 degrees 12 minutes West, 91.3 feet to the point and place of beginning.

**And also**

ALL that certain plot, piece or parcel of land, situate lying and being in the Village of Suffern, Town of Ramapo, County of Rockland and State of New York, more particularly bounded and described as follows:

BEGINNING at a point where the easterly line of land now or formerly of Suffern Land Co. is intersected by the southwesterly line of land of the State of New York and the northeasterly line of land now or formerly of Smith; thence running along the dividing line between said land of the State of New York and said land now or formerly of Smith, South 64 degrees 46 minutes 8 seconds east 387 feet to the southeasterly line of said land of the State of New York; thence running along said southeasterly line of land of the State of New York, North 57 degrees 31 minutes 52 seconds East 396 feet to an angle point in same; thence running along said land formerly of the State of New York now or formerly of Gustav Mayer, North 38 degrees 10 minutes 52 seconds East 246 feet to a point which is distant 90 feet southerly measured at right

## SCHEDULE A
### (Continued)

angles from Station 83 / 71 / of the survey base line for the New York State Thruway; thence running along land of the State of New York North 89 degrees 2 minutes 23 seconds West 597.85 feet to a point distant 150 feet southerly measured at right angles from Station 77 / 72 / of said survey base line; thence continuing along land of the State of New York South 26 degrees 28 minutes 37 seconds West 89.4 feet to the easterly line of land of Suffern Land Co. which point is distant 158 feet southerly measured at right angles from Station  78 / 83 / of said survey base line; thence running along the easterly line of said land now or formerly of Suffern Land Co. South 30 degrees 53 minutes 62 seconds West 282.8 feet to the point of beginning.

**And also**

ALL that certain plot, piece or parcel of land and premises, situate, lying and being in the Village of Suffern, the Town of Ramapo, County of Rockland and State of New York, more particularly bounded and described as follows:

BEGINNING on the northeasterly corner of the premises hereby being conveyed, where the southerly line of the proposed access road of the New York State Thruway intersects the easterly side of said premises; running thence (1) south 51 degrees 09 minutes 20 seconds west, 110.89 feet along the land now or formerly of Olsen; (2) continuing along said land south 49 degrees 39 minutes 20 seconds west 182 feet to a corner; (3) continuing along said land of Olsen and along the land now or formerly of Fredericks south 25 degrees 39 minutes 20 seconds west 1872.60 feet to a corner; (4) continuing along the land now or formerly of Fredericks south 71 degrees 21 minutes 50 seconds east 416.59 feet to the intersection with the northerly right of way line of the Erie Railroad (Piermont Branch); (5) running along the right of way of the Erie Railroad north 86 degrees 43 minutes 20 seconds west 881.09 feet; (6) continuing along said right of way on a radius of 1877.08 feet to the left 98.28 feet; (7)  continuing along said right of way on a radius of 1249.18 feet a distance of 482.15 feet; (8) continuing along said right of way north 72 degrees 33 minutes 50 seconds west 243.05 feet; (9) continuing along said right of way on a radius of 1877.08 feet a distance of 368.03 feet; (10) continuing along said right of way on a radius of 2831.93 feet a distance of 98.85 feet; (11) continuing along said right of way north 46 degrees 24 minutes 40 seconds west 514.01 feet to the lands of Belmont Stone Company; (12) running thence along said lands north 11 degrees 07 minutes 30 seconds east 730.70 feet; (13) continuing along said lands of Belmont Stone Company north 59 degrees 52 minutes 30 seconds east 864.50 feet to the lands now or formerly of H.L. Smith; (14) running thence along the said lands of H.L. Smith south 30 degrees 11 minutes 30 seconds east 336.05; (15) thence, continuing along the lands now or formerly of H.L. Smith and running along the center line of a brook the following five course and distances - north 57 degrees 54 minutes 30 second east 277.25 feet; (16) north 43 degrees 22 minutes 30 seconds east 204 feet; (17) north 41 degrees 32 minutes 50 seconds east 68 feet; (18) north 45 degrees 22 minutes 30  seconds east 193 feet; (19) north 9 degrees 30 minutes 30 seconds east 134.50 feet; (20) thence leaving the said brook, but continuing along the land of H.L Smith, north 19 degrees 49 minutes 30 seconds west 91.30 feet to a post in the line of land now or formerly of Haeussler; (21) running thence along the said land of Haeussler and along the land now or formerly of Beard north 50 degrees 19 minutes 30 seconds east 237.92 feet

## SCHEDULE A
### (Continued)

to a point in the southerly side of the aforesaid proposed access road of the New York State Thruway; (22) running thence in a southeasterly direction along the aforesaid southerly line of said proposed access road to the point or place of beginning.

TOGETHER WITH the right to use a drainage pipe under the New York State Thruway as set forth, defined and limited in that certain Decision of Hon. Alexander Del Giorno (State of New York, Court of Claims), with respect to Claims No. 33215 and No. 35032 entered November 27, 1957, and filed on November 29, 1957, in the Office of the Clerk of the Court of Claims.

