# EXHIBIT F

**SUFFERN PARTNERS LLC** and **NORTH 14TH STREET REALTY ASSOCIATES LLC**,
collectively, as mortgagor (collectively, Borrower)

to

**CPIF LENDING, LLC**, as mortgagee (Lender)

---

## AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

| | |
|---|---|
| Dated: | As of September 6, 2017 |
| Location: | Novartis Pharmaceutical Campus<br>25 Old Mill Road<br>Suffern, New York 10901<br>Section: 55.22, Block 1, Lot 1 |
| and: | 19 Hemion Road<br>Montebello, New York 10901<br>Section: 55.6, Block 1, Lot 1 |
| and: | Route 59<br>Suffern, New York 10901<br>Section: 55.37, Block 1, Lot 31 |
| County: | Rockland |
| Location: | 200 North 14th Street a/k/a 2 Berry Street<br>Brooklyn, New York 11249<br>Block 2279, Lot 15 |
| and: | 4-6 Berry Street<br>Brooklyn, New York 11249<br>Block 2279, Lot 24 |
| County: | Kings |

PREPARED BY AND UPON
RECORDATION RETURN TO:
CASSIN & CASSIN LLP
711 Third Avenue, 20th Floor
New York, New York 10017
Attention: Recording Department

**THIS MORTGAGE DOES NOT ENCUMBER REAL PROPERTY PRINCIPALLY IMPROVED OR TO BE IMPROVED BY ONE OR MORE STRUCTURES CONTAINING IN THE AGGREGATE NOT MORE THAN SIX (6) RESIDENTIAL DWELLING UNITS HAVING THEIR OWN SEPARATE COOKING FACILITIES.**

{01312538;4}

**AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

THIS AMENDED, RESTATED AND CONSOLIDATED MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as the same may be amended, modified, supplemented, extended and spread from time to time, this "**Mortgage**") is made as of September 6, 2017, by **SUFFERN PARTNERS LLC**, a New York limited liability company ("**Rockland County Borrower**"), having an address at 202 Grandview Avenue, Monsey, New York 10950 and **NORTH 14TH STREET REALTY ASSOCIATES LLC**, a New York limited liability company ("**Kings County Borrower**"), having an address at 202 Grandview Avenue, Monsey, New York 10950 (Rockland County Borrower and Kings County Borrower, jointly and severally, as co-borrowers, individually and collectively (as the context may require), and together with their permitted successors and assigns shall hereinafter be referred to as "**Borrower**" or "**Borrowers**"), collectively, as mortgagor, for the benefit of **CPIF LENDING, LLC**, a Washington limited liability company ("**Lender**"), as mortgagee, whose mailing address is 1910 Fairview Avenue East, Suite 200, Seattle, Washington 98102.

## WITNESSETH:

**WHEREAS**, this Mortgage is given to secure a loan (the "**Loan**") in the principal sum of **$33,000,000.00** pursuant to that certain Loan Agreement dated as of the date hereof between Borrowers and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by that certain Amended, Restated and Consolidated Promissory Note dated the date hereof made by Borrowers, jointly and severally, to Lender (such Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**");

**WHEREAS**, Lender is the holder of the mortgages listed on Schedule A-1 annexed hereto and made a part hereof (the "**Existing Rockland County Mortgages**") and the notes (the "**Existing Rockland County Notes**") secured thereby which are listed on Schedule B-1 annexed hereto and made a part hereof and that there are no offsets, setoffs or counterclaims against payment of said amounts due under the Existing Rockland County Notes;

**WHEREAS**, Lender is the holder of the mortgages listed on Schedule A-2 annexed hereto and made a part hereof (the "**Existing Kings County Mortgages**"; together with the Existing Rockland County Mortgages shall individually and collectively (as the context may require) be referred to as the "**Existing Mortgages**") and the notes (the "**Existing Kings County Notes**"; together with the Existing Rockland County Notes shall individually and collectively (as the context may require) be referred to as the "**Existing Notes**") secured thereby which are listed on Schedule B-2 annexed hereto and made a part hereof and that there are no offsets, setoffs or counterclaims against payment of said amounts due under the Existing Kings County Notes;

**WHEREAS**, the Existing Notes were combined, consolidated and restated by the Note given by Borrowers to Lender simultaneously herewith in evidence of the Loan, with interest from the date hereof at the rates set forth in the Note, such interest and the principal amount thereof to be payable in accordance with the terms and conditions provided in the Note and Loan Agreement;

{01312538;4}

**WHEREAS**, Borrowers desire to secure the payment of the Debt and the performance of all of their obligations under the Note, the Loan Agreement and the other Loan Documents; and

**WHEREAS**, Borrowers and Lender desire (a) to combine, consolidate and modify the liens of the Existing Mortgages, so as to create solely one lien covering the Property (as hereinafter defined), and (b) to restate the terms and conditions of the Existing Mortgages in their entirety in the manner hereinafter set forth;

**WHEREAS**, this Mortgage is given pursuant to the Loan Agreement and Note, and payment, fulfillment, and performance by Borrowers of their obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement, the Note, and that certain Assignment of Leases and Rents of even date herewith made by Borrowers in favor of Lender delivered in connection with this Mortgage (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the **"Assignment of Leases"**), including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Mortgage (the Loan Agreement, the Note, this Mortgage, the Assignment of Leases and all other documents evidencing or securing or otherwise setting out conditions, covenants, representations and/or remedies in favor of the Lender in connection with the funding of the Debt (including all additional mortgages, deeds of trust, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the **"Loan Documents"**).

**NOW THEREFORE**, in consideration of the making of the Loan and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Borrower hereby agrees, covenants, represents and warrants with and to Lender as follows:

The Existing Mortgages are hereby consolidated, modified and restated in their entirety, and the liens of the Existing Mortgages, as so consolidated are hereby amended, modified and restated so that all of the terms and conditions contained in this Mortgage shall supersede and control the terms and conditions of the Existing Mortgages (it being agreed that the execution of this Mortgage shall not impair the lien created by the Existing Mortgages) and that together they shall hereafter constitute but one mortgage and one lien represented by this Mortgage securing the amount of the Loan plus interest, and creating a single lien on the Property. Borrowers hereby assume all of the obligations and agreements of the Existing Mortgages and the notes or bonds secured thereby.

This Security Instrument does not extinguish the outstanding indebtedness evidenced by the Existing Notes or discharge or release the Existing Mortgages securing the indebtedness of the Existing Notes or any other security, and the parties do not intend this Mortgage to be a substitution or novation of the original indebtedness or instruments securing the same.

Each Borrower hereby irrevocably mortgages, grants, transfers, conveys and assigns to Lender, with power of sale for the benefit and security of Lender, all of Borrowers' present and future estate, right, title, claim, and interest, either in law or in equity, in and to the following property (**"Property"**):

(a)    The real property (**"Realty"**) described in <u>Exhibit A</u>, and all existing and future rights to the alleys, streets and roads adjoining or abutting the Realty;

{01312538;4}

3

(b)     All present and future easements, access, air and development rights, minerals and oil, gas and other hydrocarbon substances, royalties, water, water rights and water stock, and all other rights, hereditaments, privileges, permits, licenses, franchises and appurtenances belonging or in any way appertaining to the Realty;

(c)     All present and future buildings, improvements and tenements located on the Realty ("**Improvements**");

(d)     All present and future fixtures and articles of property attached to, or used or adapted for use in the ownership, development, operation or maintenance of the Realty and Improvements (whether such items are leased, owned, or subject to any title-retaining or security instrument), including without limitation all heating, cooling, air-conditioning, ventilating, refrigerating, plumbing, generating, power, lighting, laundry, maintenance, incinerating, lifting, cleaning, fire prevention and extinguishing, security and access control, cooking, gas, electric and communication fixtures, equipment and apparatus; all engines, motors, conduits, pipes, pumps, tanks, ducts, compressors, boilers, water heaters and furnaces; all ranges, stoves, disposers, refrigerators and other appliances; all escalators and elevators, baths, sinks, cabinets, partitions, mantels, built-in mirrors, window shades, blinds, screens, awnings, storm doors, windows and sash; all carpeting, underpadding, floor covering, panelling, and draperies; and all shrubbery and plants. All such items shall be deemed part of the Realty and not severable wholly or in part without material injury to the freehold;

(e)     All present and future rents, revenues, issues, profits and income from the Realty or the Improvements, and all present and future leases and other agreements for the occupancy or use of all or any part of the Realty and Improvements, including without limitation all cash or security deposits, advance rentals and deposits or payments of similar nature, and all guarantees of tenants' or occupants' performance under such leases and agreements;

(f)     All present and future tangible personal property ("**Personal Property**") used in connection with the ownership, development, operation or maintenance of the Realty and Improvements, including without limitation all furniture, furnishings, equipment, and supplies;

(g)     All present and future intangible personal property used in connection with the ownership, development, operation or maintenance of the Realty, Improvements, and Personal Property, including without limitation, all permits, licenses and franchises, contract rights (including without limitation architectural, engineering, consulting, and management contracts), accounts receivable, escrow accounts, insurance policies, deposits, instruments, documents of title, general intangibles, business records and the exclusive right to the use of trade names;

(h)     All present and future materials, supplies, and other goods, wherever located, whether in the possession of Borrower, warehouseman, bailee, or any other person, purchased for use in the construction, operation or furnishing of the Improvements, together with all documents, contract rights, and general intangibles relating thereto;

(i)     All present or future site plans, plats, architectural plans and specifications, work drawings, surveys, engineering reports, test borings, market surveys, and other work products relating to the Realty and Improvements;

{01312538;4}

4

(j)        All present or future agreements relating to any of the Property, construction contracts relating to the Improvements, together with all performance, payment, completion or other surety bonds in connection with or related to any such construction contracts which are transferable by Borrower;

(k)        All present and future contracts and policies of insurance which insure any of the Realty, buildings, structures or improvements on the Realty, or any fixtures or personal property thereon, against casualty and theft, and all monies and proceeds and rights thereto which may become payable by virtue of any insurance contracts or policies and all condemnation awards with respect to any taking or exercise of eminent domain by any governmental authority with respect to all or any portion of the Property;

(l)        Any good faith deposit or other deposit paid to any potential lender on the Property; and

(m)        All products and proceeds of the foregoing.

The following obligations are secured by this Mortgage (collectively the "**Secured Obligations**"):

i.        Payment of the sum of **THIRTY-THREE MILLION AND NO/100 DOLLARS ($33,000,000.00)**, or so much thereof as may be advanced, with interest thereon, according to the terms and provisions of that certain Amended, Restated and Consolidated Promissory Note dated as of the date hereof and given by Borrowers, jointly and severally, to the order of Lender (as the same may be renewed, modified, amended, supplemented and extended from time to time, the "**Note**").

ii.        Payment of all sums advanced to protect the security of this Mortgage, together with interest thereon as herein provided;

iii.        Payment of all other sums which are or which may become owing under the "Loan Documents" (defined below) or which may be advanced by Lender pursuant to the Loan Documents;

iv.        The performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined below); and

v.        Performance of all of Borrower's other obligations under the Loan Documents.

