Kevin J. Nash, Esq.
**Goldberg Weprin Finkel Goldstein LLP**
*Proposed Attorneys for Debtor/Plaintiff*
1501 Broadway, 22nd Floor
New York, New York 10036
Phone: (212) 221-5700

Michael Levine, Esq.
**Levine & Associates, P.C.**
*Proposed Special Litigation Counsel to the Debtor*
15 Barclay Road
Scarsdale, NY 10583
Phone: (914) 600-4288

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

In re:                                                                  :      Chapter 11

RS OLD MILL, LLC,                           ,                    Case No. 17-22218 (RDD)
                                                                            :
                            Debtor
------------------------------------------------X
RS OLD MILL, LLC,                                                Adversary No. 19-8243 (RDD)

                                                  Plaintiff,    :

- against -
                                                                            :      DECLARATION OF
                                                                                   <u>YEHUDA SALAMON</u>
SUFFERN PARTNERS LLC, BRIDGEWATER
CAPITAL PARTNERS LLC, ISAAC GENUTH,        :
MARK YUNGER a/k/a "MARK JUNGER," GOLDIE
REISMAN, MOSES REICHMAN, RS OLD MILLS    :
RD LLC., DAVID FLEISCHMANN, THOMAS
LANDRIGAN, and CPIF LENDING, LLC,              :

                                                Defendants.   :

------------------------------------------------X

      **Yehuda Salamon**, pursuant to 28 U.S.C. § 1745, hereby declares that the following is true and correct:

1. I am a principal of RS Old Mill, LLC, the Debtor in the within action, and the Plaintiff in the Adversary Proceeding captioned above (the "Adversary Proceeding"). As such, I am fully familiar with all of the facts and circumstances as are hereinafter set forth. I make this Declaration in opposition to the motions by the various Adversary Proceeding Defendants to either (i) grant the *nunc pro tunc* sale of the Debtor's assets for no consideration, or (ii) dismiss the Debtor's Chapter 11 case in its entirety, or (iii) dismiss the Adversary Proceeding Complaint (the "Complaint"), or (iv) abstain from hearing and determining the allegations in the Complaint.

2. At the heart of each of the above-identified motions is the allegation that the Debtor somehow "benefited" or received $12 million from the series of transactions described in the Complaint regarding the sale of the Novartis Property. I make this Declaration so that the Court is aware that those allegations are completely false. The truth of the matter is that the Debtor did not benefit *at all* from the machinations regarding the Novartis Property and received nothing from the same.

3. The factual circumstances regarding the acquisition and sale of the Novartis Property are laid out in the Adversary Complaint and I confirm that the factual allegations therein are correct to the best of my knowledge. I will not repeat or discuss all of those allegations here, but I highlight for the Court those that are most relevant to the instant motion. In November of 2016, I (on behalf of the Debtor) entered into a written contract of sale with Novartis, whereby the Debtor agreed to purchase from Novartis the developed real property situated in Rockland County (the "Novartis Property") for a purchase price of $18 million. The Debtor put up a down payment of $2.5 million, as required by the contract.

4. At the time that we entered into that contract, I believed that the purchase price for the same was well undervalued and that a very substantial profit could be made if we could close that

2

purchase at that price. The plan was that we would fix up the property and rent (or net-lease) it to major tenants.

5. The first order of business, however, was to obtain financing for the acquisition and I (and my business consultant, Marty Stern),[1] went about the process of attempting to locate that financing. We located an entity called Bridgewater Capital Partners ("Bridgewater"), and we entered into a financing agreement with that entity. A copy of the same is annexed to the Debtor's Omnibus Opposition to the Motion to Dismiss the Adversary Proceeding as Exhibit "10". It provided that Bridgewater would obtain (from an outside source, or itself provide), a loan in the amount of Eighteen Million Dollars ($18,000,000.00) to the Debtor as financing for the acquisition of the Novartis Property. The agreement also provided that Bridgewater would, at its own expense, (i) obtain all necessary permits, approvals and the like regarding the development, sale, lease or joint venturing of the Novartis Property, or portions thereof; (ii) employ all necessary architects, engineers, designers, expediters and other service providers to advance and conclude the Project; (iii) market and promote the Project; and (iv) perform other services necessary to further the Project. As compensation for the services to be provided by Bridgewater, Bridgewater was to receive "equity participation in [RS Old Mill LLC] in an amount not more than One Million Dollars in value as of the date of the closing."