## Parcel B

ALL that certain plot, piece or parcel of land, situate, lying and being in the Village of Suffern, Town of Ramapo, County of Rockland and State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the previously widened westerly line of Hemion Road, where the same in intersected by the northerly line of the Erie Lackawanna Railroad Right of Way. Said point being distant 15.00 feet on a course of North 81 degrees 15 minutes 39 seconds West along the northerly line of the Erie Railroad from the original westerly line of said Hemion Road; and running thence (1) North 81 degrees 15 minutes 39 seconds West 16.36 feet along the northerly right of way line of the Erie Lackawanna Railroad to a bend therein; thence (2) North 87 degrees 44 minutes 26 seconds West 571.32 feet along the same to a bend therein; thence (3) North 87 degrees 37 minutes 29 seconds West 160.06 feet continuing along the same to a corner of lands now or formerly of the Geigy Chemical Company; thence (4) North 71 degrees 35 minutes 30 seconds West 432.62 feet along lands now or formerly of the Geigy Chemical Company to a point; thence (5) North 26 degrees 54 minutes 30 seconds East 379.93 feet continuing along the same to a monument; thence (6) South 72 degrees 14 minutes 35 seconds East 1095.54 feet continuing along the same to a point in the previously widened westerly line of Hemion Road (said point being distant 2.00 feet on a course of North 72 degrees 14 minutes 35 seconds West from the original westerly line of Hemion Road, and a corner of lands now or formerly of the Geigy Chemical Company); thence (7) South 18 degrees 29 minutes 43 seconds West 182.35 feet along the previously widened westerly line of Hemion Road to the point or place of beginning.

## SCHEDULE A
### (Continued)

**And also**

ALL that certain plot, piece or parcel of land, situate lying and being in the Town of Ramapo, County of Rockland and State of New York, more particularly bounded and described as follows:

BEGINNING at a point in the westerly line of Hemion Road, said point of beginning being distant 511.50 feet northerly along said westerly line of Hemion Road from the center line of the Erie Lackawanna Railroad Company tracks, and said point of beginning being distant 3.60 feet on a course North 11 degrees 37 minutes 20 seconds East from a Rockland County Highway Monument set in said westerly line of Hemion Road; and running THENCE (1) along a stone wall and on a course North 75 degrees 29 minutes West, a distance of 378.70 feet; THENCE (2) turning and running along another stone wall and on a course North 22 degrees 7 minutes 30 seconds East, a distance of 204.0 feet; THENCE (3) turning and running along still another stone wall and on a course South 74 degrees 35 minutes 30 seconds East, a distance of 348.18 feet to the westerly line of Hemion Road; THENCE (4) along the westerly line of Hemion Road and on a course South 14 degrees 13 minutes 5 seconds West, a distance of 142.69 feet to a Rockland County Highway monument; and THENCE (5) still along the westerly line of Hemion Road and on a course South 11 degrees 37 minutes 20 seconds West, a distance of 54.17 feet to the point or place of beginning.

**And also**

ALL that certain plot, piece or parcel of land and premises, situate lying and being in the Town of Ramapo, County of Rockland and State of New York, bounded and described as follows:

BEGINNING at a point in the center of Hemion Road at the northeasterly corner of premises now or formerly of Gertrude Conklin (1) North 73 degrees 21 minutes 40 seconds West 1114.06 feet to the Easterly line of premises now or formerly of Henry and Sidney Mayer; thence (2) North 25 degrees 47 minutes 25 seconds East 510.36 feet to an iron pipe in the Southerly line of lands now or formerly of Arthur Olsen; thence (3) South 72 degrees 14 minutes 40 seconds East, 654.11 feet to an iron pipe; thence (4) along lands now or formerly of Martin Hunter, South 23 degrees 57 minutes 10 seconds West 214.36 feet to an iron pipe in the southwesterly corner of Hunter's premises; thence along the southwesterly line of said Hunter's property South 72 degrees 1 minute 10 seconds East 390.23 to the center line of Hemion Road; thence South 13 degrees 17 minutes 55 seconds West 270.93 feet to the point or place of beginning.