For purposes of this Mortgage, (x) the term "**Loan Documents**" means the Note, this Mortgage, that certain Loan Agreement, dated as of the date hereof and entered into between Borrowers and Lender (as the same may be modified, amended, supplemented and extended from time to time, the "**Loan Agreement**"), that certain Assignment of Leases and Rents, dated as of the date hereof and entered into between Borrowers and Lender (as the same may be modified, amended, supplemented and extended from time to time, the "**Assignment of Leases**"), that certain Pledge and Security Agreement whereby the members of each Borrower pledge a total of 100% of their direct equity interests in each Borrower to Lender as additional collateral for the Loan and all other amounts due by Borrower pursuant to the terms set forth in the Loan Documents (each such member, a "**Pledgor**") for the benefit of Lender (the "**Pledge Agreement**") and all other documents and instruments securing and/or evidencing the Loan (except the following documents shall not be considered Loan Documents for purposes hereof, (i) the Environmental Indemnity made by Goldie Reisman (the "**Guarantor**") and Borrowers for the benefit of

{01312538;4}                                                    5

Lender (the "**Environmental Indemnity**"), (ii) the Guaranty Agreement made by Guarantor for the benefit of Lender (the "**Guaranty Agreement**"), and (iii) the Payment and Carry Guaranty Agreement given by Guarantor for the benefit of Lender (the "**Payment Guaranty**"), and any and all modifications, extensions, renewals and replacements thereof, and (y) the term "**Transaction Documents**" means the Loan Documents together with the Environmental Indemnity, the Guaranty Agreement, and the Payment Guaranty, and any and all modifications, extensions, renewals and replacements thereof.

Notwithstanding anything to the contrary expressed or implied in this Mortgage or in any other Transaction Document, in no event shall the Secured Obligations be deemed to include, or any assignment of, lien upon or security interest in any real property or estate for years therein made or created pursuant to this Mortgage or any other Transaction Document be deemed to secure, (a) any debts, liabilities or obligations of any kind on the part of any Indemnitor pursuant to the Environmental Indemnity or (b) any debts, liabilities or obligations of any kind on the part of any guarantor or other surety (including, but not limited to, any Guarantor or any Pledgor) pursuant to any guaranty or other suretyship obligation (including, but not limited to, any of the Guaranty Agreement, the Payment Guaranty or the Pledge Agreement). This paragraph is sometimes referred to in one or more of the Transaction Documents as the "**Carve-Out Provision.**"

BORROWER HEREBY REPRESENTS, WARRANTS, COVENANTS AND AGREES AS FOLLOWS:

**SECTION 1.    TITLE AND USE.**

**1.1    Warranty of Title.** Each Borrower covenants and agrees that: (i) Borrower is lawfully seized of the estate hereby conveyed and has full right and power to grant, mortgage, convey and assign the Property, (ii) the Property is free from liens, encumbrances, exceptions and other charges of any kind whatsoever, except for the exceptions listed in Lender's title insurance policy insuring this Mortgage or exceptions otherwise approved in writing by Lender (each a "**Permitted Exceptions**"), (iii) no other liens or encumbrances, whether superior or inferior to this Mortgage, shall be created or suffered to be created by Borrower without the prior written consent of Lender, (iv) no default on the part of Borrower or any other person exists under any of the Permitted Exceptions and all of the Permitted Exceptions are in full force and effect and in good standing, without modification, (v) none of the Permitted Exceptions will be modified by Borrower without Lender's prior written consent, (vi) Borrower shall fully comply with all the terms of the Permitted Exceptions and shall deliver to Lender a copy of all notices delivered in connection with the Permitted Exceptions, (vii) Lender has the right to contact the other parties to the Permitted Exceptions to confirm the status thereof, and Borrower from time to time shall, at the request of Lender, request of such parties a certificate confirming such information regarding the Permitted Exceptions as Lender may request, and (viii) Borrower shall forever warrant and defend the Property unto Lender against all claims and demands of any other person whatsoever, subject only to non-delinquent taxes and assessments and the Permitted Exceptions. In the event any action or proceeding is commenced that questions Borrower's title or the interest of Lender under this Mortgage, Borrower shall defend the action and hold Lender harmless at Borrower's expense. Borrower may be the nominal party in such proceeding, but Lender shall be entitled to participate and be represented in the proceeding by counsel of Lender's choice, and Borrower shall deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**1.2    Non-Agricultural Use; Commercial Loan.** Each Borrower represents and warrants to the Lender that none of the Property is presently, or will be during the term of the Loan, used for agricultural or farming purposes. The Loan secured by this Mortgage is a commercial loan for the acquisition of the Property.

**1.3    Hazardous Materials.** Each Borrower has made certain representations, warranties and covenants regarding hazardous materials and environmental matters in the Environmental Indemnity, and Borrower shall comply with the aforesaid covenants regarding hazardous materials and environmental matters.

**SECTION 2.    BORROWER'S COVENANTS.**

**2.1    Payment and Performance of Secured Obligations.** Borrowers shall pay when due all sums which are now or which may become owing under the Note and the Loan Agreement, and shall pay and perform all other Secured Obligations in accordance with their terms.

**2.2    Payment of Taxes, Utilities, Liens and Charges.**

(a)    Taxes and Assessments. Except as the same may otherwise be paid pursuant to Section 3, Borrower shall pay directly to the payee thereof when due all Taxes (as defined in the Loan Agreement) and assessments (including without limitation, non-governmental levies or assessments such as maintenance charges, owner association dues or charges, or fees, levies or charges resulting from covenants, conditions or restrictions) levied, assessed or charged against or with respect to the Property or this Mortgage. Upon request, Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph and all receipts evidencing such payments.

(b)    Utilities. Borrower shall pay when due all utility charges and assessments for services furnished to the Property.

(c)    Labor and Materials. Borrower shall pay when due the claims of all persons supplying labor or materials to or in connection with the Property.

(d)    Liens and Charges. Borrower shall promptly discharge any lien, encumbrance, or other charge, whether superior or inferior to this Mortgage, which may be claimed against the Property.

(e)    Taxes, Assessments and Other Charges Imposed on Lender. If, at any time after the date of this Mortgage, any law is enacted or changed (including any interpretation thereof) which subjects Lender to any increase in any tax (except federal, state or local income taxes), assessments, or other charge, in any form measured by or based on any portion of the indebtedness secured by this Mortgage, Borrower shall pay such increased amount to Lender on demand; provided that if any such payment would be unlawful, Lender may declare all accrued interest and the entire principal balance of the Note immediately due and payable, in which case no prepayment premium pursuant to Section 3 of the Note shall be payable.

(f)    Right to Contest. Notwithstanding anything set forth in this Section 2.2, so long as no Event of Default shall occur hereunder, Borrower shall have the right to contest the amount or validity in whole or in part of any Taxes, lien, encumbrance or other charge against the Property by

{01312538;4}

7

appropriate administrative or judicial proceedings conducted in good faith and with due diligence, in which event Borrower, upon written notice to Lender, may defer payment of any such Taxes, lien, encumbrance or other charge, so long as (i) Borrower shall have provided Lender with evidence satisfactory to Lender that such proceedings shall operate to prevent the sale of the Property or any portion thereof, or the imposition of any penalties on Borrower or the Property; (ii) neither the Property nor any part thereof will, by reason of such postponement or deferment, be in danger of being forfeited or lost; (iii) before the date such Taxes, lien, encumbrance or other charge becomes delinquent, Borrower shall provide Lender with such security as Lender may reasonably require to insure payment thereof and prevent any forfeiture or loss of the Property or any part thereof; and (iv) on a final determination of such contest, which is not appealable or is not being appealed, Borrower shall pay the amount of the Taxes, lien, encumbrance or other charge if and when due, and prior to the imposition of any penalties or delinquent interest.

**2.3** **Insurance.**

(a)   <u>Coverages Required</u>. Borrowers shall keep the following insurance coverages in effect with respect to the Property:

(1)   An "All-Risk" hazard insurance policy on the Property, which during the construction of the Improvements, if applicable, shall be in a Builder's All-Risk Form. Such insurance shall name Lender as loss payee on a Form 438-BFU or acceptable equivalent attached to the policy, shall be in an amount not less than one hundred percent (100%) of the full replacement cost of the Improvements and any other improvements on the Property, and shall contain such endorsements and coverages as Lender may reasonably require. In addition, no deductible payable under the foregoing policy shall exceed $25,000.00.

(2)   A flood insurance policy in the maximum amount available, as required by the Flood Disaster Protection Act of 1973, if the Property is located in an area designated by the United States Department of Housing and Urban Development as a special flood hazard area (Flood Zone A or V). The policy shall name Lender as loss payee on a Form 438-BFU or acceptable equivalent attached to the policy.

(3)   A commercial general liability insurance on an Occurrence Based policy with respect to the Property insuring against claims of bodily injury, death or property damage (combined single limit form), in an amount not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate, naming Lender as an additional insured, plus umbrella or excess liability coverage in an amount not less than Twenty Million Dollars ($20,000,000). If this insurance policy covers multiple locations the general aggregate limit must apply per location.

(4)   Insurance against such similar or other hazards, casualties, liabilities and contingencies, in such forms and amounts, as Lender may from time to time reasonably require.

(5)   Loss of rental value insurance and/or business interruption insurance, as follows: If all or any portion of the Property is rented or leased, loss of rental value insurance in an amount equal to twelve (12) months' aggregate gross rents from the Property as is so occupied. If all or any portion of the Property is occupied by Borrower, business interruption insurance in an amount

{01312538;4}

8

equal to twelve (12) months' net income from such portion of the Property as is so occupied. The amount(s) of such coverage(s) shall be subject to adjustment, from time to time at Lender's request, to reflect changes in the rental and/or income levels during the term of the Loan.

(6)     An environmental liability insurance policy (the "**Environmental Insurance Policy**") issued by Beazley Insurance with a $25,000,000.00 loss limit and a $100,000.00 deductible covering the period from the Closing Date to and including the first anniversary of the Closing Date. Borrower shall renew the Environmental Insurance Policy each year during the term of the Loan at least ten (10) business days prior to the expiration of such Environmental Insurance Policy.

Any blanket insurance Policy shall be subject to Lender approval and shall otherwise provide the same protection as would a separate insurance policy insuring only the Property in compliance with the provisions of this Section 2.3 (any such blanket policy, an "**Acceptable Blanket Policy**"). To the extent that the insurance policies set forth in this Section 2.3 are maintained pursuant to an Acceptable Blanket Policy that covers more than one location within a one thousand foot radius of the Property (the "**Radius**"), the limits of such Acceptable Blanket Policy must be sufficient to maintain coverages as set forth in Section 2.3(a) for the Property and any and all other locations combined within the Radius that are covered by such blanket policy calculated on a total insured value basis.

(b)     Policies. Each insurance policy will be issued by a company and in a form reasonably acceptable to Lender. All insurance shall be written on policies with an AM Best rating of at least A-, VII or better. All required policies will provide for at least thirty (30) days' written notice to Lender prior to the effective date of any cancellation or material amendment, which term shall include any reduction in the scope or limits of coverage, except ten (10) days prior notice of cancellation for non-payment of premiums. Borrower shall furnish to Lender (i) within five days of request from Lender, the original of each required insurance policy, or (ii) a certified copy thereof together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. As security for the Secured Obligations, Borrower hereby assigns to Lender all required insurance policies (to the extent assignable), together with all proceeds thereof, rights thereto and all unearned premiums returnable upon cancellation; provided, however, Lender acknowledges and agrees that any proceeds from the commercial general liability insurance policy shall be utilized to solely pay the claims under such insurance policy, and need not be paid directly to Lender.

(c)     Payment; Renewals. Borrower shall promptly furnish to Lender all renewal notices relating to insurance policies. Except as the same may otherwise be paid under Section 3, Borrower shall pay all premiums on insurance policies directly to the carrier. At least fifteen (15) days prior to the expiration date of each such policy, Borrower shall furnish to Lender a renewal policy in a form acceptable to Lender, together with evidence that the renewal premium has been paid.