---

[1] I am told that various allegations have been made with respect to Mr. Stern to the effect that he has some undisclosed interest in the Debtor or the Novartis transaction. I represent to the Court that Mr. Stern has no such interest, he is not a member of the Debtor, nor does the Debtor have any arrangement with him whereby he will receive any part of the Debtor's property. Mr. Stern has, for many, many years, been my trusted advisor and consultant and I value his business judgment and acumen. I speak with him on virtually a daily basis and he very often acts as a consultant for me in various business transactions. But, as I said, he has no financial interest in the Debtor or the Novartis transaction. His involvement has been strictly on my behalf and I know he has no ulterior motive other than to protect me.

6. I honestly believed at that time that, having secured financing, if we could properly complete due diligence, the Debtor was about to obtain a potentially lucrative plot of land for development.

7. Ultimately, because we had a dispute with Novartis regarding environmental testing, we were compelled to file the instant Chapter 11 Petition to ensure that the transaction would go forward and we would be able to pay the expenses that we were building up in due diligence and otherwise.

8. Thankfully, we were able to resolve those disputes, but shortly before the Debtor was going to close with Novartis, we were told by the Debtor's supposed attorney (Thomas Landrigan) that the structure of the deal had changed and that another party, Suffern Partners LLC, was going to be involved in the sale.[2] Bridgewater was supposed to finance the closing of the transaction by giving us (or obtaining) a loan for $18 million, in which event the Debtor would have received the Old Mill Road Property in fee simple, and received another $2.5 million to pay its creditors (because it had already paid a down payment of $2.5 million toward the $18 million purchase price). Instead, we were told that there was now going to be a series of transactions.

9. We were told that the Novartis Property was going to be "resold" for $30 million to Suffern Partners (in which the Debtor would supposedly get a majority interest), and that the $12 million excess over the $18 million purchase price to Novartis would ultimately go to the Debtor, who would then pay any remaining creditors and move to dismiss its Chapter 11 Petition. We also were told that no Bankruptcy Court approval was required for this "new structure" because the attorney for the Debtor (Mr. Landrigan), the attorney for Suffern Partners (Defendant David Fleischmann), Bridgewater's principals (Defendants Genuth and Yunger), and the attorneys for the lender ("CPIF"), had worked it all out so that it would be legal and proper. Ultimately, Defendant Fleischmann (the

---

[2] When I use the word "we," I mean either myself or Mr. Stern, or both of us.

4

attorney for Suffern) wrote and signed an Opinion Letter that supposedly "confirmed" that we did not need any Bankruptcy Court approval, and the lender obtained a title insurance policy that insured title knowing that an entity in Bankruptcy was transferring the property with no Bankruptcy Court approval.

10. I relied upon the attorneys who were advising me, specifically Mr. Landrigan (our supposed real estate attorney, who I later learned had been representing other parties to the transaction for many years) and Douglas Pick, our bankruptcy attorney, to make sure that we were complying with any Court requirements; I relied upon Suffern's attorney (Defendant Fleischmann) and his written Opinion letter; and I relied upon the lender, who also said that the transaction was completely proper.

11. English is not my first language, and I am not able to read English as well as I would like. I signed whatever documents Mr. Landrigan gave me to sign, trusting him to be protecting the Debtor's interests, and believing whatever he gave me to sign to be proper.[3]

12. The Debtor eventually closed on the Novartis Property purchase, and I fully expected that the Debtor would get the funds that it was promised ($12 million). However, the Debtor did not get a dime, nor did it get its promised majority interest in Suffern. We tried for months and months to get the Debtor's money and the interest in Suffern, all to no avail.[4]

13. I am told that the Adversary Proceeding Defendants have represented to the Court that money from the Novartis Closing went to Mr. Landrigan. Those funds never came to the Debtor. Whatever Mr. Landrigan did with the funds (assuming he actually received them), he unquestionably

---

[3] For this Declaration, I read it and had my attorney read and explain it to me before I signed it.

[4] We tried to work out the issues, at one point thinking that we would have Lone Pine Associates (another of my companies) buy out the Debtor's interest in Suffern Partners and pay the creditors that way. But nothing worked and we were unable to resolve the matter or get the Debtor's funds.

5

did it with Suffern Partners' and Bridgewater's knowledge and consent. We will, of course, "follow the money" in discovery in this adversary proceeding and determine exactly why the Debtor did not get its funds and precisely who absconded with them. But one thing that is beyond argument, the Debtor never got its funds.

14. The detailed series of events is, as I indicated, described in the Complaint, and there are many more stories, and sub-plots that I have not gone into here, but which further illustrate the Adversary Defendants' unauthorized and fraudulent operations. I present the above only to emphasize to the Court that the Debtor has not received any of the funds to which it was entitled, has lost its $2.5 million down payment, and has no remaining assets or funds to pay its remaining creditors.

15. I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief.

Dated: Spring Valley, New York
May 30, 2019

**I read the foregoing and had my attorney read and explain it to me before I signed it**

_____
Yehuda Salamon

6