**And also**

ALL that certain plot, piece or parcel of land and premises, situate lying and being in the Town of Ramapo, County of Rockland and State of New York, bounded and described as follows:

BEGINNING at a post in the southwest corner of said lot, being also the northwest corner of lot of James and Henry Frederick, and running thence (1) south 74 degrees 30 minutes east, part of

### SCHEDULE A
### (Continued)

the way along a post and wire fence and a stone wall, 655 feet to a post; thence (2) south 21 degrees 10 minutes west 11.2 feet to the southerly side of a stone wall; thence (3) south 75 degrees 20 minutes east, along the southerly side of said stone wall 359 feet to the middle of the public highway running from the Montebello Road to the Nyack Turnpike; thence (4) through the center of the same north 18 degrees 15 minutes east 380 feet; thence (5) running still along the center of said road 450 feet more or less to a point; thence (6) still along the center of the same north 45 degrees 26 minutes east 433 feet to a point opposite the remains of an old stone wall; thence (7) north 68 degrees 11 minutes west, part of the way along the remains of an old stone wall, 335 feet to an iron pipe in the bed of the old pond; thence (8) north 14 degrees 8 minutes east, part of the way through the brook, 412 feet to a rock and northwest corner of premises formerly of Charles Ackerson; thence (9) north 41 degrees 3 minutes west along a stone wall 393 feet to a large oak tree; thence (10) south 48 degrees 21 minutes west along the remains of an old stone wall 255 feet; thence (11) south 49 degrees west along the remains of an old wall 578 feet to a stake and stones; thence (12) south 47 degrees 30 minutes west 182 feet to a stake; thence (13) south 23 degrees 30 minutes west 993 feet along a stone wall to the place of beginning.

EXCEPTING AND EXCLUDING THEREFROM:

A. The portion of the above lands conveyed by Geigy Chemical Corporation to County of Rockland by Deed dated October 23, 1963, and recorded Office of the Clerk of the County of Rockland on October 29, 1963 in Liber 768, Page 18;

B. The portion of the above lands conveyed by Alicia I. Olsen to the County of Rockland for reconstruction of Hemion Road, by Deed dated October 11, 1948, and recorded in the Office of the Clerk of the County of Rockland on the 20th day of October, 1949, in Book 487 of Deeds, Page 291; and

C. All lands north of the southerly line of the access road of the New York State Thruway and north of the most southerly line of all portions acquired by said Thruway; It being intended to exclude all the lands lying north of the Thruway and the following parcels acquired for New York State Thruway:

| | |
|---|---|
| **Map No. 471-** | Parcel No. 471- 3.96 acres, more or less, in Book 4 of Thruway Maps, Page 720, 721. |
| **Map No. 1248-** | Parcel No. 1248- 1.72 acres, more or less, in Book 5 of Thruway Maps, Page 937, 938. |
| **Map No. 1285-** | Parcel No. 1285- 0.041 acres, more or less, or 1,177 square feet, more or less, in Book 6 of Thruway Maps, Page 1206. |

## SCHEDULE A
### (Continued)

| | |
|---|---|
| **Map No. 1286-** | Parcel No. 1286- 0.203 acres, more or less, or 8,850 square feet, more or less, in Book 6 of Thruway Maps, Page 1206, 1207. |
| **Map No. 418-** | Parcel No. 418- 0.341 acres, more or less, or 10,518 square feet, more or less, in Book 4 of Thruway Maps, Page 716. |

## Parcel C

ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo, County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point in a stonewall on the northeasterly side of Route 59, distant 407.25 feet northwesterly from the West side of Mt. Eymard Seminary; running thence North 56 degrees 1 minute 40 seconds West along said stonewall and said side of Route 59, 88.07 feet to a point and the southeasterly side of an existing 12 foot Right of Way; thence North 31 degrees 38 minutes 5 seconds East along said side of the 12 foot Right of Way 149.63 feet to a point; thence North 20 degrees 26 minutes 5 seconds East, still along said Right of Way 117.98 feet to the lands of the Erie Railroad Company; thence South 61 degrees 50 minutes 20 seconds East along said lands 88.81 feet to other lands of the Society of the Holy Child Jesus; thence South 20 degrees 26 minutes 5 seconds West along said last mentioned land 114.68 feet to a point; thence South 31 degrees 38 minutes 5 seconds West, still along said last mentioned lands, 161.85 feet to the northeasterly side of Route 59 at the point of beginning

### And also

ALL that certain plot, piece or parcel of land and premises, situate lying and being in the Village of Suffern, Town of Ramapo, County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point where Route 59 intersects the Southeasterly side of an existing 12 foot Right of Way and the Northwesterly side of an 88 foot wide parcel conveyed by the Society of the Holy Child Jesus to Geigy Chemical Corp.; running thence North 31 degrees 38 minutes 5 seconds East along the side of said 38 foot parcel 149.63 feet to a point; thence North 20 degrees 26 minutes 5 seconds East, still along said side of said parcel 117.98 feet to the land of the Erie Railroad Company; thence North 61 degrees 50 minutes 20 seconds West along said railroad property and crossing said 12 foot Right of Way 12.11 feet to other lands of the Society of the Holy Child Jesus; thence South 20 degrees 26 minutes 5 seconds West along said last mentioned lands 118.44 feet; thence South 31 degrees 38 minutes 5 seconds West still along said last mentioned lands 147.97 feet to a point on the Northeasterly side of Route 59; thence South 56 degrees 1 minute 40 seconds East along said side of Route 59, 12.01 feet to the point or place of beginning.