(d)     Application of Insurance Proceeds. Any proceeds received by Lender in connection with the Property shall be deposited in an interest-bearing account with interest accruing for the benefit of Borrower. In the event of any loss, Borrower shall give prompt written notice thereof to the insurance carrier and Lender. Subject to the terms set forth in the Loan Agreement, Borrower hereby authorizes Lender as Borrower's attorney-in-fact to make proof of loss, to adjust and compromise any claim, to commence, appear in and prosecute, in Lender's or Borrower's name, any action relating to any

{01312538;4}

9

claim, and to collect and receive insurance proceeds; provided, however, that Lender shall have no obligation to do so. Lender shall apply any insurance proceeds received by it hereunder first to the payment of the costs and expenses incurred in the collection of the proceeds and then, other than proceeds from the commercial general liability insurance policy, in its absolute discretion and without regard to the adequacy of its security, to:

(1)    The payment of the Secured Obligations, whether then due and payable or not. Any such application of proceeds to principal on the Note shall be without imposition of any prepayment fee otherwise payable under the Note, but shall not extend or postpone the due dates of the installment payments under the Note, or change the amounts thereof; or

(2)    The reimbursement of Borrower, under Lender's prescribed disbursement control procedures, for the cost of restoration or repair of the Property. Lender may, at its option, condition the reimbursement on Lender's approval of the plans and specifications of the reconstruction, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage completion of construction, application of payments and satisfaction of liens as Lender may reasonably require.

Except to the extent that insurance proceeds are applied to payment of the Secured Obligations, nothing herein contained shall be deemed to excuse Borrower from restoring, repairing or maintaining the Property as provided in Section 2.4, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient in amount.

(e)    Transfer of Title. If the Property is sold pursuant to Section 7 or if Lender otherwise acquires title to the Property, Lender shall have all of the right, title and interest of Borrower in and to any insurance policies (other than the Acceptable Blanket Policy with respect to commercial general liability coverage) and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

## 2.4    Preservation and Maintenance of Property; Right of Entry.

(a)    Preservation and Maintenance. Borrowers shall (i) not commit or suffer any waste or permit any impairment or deterioration of the Property, (ii) not abandon the Property, (iii) restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Lender may reasonably approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (iv) keep the Property, including Improvements, fixtures, equipment, machinery and appliances thereon, in good condition and repair and shall replace fixtures, equipment, machinery and appliances of the Property when necessary to keep such items in good condition and repair, and (v) generally operate and maintain the Property in a commercially reasonable manner.

(b)    Alterations. None of the Improvements shall be structurally altered, removed or demolished, in whole or in part, without Lender's prior written consent, nor shall any fixture or chattel covered by this Mortgage and adapted to the use and enjoyment of the Property be removed at any time without like consent unless actually replaced by an article of equal suitability which is owned by Borrower free and clear of any lien or security interest.

{01312538;4}

10

(c)    Right of Entry.  Lender is hereby authorized to enter the Property, including the interior of any structures, at reasonable times and after at least twenty-four (24) hours prior written notice (except in the event of an emergency in which case no prior notice is required, or as otherwise permitted by Borrower) for the purpose of inspecting the Property to determine Borrower's compliance with this paragraph.

2.5    **Parking.**  If any part of the automobile parking areas included within the Property is taken by condemnation, and before the parking areas are diminished for any other reason, Borrower shall take all actions as are necessary to provide parking facilities in kind, size and location to comply with all governmental zoning and other regulations and all leases.  Before making any contract for substitute parking facilities, Borrower shall furnish to Lender satisfactory assurance of completion thereof free of liens and in conformity with all government zoning and other regulations.  This Mortgage shall constitute a first lien on all such substitute parking facilities.

2.6    **Use of Property.**  Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body, and all other covenants, conditions and restrictions applicable to the Property, and pay all fees and charges in connection therewith.  Unless required by applicable law or unless Lender has otherwise agreed in writing, Borrower shall not allow changes in the use for which all or any part of the Property was intended at the time this Mortgage was executed without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.  Borrower shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

2.7    **Condemnation.**  Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking (including without limitation any change in the grade of the Property), whether direct or indirect, of the Property or part thereof or interest therein, and Borrower shall appear in and prosecute any such action or proceeding unless otherwise directed by Lender in writing. Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower, to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any such condemnation or other taking, and to settle or compromise any claim in connection with such condemnation or other taking.  All awards, payments, damages, direct, consequential and otherwise, claims, and proceeds thereof, in connection with any such condemnation or other taking, or for conveyances in lieu of condemnation, are hereby assigned to Lender, and all proceeds of any such awards, payments, damages or claims shall be paid to Lender. Lender shall apply any such proceeds in the manner and upon the terms and conditions set forth in Section 2.3(d) above relating to the application of insurance proceeds.

2.8    **Protection of Lender's Security.**  Borrower shall give notice to Lender of and shall appear in and defend any action or proceeding that may affect the Property, the interests of Lender therein, or the rights or remedies of Lender under the Loan Documents.  If any such action or proceeding is commenced, or Borrower fails to perform any obligation under the Loan Documents, Lender may, at its option, make any appearances, disburse any sums, make any entries upon the Property, and take any actions as may be necessary or desirable to (i) protect or enforce the security of this Mortgage, (ii) remedy Borrower's failure to perform its obligations under the Loan Documents (without waiving such default by Borrower), or (iii) otherwise protect Lender's interests.  Borrower shall pay all losses, damages, fees, costs, and expenses incurred by Lender in taking such actions, including without limitation reasonable legal fees.

{01312538;4}

11

**2.9    Reimbursement of Lender's Expenses.** All amounts disbursed by Lender pursuant to Section 2.8 or any other provision of this Mortgage, with interest thereon, shall be additional indebtedness of Borrower secured by this Mortgage. All such amounts shall be immediately due and payable and bear interest from the date of disbursement at the lesser of the then applicable interest rate under the Note, or the maximum rate permitted by law.

**2.10    Books and Records, Financial Statements.** Borrower shall keep and maintain at Borrower's address stated above, or such other place as Lender may approve in writing, books of accounts and records adequate to reflect correctly the results of the operation of the Property, and copies of all written contracts, leases and other instruments which affect the Property. Such books, records, contracts, leases and other instruments shall be subject to examination, inspection and copying at any reasonable time by Lender upon at least twenty-four (24) hours prior written notice, or as otherwise permitted by Borrower. During the term of the Loan, Borrower shall provide to Lender, in form satisfactory to Lender, the financial information required by Lender pursuant to the terms set for the in the Loan Agreement. Furthermore, during the term of the Loan (at any time that Lender is not maintaining a reserve for the payment of Taxes pursuant to the terms of the Note or pursuant to Section 3.1 below), Borrower shall provide to Lender within twenty (20) days after the due date, evidence of the payment of any and all real estate taxes due and payable in connection with the Property. The obligations set forth in this Section 2.10 shall survive and apply until any and all monetary obligations that Borrower, any guarantor or any related entity of Borrower or any guarantor owes to Lender, now existing or hereafter arising, whether related to the Loan, the Loan Documents or otherwise, have been satisfied in full.

**SECTION 3.    RESERVES.** Subject to the provisions regarding reserves as set forth in the Note and the other Loan Documents:

**3.1    Deposits.** Subject to the terms set forth in Section 1.2 of the Note, Borrower shall deposit on the dates required by Lender a sum equal to (i) the Taxes and special assessments due or to become due in connection with the Property, and (ii) the premiums due or to become due on insurance policies as may be required under this Mortgage. Lender may require Borrower to deposit with Lender, in advance, upon not less than thirty (30) days prior written notice, such other sums for other taxes, assessments, premiums, charges and impositions in connection with Borrower or the Property as Lender reasonably deems necessary to protect Lender's interests (**"Other Impositions"**). Such sums for Other Impositions shall be deposited in a lump sum or in periodic installments, at Lender's option. If required by Lender, Borrower shall promptly deliver to Lender all bills and notices with respect to any taxes, assessments, premiums and Other Impositions. Lender shall not be required to pay Borrower any interest, earnings or profits on any sums deposited with Lender. All sums deposited with Lender under this Section 3.1 are hereby pledged as security for the Secured Obligations.

**3.2    Application of Deposits.** All such deposited sums shall be held by Lender and applied in such order as Lender elects to pay such Taxes, assessments, premiums and Other Impositions or, upon any Event of Default, may be applied in whole or in part, to the Secured Obligations. The arrangement provided for in this Section 3 is solely for the added protection of Lender and entails no responsibility on Lender's part beyond the allowing of due credit, without interest, for the sums actually received by it. Upon any assignment of this Mortgage by Lender, any funds on hand shall be turned over to the assignee and any responsibility of Lender with respect thereto shall terminate. Each transfer of the Property in accordance with Section 4 below shall automatically transfer to the transferee all rights of Borrower with

{01312538;4}

12

respect to any funds deposited hereunder. Upon payment in full of the Secured Obligations, Lender shall promptly refund to Borrower the remaining balance of any deposits then held by Lender.

**3.3     Adjustments to Deposits.** If the total deposits held by Lender exceeds the amount deemed necessary by Lender to provide for the payment of such Taxes, assessments, premiums and Other Impositions, such excess may, provided there is no Event of Default or any event which would constitute an Event of Default if not cured within the time allowed, be credited by Lender on the next due installment or installments of such deposits. If at any time the total deposits held by Lender are less than the amount deemed reasonably necessary by Lender to provide for the payment of such taxes, assessments, premiums and Other Impositions, Borrower shall promptly deposit the deficiency with Lender after receipt of written demand from Lender.

## SECTION 4.    RESTRICTIONS ON TRANSFER OR ENCUMBRANCE.

**4.1     Prohibition on Transfer.** (a)    Subject to the Permitted Transfers (as hereinafter defined) described in clause (b) below, neither the Property nor any part thereof or interest therein shall be encumbered, sold (by contract or otherwise), conveyed, pledged, or otherwise transferred by Borrower; nor shall there be any change in (i) the ownership or Control (as such term is defined in the Loan Agreement) of any of Borrower's stock if Borrower is a corporation, (ii) the ownership or Control of any membership interest if Borrower is a limited liability company, (iii) the ownership or Control of any general partnership interest in Borrower if Borrower is a partnership, (iv) the ownership or Control of any beneficial interest in Borrower if Borrower is not otherwise a natural person or persons, and (v) the ownership or control of any stock, any general partnership interest, membership interests or any other beneficial interest in any corporation, partnership, limited liability company or other entity that has a direct or indirect ownership interest in Borrower. Any such action without Lender's prior written consent shall be deemed to increase the risk of Lender, and shall constitute an automatic Event of Default. Lender shall be entitled, at its option, to declare immediately due and payable all of the Secured Obligations secured by this Mortgage, and exercise any other rights and remedies that it may have under this Mortgage or the other Loan Documents. Lender may, in its sole discretion, consent to any such action subject to such terms and conditions as Lender may require, in its sole discretion. In such event Lender shall not be required to release the original obligor or any other party liable for the Secured Obligations.

(b)     Notwithstanding anything to the contrary contained in Section 4.1(a) hereof, the following Transfers (so long as any such Transfer satisfies all of the below conditions in this Section 4.1(b)) (each a "**Permitted Transfer**") shall be permitted hereunder:

(i)     Provided no Event of Default shall then exist, a transfer of direct or indirect interests in Borrower (other than a transfer of Principal's interest in Borrower or any direct or indirect interest in Principal) shall be permitted without Lender's consent provided that:

(A)    Borrower and Principal (as defined in the Loan Agreement) shall continue to be a Single Purpose Bankruptcy Remote Entity;

(B)    such transfer shall not cause the transferee (other than to Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds forty-nine percent (49%);

{01312538;4}

13

(C)    (1) after giving effect to such a transfer pursuant to this clause (i), Borrower shall continue to be Controlled by Guarantor and (2) such Transfer shall not result in a change of the day to day management and operations of the Property, Borrower or Principal; and

(D)    if such transfer would cause the transferee (other than Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), (x) such transferee is reasonably approved by Lender and (y) Borrower shall provide to Lender thirty (30) days prior written notice thereof.