## SCHEDULE A
### (Continued)

*The aforesaid Parcels A and B and C being further described according to that certain Survey made by Jaroslava Vonder (of Paulus, Sokolowski and Sartor, LLC), initially issued February 10, 2017, certifications revised August 31, 2017, as follows:*

*As to Parcels A and B*

ALL that certain plot, piece or parcel of land, situate, lying and being in Villages of Suffern and Montebello, Town of Ramapo, Rockland County, New York, more particularly bounded and described as follows:

**BEGINNING** at a point in the westerly right-of-way of Hemion Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

1.   South 85°05'01" West a distance of 16.71 feet to a point, thence;

2.   South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

3.   South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

4.   South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

5.   On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

6.   On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

7.   North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

8.   On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

9.   On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

# SCHEDULE A
## (Continued)

10.  North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

11.  North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

12.  North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

13.  North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

14.  North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

15.  South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

16.  North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

17.  North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

18.  North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

19.  South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

20.  On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

21.  On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

22.  South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

## SCHEDULE A

### (Continued)

23.   South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

24.   South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

25.   South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

26.   On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

27.   South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

28.   South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

29.   South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

30.   South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

31.   On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

32.   On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

33.   South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

34.   South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

35.   South 00°43'26" West a distance of 269.50 feet to a point, thence;

## SCHEDULE A
### (Continued)

36. Along South 05°41'47" West a distance of 182.36 feet to the **POINT OF BEGINNING**;

*As to Parcel C*

ALL that certain plot, piece or parcel of land, situate, lying and being in Village of Suffern, Town of Ramapo, Rockland County, New York, more particularly bounded and described as follows:

**BEGINNING** at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the following two (2) courses from the terminus of the sixth (6) course of the Overall Site Description of Tax Map Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section 55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York,

1. North 86°37'10" West a distance of 155.99 feet to a point, thence;

2. South 12°02'41" West a distance of 93.63 feet to the point of BEGINNING,

RUNNING THENCE from said point of BEGINNING, the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;

A. South 12°02'41" West a distance of 114.73 feet to a point, thence;

B. South 23°17'21" West a distance of 161.86 feet to a point in the northerly right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64°22'23" West a distance of 100.09 feet to a point, thence, the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;

A. North 23°13'11" East a distance of 148.10 feet to a point, thence;

B. North 12°05'22" East a distance of 118.44 feet to a point in the southerly right-of-way of the Consolidated Railway Corporation, thence;

THENCE along said southerly right-of-way, South 70°07'33" East a distance of 101.00 feet to the **POINT OF BEGINNING**.

### END OF SCHEDULE A

INSTRUCTIONS(RP-5217-PDF-INS): www.orps.state.ny.us

| FOR COUNTY USE ONLY | 392607 | New York State Department of |
|---|---|---|

**New York State Department of**
**Taxation and Finance**
Office of Real Property Tax Services

**RP- 5217-PDF**
Real Property Transfer Report (8/10)

| FOR COUNTY USE ONLY | |
|---|---|
| C1. SWIS Code | 392617 |
| C2. Date Deed Recorded | 9/14/2017 <br> Month  Day  Year |
| C3. Book | 2017 | C4. Page | 29310 |

## PROPERTY INFORMATION

**1. Property Location**
25 — · STREET NUMBER     Old Mill Road — · STREET NAME
Town of Ramapo — · CITY OR TOWN     Village of Suffern — VILLAGE     10901 — · ZIP CODE

**2. Buyer Name**
RS OLD MILL, LLC — · LAST NAME/COMPANY     FIRST NAME
LAST NAME/COMPANY     FIRST NAME

**3. Tax Billing Address**
Indicate where future Tax Bills are to be sent if other than buyer address(at bottom of form)
LAST NAME/COMPANY     FIRST NAME
STREET NUMBER AND NAME     CITY OR TOWN     STATE     ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** 3 # of Parcels OR ☐ Part of a Parcel

**(Only if Part of a Parcel) Check as they apply:**
4A. Planning Board with Subdivision Authority Exists ☐
4B. Subdivision Approval was Required for Transfer ☐
4C. Parcel Approved for Subdivision with Map Provided ☐

**5. Deed Property Size**
X — · FRONT FEET  · DEPTH   OR   161.96 — · ACRES

**6. Seller Name**
NOVARTIS CORPORATION — · LAST NAME/COMPANY     FIRST NAME
LAST NAME/COMPANY     FIRST NAME

**\*7. Select the description which most accurately describes the use of the property at the time of sale:**
J. Industrial

**Check the boxes below as they apply:**
8. Ownership Type is Condominium ☐
9. New Construction on a Vacant Land ☐
10A. Property Located within an Agricultural District ☐
10B. Buyer received a disclosure notice indicating that the property is in an Agricultural District ☐