(ii)    provided no Event of Default shall then exist, a transfer of any direct or indirect interest in Borrower (other than a Transfer of Principal's interest in Borrower or any direct or indirect interest in Principal) related to or in connection with the estate planning of such transferor to (1) an immediate family member of such interest holder (or to partnerships or limited liability companies Controlled solely by one or more of such family members) or (2) a trust established for the benefit of such immediate family member, provided that:

(A)    Borrower shall provide to Lender thirty (30) days prior written notice thereof;

(B)    such Transfer shall not otherwise result in a change of Control of Borrower or change of the day to day management and operations of the Property;

(C)    each of Borrower and Principal shall continue to be a Special Purpose Bankruptcy Remote Entity;

(D)    if such transfer would cause the transferee (other than Guarantor), together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which equals or exceeds ten percent (10%), such transferee is reasonably approved by Lender; and

(E)    (1) after giving effect to such a transfer pursuant to this clause (ii), Borrower shall continue to be Controlled by Guarantor and (2) such Transfer shall not result in a change of the day to day management and operations of the Property, Borrower or Principal.

In connection with any Permitted Transfer, to the extent a transferee (other than a passive investor that does not Control Borrower; provided, however, Lender in all instances will still be permitted to run OFAC and Patriot Act searches on such passive investors which searches shall be reasonably satisfactory to Lender) shall own ten percent (10%) or more of the direct or indirect ownership interests in Borrower immediately following such transfer (provided such transferee owned less than ten percent (10%) of the direct or indirect ownership interests in Borrower as of the Closing Date), Borrower shall deliver (and Borrower shall be responsible for any reasonable out of pocket costs and expenses in connection therewith), customary searches reasonably requested by Lender in writing (including credit, judgment, lien, litigation, bankruptcy, criminal and watch list) reasonably acceptable to Lender with respect to such transferee.  In addition and except as provided for above in this <u>Section 4.1(b)</u>, in connection with any Permitted Transfer, Principal shall remain the managing member of Borrower.

**SECTION 5.    <u>UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.</u>**
{01312538;4}

14

**5.1    Grant to Lender.**  This Mortgage constitutes a security agreement pursuant to the Uniform Commercial Code with respect to (a) any of the Property which, under applicable law, is not real property or effectively made part of the real property by the provisions of this Mortgage; and (b) any and all other property now or hereafter described on any Uniform Commercial Code Financing Statement naming Borrower as Debtor and Lender as Secured Party and affecting property in any way connected with the use and enjoyment of the Property (any and all such other property constituting "**Property**") for purposes of this Mortgage.  Borrower hereby grants Lender a security interest in all property described in clauses (a) and (b) above as security for the Secured Obligations.  For purposes of this Mortgage, the term "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York or, if and to the extent applicable, any other relevant jurisdiction.

**5.2    Fixture Filing.**  This Mortgage shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code with respect to all of the Property consisting of goods that are or are to become "fixtures" (as that term is defined in Section 9102 of the Uniform Commercial Code) related to the real property described in this Mortgage, upon being filed for record in the real estate records of the county in which such fixtures are or are to be located.  With respect to said fixture filing, (a) the name of each debtor is Suffern Partners LLC and North 14th Street Realty Associates LLC, (b) the name of the secured party is CPIF Lending, LLC, (c) the collateral covered hereby includes goods that are or are to become "fixtures" (as that term is defined in Section 9102 of the Uniform Commercial Code) related to the real property described in this Mortgage, and (d) the debtor is the record owner of, or otherwise has an interest of record in, the real property described in this Mortgage.  Information concerning the security interest herein granted may be obtained at the addresses of the debtor (Borrower) and the secured party (Lender) as set forth in the first paragraph of this Mortgage.

**5.3    Status of Borrower; Financing Statements.**  Each Borrower's exact legal name is correctly set forth on the signature page of this Mortgage.  Each Borrower is an organization of the type specified in the introductory paragraph of this Mortgage.  Each Borrower is incorporated in or organized under the laws of the state specified in the introductory paragraph of this Mortgage.  Borrower will not cause or permit any change to be made in its name, identity or corporate, company or partnership structure (including, for this purpose, its jurisdiction of organization) unless the Borrower shall have notified Lender in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Lender for the purpose of further perfecting or protecting the lien and security interest of Lender in the Property.  Each Borrower's principal place of business and chief executive office, and the place where Borrower keeps its book and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writing, plans, specifications and schematics concerning the Property, has been for the preceding four months (or less if for the entire existence of Borrower) and will continue to be the address of Borrower set forth in the first paragraph of this Mortgage (unless Borrower notifies Lender of any change in writing at least thirty (30) days prior to the date of such change).  If Borrower is an individual, Borrower's principal residence has been for the preceding four months and will continue to be the address of the principal residence of Borrower set forth at the end of this Mortgage (unless Borrower notifies Lender of any change in writing at least thirty (30) days prior to the date of such change).  Rockland County Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is 5183694.  Kings County Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is 2240110.  Each Borrower shall promptly notify Lender of any change of its organizational identification number.  If Borrower does not now have an organizational identification number and

{01312538;4}

15

later obtains one, Borrower shall promptly notify Lender of such organizational identification number. Borrower agrees that Lender may file this Mortgage, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Mortgage or of any other security agreement or financing statement shall be sufficient as a financing statement. Borrower hereby authorizes Lender (and Lender's representatives and agents) to file financing statements (and amendments thereto) relating to the Property. The form and substance of any financing statement filed with respect to this Mortgage shall be as Lender, in its sole discretion, may determine. Borrower shall pay all costs of filing such financing statements and any extensions, continuations, renewals, amendments and releases thereof, and shall pay all costs and expenses of any record searches for financing statements which Lender may require.

**5.4    Lender's Rights and Remedies.** With respect to the property subject to the foregoing security interest, Lender shall have all the rights and remedies (i) of a secured party under the Uniform Commercial Code, and (ii) as provided by law. In exercising its remedies, Lender may proceed against the items of real property and any items of personal property separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies. Upon demand by Lender following an Event of Default hereunder, Borrower shall assemble any items of personal property and make them available to Lender at the Property. Lender shall give Borrower at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such Property or of the time of or after which any private sale or any other intended disposition is to be made. Any person permitted by law to purchase at any such sale may do so. Such Property may be sold at any one or more public or private sales as permitted by applicable law.

**SECTION 6.    ASSIGNMENT OF RENTS AND LEASES; LEASES OF PROPERTY; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

**6.1    Assignment of Rents and Leases.** As part of the consideration for the Secured Obligations, and not as additional security therefor, Borrower hereby absolutely and unconditionally assigns and transfers to Lender all right, title and interest of Borrower in and to: (a) any and all present and future leases, subleases, and other agreements for the occupancy or use of all or any part of the Property, and any and all extensions, renewals and replacements thereof ("**Leases**"); (b) all cash or security deposits, advance rentals and deposits of a similar nature under the Leases; (c) any and all guarantees of tenants' or occupants' performances under any and all Leases; and (d) all rents, issues, profits and revenues ("**Rents**") now due or which may become due or to which Borrower may now or shall hereafter become entitled or may demand or claim (including Rents coming due during any redemption period), arising or issuing from or out of any and all Leases, including without limitation minimum, additional, percentage and deficiency rents and liquidated damages.

**6.2    Collection of Funds.** (a) It is intended by Borrower that this Mortgage constitute a present, absolute assignment of the Leases, Rents, any lease guaranties and bankruptcy claims, and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 6.2, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents, as well as any sums due under any lease guaranties. Borrower shall hold the Rents, as well as all sums received pursuant to any lease guaranty, or a portion thereof sufficient to discharge all current sums due on the Secured Obligations, in trust for the benefit of Lender for use in the payment of such sums; provided, however, that so long as an Event of Default is not then continuing, and Borrower is in compliance with its obligations under the Loan Documents, Borrower may make distributions and/or pay

{01312538;4}

dividends pursuant to the express terms set forth in the applicable organizational documents to its partners and members. Upon or at any time after the occurrence of an Event of Default, the license granted to Borrower above shall automatically be revoked and Lender shall immediately be entitled to possession of all Rents and all sums due under any lease guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving any Event of Default, without regard to the adequacy of the security for the Secured Obligations, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto, and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper and, either with or without taking possession of the Property, in its own name, demand, sue for or otherwise collect and receive all Rents and all sums due under all lease guaranties, including, without limitation, those past due and unpaid (with all such Rents and all sums due under any lease guaranties to be deposited with Lender), with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper. In addition, upon the occurrence of an Event of Default, Lender, at its option, may (1) complete any construction on the Property in such manner and form as Lender deems advisable, (2) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any lease guaranties (with all such Rents and all sums due under any lease guaranties to be deposited with Lender), and/or (3) either (i) require Borrower to pay monthly in advance to Lender or to any receiver appointed to collect the Rents the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in the possession of Borrower, or (ii) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise. The provisions set forth in this Section 6.2 shall be in all instances subject to the rights of tenants under their respective executed Leases.

(b)    Pursuant to the terms of the DACA (as defined in the Loan Agreement), Lender shall immediately be entitled to possession of all Rents from the Property as the same become due and payable, including without limitation Rents then due and unpaid. Borrower hereby expressly authorizes and directs all present and future tenants of the Property to pay any and all Rents due Borrower pursuant to the Leases directly to Lender or such nominee as Lender may designate. Borrower agrees any tenants who make payments directly to Lender or its designee after receipt of such a notice are hereby expressly relieved of any and all duty, liability or obligation to Borrower in respect of all payments so made. Lender may exercise, in Lender's or Borrower's name, all rights and remedies available to Lender with respect to collection of Rents. Nothing herein contained shall be construed as obligating Lender to perform any of Borrower's obligations under any of the Leases. To the extent that any Rents are delivered to Borrower, all such Rents shall be held by Borrower as trustee for the benefit of Lender only.

**6.3    Borrower's Representations and Warranties.**    Borrower hereby represents and warrants to Lender that Borrower has not executed and will not execute any other assignment of said Leases or Rents, that Borrower has not performed and will not perform any acts and has not executed and will not execute any instrument which would prevent Lender from exercising its rights under this Section 6, and that at the time of execution of this Mortgage there has been no anticipation or prepayment of any of the Rents of the Property for more than one (1) month prior to the due dates thereof. Borrower shall

{01312538;4}

17

execute and deliver to Lender such further assignments of Rents and Leases of the Property as Lender may from time to time reasonably request.

**6.4    Leases of the Property.**    Borrower shall comply with and observe Borrower's obligations as landlord under all Leases and will do all that is necessary to preserve all Leases in force and free from any right of counterclaim, defense or set off.    Borrower shall furnish Lender with executed copies of all Leases now existing or hereafter made and all Leases hereafter entered into will be on a form and in substance satisfactory to Lender, in its sole discretion.    At such time as Borrower intends to enter into a new Lease, Borrower shall submit the prospective Lease to Lender for its review and approval; such approval, or Lender's disapproval with respect to any specific terms, shall be provided to Borrower within ten (10) business days following the date on which any prospective Lease is submitted to Lender.    If Lender has not responded within ten (10) business days of Borrower's request for approval, Lender's approval will be deemed given in accordance with and pursuant to, the terms set forth in the Loan Agreement.    All commercial Leases will specifically provide that the tenant attorns to any person succeeding to the interest of Borrower upon any foreclosure of this Mortgage or conveyance in lieu thereof, provided that Lender does not disturb the tenant's rights under the Lease so long as the tenant is not in default thereunder; such attornment shall be in such form as Lender may approve and shall provide that the tenant shall not have the right of set off or defense to payment of rents for any event or act that occurred prior to such successor obtaining title to Borrower's interest except to the extent such event or act is continuing at the time such successor obtains such title.    The tenant shall also agree to execute such further evidences of attornment within ten (10) days of Lender's request.    Without Lender's written consent, Borrower shall not (i) collect or accept payment of any Rents more than one (1) month prior to the due dates thereof; (ii) modify or surrender any Lease; (iii) modify the obligations of any tenant or other occupant of the Property under any Lease; or (iv) request or consent to the subordination of any commercial Lease to any lien subordinate to this Mortgage.    Borrower shall have the right to terminate Leases at the Property.