## SALE INFORMATION

**11. Sale Contract Date** 11/28/2016
**\* 12. Date of Sale/Transfer** 09/01/2017
**\*13. Full Sale Price** 18,000,000 .00

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) *Please round to the nearest whole dollar amount.*

**14. Indicate the value of personal property included in the sale** 0 .00

**15. Check one or more of these conditions as applicable to transfer:**
A. Sale Between Relatives or Former Relatives ☐
B. Sale between Related Companies or Partners in Business. ☐
C. One of the Buyers is also a Seller ☐
D. Buyer or Seller is Government Agency or Lending Institution ☐
E. Deed Type not Warranty or Bargain and Sale (Specify Below) ☐
F. Sale of Fractional or Less than Fee Interest (Specify Below) ☐
G. Significant Change in Property Between Taxable Status and Sale Dates ☐
H. Sale of Business is Included in Sale Price ☐
I. Other Unusual Factors Affecting Sale Price (Specify Below) ☐
J. None ☒

Comment(s) on Condition:

## ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill

**16. Year of Assessment Roll from which information taken(YY)** 17     **\*17. Total Assessed Value** 4,589,800

**\*18. Property Class** 710 _ _     **\*19. School District Name** Ramapo Central

**\*20. Tax Map Identifier(s)/Roll Identifier(s) (If more than four, attach sheet with additional identifier(s))**
55.22-1-1     55.37-1-31     55.06-1-1

## CERTIFICATION

I Certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein subject me to the provisions of the penal law relative to the making and filing of false instruments.

**SELLER SIGNATURE**
Novartis Corporation
By: *[signature]*    8/31/17
SELLER SIGNATURE     DATE
Craig Osteen, Vice President and Treasurer
RS Old Mill LLC
BUYER SIGNATURE
By: *[signature]*    9/11/17
BUYER SIGNATURE     DATE
Yehuda Salamon
MANAGING MEMBER

**BUYER CONTACT INFORMATION**
(Enter information for the buyer. Note: If buyer is LLC, society, association, corporation, joint stock company, estate or entity that is not an individual agent or fiduciary, then a name and contact information of an individual/responsible party who can answer questions regarding the transfer must be entered. Type or print clearly.)

Salamon — · LAST NAME     Yehuda — FIRST NAME
(718) — · AREA CODE     947-7400 — · TELEPHONE NUMBER (Ex: 9999999)
17 — · STREET NUMBER     Lime Kiln Road — · STREET NAME
Suffern — · CITY OR TOWN     NY — · STATE     10901 — · ZIP CODE

**BUYER'S ATTORNEY**
Landrigan — LAST NAME     Thomas — FIRST NAME
(845) — AREA CODE     291-1900 — TELEPHONE NUMBER (Ex: 9999999)

ADDENDUM

Location and description of additional property conveyed

| Tax map designation | SWIS Code | Street Address | City, town or Village | County |
|---|---|---|---|---|
| 55.37-1-31 | 392607 | Route 59 | Village of Suffern | Rockland |
| 55.06-1-1 | 392617 | 19 Hemion Road | Village of Montebello | Rockland |

# <u>EXHIBIT G</u>

Paul Piperato, County Clerk
1 South Main St., Ste. 100
New City, NY 10956
(845) 638-5070

# Rockland County Clerk Recording Cover Sheet

**Received From :**
RIVERSIDE ABSTRACT, LLC
3839 FLATLANDS AVE
SUITE 208
BROOKLYN, NY 11234

**Return To :**
RIVERSIDE ABSTRACT, LLC
3839 FLATLANDS AVE
SUITE 208
BROOKLYN, NY 11234

**Method Returned : ERECORDING**

**First GRANTOR**
RS OLD MILL LLC

**First GRANTEE**
RS OLD MILLS RD LLC

**Index Type :** Land Records
**Instr Number :** 2017-00029395
**Book :**              **Page :**

**Type of Instrument :** Deed
**Type of Transaction :** Deed Other
**Recording Fee:**              $336.00

**Recording Pages :**              9

The Property affected by this instrument is situated in Ramapo, in the County of Rockland, New York

|  **Real Estate Transfer Tax** |  |
| --- | --- |
| **RETT # :** | 936 |
| **Deed Amount :** | $0.00 |
| **RETT Amount :** | $0.00 |
| **Total Fees :** | $336.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was recorded in the Clerk's office for Rockland County, New York

On (Recorded Date) . 09/14/2017

At (Recorded Time) . 12.13.00 PM



Paul Piperato, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: NYROCKLANDUSER17   Printed On : 09/14/2017      At : 12:16:52PM