**6.5    Lender in Possession; Appointment of Receiver.**    Upon any Event of Default hereunder, Lender may, in person, by agent or by a court-appointed receiver, regardless of the adequacy of Lender's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof in the same manner and to the same extent as Borrower could do the same, including without limitation the execution, enforcement, cancellation and modification of Leases, the collection of all Rents of the Property, the removal and eviction of tenants and other occupants, the making of alterations and repairs to the Property, and the execution and termination of contracts providing for management or maintenance of the Property, all on such terms as are deemed best by Lender to protect the security of this Mortgage.    From and after the occurrence of any such Event of Default, if any owner of the Property shall occupy the Property or part thereof such owner shall pay to Lender in advance on the first day of each month a reasonable rental for the space so occupied, and upon failure so to do Lender shall be entitled to remove such owner from the Property by any appropriate action or proceedings.    Following an Event of Default hereunder, Lender shall be entitled (regardless of the adequacy of Lender's security) to the appointment of such receiver, Borrower hereby consenting to the appointment of such receiver.    Said receiver may serve without bond and, if permitted by law, may be Lender or an employee of Lender.    The receiver shall have, in addition to all the rights and powers permitted under applicable law, all the rights and powers granted to Lender in this Section 6.    Lender or the receiver shall be entitled to receive a reasonable fee for so managing the Property.

{01312538;4}

18

**6.6    Application of Rents.** All Rents collected by Lender shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the Rents, including without limitation reasonable attorneys' fees, receiver's fees, premiums on receiver's bonds, costs of maintenance and repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Borrower under the Leases, and then to the Secured Obligations, or in such other order as Lender may determine in its sole discretion. Lender or the receiver shall be liable to account only for those Rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Property by reason of anything done or left undone by Lender under this Section.

**6.7    Deficiencies.** To the extent, if any, that the costs of taking control of and managing the Property, collecting the Rents, and discharging obligations and liabilities of Borrower under the Leases, exceed the Rents of the Property, the excess sums expended for such purposes shall be indebtedness secured by this Mortgage. Such excess sums shall be payable upon demand by Lender and shall bear interest from the date of disbursement at the greater of the default rate under the Note, or the maximum rate permitted by law.

**6.8    Lender Not Mortgagee in Possession.** Nothing herein shall constitute Lender a "mortgagee in possession" prior to its actual entry upon and taking possession of the Property. Entry upon and taking possession by a receiver shall not constitute possession by Lender.

**6.9    Enforcement.** Lender may enforce this assignment without first resorting to or exhausting any other security or collateral for the Secured Obligations.

**SECTION 7.    EVENTS OF DEFAULT.**

**7.1    Events of Default.** The occurrence of any one or more of the following shall constitute an Event of Default hereunder:

(a)    The failure by Borrower to keep, perform, or observe any covenant, condition or agreement on the part of Borrower in any of Section 2.2 and Section 2.3 of this Mortgage, which failure continues for five (5) days after notice from Lender to Borrower.

(b)    The failure by Borrower to keep, perform or observe any covenant, condition or agreement on the part of Borrower in this Mortgage, other than as set forth in clause (a) above, which failure continues for more than thirty (30) days after the earlier of the date on which Borrower knew of such failure or the date that Borrower received notice from Lender of such failure; provided, however, in the case of a default of a covenant, condition or agreement which is capable of cure but cannot reasonably be cured within such thirty (30) day period, and provided Borrower shall have given Lender a written undertaking to, and shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional thirty (30) days; and provided further that if a different notice or grace period is specified under the Note (or elsewhere in this Mortgage) after which such particular breach will become an Event of Default, the specific provision elsewhere in this Mortgage or in the Note shall control.

(c)    The occurrence of an "Event of Default" under and as defined in the Note, or an event of default under the Loan Agreement or any of the other Loan Documents.

{01312538;4}

19

(d)    The failure by Borrower to keep, perform or observe any covenant, condition or agreement on the part of Borrower within any applicable notice and cure period in the Environmental Indemnity.

(e)    An unauthorized lien or encumbrance unless within twenty (20) days of written notice by Lender to Borrower of the existence of such claim, lien or encumbrance Borrower (a) obtains a release and satisfaction of such lien, claim of lien, judgment or encumbrance, or (b) provides Lender with a bond (or other security) acceptable to Lender in the amount to be determined by Lender in its commercially reasonable discretion. If Borrower does not post the bond or other security reasonably satisfactory to Lender within said twenty (20) days, Lender, at its option, may pay such lien, claim of lien, judgment or other encumbrance against the Property and Borrower shall reimburse Lender, on demand, for any such disbursement made. Lender's rights under this paragraph shall not be affected by any claim of Borrower that the lien, judgment or encumbrance is invalid, it being understood that the decision of the Lender to pay or withhold is to be made by Lender in its sole discretion, subject only to Borrower's right to provide a bond or other security satisfactory to Lender as provided above.

(f)    Any violation or default of the terms and provisions set forth in Section 4 hereof.

(g)    The failure by Borrowers to keep, perform, or observe any covenant, condition or agreement on the part of Borrowers in Section 2.1 of this Mortgage.

7.2    **Acceleration Upon Default; Additional Remedies.** Upon any Event of Default, Lender may, at its option and without notice to or demand upon Borrower, exercise any one or more of the following actions: (a) declare all the Secured Obligations immediately due and payable; (b) bring a court action to enforce the provisions of this Mortgage or any of the other Loan Documents; (c) foreclose this Mortgage as a mortgage in any judicial foreclosure action permitted under applicable law; (d) cause any or all of the Property to be sold under the power of sale granted by this Mortgage in any manner permitted by applicable law; (e) elect to exercise its rights with respect to the Leases and the Rents; (f) exercise any or all of the other rights and remedies under this Mortgage and the other Loan Documents; and/or (g) exercise any other right or remedy available under law or in equity. To the extent permitted by law, every right and remedy provided in this Mortgage or afforded by law or equity or any other agreement between Lender and Borrower, and may be exercised concurrently, independently or successively, in any order whatsoever. Lender may exercise any of its rights and remedies at its option without regard to the adequacy of its security.

7.3    **Exercise of Power of Sale.** For any sale under the power of sale granted by this Mortgage, Lender shall record and give all notices required by law and then, upon the expiration of such time as is required by law. If the Property includes several lots or parcels, Lender in its discretion may designate their order of sale or may elect to sell all of them as an entirety. The Property, real, personal and mixed, may be sold in one parcel. Any person permitted by law to do so may purchase at any sale. Upon any sale, Lender will execute and deliver to the purchaser or purchasers a deed or deeds conveying the Property sold, but without any covenant or warranty, express or implied, and the recitals in the Lender's deed showing that the sale was conducted in compliance with all the requirements of law shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchasers and encumbrances for value.

{01312538;4}

**7.4**    **Application of Sale Proceeds.** The proceeds of any sale under this Mortgage shall be applied in the following manner: (a) first to the payment of the costs and expenses of the sale; including without limitation legal fees and disbursements, title charges and transfer taxes, and payment of all expenses; (b) second to the payment of all sums expended by Lender under the terms of this Mortgage and not yet repaid, together with interest on such sums from date of disbursement at the applicable interest rate under the Note from time to time or the maximum rate permitted by applicable law if that is less; and (c) third to the payment of all other Secured Obligations in any order that the Lender chooses; and (d) the remainder, if any, to the person or persons legally entitled to it.

**7.5**    **Waiver of Order of Sale and Marshalling.** Borrower waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to direct the order in which any of the Property will be sold in the event of any sale under this Mortgage. Each successor and assign of Borrower, including any holder of a lien subordinate to this Mortgage, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

**7.6**    **Non-Waiver of Defaults.** The entering upon and taking possession of the Property, the collection of Rents or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the Property, and the application or release thereof as herein provided, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

**7.7**    **Expenses During Redemption Period.** If this Mortgage is foreclosed as a mortgage and the Property sold at a foreclosure sale pursuant to such judicial proceeding, the purchaser may during any redemption period allowed, make such repairs or alterations on the Property as may be reasonably necessary for the proper operation, care, preservation, protection and insuring thereof. Any sums so paid together with interest thereon from the time of such expenditure at the greater of the default rate under the Note, or the maximum rate permitted by law, shall be added to and become a part of the amount required to be paid for redemption from such sale.

**7.8**    **Foreclosure Subject to Tenancies.** Lender shall have the right at its sole option to foreclose this Mortgage subject to the rights of any tenant or tenants of the Property.

**7.9**    **Evasion of Prepayment Terms.** If any Event of Default has occurred, a tender of payment of the indebtedness secured hereby at any time prior to or at a judicial or non-judicial foreclosure sale of the Property by Borrower, or anyone on behalf of Borrower, shall constitute an evasion of any prepayment terms of the Note, if any, and shall constitute a voluntary prepayment thereunder, and any such tender shall include any prepayment premium required under the Note, if any.

**7.10**    **Lender's Expenses.** Borrower shall pay all of Lender's expenses incurred in any efforts to enforce any terms of this Mortgage, whether or not any suit is filed, including without limitation legal fees and disbursements, foreclosure costs and title charges. All such sums, with interest thereon, shall be additional indebtedness of Borrower secured by this Mortgage. Such sums shall be immediately due and payable and shall bear interest from the date of disbursement at the greater of the default rate under the Note, or the maximum rate permitted by law.

**SECTION 8.    GENERAL.**

{01312538;4}

**8.1    No Offset.** Borrower's obligation to timely pay and perform all obligations under the Note, this Mortgage and the other Loan Documents shall be absolute and unconditional and shall not be affected by any event or circumstance; including without limitation any setoff, counterclaim, abatement, suspension, recoupment, deduction, defense or any other right that Borrower or any guarantor may have or claim against Lender or any other person or entity. The foregoing shall not constitute a waiver of any claim or demand which Borrower or any guarantor may have in damages or otherwise against Lender or any other person or entity; provided that Borrower shall maintain a separate action thereon.

**8.2    Application of Payments.** Except as applicable law or this Mortgage may otherwise provide and notwithstanding anything to the contrary in the Note, Lender may apply all payments received by Lender under the Note or this Mortgage in the following order of priority:  (a) Lender's expenses incurred in any efforts to enforce any terms of this Mortgage; (b) interest payable on advances made to protect the security of this Mortgage; (c) principal of such advances; (d) amounts payable to Lender by Borrower under Section 3 for reserves; (e) interest and late charges payable on the Note; (f) principal of the Note; and (g) any other Secured Obligations in such order as Lender, at its option, may determine; provided, however, that Lender may, at its option, apply any such payments received to interest on or principal of the Note prior to applying such payments to interest on and principal of advances made to protect the security of this Mortgage.

**8.3    Reconveyance.** Upon payment of all sums secured by this Mortgage, Lender shall surrender this Mortgage and all notes evidencing indebtedness secured by this Mortgage. Lender shall reconvey at Borrower's expense the Property without warranty to the person or persons legally entitled thereto. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals therein of any matters or facts shall be conclusive proof of the truthfulness thereof. Such person or persons shall pay Lender's reasonable costs incurred in so reconveying the Property.

**8.4    Intentionally Omitted.**

**8.5    Lender's Powers.** Without affecting the liability of any person for payment or performance of the Secured Obligations or any of Lender's rights or remedies, Lender, at its option, may extend the time for payment of the indebtedness secured hereby or any part thereof, reduce payment thereon, release anyone liable on any of said indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of the indebtedness, release the lien of this Mortgage on any part of the Property, take or release other or additional security, release or reconvey or cause to be released or reconveyed all or any part of the Property, or consent to the making of any map or plat of the Property, consent to the granting of any easement or creating any restriction on the property, or join in any subordination or other agreement affecting this Mortgage or the lien or charge hereof. Borrower shall pay Lender a reasonable service charge, together with such title insurance premiums and reasonable attorneys' fees as may be incurred at Lender's option, for any such action if taken at Borrower's request.