# RS OLD MILL, LLC
## GRANTOR

## TO

# RS OLD MILLS RD LLC
## GRANTEE

## BARGAIN AND SALE DEED
### WITH COVENANT AGAINST GRANTOR'S ACTS

Dated:  as of September 5, 2017

Property known as:

| Parcel A: | Parcel B: | Parcel C: |
|---|---|---|
| 25 Old Mill Road Suffern, New York | 19 Hemion Road Montebello, New York | Route 59 Suffern, New York |
| County: Rockland Village: Suffern Section: 55.22 Block: 1 Lot: 1 Town: Ramapo | County: Rockland Village: Montebello Section: 55.06 Block: 1 Lot: 1 Town: Ramapo | County: Rockland Village: Suffern Section: 55.37 Block: 1 Lot: 31 Town: Ramapo |

Record and Return to:

*David Fleischman Esq*
*2233 Nostrand Ave*
*Brooklyn NY 11210*

{11305441:8}

# BARGAIN AND SALE DEED
## WITH COVENANTS AGAINST GRANTORS ACTS

**THIS INDENTURE**, made as of the 5th day of September, 2017,

**BETWEEN**

**RS OLD MILL, LLC**, a Delaware limited liability company, having an address at 17 Lime Kiln Road, Suffern, New York 10901 (the "Grantor"), and **RS OLD MILLS RD LLC**, a New York limited liability company, having an address at 202 Grandview Avenue, Monsey, New York 10950 (the "Grantee");

**WITNESSETH**, that the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, the heirs or successors and assigns of the Grantee forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Villages of Suffern and Montebello, Town of Ramapo, County of Rockland, State of New York, as more fully described on Schedule A, annexed hereto.

**SAID PREMISES** being designated as (i) Tax Map Section 55.22, Block 1 Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York (ii) Tax Map Section 55.06, Block 1 Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York and (iii) Tax Map Section 55.37, Block 1 Lot 31, Village of Suffern, Town of Ramapo, Rockland County, New York.

**SAID PREMISES** being and intended to be the same premises described in the deeds to NOVARTIS CORPORATION (or its predecessors, as applicable) from (i) Robert L. Smith, as executor of the Estate of Henry L. Smith under the last will and testament of Henry L. Smith, deceased, by Executor's Deed dated September 22, 1975, and recorded in the Office of the Rockland County Clerk (the "Office") on September 29, 1975 in Liber 968, Page 34; (ii) Maurice J. Palizza, Inc. by Deed dated April 21, 1971 and recorded in the Office on May 3, 1971 in Liber 889, Page 588; (iii) 8 J's Incorporated by Deed dated May 17, 1966 and recorded in the Office on April 29, 1971 in Liber 889, Page 384; (iv) Robert J. McMaster by Deed dated August 13, 1965 and recorded in the Office on August 30, 1965 in Liber 796, Page 892; (v) Church of the Sacred Heart by Deed dated October 24, 1960 and recorded in the Office on November 7, 1960 in Liber 724, Page 347; (vi) Robert W. Prier and Belle Zeck, as Trustees for Gwenn Mayer, Janice Mayer and Felicia Mayer, pursuant to a Trust Agreement dated November 6, 1959 by Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 991; (vii) Henry Mayer and Sidney Mayer, as Executors and Trustees of the Estate of Gustav Mayer, deceased, and Milton Klein as Trustee under the Last Will and Testament of Gustav Mayer,

{11305441:8}

deceased, by Executor's Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 987; and (viii) Society of the Holy Child Jesus by Deed dated February 4, 1963 and recorded in the Office on February 8, 1963 in Liber 756, Page 940.

**SAID PREMISES ARE CONVEYED SUBJECT TO THE FOLLOWING RESTRICTIVE PROVISIONS AS TO THE USE OF SAID PREMISES:** Residential uses of any kind or nature are prohibited on, over or under the premises conveyed herein including, without limitation, single family dwellings, multi-family dwellings and mobile home dwellings and related facilities such as schools and other educational institutions and child care facilities of any kind. For avoidance of doubt, any and all uses of the premises conveyed herein are restricted to uses which are commercial or industrial and under no circumstances residential. The forgoing prohibition and restriction shall run with the land. The foregoing restriction shall be enforceable solely and exclusively by Grantor or any of the parent, subsidiary or affiliates of Grantor or any of the respective successors or assigns of any of the foregoing.

**TOGETHER** with all right, title, and interest, if any, of the Grantor in and to any streets and roads abutting the above described premises to the center line thereof; **TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to said premises; **TO HAVE AND TO HOLD** the premises herein granted unto the Grantee, the heirs or successors and assigns of the Grantee forever.

**AND** the Grantor covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid and except as set forth in any documents of record as of the date hereof.

**AND** the Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for the conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**AND** the Grantor is conveying the premises in the ordinary course of business.

**[Remainder of Page Intentionally Left Blank; Signature Page to Follow]**

{11305441:8}

**[Signature Page to Bargain and Sale Deed]**

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed as of the date first above written.