**8.6    Subrogation.** Lender shall be subrogated for further security to the lien, although released of record, of any and all encumbrances discharged, in whole or in part, by the proceeds of the Note or any other indebtedness secured thereby.

**8.7    Limitation on Interest and Charges.** The interest, fees and charges under the Loan Documents shall not exceed the maximum amounts permitted by any applicable law. If any such interest,

{01312538;4}

fee or charge exceeds the maximum, the interest, fee or charge shall be reduced by the excess and any excess amounts already collected from Borrower shall be refunded. Lender may refund such excess either by treating the excess as a prepayment of principal under the Note or by making a direct payment to Borrower. If Lender elects to treat the excess as a prepayment of principal, Borrower shall not be obligated to pay any prepayment premium required under the Note. The provisions of this paragraph shall control over any inconsistent provision in the Loan Documents.

**8.8    Additional Documents; Power of Attorney.** Borrower, from time to time, shall execute, acknowledge and deliver to Lender upon request, and hereby irrevocably appoints Lender its attorney-in-fact to execute, acknowledge, deliver and if appropriate file and record, such security agreements, assignments for security purposes, assignments absolute, financing statements, affidavits, certificates and other documents, in form and substance satisfactory to Lender, as Lender may request in order to perfect, preserve, continue, extend or maintain the assignments herein contained, the lien and security interest under this Mortgage, and the priority thereof; provided, however, Lender will not exercise its power of attorney granted here until an Event of Default has occurred or Lender has given Borrower written notice of the need for Borrower to execute, acknowledge and deliver the items recited above and Borrower has failed to take such action within five business days of receipt of such written notice from Lender. Borrower shall pay to Lender upon request therefor all costs and expenses incurred in connection with the preparation, execution, recording and filing of any such document.

**8.9    Waiver of Statute of Limitations.** To the full extent Borrower may do so, Borrower hereby waives the right to assert any statute of limitations as a defense to the enforcement of the lien of this Mortgage or to any action brought to enforce the Note or any other obligation secured by this Mortgage.

**8.10    Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy, and no waiver by Lender of any particular default shall constitute a waiver of any other default or of any similar default in the future. Without limiting the generality of the foregoing, the acceptance by Lender of payment of any sum secured by this Mortgage after the due date thereof shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Mortgage, nor shall Lender's receipt of any awards, proceeds or damages under Sections 2.3 and 2.7 hereof operate to cure or waive Borrower's default in payment of sums secured by this Mortgage.

**8.11    Modifications and Waivers.** This Mortgage cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, change, discharge or termination is sought.

**8.12    Notice.** Any notice to Borrower under this Mortgage shall be to the address noted above or such other address as may be designated by Borrower in writing so long as such notice is given in accordance with the notice provisions in the Loan Documents.

**8.13    Governing Law; Severability; Captions.** This Mortgage shall be governed by the laws of the State of New York applicable to contracts made and intended to be performed entirely therein. If

{01312538;4}

23

any provision or clause of this Mortgage conflicts with applicable law, such conflicts shall not affect other provisions or clauses hereof which can be given effect without the conflicting provision, and to this end the provisions hereof are declared to be severable. The captions and headings of the paragraphs and articles of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

**8.14    Definitions.** As used herein: the term "Borrower" means the Borrower herein named, together with any subsequent owner of the Property or any part thereof or interest therein; and the term "Lender" means the Lender herein named, together with any subsequent owner or holder of the Note or any interest therein, including pledgees, assignees and participants.

**8.15    Successors and Assigns; Joint and Several Liability; Agents.** This Mortgage shall bind and inure to the benefit of the parties hereto and their respective heirs, devisees, legatees, administrators, executors, successors and assigns. Each person executing this Mortgage as Borrower shall be jointly and severally liable for all obligations of Borrower hereunder. In exercising any rights hereunder or taking actions provided for herein, Lender may act through its respective employees, agents or independent contractors as authorized by Lender.

**8.16    Time.** Time is of the essence in connection with all obligations of Borrower herein.

**8.17    Estoppel Certificate.** Borrower shall, within fifteen (15) days of a written request from Lender and at no charge to Lender, furnish Lender or any other party designated by Lender with a written statement, duly acknowledged, setting forth the sums secured hereby and any right of set-off, counterclaim or other defense that may exist with regard to the Secured Obligations.

**8.18    Intentionally Omitted.**

**8.19    Intentionally Omitted.**

**8.20    WAIVER OF JURY TRIAL. BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS MORTGAGE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

**SECTION 9.    STATE SPECIFIC PROVISIONS.**

{01312538;4}

24

9.1    **Principles of Construction**.  In the event of any inconsistencies between the terms and conditions of this Article 9 and the terms and conditions of this Mortgage, the terms and conditions of this Article 9 shall control and be binding.

9.2    **Certain Matters Relating to the Laws of the State of New York**.  Notwithstanding any provision hereof or of any other Loan Document to the contrary, the following provisions shall apply:

(a)    **Section 254 of the RPL**.  In the event of any conflict, inconsistency or ambiguity between the provisions of the Loan Documents and the provisions of subsection 4 of Section 254 of the Real Property Law of New York, the provisions of the Loan Documents shall control.

(b)    **Section 291-f of the RPL**.  In addition to any other right or remedy contained herein or in any other Loan Document, Lender shall have all of the rights against lessees of the Property or any part thereof as are set forth in Section 291-f of the Real Property Law of New York.

(c)    **Trust Fund**.  Pursuant to Section 13 of the Lien Law of New York, Borrower shall receive the advances secured hereby and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any improvement before using any part thereof for any other purpose.  Borrower shall comply strictly with Section 13-f of the Lien Law of New York.

(d)    **Commercial Property**.  Borrower represents and warrants that this Mortgage does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six (6) residential dwelling units having their own separate cooking facilities.

(e)    **Transfer Tax Provisions**.  (i) Borrower covenants and agrees that, in the event of a sale of the Property or other Transfer, it will duly complete, execute and deliver to Lender contemporaneously with the submission to the applicable taxing authority or recording officer, all forms and supporting documentation required by such taxing authority or recording officer to estimate and fix any and all applicable state and local real estate transfer taxes (collectively, "**Transfer Taxes**") by reason of such sale or other Transfer or recording of the deed evidencing such sale or other Transfer.

(ii)    Borrower shall pay all Transfer Taxes that may hereafter become due and payable with respect to any Transfer, and in default thereof Lender may pay the same and the amount of such payment shall be added to the Debt and, unless incurred in connection with a foreclosure of this Mortgage, be secured by this Mortgage.  The provisions of this Section shall survive any Transfer and the delivery of the deed in connection with any Transfer.

(f)    **Maximum Principal Amount**.  NOTWITHSTANDING ANY PROVISION SET FORTH HEREIN TO THE CONTRARY, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS SECURED BY THIS SECURITY INSTRUMENT AT EXECUTION, OR WHICH UNDER ANY CONTINGENCY MAY BECOME SECURED HEREBY AT ANY TIME HEREAFTER, IS U.S. **$33,000,000.00** PLUS ALL INTEREST PAYABLE UNDER THE NOTE

{01312538;4}

AND ALL AMOUNTS EXPENDED BY LENDER AFTER DEFAULT BY BORROWER: (A) FOR THE PAYMENT OF TAXES, CHARGES OR ASSESSMENTS WHICH MAY BE IMPOSED BY LEGAL REQUIREMENTS UPON THE MORTGAGED PROPERTY; (B) TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS SECURITY INSTRUMENT; (C) FOR ANY EXPENSES INCURRED IN MAINTAINING THE SECURITY INSTRUMENT PROPERTY AND UPHOLDING THE LIEN OF THIS SECURITY INSTRUMENT, INCLUDING, BUT NOT LIMITED TO, THE EXPENSE OF ANY LITIGATION TO PROSECUTE OR DEFEND THE RIGHTS AND LIEN CREATED BY THIS SECURITY INSTRUMENT, AND (D) FOR ANY AMOUNT, COST OR CHARGE TO WHICH MORTGAGEE BECOMES SUBROGATED, UPON PAYMENT, WHETHER UNDER RECOGNIZED PRINCIPLES OF LAW OR EQUITY, OR UNDER EXPRESS STATUTORY AUTHORITY, TOGETHER WITH INTEREST ON ALL OF THE FOREGOING AMOUNTS AT THE DEFAULT RATE (AS DEFINED IN THE LOAN AGREEMENT); PROVIDED HOWEVER, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE MAXIMUM AMOUNT OF PRINCIPAL INDEBTEDNESS THAT IS ATTRIBUTABLE TO THE KINGS COUNTY PROPERTY (AS DEFINED IN THE LOAN AGREEMENT) FOR PURPOSES OF ENFORCING THIS MORTGAGE IS $11,000,000.00.

(g)    **Covenants in Addition to RPL**.  All covenants hereof shall be construed as affording to Lender rights in addition to and not exclusive of the rights conferred under the provisions of Sections 254, 271, 272 and 291-f of the Real Property Law of the State of New York or any other applicable laws.

(h)    **Non-Judicial Foreclosure**.  If an Event of Default shall occur hereunder, Lender may elect to sell the Property or any part thereof by exercise of the power of foreclosure or of sale granted to Lender by Article 13 of the Real Property Actions and Proceedings Law of the State of New York (the "**RPAPL**").  In such case, Lender may commence a civil action to foreclose this Security Instrument pursuant to and in accordance with Article 13 of the RPAPL.

[Signature on following Page]

{01312538;4}

Dated as of the day and year first written above.

BORROWER:

SUFFERN PARTNERS LLC, a
New York limited liability company

By:   RSOM CORP., a
      New York corporation, its Managing Member

By: _____
Name:   Goldie Reisman
Title:   President

Address:          Suffern Partners LLC
                  202 Grandview Avenue
                  Monsey, New York 10950
                  Attention: Goldie Reisman
Email Address:    goldie.reisman.sterling@gmail.com

With a copy to:   Law Offices of David Fleischmann P.C.
                  2233 Nostrand Avenue, 3rd Floor
                  Brooklyn, New York 11210
                  Attention: David Fleischmann, Esq.
Email Address:    David@dfleischmann.com

### ACKNOWLEDGMENT

STATE OF NEW YORK   )
                    ) : ss.:
COUNTY OF Sullivan  )

On the _31_ day of August, in the year 2017, before me, the undersigned personally appeared **GOLDIE REISMAN**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

ELISHEVA BASCH
Notary Public State of NY
No. 01BA6085777
Qualified in Kings County
Comm. Expires 3/5/20_19

### [SIGNATURES CONTINUE ON FOLLOWING PAGE]

Novartis Campus – Loan No. 330161456

**BORROWER:**

**NORTH 14TH STREET REALTY ASSOCIATES LLC,** a
New York limited liability company

By: _____
Name:      Goldie Reisman
Title:       Managing Member

| | |
|---|---|
| Address: | North 14th Street Realty Associates LLC |
| | 202 Grandview Avenue |
| | Monsey, New York 10950 |
| | Attention: Goldie Reisman |
| Email Address: | goldie.reisman.sterling@gmail.com |
| | |
| With a copy to: | Law Offices of David Fleischmann P.C. |
| | 2233 Nostrand Avenue, 3rd Floor |
| | Brooklyn, New York 11210 |
| | Attention: David Fleischmann, Esq. |
| Email Address: | David@dfleischmann.com |

### ACKNOWLEDGMENT

STATE OF NEW YORK        )
                                          : ss.:
COUNTY OF _Sullivan_     )

On the _31_ day of August, in the year 2017, before me, the undersigned personally appeared **GOLDIE REISMAN,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____                    ELISHEVA BASCH
Signature and Office of individual                      Notary Public State of NY
taking acknowledgment                                   No. 01BA3055777
                                                                      Qualified in Kings County
                                                                      Comm. Expires 3/5/20_17_

### [SIGNATURES CONTINUE ON FOLLOWING PAGE]

Novartis Campus – Loan No. 330161456

CPIF LENDING, LLC, a Washington limited liability company, holder of the Original Mortgages, signs below to acknowledge its consent to the terms of this Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing.