**GRANTOR**

IN PRESENCE OF:

RS OLD MILL, LLC,
a Delaware limited liability company

By: _____
   Name: Yehuda Salamon
   Title: Managing Member

State of New York          :
                           : ss:
County of Rockland         :

On the 5th day of September, 2017, before me, the undersigned, personally appeared YEHUDA SALAMON personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the   individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

YUDAH JUNGER
Notary Public - State of New York
No. 01JU6219230
Qualified in Kings County County
My Commission Expires: 03/22/20 /Y

SCHEDULE A

Village of suffern
Town of Ramapo
County of Rockland, State of NY.

Title No.:  **RANY-27660**

**Parcels A & B:**

BEGINNING at a point in the westerly right-of-way of Hemion Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

**SCHEDULE A**

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel A: 25 Old Mill Road, Suffern, NY 10901.
Designated as Section 55.06, Block 1, Lot 1, Rockland County, and also known as Parcel B: 19 Hemion Road, Montebello, NY 10901.

SCHEDULE A

**Parcel C**

Village of

ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo, County of Rockland and State ofNew York, being bounded and described as follows:

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section 55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;
    a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
    b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;
    1. South 12 degrees 02 minutes 41 seconds West a distanceof 114.74 feet to a point;
    2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09 feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;
    1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
    2. North 12 degrees 05 minutes 22 seconds East a distanceof 118.44 feet to a point in the Southerly right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel C: Route 59, Suffern, NY 10901.

# EXHIBIT H

Paul Piperato, County Clerk
1 South Main St., Ste. 100
New City, NY  10956
(845) 638-5070

# Rockland County Clerk Recording Cover Sheet

**Received From :**
RIVERSIDE ABSTRACT,LLC
3839 FLATLANDS AVE
SUITE 208
BROOKLYN, NY  11234

**Return To :**
RIVERSIDE ABSTRACT,LLC
3839 FLATLANDS AVE
SUITE 208
BROOKLYN, NY  11234

**Method Returned : ERECORDING**

**First GRANTOR**

RS OLD MILLS RD LLC

**First GRANTEE**

SUFFERN PARTNERS LLC

**Index Type :** Land Records
**Instr Number :** 2017-00029396
**Book :**                    **Page :**

**Type of Instrument :** Deed
**Type of Transaction :** Deed Other
**Recording Fee:**              $336.00

**Recording Pages :**              9

The Property affected by this instrument is situated in Ramapo, in the County of Rockland, New York

| Real Estate Transfer Tax | |
|---|---|
| **RETT # :** | 937 |
| **Deed Amount :** | $30,000,000.00 |
| **RETT Amount :** | $120,000.00 |
| **Total Fees :** | $120,336.00 |

State of New York

County of Rockland

I hereby certify that the within and foregoing was recorded in the Clerk's office for Rockland County, New York

On (Recorded Date) . 09/14/2017

At (Recorded Time) . 12.17.00 PM

Paul Piperato, County Clerk

This sheet constitutes the Clerks endorsement required by Section 319 of Real Property Law of the State of New York

Entered By: NYROCKLANDUSER17  Printed On : 09/14/2017        At : 12:18:54PM

# RS OLD MILLS RD, LLC
## GRANTOR

## TO

# SUFFERN PARTNERS LLC
## GRANTEE

## BARGAIN AND SALE DEED
### WITH COVENANT AGAINST GRANTOR'S ACTS

Dated:  as of September 5, 2017

Property known as:

| Parcel A: | Parcel B: | Parcel C: |
|---|---|---|
| 25 Old Mill Road<br>Suffern, New York | 19 Hemion Road<br>Montebello, New York | Route 59<br>Suffern, New York |
| County: Rockland<br>Village: Suffern<br>Section: 55.22<br>Block: 1<br>Lot: 1<br>Town of Romapo | County: Rockland<br>Village: Montebello<br>Section: 55.06<br>Block: 1<br>Lot: 1<br>Town of Romapo | County: Rockland<br>Village: Suffern<br>Section: 55.37<br>Block: 1<br>Lot: 31<br>Town of Romapo |

Record and Return to:

David Fleischman Esq
2233 Nostrand A C
Brooklyn Ny 11218

{11305441:8}

## BARGAIN AND SALE DEED
## WITH COVENANTS AGAINST GRANTORS ACTS

**THIS INDENTURE**, made as of the 5th day of September, 2017,

**BETWEEN**

**RS OLD MILLS RD, LLC**, a Delaware limited liability company, having an address at 17 Lime Kiln Road, Suffern, New York 10901 (the "Grantor"), and **SUFFERN PARTNERS LLC**, a New York limited liability company, having an address at 202 Grandview Avenue, Monsey, New York 10950 (the "Grantee");

**WITNESSETH**, that the Grantor, in consideration of Ten ($10.00) Dollars and other good and valuable consideration, paid by the Grantee, does hereby grant and release unto the Grantee, the heirs or successors and assigns of the Grantee forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Villages of Suffern and Montebello, Town of Ramapo, County of Rockland, State of New York, as more fully described on Schedule A, annexed hereto.