LENDER:

CPIF LENDING, LLC, a
Washington limited liability company

By:     CPIF Holdings, LLC, its manager

     By:     Columbia Pacific Income Fund II, L.P., its manager

          By:     Columbia Pacific Income Fund II GP, LLC, its general partner

               By:     Columbia Pacific Advisors, LLC, its manager

                    By:
                    Name:
                    Title:     **ALEX WASHBURN**
                                     MANAGER

### ACKNOWLEDGMENT

STATE OF Washington )
                     : ss.:
COUNTY OF   King   )

    On the 21 day of August, in the year 2017, before me, the undersigned personally appeared Alex Washburn, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

YASAMINE FIROOZI
Notary Public
State of Washington
My Appointment Expires Jul 30, 2020

Novartis Campus – Loan No. 330161456

## EXHIBIT "A"

### LEGAL DESCRIPTION

**Parcels I-II:**
BEGINNING at a point in the westerly right-of-way of Hemlon Road (variable width right-of-way), said point being the intersection of the northerly right-of-way of Consolidated Rail Corporation with said westerly right-of-way, and running thence, the following ten (10) courses along said northerly right-of-way;

South 85°05'01" West a distance of 16.71 feet to a point, thence;

South 78°48'56" West a distance of 571.32 feet to a point marked by an iron pin, thence;

South 79°00'34" West a distance of 160.04 feet to a point marked by a concrete monument, thence;

South 80°48'20" West a distance of 881.22 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 98.38 feet whose chord bears South 82°07'01" West a chord distance of 98.37 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 1249.18 feet, an arc length of 469.95 feet whose chord bears North 84°37'34" West a chord distance of 467.18 feet to a non-tangential point marked by a mag-nail, thence;

North 86°37'10" West a distance of 243.08 feet to a point of cusp marked by a mag-nail, thence;

On a curve to the right having a radius of 1877.08 feet, an arc length of 377.48 feet whose chord bears North 68°15'36" West a chord distance of 376.84 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2831.93 feet, an arc length of 98.91 feet whose chord bears North 60°16'06" West a chord distance of 98.90 feet to a non-tangential point marked by a concrete monument, thence;

North 59°20'58" West a distance of 514.07 feet to a point marked by a concrete monument, thence, the following seven (7) courses along the easterly line of Lot 1, Block 1, Section 55.21;

North 01°56'45" West a distance of 730.41 feet to a point marked by a concrete monument, thence;

North 47°23'01" East a distance of 865.96 feet to a point marked by a concrete monument, thence;

North 47°30'23" East a distance of 200.00 feet to a point marked by an iron pin, thence;

North 39°35'37" East a distance of 317.50 feet to a point marked by an iron pin, thence;

South 55°46'42" West a distance of 75.01 feet to a point marked by a concrete monument, thence;

North 65°50'24" West a distance of 387.00 feet to a point marked by an iron pin, thence;

North 29°54'35" East a distance of 282.80 feet to a point marked by a concrete monument in the southerly right-of-way of the New York State Thruway, thence, the following nine (9) courses along said right-of-way;

North 82°20'55" East a distance of 88.18 feet to a point marked by a concrete monument, thence;

South 89°08'47" East a distance of 594.93 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 4112.81 feet, an arc length of 203.76 feet whose chord bears South 84°40'04" East a chord distance of 203.74 feet to a point of cusp marked by a concrete monument, thence;

On a curve to the right having a radius of 2829.79 feet, an arc length of 433.53 feet whose chord bears South 78°29'25" East a chord distance of 433.11 feet to a non-tangential point, thence;

South 74°26'56" East a distance of 768.63 feet to a point marked by a concrete monument, thence;

South 74°27'27" East a distance of 255.71 feet to a point marked by a concrete monument, thence;

South 74°07'33" East a distance of 228.48 feet to a point marked by a concrete monument, thence;

South 64°22'43" East a distance of 170.25 feet to a point marked by a mag-nail, thence;

On a curve to the right having a radius of 998.10 feet, an arc length of 241.62 feet whose chord bears South 58°34'41" East a chord distance of 241.03 feet to a point marked by a concrete monument in the westerly right-of-way of Hemion Road (variable width right-of-way), thence, the following ten (10) courses along said westerly right-of-way;

South 10°15'07" West a distance of 106.20 feet to a point marked by a concrete monument, thence;

South 32°47'54" West a distance of 38.40 feet to a point marked by a concrete monument, thence;

South 20°47'55" West a distance of 102.98 feet to a point marked by a capped iron pin, thence;

South 68°37'59" East a distance of 12.63 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 770.94 feet whose chord bears South 14°18'03" West a chord distance of 765.43 feet to a point of cusp marked by a capped iron pin, thence;

On a curve to the left having a radius of 1860.00 feet, an arc length of 142.22 feet whose chord bears South 00°25'37" East a chord distance of 142.19 feet to a non-tangential point marked by a capped iron pin, thence;

South 02°37'03" East a distance of 7.74 feet to a point marked by a capped iron pin, thence;

South 02°37'43" West a distance of 50.15 feet to a point marked by a mag-nail, thence;

South 00°43'26" West a distance of 269.50 feet to a point, thence;

Along South 05°41'47" West a distance of 182.36 feet to the POINT OF EGINNING.


Note: Address. Block & Lot shown for informational purposes only

Designated as Section 55.22 , Block 1, Lot 1, Rockland County, and also known as Parcel I: 25 Old Mill Road, Suffern, NY 10901.

Designated as Section 55.06. Block 1, Lot 1, Rockland County. and also known as Parcel II: 19 Hemion Road, Montebello, NY 10901.

**Parcel III**
ALL that certain plot, piece or parcel of land and premises, situate lying and being in Suffern, Town of Ramapo, County of Rockland and State of New York, being bounded and described as follows:

BEGINNING at a point in the southerly right-of-way of the Consolidated Railway Corporation, said point being the following two (2) courses from the terminus of the sixth (6) course of the overall site description of Tax Map Section 55.22, Block 1, Lot 1, Village of Suffern, Town of Ramapo, Rockland County, New York, Tax Map Section 55.06, Block 1, Lot 1, Village of Montebello, Town of Ramapo, Rockland County, New York;
    a. North 86 degrees 37 minutes 10 seconds West a distance of 155.99 feet to a point;
    b. South 12 degrees 02 minutes 41 seconds West a distance of 93.63 feet to the point of BEGINNING;

RUNNING THENCE the following two (2) courses along the westerly line of Lot 3, Block 1, Section 55.38;
    1. South 12 degrees 02 minutes 41 seconds West a distance of 114.74 feet to a point;
    2. South 23 degrees 17 minutes 21 seconds West a distance of 161.86 feet to a point in the northerly right-of-way of Lafayette Avenue (New York State Route 59) (variable width right-of-way);

THENCE along said northerly right-of-way, North 64 degrees 22 minutes 23 seconds West a distance of 100.09 feet to a point;

THENCE the following two (2) courses along the easterly line of Lot 30.12, Block 1, Section 55.29;
    1. North 23 degrees 13 minutes 11 seconds East a distance of 148.10 feet to a point;
    2. North 12 degrees 05 minutes 22 seconds East a distance of 118.44 feet to a point in the Southerly right-of-way of the Consolidated Railway Corporation;

THENCE Along said southerly right-of-way, South 70 degrees 07 minutes 33 seconds East a distance of 101.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Section 55.37, Block 1, Lot 31, Rockland County, and also known as Parcel III: Route 59, Suffern, NY 10901.

**Parcel IV:**
All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings,
City and State of New York, bounded and described as follows:

Beginning at a corner formed by the intersection of the southerly side of North 14th Street with the westerly side
of Berry Street;

RUNNING THENCE southerly along the westerly side of Berry Street, 24 feet 6 inches;

THENCE westerly parallel with North 14th Street and through a party wall, 99 feet 6 inches;

THENCE southerly parallel with Berry Street and through a party wall, 50 feet 6 inches;

Exh. A-3

THENCE westerly parallel with North 14th Street, 6 inches;

THENCE southerly parallel with Berry Street, 25 feet;

THENCE westerly parallel with North 14th Street, 125 feet;

THENCE northerly parallel with Berry Street, 100 feet to the southerly side of North 14th Street;

THENCE easterly along the southerly side of North 14th Street, 225 feet to place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 15, Kings County, and also known as 200 North 14th Street, Brooklyn, NY 11249.

**Parcel V:**
All that certain lot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings,
City and State of New York, bounded and described as follows:

BEGINNING at a point on the northwesterly side of of Berry Street, distant 24 feet 6 inches southwesterly from the corner formed by the northwesterly side of Berry Street and the southwesterly side on North 14th Street;

RUNNING THENCE northwesterly parallel with North 14th Street and part of the distance through a party wall, 99 feet 6 inches;

THENCE southwesterly parallel with Berry Street and part of the distance through a party wall, 50 feet 6 inches;

THENCE southeasterly parallel with North 14th Street, 99 feet 6 inches to the northwesterly side of Berry Street; and

THENCE northeasterly along the northwesterly side of Berry Street, 50 feet 6 inches to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 2279, Lot 24, Kings County, and also known as 4-6 Berry Street, Brooklyn, NY 11249.

## SCHEDULE A-1

### EXISTING ROCKLAND COUNTY MORTGAGES

1.      Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Suffern Partners LLC, as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded with the County Clerk of Rockland County (the "**County Clerk**") in the original principal amount of $22,000,000.00.

## SCHEDULE A-2

### EXISTING KINGS COUNTY MORTGAGES

1.      Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.      Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.      Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.      Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgagee dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08

3A.      Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates

{01312538;4}

LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

3B.    Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

3C.    Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

3D.    Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN 2010000139922.

The lien of the consolidated mortgage identified in 3A above was thereafter spread to Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North 14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of $400,000.00.

4A.    Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single consolidated lien in the amount of $2,900,000.00.

4B.    Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November 27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.    Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming a single consolidated lien in the amount of $2,900,000.00.

{01312538;4}

6.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant to that certain Mortgage Consolidation, Modification and Extension Agreement given by North 14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18, 2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00

The above Mortgages 1, 2, 3, 4, 5 and 6, were further assigned pursuant to that certain Assignment of Mortgage from TD Bank, N.A., a national banking association, as assignor to CPIF Lending, LLC, a Washington limited liability company, as assignee dated September 6, 2017 and intended to be recorded in the Register's Office, with a current unpaid principal balance of $4,839,369.06.

7.    Gap Mortgage made by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office in the original principal amount of $6,160,630.94.

7A.    Which Mortgages 1, 2, 3, 4, 5, 6 and 7 were amended, restated and consolidated by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office forming a single lien in the amount of $11,000,000.00.

Which lien of the consolidate mortgage identified in 7A above, was thereafter spread to Block 1, Lot 1 and Lot 31 located in the City of Suffern, County of Rockland, New York by Spreader Agreement by and among North 14th Street Realty Associates, Suffern Partners LLC and CPIF Lending, LLC dated September 6, 2017 and intended to be recorded with the County Clerk (as hereinafter defined).

{01312538;4}

## SCHEDULE B-1

### EXISTING ROCKLAND COUNTY NOTES

1. Promissory Note made by Suffern Partners LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $22,000,000.00.

{01312538;4}

## SCHEDULE B-2

### EXISTING KINGS COUNTY NOTES

1.      Mortgage Note made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., in favor of Simplex Inc., dated August 20, 2001 in the original principal amount of $499,980.00.