**SAID PREMISES** being designated as (i) Tax Map Section 55.22, Block 1 Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York (ii) Tax Map Section 55.06, Block 1 Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York and (iii) Tax Map Section 55.37, Block 1 Lot 31, Village of Suffern, Town of Ramapo, Rockland County, New York.

**SAID PREMISES** being and intended to be the same premises described in the deeds to NOVARTIS CORPORATION (or its predecessors, as applicable) from (i) Robert L. Smith, as executor of the Estate of Henry L. Smith under the last will and testament of Henry L. Smith, deceased, by Executor's Deed dated September 22, 1975, and recorded in the Office of the Rockland County Clerk (the "Office") on September 29, 1975 in Liber 968, Page 34; (ii) Maurice J. Palizza, Inc. by Deed dated April 21, 1971 and recorded in the Office on May 3, 1971 in Liber 889, Page 588; (iii) 8 J's Incorporated by Deed dated May 17, 1966 and recorded in the Office on April 29, 1971 in Liber 889, Page 384; (iv) Robert J. McMaster by Deed dated August 13, 1965 and recorded in the Office on August 30, 1965 in Liber 796, Page 892; (v) Church of the Sacred Heart by Deed dated October 24, 1960 and recorded in the Office on November 7, 1960 in Liber 724, Page 347; (vi) Robert W. Prier and Belle Zeck, as Trustees for Gwenn Mayer, Janice Mayer and Felicia Mayer, pursuant to a Trust Agreement dated November 6, 1959 by Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 991; (vii) Henry Mayer and Sidney Mayer, as Executors and Trustees of the Estate of Gustav Mayer, deceased, and Milton Klein as Trustee under the Last Will and Testament of Gustav Mayer,

{11305441:8}

deceased, by Executor's Deed dated August 9, 1960 and recorded in the Office on August 9, 1960 in Liber 719, Page 987; and (viii) Society of the Holy Child Jesus by Deed dated February 4, 1963 and recorded in the Office on February 8, 1963 in Liber 756, Page 940.

**SAID PREMISES ARE CONVEYED SUBJECT TO THE FOLLOWING RESTRICTIVE PROVISIONS AS TO THE USE OF SAID PREMISES:** Residential uses of any kind or nature are prohibited on, over or under the premises conveyed herein including, without limitation, single family dwellings, multi-family dwellings and mobile home dwellings and related facilities such as schools and other educational institutions and child care facilities of any kind. For avoidance of doubt, any and all uses of the premises conveyed herein are restricted to uses which are commercial or industrial and under no circumstances residential. The forgoing prohibition and restriction shall run with the land. The foregoing restriction shall be enforceable solely and exclusively by Grantor or any of the parent, subsidiary or affiliates of Grantor or any of the respective successors or assigns of any of the foregoing.

**TOGETHER** with all right, title, and interest, if any, of the Grantor in and to any streets and roads abutting the above described premises to the center line thereof; **TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to said premises; **TO HAVE AND TO HOLD** the premises herein granted unto the Grantee, the heirs or successors and assigns of the Grantee forever.

**AND** the Grantor covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid and except as set forth in any documents of record as of the date hereof.

**AND** the Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for the conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**AND** the Grantor is conveying the premises in the ordinary course of business.

**[Remainder of Page Intentionally Left Blank; Signature Page to Follow]**

{11305441:8}

**[Signature Page to Bargain and Sale Deed]**

**IN WITNESS WHEREOF,** the Grantor has duly executed this deed as of the date first above written.

**GRANTOR**

RS OLD MILLS RD, LLC,
a Delaware limited liability company

IN PRESENCE OF:

By: _____
Name: Avrohom Kaufman
Title: Managing Member

State of New York          :
                           : ss:
County of Rockland         :

On the 5th day of September, 2017, before me, the undersigned, personally appeared Avrohom Kaufman personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

YUDAH JUNGER
Notary Public - State of New York
No. 01JU6219230
Qualified in Kings County County
My Commission Expires: 03/22/20__

SCHEDULE A

Village of Suffern
Town of Ramapo
County of Rockland, State of NY:

Title No.: **RANY-27660**

**Parcels A & B:**
BEGINNING at a point in the westerly right-of-way of Hemion Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

Schedule A Description

RANY-27660

**SCHEDULE A**

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel A: 25 Old Mill Road, Suffern, NY 10901.
Designated as Section 55.06, Block 1, Lot 1, Rockland County, and also known as Parcel B: 19 Hemion Road, Montebello, NY 10901.

Schedule A Description                                                                                            RANY-27660

SCHEDULE A

**Parcel C**                                                                   Village of

ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo,
County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the
following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map
Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section
55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;
   a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
   b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;
   1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;
   2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly
right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09
feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;
   1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
   2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the Southerly
right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00
feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel C: Route 59, Suffern,
NY 10901.

Schedule A Description                                                                   RANY-27660