2.      Replacement Promissory Note made by North 14th Street Realty Associates LLC, to Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $500,020.00.

3.      Consolidated Secured Mortgage Note made by North 14th Street Realty Associates LLC in favor of Brooklyn Federal Savings Bank, dated May 30, 2002 in the original principal amount of $1,000,000.00.

4.      Gap Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC dated October 9, 2007 in the original principal amount of $1,579,716.08.

5.      Consolidated Secured Promissory Note made by North 14th Street Realty Associates LLC in favor of PAF Capital, LLC, dated October 9, 2007 in the original principal amount of $2,500,000.00.

6.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $400,000.00.

7.      Amended and Restated Mortgage Note made by North 14th Street Realty Associates LLC in favor of The Bank of East Asia (U.S.A.) N.A., dated April 15, 2010 in the original principal amount of $2,900,000.00.

8.      Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $122,229.95.

9.      Consolidated Mortgage Loan Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated November 27, 2012 in the original principal amount of $2,900,000.00

10.     Mortgage Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A. dated April 8, 2016 in the original principal amount of $2,345,109.58.

11.     Consolidated Note made by North 14th Street Realty Associates LLC in favor of TD Bank, N.A., dated April 8, 2016 in the original principal amount of $5,000,000.00.

12.     Gap Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company, dated September 6, 2017 in the original principal amount of $6,160,630.94.

{01312538;4}

13.    Amended, Restated and Consolidated Promissory Note made by North 14th Street Realty Associates LLC in favor of CPIF Lending, LLC, a Washington limited liability company dated September 6, 2017 in the original principal amount of $11,000,000.00.

{01312538;4}

**255 AFFIDAVIT**

**(Amended, Restated and Consolidated Mortgage)**

STATE OF NEW YORK      )
                           : ss.:
COUNTY OF SULLIVAN    )

      The undersigned, collectively, the borrower hereunder ("**Mortgagor**"), being duly sworn, deposes and says that he is familiar with the following facts:

      1.    That the mortgages set forth on EXHIBIT "A" hereto securing the aggregate principal amount of **$33,000,000.00** owned or held by **CPIF LENDING, LLC**, a Washington limited liability company ("**Mortgagee**"), were duly recorded as set forth in EXHIBIT "A", and that all mortgage recording tax payable thereon has been paid.

      2.    That an Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "**Mortgage**"), dated as of September 6, 2017 by and between Mortgagor and Mortgagee is being tendered herewith for recording in the Office of the City Register, County of Kings and in the Office of the County Clerk, County of Rockland, State of New York and that no mortgage recording tax is payable thereon.

      3.    That the Mortgage herewith submitted for recording does not create or secure any new or further indebtedness other than the principal indebtedness or obligation secured by, or which under any contingency may be secured by the mortgages described in Paragraph 1 hereof.

      4.    That this affidavit is being made pursuant to Section 255 of the Tax Law of the State of New York for the purpose of claiming exemption from any additional tax on recording of the Mortgage being submitted herewith.

**[NO FURTHER TEXT ON THIS PAGE]**

**MORTGAGOR:**

**SUFFERN PARTNERS LLC, a**
New York limited liability company

By:    **RSOM CORP., a**
New York corporation, its Managing Member

By: _____
Name:          Goldie Reisman
Title:           President

Sworn to before me this
___ day of August, 2017

_____
NOTARY PUBLIC

ELISHEVA BASCH
Notary Public State of NY
No. 01BA6055777
Qualified in Kings County
Comm. Expires 3/5/20___

**MORTGAGOR:**

**NORTH 14TH STREET REALTY ASSOCIATES LLC, a**
New York limited liability company

By: _____
Name:          Goldie Reisman
Title:           Managing Member

Sworn to before me this
___ day of August, 2017

_____
NOTARY PUBLIC

ELISHEVA BASCH
Notary Public State of NY
No. 01BA6055777
Qualified in Kings County
Comm. Expires 3/5/20___

Novartis Campus – Loan No. 330161456

## EXHIBIT "A"

### (Schedule of Mortgages)

## MORTGAGE A – AS TO KINGS COUNTY PROPERTY

1.      Mortgage made by North 14th Street Realty Associates LLC and 301-303 Ocean Realty Corp., as mortgagor, in favor of Simplex Inc., as mortgagee dated August 20, 2001 and recorded in the New York City Registers Office, County of Kings, New York (the "Register's Office") September 13, 2001 in Reel 5280, Page 572 in the original principal amount of $499,980.00.

Which lien of Mortgage 1 encumbering Block 2279, Lot 13 was partially released by Simplex Inc., as mortgagee pursuant to that certain Partial Release of Mortgage dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 713.

1A.      Which Mortgage 1 was assigned from Simplex Inc., as assignor, to Brooklyn Federal Savings Bank, as assignee, pursuant to that certain Assignment of Mortgage dated May 30, 2002 and recorded in the Register's Office July 2, 2002 in Reel 5700, page 719

2.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor to Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 722 in the original principal amount of $500,020.00.

2A.      Which Mortgages 1 and 2 were consolidated pursuant to that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and Brooklyn Federal Savings Bank, as mortgagee, dated May 30, 2002 and recorded in the Register's Office July 3, 2002 in Reel 5700, Page 748 forming a single consolidated lien in the amount of $1,000,000.00.

Which consolidated mortgage described in 2A above was assigned by Assignment of Mortgage from Brooklyn Federal Savings Bank, as assignor, to Bayview Financial, L.P., as assignee, dated March 12, 2003 and recorded in the Register's Office on April 2, 2005 as CRFN 2005000236989.

2B.      Which Mortgages 1 and 2 were further assigned by Assignment of Mortgage from Bayview Financial, L.P., as assignor, to PAF Capital, LLC, as assignee, dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531885.

Which consolidated lien encumbering Block 2279, Lot 24 was partially released by Partial Release of Mortgage dated October 9, 2007 and recorded in the Register's Office on October 22, 2007 as CRFN 2007000531882.

3.      Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of PAF Capital, LLC, a mortgagee dated October 9, 2007 and recorded in the Register's Office October 23, 2007 as CRFN 2007000531886 in the original principal amount of $1,579,716.08

3A.      Which Mortgages 1, 2 and 3 were consolidated by that certain Consolidation, Extension and Modification Agreement by and between North 14th Street Realty Associates LLC, as mortgagor and PAF Capital, LLC, as mortgagee, dated October 9, 2007 and recorded in the Register's Office October 22, 2007 as CRFN 2007000531887 forming a single consolidated lien in the amount of $2,500,000.00.

{01313790;1}

3B.    Which Mortgages 1, 2 and 3 were assigned by Collateral Assignment of Mortgage from
PAF Capital, LLC, as assignor, to CSE Mortgage LLC, as assignee dated October 9, 2007 and
recorded in the Register's Office on October 22, 2007 as CRFN 2007000531890.

3C.    Which Mortgages 1, 2 and 3 were further assigned by Collateral Assignment of Mortgage
from CSE Mortgage LLC, as assignor, to PAF Capital, LLC, as assignee, dated February 22,
2010 and recorded in the Register's Office April 27, 2010 as CRFN 2010000139921.

3D.    Which Mortgages 1, 2 and 3 were further assigned by Assignment of Mortgage from
PAF Capital, LLC, as assignor, to The Bank of East Asia (U.S.A.) N.A., as assignee, dated
February 22, 2010 and recorded in the Register's Office on April 27, 2010 as CRFN
2010000139922.

    The lien of the consolidated mortgage identified in 3A above was thereafter spread to
Block 2279, Lot 24 by Mortgage Modification and Spreader Agreement by and between North
14th Street Realty Associates and The Bank of East Asia (U.S.A.) N.A. dated April 15, 2010 and
recorded in the Register's Office April 27, 2010 as CRFN 2010000139923.

4.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of
The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and recorded in the
Register's Office April 27, 2010 as CRFN 2010000139924 in the original principal amount of
$400,000.00.

4A.    Which Mortgages 1, 2, 3 and 4 were consolidated by that certain Consolidation,
Extension and Modification Agreement by and between North 14th Street Realty Associates LLC,
as mortgagor and The Bank of East Asia (U.S.A.) N.A., as mortgagee, dated April 15, 2010 and
recorded in the Register's Office April 27, 2010 as CRFN 2010000139925 forming a single
consolidated lien in the amount of $2,900,000.00.

4B.    Which Mortgages 1, 2, 3 and 4 were assigned by Assignment of Mortgage from The
Bank of East Asia (U.S.A.) N.A., as assignor, to TD Bank, N.A., as assignee, dated November
27, 2012 and recorded in the Register's Office on December 27, 2012 as CRFN 2012000481380.

5.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of
TD Bank, N.A., as mortgagee dated November 27, 2012 and recorded in the Register's Office
December 7, 2012 as CRFN 2012000481381 in the original principal amount of $122,229.95.

5A.    Which Mortgages 1, 2, 3, 4 and 5 were consolidated, extended and modified by that
certain Consolidation, Extension and Modification Agreement by and between North 14th Street
Realty Associates LLC, as mortgagor and TD Bank, N.A., as mortgagee dated November 27,
2012 and recorded in the Register's Office December 7, 2012 as CRFN 2012000481382 forming
a single consolidated lien in the amount of $2,900,000.00.

6.    Mortgage made by North 14th Street Realty Associates LLC, as mortgagor, in favor of
TD Bank, N.A., as mortgagee, dated April 8, 2016 and recorded in the Register's Office April 18,
2016 as CRFN 2016000134705 in the original principal amount of $2,345,109.58.

    Which Mortgages 1, 2, 3, 4, 5 and 6 were consolidated, modified and extended pursuant
to that certain Mortgage Consolidation, Modification and Extension Agreement given by North
14th Street Realty Associates LLC, as mortgagor in favor of TD Bank, N.A., a national banking
association, as mortgagee dated April 8, 2016 and recorded in the Register's Office April 18,

2016 as CRFN 2016000134706 forming a single consolidated lien in the amount of $5,000,000.00

The above Mortgages 1, 2, 3, 4, 5 and 6, were further assigned pursuant to that certain Assignment of Mortgage from TD Bank, N.A., a national banking association, as assignor to CPIF Lending, LLC, a Washington limited liability company, as assignee dated September 6, 2017 and intended to be recorded in the Register's Office, with a current unpaid principal balance of $4,839,369.06.

7.        Gap Mortgage made by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office in the original principal amount of $6,160,630.94.

7A.      Which Mortgages 1, 2, 3, 4, 5, 6 and 7 were amended, restated and consolidated by that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing given by North 14th Street Realty Associates LLC, as mortgagor in favor of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office forming a single lien in the amount of $11,000,000.00.

Which lien of the consolidate mortgage identified in 7A above, was thereafter spread to Block 1, Lot 1 and Lot 31 located in the City of Suffern, County of Rockland, New York by Spreader Agreement by and among North 14th Street Realty Associates, Suffern Partners LLC and CPIF Lending, LLC dated September 6, 2017 and intended to be recorded with the County Clerk (as hereinafter defined.)

## MORTGAGE B – AS TO ROCKLAND COUNTY PROPERTY

1.        Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing made by Suffern Partners LLC, as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded with the County Clerk of Rockland County (the **"County Clerk"**) in the original principal amount of $22,000,000.00.

## CONSOLIDATION OF MORTGAGES A AND B

Which above MORTGAGE A and MORTGAGE B, were consolidated, amended and restated pursuant to that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing by Suffern Partners LLC and North 14th Street Realty Associates LLC, collectively as mortgagor for the benefit of CPIF Lending, LLC, a Washington limited liability company, as mortgagee dated September 6, 2017 and intended to be recorded in the Register's Office and with the County Clerk forming a single consolidated lien in the amount of $33,000,000.00

{01313790;1}