# EXHIBIT F

Page 1

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF KINGS

     Index #: 520434/2016

4    - - - - - - - - - - - - - - - - - -x

5    GALSTER FUNDING, LLC,

6                          Plaintiff,

7          -against-

8    YEHUDA SALAMON, ETTY SALAMON, YIDEL'S

     SHOPPING CART, INC. 4921 12TH AVENUE LLC,

9    YIDELS FRESH FOOD STATION, LLC, YIDELS

     ONLINE FOOD STATION, LLC, THE SHOPPING

10   CART, INC., YIDEL'S GROCERY, INC. and

     SIGNATURE BANK,

11                        Defendants.

12   - - - - - - - - - - - - - - - - - -x

13                        50 Court Street

                          Brooklyn, New York

14

                          July 2, 2018

15                        10:00 a.m.

16

17       EXAMINATION BEFORE TRIAL of YEHUDA

18   SALAMON, a Defendant in the above-entitled

19   action, held at the above time and place,

20   taken before Shirley Nottes-Werner, a

21   Notary Public of the State of New York,

22   pursuant to Court Order and stipulations

23   between Counsel.

24

25              *       *       *

Page 2

```
1
2  APPEARANCES:
3
     BUTLER FITZGERALD FIVESON & McCARTHY
4    Attorneys for Plaintiff
       9 East 45th Street
5      New York, New York 10017
6    BY: DAVID FIVESON, ESQ.
       File # 3696-06265
7
8
9
10
     LEVINE & ASSOCIATES
11   Attorneys for Defendants
       15 Barclay Road
12     Scarsdale, New York 10583
13   BY: MICHAEL LEVINE, ESQ.
14
15
16
17        *   *   *
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  Y E H U D A   S A L A M O N, the Witness
3  herein, having first been affirmed by the
4  Notary Public, was examined and testified
5  as follows:
6        MR. FIVESON: Good morning, Mr.
7  Salamon. My name is David Fiveson. I
8  represent the plaintiff, Galster
9  Funding, LLC.
10        Have you ever been deposed
11 before?
12        THE WITNESS: No.
13        MR. FIVESON: So there's certain
14 rules that if you follow, we'll get a
15 clean record and it will make sure
16 there are no errors and we can
17 expedite this.
18        The first rule is that if I ask
19 you a question and you don't
20 understand any portion of the
21 question, tell me you don't
22 understand, I will rephrase it. Okay?
23        THE WITNESS: Yes.
24        MR. FIVESON: I don't want you
25 to guess or assume. If you don't know
```

Page 4

```
1
2  an answer to a question, that's an
3  honest answer, say "I don't know."
4  Okay?
5        THE WITNESS: I'm asking what
6  you said now.
7        MR. FIVESON: If you don't know
8  an answer to a question, and that's an
9  honest answer, tell me you don't know.
10 Okay?
11        THE WITNESS: Yes.
12        MR. FIVESON: I don't want you
13 to guess or assume. Okay?
14        THE WITNESS: Yes.
15        MR. FIVESON: This lady can only
16 take down English, so if you know an
17 answer to a question, please
18 communicate it in English. Don't
19 answer with an uh-huh, a shrug of the
20 shoulders or a nod of the head. Okay?
21        THE WITNESS: Yes.
22        MR. FIVESON: If you need to
23 take a break, go to the men's room,
24 this is not a marathon, tell us you
25 need to take a break and we will take
```

Page 5

```
1
2  a break.
3        THE WITNESS: Yes.
4  EXAMINATION BY
5  MR. FIVESON:
6        Q.   What is your name?
7        A.   Yehuda Salamon.
8        Q.   Where do you reside?
9        A.   1152 53rd Street, Brooklyn, New
10 York 11219.
11        Q.   How long have you resided at
12 1152 53rd Street?
13        A.   Long time.
14        Q.   What's a long time?
15        A.   Um, I don't remember exactly.
16        Q.   I'm not asking exactly. Can you
17 tell me approximately how many years
18 you've lived there?
19        A.   Twenty-five.
20        Q.   Who do you reside there with
21 today?
22        A.   My wife.
23        Q.   What is your wife's name?
24        A.   Etty.
25        Q.   E T T Y?
```

2 (Pages 2 - 5)

**Page 6**

Y. Salamon

1
2    A.   Yes.
3    Q.   S A L A M O N?
4    A.   Yes.
5    Q.   What is Etty's date of birth?
6    A.   Why?  You want to send flowers?
7        MR. FIVESON:  I ask the
8    questions.
9    Q.   What's her date of birth?
10   A.   4/7/71.
11   Q.   What's your date of birth, sir?
12   A.   1/16/ 72.
13   Q.   Do you work today?  Are you
14   employed?
15   A.   Yes.
16   Q.   What do you do?
17   A.   Grocery.
18   Q.   When you say grocery, what do
19   you mean?  You own a grocery store?
20   A.   Yes.
21   Q.   Do you do business as Yidel's
22   Shopping Cart, Inc.?
23   A.   Yes.
24   Q.   Is that the grocery store?
25   A.   Yes.

**Page 7**

Y. Salamon

1
2    Q.   Does Yidel's Shopping Cart have
3    a location where it does business as a
4    grocery store?
5    A.   Yes.
6    Q.   Where?
7    A.   Brooklyn.
8    Q.   Where in Brooklyn?
9    A.   12th Avenue.
10   Q.   What's the address?
11   A.   4921 12th Avenue.
12   Q.   That's in Brooklyn?
13   A.   Yes.
14   Q.   What's the zip code on that?
15   A.   11219.
16   Q.   Yidel's Shopping Cart, is that
17   incorporated?  I see it's Inc. in your
18   caption?
19       MR. LEVINE:  Well, it's your
20   caption.
21       You can answer.
22   Q.   Is it a corporation?
23   A.   I believe so.
24   Q.   You believe it to be a New York
25   corporation?

**Page 8**

Y. Salamon

1
2    A.   To the best of my knowledge.
3    Q.   Do you hold an office for
4    Yidel's Shopping Cart, Inc.; president,
5    vice president?  Do you have an office?
6    A.   What do you mean?
7    Q.   Who runs this corporation
8    Yidel's Shopping Cart?
9    A.   I own.
10   Q.   You do?
11   A.   Yeah.
12   Q.   Is there anybody else that runs
13   it?
14   A.   Runs it, no.
15   Q.   When you say runs it, you make
16   the day-to-day decisions for Yidel's?
17   A.   Yes.
18   Q.   Are you the sole stockholder of
19   Yidel's?
20   A.   I don't know.  I have
21   professionals, my accountant, everything
22   how it's structured.
23   Q.   Who is your accountant?
24   A.   Hirschfeld (phonetic).
25   Q.   Hirschfeld.

**Page 9**

Y. Salamon

1
2    A.   Yes.
3    Q.   How do you spell that?
4    A.   I don't know.
5    Q.   Where is this accountant,
6    Mr. Hirschfeld?
7    A.   Williamsburg.
8    Q.   What's his first name?
9    A.   I call him Mr.  I don't know.
10   Q.   Does he do the tax returns for
11   Yidel's?
12   A.   Yes.
13   Q.   Does he do the tax returns for
14   the other entities that are named as the
15   defendants in this action?
16       MR. LEVINE:  I think you need to
17   specify that, make sure that he knows
18   who the other defendants are.
19       MR. FIVESON:  Thank you,
20   Counselor.
21       MR. LEVINE:  You're welcome.
22   Q.   You have 4921 12th Avenue,
23   Yidel's Fresh Food Station, Yidel's Online
24   Food Station, The Shopping Cart, Inc., and
25   Yidel's Grocery, Inc.  Does he do the tax

3 (Pages 6 - 9)

Page 10

```
1          Y. Salamon
2  returns for those entities or any one of
3  them?
4     A.   Some, yes.
5     Q.   Do you have any other
6  accountants other than Mr. Hirschfeld in
7  Williamsburg?
8     A.   Not that I know of.
9     Q.   Does Mr. Hirschfeld prepare the
10 tax returns for Yidel's Shopping Cart?
11    A.   I believe so.
12    Q.   Do you pay him with a check?
13    A.   I believe so.
14    Q.   Does he give you an invoice for
15 his services?
16    A.   Probably.
17    MR. FIVESON:  If I leave a line
18    in the transcript, can you tell me
19    what his address is in Williamsburg?
20    MR. LEVINE:  We'll take it under
21    advisement.
22 (Insert) _____
23    Q.   You don't know his address?
24    A.   No.
25    Q.   Have you ever been to his
```

Page 11

```
1          Y. Salamon
2  office?
3     A.   I was.
4     Q.   Where was his office, on what
5  street?
6     A.   I don't remember.
7     Q.   When was the last time you were
8  at his office?
9     A.   I think last year.
10    Q.   What was the purpose of you
11 going to his office?
12    A.   I don't remember.
13    Q.   How long had you used
14 Mr. Hirschfeld as your accountant, how
15 many years?
16    A.   A few.
17    Q.   What's a few?
18    A.   Less than ten.
19    Q.   Now, you said you have other
20 professionals that you use in connection
21 with Yidel's Shopping Cart. I asked you
22 if it was a New York corporation and who
23 the shareholders were and you said, I have
24 an accountant and other professionals.
25    MR. LEVINE:  Objection to form.
```

Page 12

```
1          Y. Salamon
2     Q.   What other professionals did you
3  use in connection with Yidel's Shopping
4  Cart?
5     MR. LEVINE:  Objection to form.
6     A.   Other than Mr. Hirschfeld?
7     MR. LEVINE:  Objection to form.
8     You can answer.
9     A.   I have a marketing group.
10    Q.   Who are they?
11    A.   PTX.
12    Q.   How do you spell that?
13    A.   PTX.
14    Q.   Where are they located?
15    A.   In Brooklyn.
16    Q.   Where in Brooklyn?
17    A.   39th Street.
18    Q.   What do they do?
19    A.   They help me out with the
20 business.
21    Q.   What do they do to help you out
22 with the business?
23    A.   The problem is that I don't
24 remember exactly what, because I'm not
25 using them for a long time.
```

Page 13

```
1          Y. Salamon
2     Q.   Any other professional groups
3  you used in connection with Yidel's
4  Shopping Cart?
5     A.   Nothing that I remember.
6     Q.   I can't hear you.
7     MR. LEVINE:  He said he doesn't
8     remember.
9     A.   I don't remember.
10    Q.   Did you use an attorney to
11 organize Yidel's Shopping Cart?
12    A.   Probably.
13    Q.   Do you recall?
14    A.   No.
15    Q.   Do you know when Yidel's
16 Shopping Cart was incorporated?
17    A.   No.
18    Q.   What's your highest level of
19 education?
20    A.   I don't understand.
21    Q.   Well, did you go to school?
22    A.   Yes.
23    Q.   What school did you go to?
24    A.   UTA.
25    Q.   What's UTA?
```

Page 14

1          Y. Salamon
2    A.   What it means?
3    Q.   What does it mean?
4    A.   United Talmudic Academy.
5    Q.   United Talmud Medical Academy?
6    A.   No, not medical.
7    Q.   United Talmud Academy, right?
8    A.   Yes.
9    Q.   You have to keep your --
10        MR. LEVINE: Why do we have to
11   raise our voice?
12        MR. FIVESON: Please keep your
13   voice up so she can hear you and so I
14   can hear you. Okay? That was another
15   one of the rules, so we can -- w.
16        THE WITNESS: I think I'm
17   talking loud.
18        MR. FIVESON: Off the record.
19        [Discussion held off the
20   record.]
21   Q.   Where is United Talmud Academy?
22   A.   In Brooklyn.
23   Q.   Where in Brooklyn?
24   A.   53rd Street.
25   Q.   And?

Page 15

1          Y. Salamon
2    A.   And 14th Avenue.
3    Q.   And did you graduate from this
4    institution?
5    A.   What do you mean graduate?
6    Q.   Did you finish?
7    A.   When you finish -- I mean, when
8    you're 13 years old you go away.
9    Q.   So you went to the United Talmud
10   Academy until you were 13?
11   A.   Yes.
12   Q.   Did you go to any school after
13   you were 13?
14   A.   Yes.
15   Q.   Where did you go?
16   A.   Mount Kisco.
17   Q.   What's in Mount Kisco?
18   A.   Yeshiva.
19   Q.   What Yeshiva did you go to?
20   A.   Nitra, N I T R A.
21   Q.   How many years did you spend at
22   Nitra?
23   A.   Five.
24   Q.   When you finished Nitra, how old
25   were you?

Page 16

1          Y. Salamon
2    A.   Eighteen.
3    Q.   Did you have any formal
4    education after Nitra?
5    A.   No.
6    Q.   When did you start taking up
7    employment?
8    A.   Then.
9    Q.   So right after Nitra you took up
10   employment at 18?
11   A.   Yes.
12   Q.   What was your first job?
13   A.   I helped -- I helped my father.
14   Q.   What did your father do?
15   A.   He had, um, an electronic
16   business.
17   Q.   What is your father's name?
18   A.   Moshe.
19   Q.   Moshe Salamon?
20   A.   Yes.
21   Q.   Is he alive today?
22   A.   Yes.
23   Q.   What's his address?
24   A.   Why do you need his address?
25        MR. LEVINE: Come on.

Page 17

1          Y. Salamon
2    Objection. What's the purpose of
3    that?
4        MR. FIVESON: He may be a
5    witness. I want to know his address.
6    It's just discovery.
7        MR. LEVINE: No. Don't answer
8    that question.
9        Next question.
10       Leave a blank in the transcript
11   and we'll take it under advisement.
12   (Insert) _____
13       MR. FIVESON: Just so we're
14   clear, I'm going to keep the
15   deposition open for any questions you
16   instruct him not to answer, excluding
17   privilege, of course, Counsel, and I'm
18   going to move that he come back. So
19   that's up to you.
20       MR. LEVINE: Do whatever you
21   think is necessary.
22       MR. FIVESON: I will do whatever
23   I think is necessary. Thank you.
24       MR. LEVINE: Why don't we stick
25   to relevant matters?

5 (Pages 14 - 17)

Page 18

1          Y. Salamon
2          MR. FIVESON: Well, you're
3    deciding what's relevant. The issue
4    is what is discoverable.
5          THE WITNESS: If I have to come
6    back —
7          MR. LEVINE: No, no, no. Just
8    be quiet. Answer the next question.
9    Q.    How long did you work in the
10    electronic business with your father?
11    A.    (No verbal response.)
12          THE WITNESS: Can I —
13          MR. LEVINE: Just answer.
14    A.    I don't remember.
15    Q.    Well, can you give me an
16    approximation how many years?
17    A.    Two years.
18          THE WITNESS: I want to talk.
19          MR. FIVESON: You want to speak
20    to your lawyer?
21          THE WITNESS: Yes.
22          MR. LEVINE: Step outside for a
23    second.
24          (Short recess was taken.)
25    Q.    After you worked with your

Page 19

1          Y. Salamon
2    father for two years, what was your next
3    employment?
4    A.    I worked with my grandfather.
5    Q.    What is your grandfather's name?
6    A.    Ely Salamon.
7    Q.    Can you spell that, please?
8    A.    E L Y, S A L A M O N.
9    Q.    Ely Salamon?
10    A.    Ely Salamon.
11    Q.    Is Ely Salamon alive?
12    A.    No.
13    Q.    What did you do with your
14    grandfather Ely Salamon for employment?
15    A.    He had a grocery and other stuff
16    that I helped him.
17    Q.    Was he ever an owner of Yidel's
18    Shopping Cart, Inc.?
19    A.    No.
20    Q.    What was the location when you
21    worked for your grandfather Ely Salamon?
22    A.    16th Avenue.
23    Q.    Where on 16th Avenue?
24    A.    55th Street.
25    Q.    What was the address?

Page 20

1          Y. Salamon
2    A.    5424 16th.
3    Q.    And how long did you work with
4    your grandfather?
5    A.    A few years.
6    Q.    What's a few?
7    A.    Less than five.
8    Q.    What was your next employment
9    after with your grandfather?
10    A.    On 15th Avenue.
11    Q.    What did you do?
12    A.    Also grocery.
13    Q.    Did you do this on your own or
14    were you with anybody else?
15    A.    Someone else.
16    Q.    Who did you work with?
17    A.    Abramowitz.
18    Q.    What's his first name?
19    A.    Um, Wolf.
20    Q.    Wolf?
21    A.    Yes.
22    Q.    How long did you work with
23    Mr. Wolf Abramowitz?
24    A.    Also a few years.
25    Q.    What's a few?

Page 21

1          Y. Salamon
2    A.    Less than five.
3    Q.    Were you a partner with
4    Mr. Abramowitz or were you just an
5    employee?
6    A.    Employee.
7    Q.    And after you were with
8    Mr. Abramowitz, what did you do?
9    A.    I went Yidel's.
10    Q.    Then you organized Yidel's —
11    A.    Yes.
12    Q.    — is that correct?
13    A.    Yes.
14    Q.    How long has Yidel's Shopping
15    Cart been in business?
16    A.    I don't know because I had a few
17    corporations, so I don't know.
18    Q.    Well, has it always been
19    operating at the address 4921 12th Avenue?
20    A.    No.
21    Q.    What address did it operate at
22    when you first started the business?
23    A.    4913 12th Avenue.
24    Q.    And how long was it at that
25    location?

6 (Pages 18 - 21)

Page 22

```
 1              Y. Salamon
 2    A.   A few years.
 3    Q.   What's a few?
 4    A.   About five.
 5    Q.   What was the next location it
 6  did business out of?
 7    A.   4921 12th.
 8    Q.   That's where it is today,
 9  correct?
10    A.   Yes.
11    Q.   How long has it been doing
12  business at 4921 12th Avenue?
13    A.   I don't remember.
14    Q.   Does Yidel's have a lease for
15  that premises?
16    A.   I remember so.
17    Q.   I can't hear you, sir.
18    A.   I remember so.
19    Q.   You do? You have a lease?
20        MR. LEVINE: He said he
21  remembers so.
22    Q.   Do you know who the landlord is
23  for that premises?
24    A.   4921 12th Avenue.
25    Q.   Is 4921 12th Avenue an LLC or a
```

Page 23

```
 1              Y. Salamon
 2  corporation?
 3    A.   I think it's LLC.
 4    Q.   Do you have any interest in that
 5  entity? Do you own any interest in that
 6  entity?
 7    A.   Yes.
 8    Q.   What is your interest?
 9    A.   It's mine.
10    Q.   You own it?
11    A.   Yes.
12        MR. FIVESON: Can we have this
13  marked as Exhibit 1 and 1A?
14        [The documents were hereby
15  marked as Plaintiff's Exhibits 1 and
16  1A for identification, as of this
17  date.]
18        THE WITNESS: Can I take a
19  break?
20        MR. FIVESON: You want to take a
21  break? Go take a break.
22        (Short recess was taken.)
23        MR. FIVESON: Are you going to
24  stand?
25        THE WITNESS: A little bit.
```

Page 24

```
 1              Y. Salamon
 2        MR. FIVESON: You can stand.
 3    Q.   I'm going to show you what's
 4  been marked as Exhibit 1, which is an
 5  accounting that was filed in this action.
 6        MR. LEVINE: Let me see this,
 7  please.
 8        MR. FIVESON: (Handing.)
 9        MR. LEVINE: This is marked as
10  1?
11        MR. FIVESON: It's marked as 1.
12  There's a signature page. I'm going
13  to ask him about it.
14        MR. LEVIN: Okay.
15    Q.   Have you ever seen that document
16  before?
17    A.   (Perusing.)
18        I saw so many documents, I don't
19  know.
20    Q.   You don't recall?
21    A.   I don't know which one I saw
22  and — I don't know what's this. I
23  mean —
24        MR. LEVINE: It's a yes or no
25  question.
```

Page 25

```
 1              Y. Salamon
 2    A.   So what? I can't say yes or no.
 3    Q.   I want to show you what's been
 4  marked as Exhibit 1A, which is a
 5  certification page. Is that your
 6  signature on that document?
 7        (Handing.)
 8    A.   (Perusing.)
 9        It looks like my signature.
10    Q.   Now, if you look at the first
11  page, there are many defendants listed in
12  this caption. Do you see that?
13        (Indicating.)
14    A.   (No verbal response.)
15    Q.   Do you understand that these are
16  defendants I'm showing you?
17        (Indicating.)
18    A.   (No verbal response.)
19        MR. LEVINE: You're asking him
20  if he sees the list of defendants?
21        MR. FIVESON: Yes.
22    Q.   Do you see that?
23    A.   I didn't read it yet.
24        MR. LEVINE: Okay.
25    A.   (Perusing.)
```

7 (Pages 22 - 25)

Page 26

1        Y. Salamon
2        Yes.
3     Q.   And you see that Etty Salamon is
4  listed as a defendant?
5     A.   Yes.
6     Q.   And then after Yidel's Shopping
7  Cart as a defendant, there is 4921 12th
8  Avenue, LLC as a defendant. Do you see
9  that?
10    A.   Yes.
11    Q.   And that's the owner of the
12 premises that leases to Yidel's Shopping
13 Cart; is that correct?
14    A.   Yes.
15    Q.   And then the next defendant is
16 Yidel's Fresh Food Station, LLC. Do you
17 see that?
18    A.   Yes.
19    Q.   Do you have any affiliation with
20 that company?
21    A.   Yes.
22    Q.   What's Yidel's Fresh Food
23 Station, LLC?
24    A.   One of the corporations.
25    Q.   Where does it do business?

Page 27

1        Y. Salamon
2     A.   At the 4921 12th.
3     Q.   What is its purpose? What does
4  it do at 4921 12th to engage in business?
5     A.   I don't know how it was made.
6     Q.   So you don't know what Yidel's
7  Fresh Food Station does?
8     A.   I don't know how to differ
9  what's what.
10    Q.   You don't know how to
11 differentiate between the LLCs?
12    A.   Right.
13    Q.   Are you a member of Yidel's
14 Fresh Food Station, LLC?
15    A.   Yes.
16    Q.   Are you the owner?
17    A.   I believe so.
18    Q.   Is your wife an owner in Yidel's
19 Fresh Food Station, LLC.
20    A.   She has nothing to do with any
21 of those corporations.
22    Q.   What about Yidel's Online Food
23 Station, LLC, they're another defendant.
24 Do you see that?
25    A.   Yes.

Page 28

1        Y. Salamon
2     Q.   Are you the owner of Yidel's
3  Online Food Station?
4     A.   I believe so.
5     Q.   What does it do?
6     A.   As I said, I don't know how the
7  accountant and the other professionals
8  they structure this.
9     Q.   What about The Shopping Cart
10 Inc., do you see that as a defendant?
11    A.   Same thing.
12    Q.   And that does business at 4921
13 12th Avenue?
14    A.   Yes.
15    Q.   And you're the owner of that?
16    A.   I believe so.
17    Q.   And Yidel's Grocery, Inc., are
18 you the owner of that?
19    A.   I believe so.
20    Q.   That also does business at 4921
21 12th Avenue, correct?
22    A.   Yes.
23       MR. FIVESON: Please mark these
24    documents as Plaintiff's Exhibit 2, 2A
25    and 2B for identification.

Page 29

1        Y. Salamon
2       [The documents were hereby
3    marked as Plaintiff's Exhibits 2, 2A
4    and 2B for identification, as of this
5    date.]
6       MR. FIVESON: I'm going to show
7    you what's been marked as Exhibit 2,
8    which appears to be a verified answer
9    that was filed in the Beis Chasidei,
10   C H A S I D E I, Gorlitz action on
11   January 6, 2017. I will hand it to
12   Counsel to look at.
13      (Handing.)
14      MR. LEVINE: (Perusing.)
15      (Handing.)
16      It's before the witness now.
17    Q:   Have you ever seen that
18 document?
19      THE WITNESS: What did he say?
20      MR. LEVINE: He asked if you
21   ever saw that document. I said it's
22   in front of you.
23    A.   How should I remember?
24    Q.   I want to show you Exhibit 2A.
25 Is that your signature?

8 (Pages 26 - 29)

Page 30

1          Y. Salamon
2      (Handing.)
3    A.   (Perusing.)
4      Looks like my signature.
5    Q.   I want to show you 2B.  Is that
6 your wife's signature?
7      (Handing.)
8    A.   (Perusing.)
9      I don't know.
10    Q.   Are you familiar with
11 condominium units C1 and R1 at 4917 12th
12 Avenue?
13    A.   I don't understand.
14    Q.   Well, are you familiar with the
15 premises condominium units C1 and R1,
16 located at the 4917 12th Avenue
17 condominium?
18      MR. LEVINE:  Objection to form.
19      You can answer.
20    A.   I don't understand.
21    Q.   What about that question don't
22 you understand?
23    A.   I don't know what you mean.
24    Q.   You don't know what a
25 condominium is?

Page 31

1          Y. Salamon
2      MR. LEVINE:  Maybe he doesn't
3    don't know what the word familiar
4    means.
5      MR. FIVESON:  All right.
6    Q.   Do you or any of your companies
7 own units C1 and R1 at the 4917 12th
8 Avenue condominiums?
9    A.   Own everything.
10    Q.   I'm sorry?
11    A.   Own everything.
12    Q.   So you own those two units?
13    A.   Yes.
14    Q.   Who lives in those two units, if
15 anyone?
16    A.   I don't remember.
17    Q.   Which one of your entities owns
18 those units?
19    A.   4921 12th Avenue, LLC.
20    Q.   Have you ever heard the entity
21 Beis, B E I S, Chasidei, C H A S I D E I,
22 Gorlitz, G O R L I T Z?
23    A.   Yes.
24    Q.   Did that entity ever loan monies
25 to any of the defendants?

Page 32

1          Y. Salamon
2      MR. LEVINE:  The defendants in
3    this case or the defendants in the
4    Gorlitz case?
5      MR. FIVESON:  The defendants in
6    my case.  Thank you, Counsel.
7    Q.   Defendants listed in Exhibit 1.
8      (Handing.)
9    A.   (Perusing.)
10      It's a tough question to answer
11 because it was on and off, questions a few
12 kind of what -- how to structure and what
13 the purpose was for it.
14    Q.   But did they loan money?  That
15 was the question.
16    A.   Yes, but the question was how
17 and for what purpose.
18    Q.   I didn't ask how.  Was the money
19 loaned by Beis Chasidei Gorlitz to any of
20 the defendants?
21      MR. LEVINE:  You can answer that
22    yes.
23    A.   Yes.
24      MR. FIVESON:  We're going to
25    have this document marked collectively

Page 33

1          Y. Salamon
2    as one exhibit.  It is an order to
3    show cause for an attachment.  It has
4    multiple exhibits attached, and we're
5    going to identify those exhibits
6    individually, but let's mark the
7    entire document as one.
8      Also, I'm telling Counsel that
9    when I go back to my office, I'm going
10    to scan all this in.  We're going to
11    e-mail you copies of everything with
12    the exhibit tabs and everything, so
13    you're going to have a full set to
14    yourself.
15      MR. LEVINE:  I appreciate that.
16    It's more beneficial to have it at the
17    deposition, but --
18      MR. FIVESON:  I agree with you,
19    but I had a lot of documents to carry.
20      MR. LEVINE:  And you had a lot
21    of time.
22      [The documents were hereby
23    marked as Plaintiff's Exhibits 3, 3A
24    and 3B for identification, as of this
25    date.]

9 (Pages 30 - 33)

Page 34

1        Y. Salamon
2    Q.   What's been marked as 3A appears
3 to be a building loan mortgage by 4921
4 12th Avenue, LLC to Beis Chasidei Gorlitz,
5 dated May 4, 2006. And what's marked as
6 3B is a signature page to that mortgage.
7        I'd like you to take a look at
8 Exhibits 3A and 3B and I'm going to ask
9 you whether you signed 3B?
10        (Handing.)
11        MR. LEVIN: So we're looking at
12 3B first, right?
13        MR. FIVESON: You can look at 3B
14 or 3A. 3A is the cover page of the
15 mortgage. 3B is the signature page.
16        MR. LEVINE: And the question
17 is, is that your signature on 3B,
18 correct?
19        MR. FIVESON: Thank you. Yes.
20        MR. LEVINE: You can answer that
21 question.
22    A.   (Perusing.)
23        It looks like.
24    Q.   Do you recall the amount of that
25 building loan mortgage?

Page 35

1        Y. Salamon
2    A.   1.3.
3    Q.   Now, did 4921 12th Avenue borrow
4 monies from Galster Funding, LLC?
5    A.   Yes.
6    Q.   And did you go to the closing of
7 that mortgage?
8        MR. LEVINE: Objection to form.
9        You can answer.
10    A.   Yes.
11        MR. FIVESON: Please mark this
12 as Plaintiff's Exhibit 3C.
13        [The document was hereby marked
14 as Plaintiff's Exhibit 3C for
15 identification, as of this date.]
16    Q.   I'm going to show you Exhibit
17 3C, sir. Is that your signature on that
18 document?
19        (Handing.)
20    A.   (Perusing.)
21        Looks like.
22    Q.   Then below you is a Yungreis, am
23 I reading that correctly, below your
24 signature?
25        MR. LEVINE: Hold on a second

Page 36

1        Y. Salamon
2    (perusing.)
3    Q.   Yes, it looks like Issac, I S A
4 A C, B, Yungreis, Y U N G R E I S, below
5 your signature?
6        MR. LEVIN: What was the
7 question?
8        MR. FIVESON: Did he sign that
9 in your presence?
10        (Indicating.)
11  .A.   I don't know. I don't remember.
12    Q.   Do you recognize that signature
13 as that of Mr. Yungreis?
14    A.   I don't remember.
15    Q.   Who is Mr. Yungreis?
16    A.   Gorlitz.
17    Q.   What do you mean Gorlitz? Is he
18 the president of Gorlitz?
19    A.   I believe so.
20        MR. FIVESON: Please mark this
21 as Plaintiff's Exhibit 3D for
22 identification.
23        [The document was hereby marked
24 as Plaintiff's Exhibit 3D for
25 identification, as of this date.]

Page 37

1        Y. Salamon
2    Q.   I want to show you what's been
3 marked as Plaintiff's Exhibit 3D, which
4 appears to be the signature page on a
5 February of 2010 forbearance agreement,
6 and I ask whether your signature appears
7 above the lines Yehuda Salamon?
8        (Indicating.)
9    A.   (Perusing.)
10        I don't remember if --
11    Q.   Is that your signature?
12    A.   It's similar.
13    Q.   What about the one, Etty Salamon
14 Individually, do you see that signature?
15 Is that your wife's signature?
16    A.   It doesn't look like the one you
17 showed me before.
18    Q.   But is it your wife's signature?
19    A.   Similar.
20    Q.   Then there is a signature above
21 the name Issac B. Yungreis. Is that
22 Mr. Yungreis's signature?
23        (Indicating.)
24    A.   Doesn't look like the one on the
25 other.

10 (Pages 34 - 37)

Page 38

Y. Salamon

2 Q. But is that his signatures?
3 A. I don't know.
4 Q. Was that document signed in your
5 presence by Mr. Yungreis?
6 A. I don't remember.
7 MR. FIVESON: Please mark that
8 as Plaintiff's Exhibit 3E, which is a
9 cover page to the forbearance
10 agreement.
11 [The document was hereby marked
12 as Plaintiff's Exhibit 3E for
13 identification, as of this date.]
14 Q. Do you recognize the forbearance
15 agreement?
16 A. (Perusing.)
17 No.
18 Q. Just so you're clear, this is
19 with Gorlitz. You don't recognize that?
20 A. I don't remember it.
21 Q. And on the bottom right-hand
22 corner of Exhibit 3E there are initials.
23 Do any of those initials appear to be your
24 initials?
25 (Indicating.)

Page 39

Y. Salamon

2 A. (Perusing.)
3 I don't think so.
4 Q. If you look from 3E, there's
5 page 2, behind it page 3, page 4, page 5,
6 page 6, page 7, and page 8 and ends in
7 Exhibit 3D, which is Exhibit 9. Can you
8 tell us whether your initials appear on
9 any of those pages in the lower right-hand
10 corner?
11 MR. LEVINE: Wait. You said 3D
12 is Exhibit 9? What does that mean?
13 MR. FIVESON: Page 9.
14 Q. Do your initials appear on page
15 2 behind Exhibit 3E?
16 (Indicating.)
17 A. (Perusing.)
18 Every page every initial looks
19 different way.
20 MR. LEVINE: Just answer his
21 question. Are those your —
22 Q. Are those your initials on the
23 bottom right-hand corner?
24 A. My initials, but I don't know if
25 I signed it.

Page 40

Y. Salamon

2 Q. They are your initials, but does
3 it appear to be in your handwriting, those
4 initials?
5 A. I don't know.
6 Q. You don't know?
7 A. No.
8 MR. FIVESON: Please mark these
9 as Plaintiff's Exhibits 3F and 3G.
10 [The documents were hereby
11 marked as Plaintiff's Exhibits 3F and
12 3G for identification, as of this
13 date.]
14 Q. I'm going to show you what's
15 marked as Plaintiff's Exhibit 3F, and the
16 signature page thereof is 3G. My first
17 question is whether you recognize the
18 document, the mortgage marked as Exhibit
19 3F, which purports to be a mortgage
20 granted by 4921 12th Avenue to Galster
21 Funding, LLC, on August 30, 2016?
22 (Handing.)
23 A. (Perusing.)
24 I have to read this.
25 Q. Do you recognize the document?

Page 41

Y. Salamon

2 MR. LEVINE: He asked you if you
3 recognize it. Read the whole thing
4 and see if you recognize it.
5 A. (Perusing.)
6 It's hard to read. It's not
7 clear.
8 MR. LEVINE: Do the best you
9 can.
10 A. It's not that I don't recognize
11 it, I can't read it. See, it's not clear.
12 (Indicating.)
13 Q. Are you reading the document?
14 A. Yes. It's very hard to read.
15 MR. LEVINE: Do you want to
16 withdraw the question?
17 MR. FIVESON: No. I want to
18 know if he recognizes the document.
19 If he feels he has to read every word,
20 then let him read every word.
21 A. (Perusing.)
22 MR. LEVINE: On the record, I
23 think you described 3F as the cover
24 page.
25 MR. FIVESON: Well, now he's

11 (Pages 38 - 41)

Page 42

1        Y. Salamon
2    reading the mortgage, right?
3        MR. LEVINE: My question is, did
4    you intend it to mean the entire
5    document?
6        MR. FIVESON: Not yet. I
7    described that page as that is the
8    cover page, and then I asked him if he
9    recognizes the mortgage.
10        MR. LEVINE: So you're asking
11    him if he recognizes the entire
12    document?
13        MR. FIVESON: Yes.
14        MR. LEVINE: Go ahead.
15    A.    (Perusing.)
16        I don't recognize it.
17    Q.    You don't?
18    A.    (No verbal response.)
19    Q.    I'm sorry?
20    A.    No.
21        MR. FIVESON: I'm sorry. Can
22    you read the last two questions and
23    answers, please?
24        [The requested portion of the
25    record was read.]

Page 43

1        Y. Salamon
2    Q.    I'm showing you Exhibit 3G. Is
3    that your signature on that document?
4        (Handing.)
5    A.    (Perusing.)
6        It looks like mine.
7        MR. FIVESON: Please mark these
8    Plaintiff's Exhibits 3H and 3I for
9    identification.
10        [The documents were hereby
11    marked as Plaintiff's Exhibits 3H and
12    3I for identification, as of this
13    date.]
14    Q.    Mr. Salamon, I'm going to show
15    you 3H, which appears to be the May 4,
16    2006 note to Gorlitz for a million, two;
17    and GI, which appears to be the signature
18    page. Do you recognize that 3H as the
19    note?
20        (Handing.)
21    MR. LEVINE: Objection to form.
22        You can answer the question.
23    A.    No.
24    Q.    Does your signature appear on
25    3I?

Page 44

1        Y. Salamon
2    A.    (Perusing.)
3        Similar.
4        MR. FIVESON: Please mark these
5    as Plaintiff's Exhibits 3J and 3 K.
6        [The documents were hereby
7    marked as Plaintiff's Exhibits 3J and
8    3K for identification, as of this
9    date.]
10    Q.    Mr. Salamon, I'm going to show
11    you Exhibit 3J, which appears to be a May
12    4, 2006 consolidated and restated note for
13    a million, three, to Gorlitz; and 3K,
14    which appears to be the signature page. I
15    ask you, do you recognize 3J as the
16    restated note?
17        MR. LEVINE: Objection to form.
18    A.    (Perusing.)
19        Looks similar.
20    Q.    Do you recognize your signature
21    on 3K?
22    A.    (Perusing.)
23        I don't recognize, but similar.
24    Q.    Now, how did it become aware
25    that Galster Funding had monies to loan

Page 45

1        Y. Salamon
2    4921 12th Avenue?
3        MR. LEVINE: Who do you mean by
4    "it"?
5        MR. FIVESON: How did he or any
6    of his other 4921 12th Avenue first
7    become aware that Galster had monies
8    available to loan monies to them?
9        MR. LEVINE: Okay.
10    A.    Through a broker.
11    Q.    Who was the broker?
12    A.    It was more than one broker. It
13    was -- it went through a few. I don't
14    know how the connection was.
15    Q.    Tell me whatever brokers you
16    understood were involved in placing this
17    loan.
18    A.    I dealt with someone -- I don't
19    remember his name.
20    Q.    Was it more than one broker?
21    A.    No, I dealt with one.
22    Q.    And you don't remember the name
23    of the broker or the entity that you dealt
24    with?
25    A.    Right.

12 (Pages 42 - 45)

Page 46

1        Y. Salamon
2    Q.    Do you know the address of this
3  entity or broker?
4    A.    No.
5    Q.    Do you have any documents that
6  would identify this entity or broker?
7    A.    I don't know.
8    Q.    Had you used this entity or
9  broker prior to the August 30, 2016 loan
10  with Galster?
11    A.    No.
12    Q.    How were you introduced to this
13  broker?
14    A.    I'm thinking who told me. Um, I
15  had constantly people calling me offering
16  me to take a mortgage. I mean, I'm trying
17  to think who told me. I don't remember.
18    Q.    Had you ever used this broker
19  prior to the August 30, 2016 loan with
20  Galster Funding?
21        MR. LEVINE: Just give me one
22  second. I'm sorry.
23        MR. FIVESON: Sure. Let's take
24  a break. Hold that question.
25        (Short recess was taken.)

Page 47

1        Y. Salamon
2        MR. FIVESON: Please mark these
3  as Plaintiff's Exhibit 4, 4A and 4B
4  for identification.
5        [The documents were hereby
6  marked as Plaintiff's Exhibits 4, 4A
7  and 4B for identification, as of this
8  date.]
9        MR. FIVESON: Please mark that
10  as Plaintiff's Exhibits 5 and 5A.
11        [The documents were hereby
12  marked as Plaintiff's Exhibits 5 and
13  5A for identification, as of this
14  date.]
15    A.    If I don't remember who the
16  broker is, then how should I remember if I
17  used him? I don't. I'm trying to think
18  who it was.
19    Q.    Was the broker present at the
20  closing?
21        MR. LEVINE: The closing of the
22  Galster loan?
23        MR. FIVESON: Correct.
24    Q.    On August 30, 2016?
25    A.    I don't think so.

Page 48

1        Y. Salamon
2    Q.    Were you present?
3    A.    Yes.
4    Q.    Where did the Galster Funding,
5  LLC loan close on August 30, 2016?
6    A.    Manhattan.
7    Q.    Do you know the address?
8    A.    No.
9    Q.    Was 4921 12th Avenue represented
10  by counsel at that closing?
11    A.    Yes.
12    Q.    Who was its counsel?
13    A.    Daniel Muller.
14    Q.    What is Mr. Muller's address, do
15  you know?
16    A.    No.
17    Q.    Had you used Mr. Muller prior to
18  this closing for transactions on behalf of
19  yourself or any of your business entities?
20    A.    No.
21    Q.    How was it that you selected
22  Daniel Muller to represent 4921 12th
23  Avenue in this closing?
24    A.    He was available that date.
25    Q.    What firm is Mr. Muller with?

Page 49

1        Y. Salamon
2    A.    I don't know.
3    Q.    Did you pay Mr. Muller, meaning
4  you or 4921 12th Avenue or any of your
5  entities, pay Mr. Muller for his services
6  rendered on August 30, 2016?
7    A.    Yes.
8    Q.    Was that by check?
9    A.    I don't remember.
10    Q.    Did Mr. Muller ever give to you
11  copies of documents that were generated or
12  exchanged at that closing?
13    A.    I don't remember.
14    Q.    Did you search your files prior
15  to testifying today to deliver to your
16  counsel, Mr. Levine, all the closing
17  documents that you have in your possession
18  regarding the August 30, 2016 closing?
19    A.    I gave him what he asked for. I
20  don't remember what I gave him.
21    Q.    Whatever he asked for, you
22  searched your records and you gave him
23  what was responsive?
24    A.    If I have, yes.
25    Q.    You searched not only your

13 (Pages 46 - 49)

Page 50

Y. Salamon

1 personal records, but those of all the
2 defendants in this action including
3 Yidel's Shopping Cart, 4921 12th Avenue,
4 LLC, Yidel's Fresh Food Station, Yidel's
5 Online Food Station, LLC, The Shopping
6 Cart, Inc., and Yidel's Grocery, correct?
7 A. Yes.
8 Q. Now, I want to show you what I
9 marked in the break as Exhibit 4, which
10 appears to be a copy of the August 30,
11 2016 mortgage from 4921 12th Avenue, LLC,
12 to Galster Funding; and Exhibits 4A and
13 4B, which appear to be signature pages.
14 First I ask you, do you recognize the
15 document Exhibit 4, as that mortgage?
16 (Handing.)
17 A. (Perusing.)
18 MR. LEVINE: When you say
19 mortgage, you mean mortgage and
20 recording cover sheet, correct?
21 MR. FIVESON: Yes.
22 A. (Perusing.)
23 Recognize, you mean if I know
24 about it?

Page 51

Y. Salamon

1 Q. Do you know what it is? Is that
2 the mortgage?
3 A. Looks like.
4 Q. That you gave to Galster
5 Funding?
6 MR. LEVINE: You can answer that
7 question.
8 THE WITNESS: You didn't tell me
9 it's going to take so long.
10 MR. LEVINE: Just answer the
11 question.
12 A. (Perusing.)
13 MR. LEVINE: The question is, is
14 that the mortgage to Galster?
15 A. Looks like.
16 Q. And does your signature appear
17 on pages 4A and 4B?
18 (Handing.)
19 A. (Perusing.)
20 MR. LEVINE: Wait.
21 Yes, go ahead.
22 A. Looks like.
23 Q. Did you sign this document at
24 the closing?

Page 52

Y. Salamon

1 A. I believe so.
2 Q. You signed 4A at the closing
3 before a notary, Ira Newman. Do you see
4 that?
5 (Indicating.)
6 A. Yes.
7 Q. Do you recall Mr. Newman?
8 A. No.
9 Q. Do you recall a notary being
10 present at that closing?
11 A. I don't remember.
12 Q. Now, let me go to Exhibit 5,
13 which appears to be the August 30, 2016
14 mortgage note for six-and-a-half million
15 dollars, from 4921 12th Avenue to Galster
16 Funding, that's Exhibits 5. And 5A is the
17 signature page. Do you recognize Exhibit
18 5 as the mortgage note granted to Galster
19 Funding?
20 (Handing.)
21 A. (Perusing.)
22 Looks like.
23 Q. And Exhibit 5A is your
24 signature?

Page 53

Y. Salamon

1 A. Looks like.
2 Q. How long did the closing take at
3 the office in Manhattan on August 30,
4 2016?
5 A. I don't remember.
6 Q. Did you arrive at the closing
7 yourself or did you arrive with someone
8 else or anyone else?
9 A. Myself.
10 Q. Did you have any e-mail
11 communications with anyone regarding this
12 closing? I'm not asking for the content
13 yet. I just want to know if there were
14 any e-mail communications?
15 A. I don't think so.
16 Q. And when I say with anyone, I'm
17 including either your broker, the lawyer
18 for Galster Funding, anybody at Galster
19 Funding, any closing or title agent, were
20 there any such communications by e-mail
21 prior to this closing by you?
22 A. I don't remember.
23 Q. Did you search your files to
24 determine whether you're in possession of

14 (Pages 50 - 53)

Page 54

Y. Salamon

2 any such e-mail communications?
3    A.    Anything that I had I provided
4 for my lawyer.
5    Q.    For your attorney?
6    A.    Yeah.
7    Q.    Now, at the time when you
8 arrived at the closing on August 30, 2016,
9 were you aware that there was a prior
10 recorded mortgage granted to Gorlitz
11 against the premises?
12    A.    I don't understand the question.
13    Q.    Well, this Exhibit 4, this
14 mortgage, grants a mortgage to Galster
15 Funding against condominium units C1 and
16 R1 at 4917 12th Avenue, correct?
17    A.    Yes.
18    Q.    And you understood that,
19 correct?
20    A.    Yes.
21    Q.    Before or prior to you going to
22 the closing on August 30, 2016, was there
23 a recorded mortgage against that property
24 previously granted to Gorlitz?
25    A.    Yes.

Page 55

Y. Salamon

2    Q.    And you knew that before you
3 went to the closing, correct?
4    A.    Yes.
5    Q.    Did you also understand that as
6 a condition of Galster loaning you
7 six-and-a-half million dollars, that prior
8 mortgage had to be either satisfied or
9 paid off?
10    A.    Yes.
11    Q.    You understood that, correct?
12    A.    Yes.
13    Q.    And you understood that 4921
14 12th Avenue was granting Galster a first
15 mortgage on those two units?
16    A.    Yes.
17    Q.    Do you understand what a first
18 mortgage is?
19    A.    Yes.
20    Q.    What is your understanding of a
21 first mortgage?
22    A.    There is no other.
23    Q.    Prior mortgages recorded against
24 the unit, correct?
25    A.    Yes, yes.

Page 56

Y. Salamon

2    Q.    Had you or anyone on your behalf
3 had communications with Gorlitz regarding
4 obtaining a satisfaction of its mortgage
5 that had been recorded against the two
6 premises?
7    A.    Yes.
8    Q.    And you had these communications
9 prior to the closing on August 30, 2016?
10    A.    Yes.
11    Q.    Now, I'm not asking you what you
12 spoke to your lawyer about, that was
13 Mr. Muller, I think you said?
14    A.    Yes.
15    Q.    So I'm not asking you that. I
16 want to know who you spoke with before you
17 went to the closing other than your
18 attorney, Mr. Muller, about getting a
19 satisfaction of that Gorlitz mortgage.
20        MR. LEVINE:  Let me clarify one
21    thing.  When you say before you went
22    to the closing, you mean at any point
23    in time?
24        MR. FIVESON:  Correct.
25        MR. LEVINE:  Not that day?

Page 57

Y. Salamon

2        MR. FIVESON:  Correct. I will
3    discuss at that day a different line
4    of questioning, correct.
5        MR. LEVINE:  So you understand
6    it's at any time —
7    Q.    I'm not asking what you spoke to
8 your lawyer about, okay?
9        MR. LEVINE:  He's asking at any
10    time, did you have a conversation --
11    Q.    Before you went to that closing?
12    A.    Yes.
13    Q.    You?
14    A.    Yes.
15    Q.    You spoke?
16    A.    Yes.
17    Q.    Who did you speak with?
18    A.    Yungreis.
19    Q.    That's Mr. Yungreis at Gorlitz?
20    A.    Yes.
21    Q.    Was this on the phone or was
22 this by e-mail? How did you communicate
23 with him regarding getting a satisfaction
24 of the mortgage?
25    A.    In person.

15 (Pages 54 - 57)

Page 58

```
1              Y. Salamon
2    Q.   You were face-to-face?
3    A.   Face-to-face.
4    Q.   Just like I'm with you?
5    A.   Yes.
6         MR. FIVESON:  Please mark this
7    black and white photo as Plaintiff's
8    Exhibit 6.
9         [The photograph was hereby
10   marked as Plaintiff's Exhibit 6 for
11   identification, as of this date.]
12   Q.   Do you recognize who is depicted
13   in the photograph Exhibit 6?
14        (Handing.)
15   A.   (Perusing.)
16        Yes.
17   Q.   Who is that?
18   A.   Yungreis.
19   Q.   Mr. Yungreis is the person with
20   the long beard?
21   A.   Yes.
22   Q.   The older gentleman?
23   A.   Yes.
24   Q.   Who is the other person depicted
25   in the photograph?
```

Page 59

```
1              Y. Salamon
2    A.   Me.
3    Q.   When was that photograph taken,
4    do you recall?
5    A.   I know where it is, but when?
6         MR. LEVINE:  He asked you when
7    was it taken, if you know.
8    A.   Yes.
9    Q.   When?
10   A.   He put on a mezuzah on the door.
11        (Indicating.)
12   Q.   But was it taken a month ago, a
13   year ago, ten years ago?
14   A.   No, probably five to ten years
15   ago.
16   Q.   Now, when did this discussion
17   with yourself and Mr. Yungreis
18   face-to-face occur regarding obtaining a
19   satisfaction of the Gorlitz mortgage? How
20   many days, months or years prior to the
21   closing?
22   A.   A few days before I knew that it
23   was paid off and I don't have.  It was
24   taken care of.  But my attorney, Muller,
25   told me that it's not taken care of.  So
```

Page 60

```
1              Y. Salamon
2    we need to take -- we have it on the
3    Gorlitz and make the satisfaction in order
4    for us to continue with the mortgage.  So
5    I told Mr. Yungreis.
6    Q.   So you understood that the note
7    to Gorlitz and Yungreis had been paid off?
8    A.   Yes.
9    Q.   That was your understanding?
10   A.   Yes.
11   Q.   And a few days before the
12   closing with Galster, you learned from
13   your lawyer that the mortgage had not been
14   taken off of record?
15   A.   Right.
16   Q.   You understand that?
17   A.   Yes.
18   Q.   When I say "of record," you
19   understand a mortgage gets recorded in the
20   City Registrar's Office?
21   A.   Yes.
22   Q.   You understand that?
23   A.   Yes.
24   Q.   You met with Mr. Yungreis a few
25   days before the August 30, 2016 closing to
```

Page 61

```
1              Y. Salamon
2    get a satisfaction of the Gorlitz
3    mortgage?
4    A.   Right.
5    Q.   You understand that?  I'm not
6    telling you.  I'm asking you.
7    A.   Yes.
8    Q.   You agree with that?
9    A.   Yes.
10   Q.   That's the truth?
11   A.   Yes.
12   Q.   Where did you meet with
13   Mr. Yungreis?
14   A.   At his home.
15   Q.   And where is his home?
16   A.   42nd Street and 15th Avenue.
17   Q.   What time of day did you meet
18   with him?
19   A.   I don't remember.
20   Q.   Did you call him and tell him
21   you're coming over or e-mail him to say,
22   look, I'm coming over?  I'm giving a
23   suggestion, I'm not telling you
24   word-for-word.  But did you tell him that
25   you were coming over to discuss this issue
```

16 (Pages 58 - 61)

Page 62

```
 1            Y. Salamon
 2   with him?
 3      A.   I don't remember. He came into
 4   the store sometimes. And sometimes he
 5   called me. Sometimes -- I don't know. I
 6   don't remember. I can't recall how it
 7   started.
 8      Q.   Now, when you met with him at
 9   his home, was anyone at the home that saw
10   you there on that occasion; maybe his
11   wife, his daughter, maybe a neighbor,
12   anybody?
13      A.   I don't remember.
14      Q.   You don't remember seeing any
15   people present in the home when you were
16   in the home?
17      A.   I don't remember. I mean, it's
18   not that I didn't see. I don't know.
19      Q.   Did you actually go into his
20   home to discuss this matter?
21      A.   Yes.
22      Q.   Do you recall where within his
23   home you discussed this matter; was it the
24   kitchen, the hallway, the bedroom, the
25   study?
```

Page 63

```
 1            Y. Salamon
 2      A.   Study room.
 3      Q.   Where was the study room
 4   located?
 5      A.   All the way in the back on the
 6   fifth floor.
 7      Q.   On the fifth floor?
 8      A.   No, the first floor --
 9      Q.   The first floor?
10      A.   The first floor is the
11   synagogue. The second floor is his first
12   floor. And then he has -- so in back of
13   his, it's the second floor, but it's in
14   his home. It's the first floor.
15      Q.   Maybe I don't understand what
16   you're saying. Let's discuss the
17   structure that is present at 42nd and 15th
18   Avenue. It's a synagogue?
19      A.   Synagogue is the first floor.
20      Q.   The first floor?
21      A.   First floor.
22      Q.   Now, is there a second floor to
23   this building?
24      A.   Yes.
25      Q.   Does it have a separate entrance
```

Page 64

```
 1            Y. Salamon
 2   from the synagogue on the first floor?
 3      A.   Yes.
 4      Q.   And what's on the second floor?
 5      A.   His residence.
 6      Q.   Is there a third floor to this
 7   building?
 8      A.   Yes.
 9      Q.   What's on the third floor?
10      A.   Also his residence.
11      Q.   Is there a separate entrance to
12   the third floor?
13      A.   No.
14      Q.   So there's just an entrance to
15   the first and the second floor; is that
16   correct?
17      A.   Yes.
18      Q.   He lives on the second and third
19   floors?
20      A.   Yes.
21      Q.   Do you belong to the synagogue
22   as part of your faith?
23          MR. LEVINE: When you say the
24      synagogue, you mean Gorlitz's
25      synagogue?
```

Page 65

```
 1            Y. Salamon
 2          MR. FIVESON: Correct.
 3      Q.   What synagogue did you belong to
 4   on August 30, 2016?
 5      A.   Multiple.
 6      Q.   Well, had you ever prayed in his
 7   synagogue, Gorlitz's synagogue, prior to
 8   this date?
 9      A.   Yes.
10      Q.   Was this a synagogue you had
11   frequented on many occasions prior to
12   August 30, 2016?
13      A.   No.
14      Q.   Is this a synagogue that you
15   would call your synagogue?
16      A.   No.
17      Q.   In a conservative, we all have
18   our synagogues. This was not your
19   synagogue, correct?
20      A.   Right. I prayed over there when
21   I worked at Mr. Abramowitz. He's a block
22   away, so -- his store is a block away. So
23   when I worked over there, I prayed over
24   there sometimes.
25      Q.   But this was not your regular
```

17 (Pages 62 - 65)

Page 66

1           Y. Salamon
2 synagogue?
3     A.   No.
4     Q.   When you went on the day prior
5 to the closing on August 30, 2016 to
6 discuss with Mr. Yungreis getting a
7 satisfaction --
8     A.   I don't know if it's the day
9 before.
10          MR. LEVINE: Objection to form.
11 Let him finish the question.
12    Q.   No, no. I didn't mean the day
13 before. On the occasion, maybe one, two,
14 or three, or five days before, but on that
15 occasion before the closing on August 30,
16 2016, when you went to Mr. Yungreis, okay,
17 did you use the second floor entrance?
18    A.   Yes.
19    Q.   And did he have to buzz you up
20 or can you just walk upstairs unannounced?
21    A.   Buzz.
22    Q.   He buzzed you up?
23  . A.   Yes.
24    Q.   Do you recall speaking to him
25 and saying, I'm here, or speaking to

Page 67

1           Y. Salamon
2 someone to be given permission to enter?
3     A.   He has cameras, so he probably
4 saw on the camera. I rang the bell and he
5 knew.
6     Q.   And you went upstairs?
7     A.   Yes.
8     Q.   I'm sorry. You met with him in
9 his study?
10    A.   Yes.
11    Q.   And that's on the second or the
12 third floor?
13    A.   On the second floor.
14    Q.   Where is that located on the
15 second floor?
16    A.   All the way in the back.
17    Q.   Now, how far did you have to
18 walk within the second floor between the
19 immediate entrance onto that level and the
20 distance it took you to get to the study?
21 How many feet?
22    Q.   Feet, however you can describe
23 it for me.
24    A.   I'd say 30, 40 feet. Forty
25 feet, probably.

Page 68

1           Y. Salamon
2     Q.   Where was Mr. Yungreis on that
3 occasion when you first saw him; was he in
4 the study, was he there when you entered
5 the second floor, was it somewhere in
6 between?
7     A.   I don't remember.
8     Q.   Did you walk to his study alone
9 after you first gained entrance to the
10 second floor?
11    A.   I don't remember.
12    Q.   Do you remember seeing anybody
13 while you walked these approximate 30 feet
14 to the study?
15    A.   I don't remember.
16    Q.   Where was he when you first saw
17 him on the second floor?
18    A.   I answered already. I don't
19 remember.
20    Q.   And you walked to the study and
21 he was in the study?
22    A.   Maybe we walked together.
23    Q.   You don't remember?
24    A.   I don't remember.
25    Q.   How did you know to go back to

Page 69

1           Y. Salamon
2 his study?
3     A.   If it -- he probably was there
4 and we went together. That was
5 probably -- or maybe his wife told me to
6 go there. I don't remember.
7     Q.   You don't remember?
8     A.   No.
9     Q.   Correct?
10    A.   Yes.
11    Q.   When you were in the study, were
12 you and he the only persons in the study
13 on this occasion?
14    A.   Yes.
15    Q.   Was the door to the study
16 closed?
17    A.   I don't know.
18    Q.   What was discussed in the study?
19    A.   That I needed a satisfaction. I
20 knew that it was taken care of and -- so
21 that was the discussion.
22    Q.   What did he say, if anything?
23    A.   That he is going to have it
24 taken care of.
25    Q.   Did he state anything else?

18 (Pages 66 - 69)

Page 70

```
1            Y. Salamon
2    A.   What do you mean anything else?
3    Q.   Well, did you ask, how is it
4  going to be taken care of, I have a
5  closing in a few days, I need to get it
6  pretty soon? I'm just suggesting. Was
7  there any type of discussion on those type
8  of issues?
9    A.   Yes. He said that he is going
10 to -- his lawyer is going to prepare me a
11 satisfaction.
12       MR. FIVESON: Would you read
13    that back, please?
14       [The requested portion of the
15    record was read.]
16    Q.   And did he tell you who his
17 lawyer was?
18    A.   No.
19    Q.   Did you make any inquiry as to
20 who the lawyer was?
21    A.   I don't remember.
22    Q.   Did you make any inquiry into as
23 to how promptly they would prepare the
24 satisfaction?
25    A.   He said right away.
```

Page 71

```
1            Y. Salamon
2    Q.   Did you discuss how you
3  personally were going to get possession of
4  this satisfaction?
5    A.   Yes.
6    Q.   What was said?
7    A.   I --
8       MR. FIVESON: Think to yourself.
9    She takes it all down.
10    A.   I'm trying to think what was
11 first and what was second.
12    Q.   Take your time.
13    A.   He gave me a satisfaction, that
14 I needed to go to sign it and notarize it
15 and send it back to him. He's going to
16 sign it, notarize it, and he's going to
17 overnight it to my lawyer -- to Muller.
18    Q.   Did he give you the satisfaction
19 there in his study on that occasion?
20    A.   No.
21    Q.   Was it discussed who would
22 prepare the satisfaction and how he would
23 get it?
24    A.   He's going to bring it to me.
25    Q.   That's what he told you?
```

Page 72

```
1            Y. Salamon
2    A.   Bring it to me or send it to me.
3  He came into the store, so...
4    Q.   But I want to know what was
5  discussed in the study. I'll get to what
6  the events were that happened afterwards.
7  I just want you to be clear. He told you
8  in the study he will prepare it and get it
9  to you?
10    A.   Yes.
11    Q.   Did he tell you he was going to
12 sign it first?
13    A.   No, he didn't tell me. It
14 wasn't discussed.
15    Q.   So he told you he is going to
16 get a satisfaction and get it to you to
17 sign?
18    A.   He didn't tell me he is going to
19 get it to me to sign.
20    Q.   What did he tell you? I just
21 want to be clear what he told you.
22    A.   He is going to get me the
23 satisfaction, but I don't know if -- when
24 I was at his house if what he -- every
25 word that he told me. He told me that
```

Page 73

```
1            Y. Salamon
2  he's going to get it taken care of.
3    Q.   At the house?
4    A.   He's going to have it taken care
5  of.
6    Q.   I'm going to back up. I am not
7  asking you to remember every word that was
8  said because you can't do that, can you?
9    A.   No.
10    Q.   I can understand we're not
11 computers. What I want to know is the sum
12 and substance of what you understood he
13 told you at that meeting.
14    A.   He told me it's going to be
15 taken care of, that I'm going to have it
16 for -- by the closing.
17    Q.   Did you tell him when the
18 closing was going to occur?
19    A.   Yes.
20    Q.   In the study?
21    A.   Yes.
22    Q.   You told him that you had paid
23 this note off to Gorlitz?
24    A.   Yes.
25    Q.   Did he acknowledge that the note
```

19 (Pages 70 - 73)

Page 74

1         Y. Salamon
2 had been paid off?
3    A.   Yes.
4    Q.   In the study?
5    A.   Yes.
6    Q.   How long did this meeting occur
7 in the study between you and Mr.
8 Yungreis?
9    A.   I don't remember.
10   Q.   Five minutes, an hour?  Your
11 best estimate, if you can.
12   A.   I don't.
13   Q.   You can't?
14   A.   No.
15   Q.   You can't estimate.  So when you
16 left that study, you understood that
17 Mr. Yungreis was going to prepare a
18 satisfaction and get it delivered to you?
19   A.   Yes.
20   Q.   Was there any other
21 understanding you had about the
22 satisfaction other than that?
23   A.   He is going to get it, that I
24 should have it for the closing.  If he
25 said to me he is going to send it to me or

Page 75

1 to my lawyer, I can't remember.  He is
2 going to send it.  I should have it for
3 the closing.
4    Q.   You thought there was no more of
5 an issue?
6    A.   Right.
7    Q.   Either you or your lawyer were
8 going to have it, correct?
9    A.   Yes.
10   Q.   And he told you that he would
11 sign it?
12   A.   That he's going to prepare it.
13   Q.   Prepare it?
14   A.   Prepare it.
15   Q.   I think you also said that he
16 wanted you to sign it.  Was there any
17 discussion about you signing the
18 satisfaction?
19   A.   He didn't discuss it then, but
20 when he — he gave it to me after his
21 lawyer prepared it to me, he told me that
22 I have to sign it.
23   Q.   I'm going to get to that.  Just
24 so we're clear, you met him in the study

Page 76

1         Y. Salamon
2 at his home sometime before your closing
3 with Galster on August 30th, correct?
4    A.   Yes.
5    Q.   The sum and substance of what
6 you understood is that Mr. Yungreis was
7 going to prepare a satisfaction and get it
8 to you?
9    A.   To me or to my lawyer.
10   Q.   Right?
11   A.   Yes.
12   Q.   How did you exit that second
13 floor that day?
14   A.   Same way.
15   Q.   Did you see anybody within that
16 30 feet from the study to the exit?
17   A.   I don't remember.
18   Q.   Now, at some point in time, did
19 you get a satisfaction of the mortgage?
20   A.   (No verbal response.)
21   Q.   Did you get a satisfaction?
22   A.   My lawyer got it, yes.
23       MR. FIVESON:  Please mark these
24 Plaintiff's Exhibit 7, Plaintiff's
25   Exhibit 8, and Plaintiff's Exhibit 9

Page 77

1         Y. Salamon
2 for identification.
3       [The documents was hereby marked
4    as Plaintiff's Exhibits 7, 8, and 9
5    for identification, as of this date.]
6    Q.   I'm going to show you what's
7 been marked as Plaintiff's Exhibit 7,
8 which appears to be a satisfaction of
9 mortgage.
10       (Handing.)
11       MR. LEVINE:  (Perusing.)
12       (Handing.)
13   A.   (Perusing.)
14   Q.   Let's assume there's no
15 handwriting on it, but just a boilerplate,
16 is that the document you received from Mr.
17 Yungreis?
18   A.   (Perusing.)
19       Looks like.
20   Q.   Where were you when you first
21 received that document?
22   A.   In my office.
23   Q.   And where is that?
24   A.   4921 12th Avenue.
25   Q.   How was it you received that

20 (Pages 74 - 77)

Page 78

1        Y. Salamon
2 document; was it by mail, Federal Express,
3 courier pigeon, e-mail? How did you get
4 it?
5      A.   You're talking -- I'm just
6 clarifying.
7      Q.   The boilerplate.
8          MR. LEVINE: Without the
9 signatures.
10      Q.   With no signatures. Well, when
11 you first received the document, was there
12 any handwriting on the document?
13      A.   I don't think so.
14      Q.   So now when you first received
15 the document without any handwriting on
16 it, you said you were in your office,
17 correct?
18      A.   Yes.
19      Q.   How did you get that document in
20 your possession for the first time?
21      A.   I believe that he brought it to
22 me.
23      Q.   "He" is Mr. Yungreis?
24      A.   Mr. Yungreis. It's either
25 Mr. Yungreis brought it to me or he sent

Page 79

1        Y. Salamon
2 it. Sometimes he sent someone from his --
3 someone working for him.
4      Q.   Well, I want to know, do you
5 recall who handed you this document for
6 the first time?
7      A.   To the best of my knowledge, it
8 was him.
9      Q.   Yungreis?
10      A.   Yes.
11      Q.   Do you recall how many days or
12 weeks or months prior to the closing did
13 he hand you this document for the first
14 time?
15      A.   A day or two, I think.
16      Q.   When you say you were at your
17 office at 49-12 12th Street --
18      A.   4921.
19      Q.   Excuse me. I stand corrected.
20 4921 12th Street --
21      A.   12th Avenue.
22      Q.   12th Avenue, is that where the
23 grocery store is?
24      A.   Yes.
25      Q.   Do you have a particular office

Page 80

1        Y. Salamon
2 that you have personally in that building?
3      A.   It's not personal.  In the
4 store.
5      Q.   But is it like an office, a
6 separate room, separate from the grocery
7 store?
8      A.   Yes.
9      Q.   Can you tell us where is this
10 office of yours at 4921 12th Avenue
11 located when you first come into the
12 grocery store?
13      A.   All the way in the back.
14      Q.   In the back?
15      A.   Yes.
16      Q.   Now, he handed it to you in your
17 office all the way in the back?
18      A.   Yes, I believe so.
19      Q.   Do you have a door to your
20 office?
21      A.   Yes.
22      Q.   Did he knock on the door?
23      A.   Probably rang the bell.
24      Q.   Were you alone in your office
25 when he handed this document to you for

Page 81

1        Y. Salamon
2 the first time?
3      A.   Usually.
4      Q.   Well, I'm talking about what you
5 recall on that day.
6      A.   I don't remember, but usually if
7 I had anybody, I send them out.
8      Q.   Of your office?
9      A.   Yeah.
10      Q.   Can you describe for me the
11 dimensions of the grocery store on 4921
12 12th Avenue in or about August of 2016,
13 how big was it?
14      A.   It's about 4,000 square feet.
15      Q.   How many entrances are there?
16      A.   One in, one out.
17      Q.   Separate from the exit, correct?
18      A.   One is an entrance, and one is
19 an exit.
20      Q.   Is there a cashier in the
21 vicinity of the exit?
22      A.   Yes.
23      Q.   How many people worked the
24 cashier?
25      A.   At one time?

21 (Pages 78 - 81)

Page 82

1          Y. Salamon
2    Q.   Customarily, how many people do
3 you have working there?
4    A.   Sometimes only one, sometimes
5 three.
6    Q.   Are there any other employees
7 working in the grocery store other than
8 yourself?
9    A.   Yes.
10        MR. LEVINE:  Are you asking
11    about August of 2016?
12        MR. FIVESON:  Yes.
13    Q.   I'm talking customarily, when
14 you're open doing business, how many
15 employees did you have working at the
16 grocery store in August of 2016 when it
17 was open for business?
18    A.   Twenty to 30.
19    Q.   Now, did any of these employees,
20 to your knowledge, witness Mr. Yungreis
21 coming to your store on that occasion
22 where he handed you the satisfaction?
23    A.   Probably, but not to remember.
24 I mean, I don't remember who came in
25 yesterday to the store.  I mean --

Page 83

1          Y. Salamon
2    Q.   Now, after Gorlitz started its
3 lawsuit against you, did you attempt to
4 identify any of your employees who may
5 have witnessed Mr. Yungreis present in
6 your store on the day that he gave you
7 this document?
8        (Indicating.)
9    A.   I don't think so.  I mean, why
10 should I?
11    Q.   Did you, to your knowledge, or
12 anyone on your behalf, obtain any written
13 statements from any of your employees that
14 were working on this day that Mr. Yungreis
15 gave you the document to document he, in
16 fact, was in your office?
17    A.   I don't think so.
18    Q.   Now, do you have any security
19 cameras in your grocery store?
20    A.   Yes.
21    Q.   Are the security cameras
22 focussed on people that enter the
23 premises?
24    A.   Yes.
25    Q.   And these security cameras, do

Page 84

1          Y. Salamon
2 they run 24 hours a day?
3    A.   Yes.
4    Q.   Do you have a security service
5 that monitors these cameras?
6    A.   No.
7    Q.   Are the events that are depicted
8 by the security cameras downloaded to any
9 database, that you know of?
10    A.   No.  Remembers for quite a time,
11 but to download it -- what did you ask?
12 Sorry.
13    Q.   You don't understand, I'll
14 rephrase it.  My question is, does the
15 film of the security camera, the events
16 that it's recording, does it get
17 downloaded to a database so you can save
18 that for any period of time?
19    A.   It's saved, yes.
20    A.   It saves in itself?
21    A.   Itself.
22    Q.   But you don't take that
23 information and download it to another
24 database?
25    A.   I don't understand how to.

Page 85

1          Y. Salamon
2    Q.   Then you don't, right?
3    A.   Right.
4    Q.   How long does the camera save
5 the filming that it records?
6        MR. LEVINE:  By filming, you're
7    including digital recording, correct?
8        MR. FIVESON:  Right.
9    A.   About 30 days.
10    Q.   Thirty days?
11    A.   Yes.
12    Q.   What happens after the 30 days?
13    A.   It goes over the same thing.
14    Q.   So it deletes it?
15    A.   Right.
16    Q.   Did you ever attempt to review
17 the recordings, the information that was
18 being either recorded or filmed by the
19 camera to document Mr. Yungreis being
20 present in your store on the day he
21 hand-delivered this to you?
22    A.   It was too late.  It was over 30
23 days from when.
24    Q.   Did you attempt to do that?
25    A.   Yes.

22 (Pages 82 - 85)

Page 86

1        Y. Salamon
2    Q.   And you determined it was too
3  late?
4    A.   I mean, yeah.
5    Q.   Now, when Mr. Yungreis handed
6  you Exhibit 7, was there any
7  handwritten --
8    A.   No.
9    Q.   -- handwriting on the document?
10   A.   No.
11       MR. LEVINE: Just let him finish
12   the entire question.
13       THE WITNESS: Yes.
14   Q.   Just so we're clear, when he
15  hand-delivered this document to you, did
16  it have a signature line for Yehuda
17  Salamon and a signature line for Beis
18  Chasidei Gorlitz?
19   A.   Yes.
20   Q.   It did?
21   A.   Yes.
22   Q.   It had the block? Do you see
23  the block?
24   A.   Yes.
25   Q.   You understand?

Page 87

1        Y. Salamon
2    A.   Yes.
3    Q.   But it did not have any of the
4  handwriting that we see on it, correct?
5    A.   Right.
6    Q.   Now, when hand-delivered this
7  document to you --
8    A.   He or his -- I'm not sure if it
9  was he or his helper.
10   Q.   Well, can you describe the
11  person?
12   A.   He had one guy that helped him
13  like -- how do you say?
14       MR. LEVINE: Assistant?
15   A.   Assistant.
16   Q.   Well, you don't know if it was
17  Mr. Yungreis or the helper?
18   A.   To the best of my knowledge, it
19  was Yungreis, but 99 percent.
20   Q.   But when this person delivered
21  it to you, there was no handwriting on the
22  document, correct?
23   A.   Yes.
24   Q.   When this person delivered it to
25  you, the signature blocks for Yehuda

Page 88

1        Y. Salamon
2  Salamon and for Beis Chasidei Gorlitz were
3  on the document?
4    A.   Yes.
5    Q.   And there was also the jurat at
6  the bottom of the page?
7    A.   Yes.
8    Q.   But it was not filled in?
9    A.   No.
10   Q.   Now, what did this person who
11  delivered the document to you state, if
12  anything, to you?
13   A.   I should go sign it, notarize
14  it, send it back to him. And he is going
15  to sign, notarize, and send it to my
16  lawyer.
17       (Indicating.)
18   Q.   Did you sign the document,
19  Exhibit 7?
20   A.   Yes.
21   Q.   Is that your signature under
22  Yehuda Salamon and above title handwritten
23  Yehuda Salamon?
24   A.   Yes.
25   Q.   Did you sign this before Schner,

Page 89

1        Y. Salamon
2  S C H N E R, Grossberger?
3    A.   Yes.
4    Q.   Where were you when you signed
5  this before this notary?
6    A.   Metropolitan Bank.
7    Q.   And where is that?
8    A.   13th Avenue, 51.
9        MR. FIVESON: I'm sorry. What
10  was the address he gave us?
11       [The requested portion of the
12  record was read.]
13   Q.   What's 51?
14   A.   51 Street.
15   Q.   Now, how soon after you got
16  possession of the document for the first
17  time did you go to the Metropolitan Bank
18  to have your signature acknowledged?
19   A.   That day.
20   Q.   So if you look at the jurat on
21  this document, it appears to be signed
22  August 25, 2016. Do you see that?
23       (Indicating.)
24   A.   Yes.
25   Q.   That number 25, is that your

23 (Pages 86 - 89)

Page 90

1        Y. Salamon
2 handwriting?
3    A.   No.
4    Q.   Did you sign it on the 25th?
5    A.   I believe so.
6    Q.   Do you have an account at
7 Metropolitan Bank?
8    A.   Yes.
9    Q.   Had you ever had documents
10 notarized at that bank by Schner
11 Grossberger?
12    A.   Yes.
13    Q.   How frequently were you present
14 at that bank prior to August 25, 2016?
15    A.   I was every day.
16    Q.   You were a regular customer
17 there?
18    A.   Huh.
19    Q.   Is that a yes?
20    A.   Yes.
21    Q.   They knew you?
22    A.   Yes.
23    Q.   Did they ask you for photo
24 identification when you took this there?
25    A.   Yes.

Page 91

1        Y. Salamon
2    Q.   They did?
3    A.   Yes.
4    Q.   Did you give it to them?
5    A.   Yes.
6    Q.   Did they photocopy it, to your
7 knowledge?
8    A.   (No verbal response.)
9    Q.   You don't know?
10    A.   I don't know.
11    Q.   Now, if you look at the jurat,
12 you see that there's some handwriting that
13 says Yehuda Salamon and a blank that says
14 Issac Yungreis. Do you see that?
15    A.   Yes.
16    Q.   Any of those handwritings in
17 your handwriting?
18    A.   No.
19    Q.   Who wrote that, do you know?
20    A.   No.
21    Q.   When Schner Grossberger
22 acknowledged your signature, did she hand
23 the document back to you?
24    A.   It was a he.
25    Q.   He. I'm sorry. Did he hand it

Page 92

1        Y. Salamon
2 back to you?
3    A.   Yes.
4    Q.   Did he sign it in your presence?
5    A.   Probably.
6    Q.   If you don't remember, tell me.
7    A.   I don't remember, but it makes
8 sense. I mean —
9    Q.   I want to know what you
10 remember. We're getting into some
11 operative facts here, so if you don't
12 know, tell me you don't know.
13    A.   Okay.
14    Q.   When you got the document back
15 in your possession after you signed it,
16 did it have this number 25 on it?
17    A.   I don't know.
18    Q.   Did it have Yehuda Salamon or
19 Isaac Yungreis written on it in the jurat?
20    A.   To the best of my knowledge,
21 I — it had Yehuda Salamon. That's it.
22    Q.   Now, when you went to have
23 Exhibit 7 acknowledged before Mr.
24 Grossberger, did you have any other
25 documents with you to have him

Page 93

1        Y. Salamon
2 acknowledge?
3    A.   No.
4    Q.   I want to show you what's been
5 marked as Exhibit 8. I ask you if you
6 recognize that document?
7        (Handing.)
8    A.   (Perusing.)
9        This is the same thing like
10 this.
11        (Indicating.)
12    Q.   They're different.
13    A.   One is for the 1.2 and one is
14 for the 1.3. No? Is it the same? What
15 is this?
16    Q.   They're different documents.
17        (Indicating.)
18    A.   I don't remember. It was maybe
19 he gave me two pages. I believe it was
20 two pages.
21        MR. LEVINE: One second, please.
22        MR. FIVESON: Go ahead,
23 Counselor. Take your time.
24        MR. LEVINE: (Perusing.)
25        Okay.

24 (Pages 90 - 93)

Page 94

1         Y. Salamon
2    Q.   Take your time and look at the
3 documents.
4    A.   (Perusing.)
5         When was the closing?
6    Q.   August 30, 2016. August 30,
7 2016.
8         MR. LEVINE:  What is the pending
9 question?
10        [The requested portion of the
11 record was read.]
12    Q.   First of all, let's go to
13 Exhibit 8. Does your signature appear on
14 Exhibit 8?
15        MR LEVINE: This one here.
16        (Indicating.)
17    Q.   We previously were discussing
18 Exhibit 7. Now I'm discussing Exhibit 8.
19 Okay?
20    A.   Okay.
21    Q.   Does your signature appear on
22 this document?
23    A.   Yes.
24    Q.   When you first got possession of
25 Exhibit 8, was there any handwriting on

Page 95

1    it?
2
3    A.   No.
4    Q.   Where were you when you first
5 got possession of that document?
6    A.   I didn't even remember it was
7 two. Now I remember.  Now I remember it
8 was two, but --
9    Q.   So you got two, two
10 satisfactions?
11    A.   It's very hard to remember now
12 what I had, whatever he gave me I went to
13 the bank and I had it signed and
14 notarized.  I mean --
15    Q.   So you went to the bank at the
16 same time and had 7 and 8 notarized,
17 correct?
18    A.   Yes.
19    Q.   Did you make any inquiry of the
20 person that delivered these documents to
21 you why you were getting two documents?
22    A.   No.  Up until this minute, I
23 didn't know it was two.
24    Q.   Did you sign Exhibit 8 before
25 Schner Grossberger at the same time you

Page 96

1         Y. Salamon
2 signed Exhibit 7?
3    A.   I was only there once then, so
4 if it's signed, then it was probably done
5 at the same time.
6    Q.   Going back to Exhibit 7, do you
7 see that the date of the satisfaction is
8 dated the 30th day of August?
9    A.   Yes.
10    Q.   Is that number 30 in your
11 handwriting?
12    A.   No.
13    Q.   You signed it on the 25th,
14 correct?
15    A.   I don't know.  I don't remember
16 when.
17    Q.   When you got the document, there
18 was the Yehuda Salamon and the Beis
19 Chasidei Gorlitz signature blocks,
20 correct?
21    A.   Right.
22    Q.   But they were not signed,
23 correct?
24    A.   Right.
25    Q.   And you signed Exhibit 8 before

Page 97

1         Y. Salamon
2 Schner Grossberger on the 25th, correct?
3    A.   I don't remember when, but I
4 signed it by him.
5    Q.   When you signed it before
6 Mr. Grossberger signed it, there was no
7 handwriting within the jurat on Exhibit 8,
8 correct?
9    A.   To the best -- I believe so.
10    Q.   Is your handwriting anywhere on
11 the jurat?  There's a Y. Salamon/I.
12 Yungreis.
13    A.   They mine.
14    Q.   Your handwriting is below the
15 Yehuda Salamon signature block, correct?
16    A.   Yes.
17    Q.   And the name Yehuda Salamon
18 across from title?
19    A.   What?
20    Q.   The word title.
21    A.   Yes.
22    Q.   Right?
23    A.   Yes.
24    Q.   Your handwriting doesn't appear
25 anywhere in the jurat; is that correct?

25 (Pages 94 - 97)

Page 98

1           Y. Salamon
2    A.   Right.
3    Q.   And we're discussing Exhibit 8,
4 so we're all clear?
5    A.   Yes.
6    Q.   Did you see Mr. Grossberger put
7 the number 25 in the jurat on Exhibit 8?
8    A.   I don't remember.
9    Q.   Did you see Mr. Grossberger
10 write Y. Salamon or I. Yungreis within the
11 jurat on Exhibit 8?
12   A.   I don't remember.
13   Q.   Getting back to Exhibit 7, did
14 you see Mr. Grossberger write the 25 in
15 the jurat?
16   A.   I don't remember.
17   Q.   Did you see Mr. Grossberger
18 write the name Yehuda Salamon or Isaac
19 Yungreis within the jurat on Exhibit 7?
20   A.   I don't remember, but I know
21 what I think.
22   Q.   Only what you saw. Only what
23 you swear to. If you don't remember,
24 that's the answer, right?
25   A.   Yes. That's the truth.

Page 99

1           Y. Salamon
2    Q.   If that's the truth, that's what
3 I want. Now, let me just go to Exhibit 9.
4 Have you ever seen that, that lost note
5 affidavit? Have you ever seen that?
6        MR. LEVINE: Let me see that,
7    please?
8        MR. FIVESON: (Handing.)
9        MR. LEVINE: Okay.
10       Have you ever seen that?
11       THE WITNESS: No.
12   Q.   Let me just jump back to
13 Exhibits 7 and 8. In Exhibit 7 under Beis
14 Chasidei Gorlitz, there's a name Isaac B.
15 Yungreis and a signature. You see that?
16   A.   Yes.
17   Q.   Did you sign that?
18   A.   No.
19   Q.   Did you see anybody write that
20 on this document?
21   A.   No.
22   Q.   Exhibit 8, same thing, on the
23 Beis Chasidei Gorlitz, there's a signature
24 and the name Issac B. Yungreis. Do you
25 see that?

Page 100

1           Y. Salamon
2    A.   Yes.
3    Q.   Did you sign that?
4    A.   No.
5    Q.   Did you see anybody sign or
6 write those words on that document?
7    A.   No.
8    Q.   Exhibit 9 now. The second page
9 of Exhibit 9 has a Beis Chasidei Gorlitz
10 signature block with a signature and the
11 name Isaac B. Yungreis. Do you see that?
12   A.   Yes.
13   Q.   Did you write that?
14   A.   No.
15   Q.   Did you see anybody write any of
16 those handwritings on it?
17   A.   No.
18   Q.   Had you ever seen this document
19 before, Exhibit 9?
20   A.   No.
21   Q.   Never?
22   A.   Nothing that I remember.
23   Q.   Now, getting back to Exhibits 7
24 and 8, after you signed these documents,
25 before the notary, what did you do with

Page 101

1           Y. Salamon
2 the document?
3    A.   I sent it to Yungreis.
4    Q.   How did you send it to Yungreis?
5    A.   One of my workers.
6    Q.   Which worker?
7    A.   I don't remember. I have it. I
8 don't remember which one.
9    Q.   Can you describe the worker?
10   A.   What do you mean?
11   Q.   What does this person look like?
12   A.   It was one of my delivery guys.
13   Q.   Was there a cover letter that
14 went with the document?
15   A.   No, I put in it an envelope. We
16 frequently sent like that, stuff.
17   Q.   You had sent Yungreis a signed
18 satisfaction in this manner on prior
19 occasions?
20   A.   I don't remember. I mean, I
21 sent him stuff. I don't know what it was.
22 I can't remember.
23   Q.   What stuff had you previously
24 sent him by one of your delivery workers?
25   A.   Sometimes groceries, sometimes

26 (Pages 98 - 101)

Page 102

1          Y. Salamon
2 cash, sometimes papers.
3     Q.   How much cash had you sent
4 Yungreis by delivery worker prior to
5 August 25, 2016?
6     A.   I don't remember.
7     Q.   Can you give us an estimate?
8     A.   I don't know.
9     Q.   Now, did you give the delivery
10 worker any instructions after you gave him
11 Exhibits 7 and 8?
12     A.   Instructions?
13     Q.   Yes.
14     A.   To take it to the rabbi. That's
15 it.
16     Q.   Is the delivery worker a
17 Hasidic?
18     A.   No.
19     Q.   How would he know where the
20 rabbi is?
21     A.   I gave him the address.
22     Q.   You gave him the address?
23     A.   Yeah.
24     Q.   Now, after this lawsuit with
25 Gorlitz was commenced, did you ever go and

Page 103

1          Y. Salamon
2 locate this delivery worker to get a
3 statement to confirm that he delivered the
4 satisfaction to Yungreis?
5     A.   I have to ask my lawyer. I
6 didn't have him. I had --
7     Q.   You had a different lawyer?
8     A.   I had a different lawyer.
9     Q.   Today, to your knowledge, has a
10 statement of this delivery worker been
11 obtained, a written statement?
12     A.   I don't know.
13     Q.   What's the name of this delivery
14 worker?
15     A.   I don't remember.
16     Q.   Well, do you have any documents
17 in your office, business records,
18 employment records that would identify the
19 name and address of this delivery worker?
20     A.   I have to check. I don't know.
21     Q.   Well, is that delivery worker
22 still employed with you today?
23     A.   I don't remember. Keeps
24 changing very frequently, so...
25     Q.   Was the delivery worker on your

Page 104

1          Y. Salamon
2 payroll?
3          THE WITNESS:  I want to ask you.
4          MR. LEVINE:  You want to ask me
5 something?
6          THE WITNESS:  Yes.
7          MR. LEVINE:  Does it have to do
8 with privilege?
9          THE WITNESS:  What is that?
10          MR. LEVINE:  Are you concerned
11 about the answer to the question?
12          THE WITNESS:  Yes.
13          MR. FIVESON:  Go ahead.
14          MR. LEVINE:  Come outside.
15          (Short recess was taken.)
16     A.   I don't know. Sometimes I have
17 busier days and I take for the day, people
18 bring me friends and everything, so they
19 get paid cash. It takes time till they go
20 on the payroll.
21     Q.   This employee, was he working
22 for Yidel's Shopping Cart?
23     A.   He was a worker.
24     Q.   Which entity was he working for,
25 Yidel's Shopping Cart?

Page 105

1          Y. Salamon
2     A.   I believe so.
3     Q.   Does Yidel's Shopping Cart
4 maintain payroll records?
5     A.   The accountant has.
6     Q.   The accountant is
7 Mr. Hirschfeld?
8     A.   I believe so.
9     Q.   He maintains the payroll records
10 for Yidel's Shopping Cart?
11     A.   Not those who get paid cash.
12     Q.   So this worker who did the
13 delivery got paid cash?
14     A.   I don't know. I don't remember
15 who it was and --
16     Q.   Just so we're clear, the person
17 who delivered Exhibits 7 and 8 to
18 Mr. Yungreis was an employee of Yidel's, a
19 delivery person who you believe was
20 getting paid cash and therefore is not on
21 your payroll?
22          MR. LEVINE:  Objection to the
23 form.
24     A.   I don't know.
25     Q.   You don't know?

27 (Pages 102 - 105)

Page 106

1       Y. Salamon
2    A.   I don't know.
3    Q.   Had you made any efforts prior
4 to today to identify this delivery person
5 who delivered Exhibits 7 and 8 to
6 Mr. Yungreis?
7       MR. LEVINE:  In answering that
8    question, make sure you do not
9    disclose any communications with your
10   attorney.
11      MR. FIVESON:  That is correct.
12.     MR. LEVINE:  Do you understand?
13      MR. FIVESON:  I don't want to
14   know what you spoke to —
15      MR. LEVINE:  The question he is
16   asking you is whether you made any
17   effort to locate this person.  You can
18   answer that question, but do not
19   · disclose any communications you had
20   either with me —
21      MR. FIVESON:  Or your prior
22   counsel.
23      MR. LEVINE:  — or your prior
24   attorney.  Do you understand?
25      MR. FIVESON:  Let me make this

Page 107

1       Y. Salamon
2 very clear, if you had a discussion
3 with Mr. Levine or any of your prior
4 two counsel, I don't want to know
5 about that.  So whatever question I
6 ask you carves that out.  Okay?  Do
7 you understand?
8       THE WITNESS:  Mm-hmm.
9       MR. FIVESON:  Is that a yes?
10      THE WITNESS:  Yes.
11   Q.   So my question is, did you make
12 any effort to identify this delivery
13 person employee?
14   A.   I made effort.  The problem is
15 that they don't talk English and
16 everything they say, yes, yes, yes.  So
17 it's very hard.  Or if they're afraid that
18 you're going to say that they messed
19 something up, they say, no, not me.
20 Everybody says, not me.  So it's very
21 hard.  Everybody says, it wasn't me.
22      MR. LEVINE:  The question is,
23   did you try to find out who it was?
24      THE WITNESS:  Right.
25   Q.   Now, this delivery person, did

Page 108

1       Y. Salamon
2 he speak English, that you handed the
3 documents to?
4    A.   They don't.
5    Q.   So how did you.communicate with
6 him?
7    A.   I write the address.
8    Q.   And that's it?
9    A.   Yes.
10   Q.   So you wrote an address and you
11 gave him the documents?
12   A.   Yes.
13   Q.   And then you.assumed he went and
14 delivered it to Mr. Yungreis?
15   A.   Yes.
16      MR. FIVESON:  Can we please have
17   this marked as Plaintiff's Exhibit 10
18   for identification?
19      [The document was hereby marked
20   as Plaintiff's Exhibit 10 for
21   identification, as of this date.]
22   Q.   Let me just make sure I
23 understand your testimony.  You don't know
24 if this delivery person is working for
25 Yidel's today?

Page 109

1       Y. Salamon
2 . A.   Right.
3    Q.   You don't know if he was on the
4 payroll?
5    A.   Right.  I don't know who it was.
6    Q.   You don't know who it was?
7    A.   No.
8    Q.   And all you did was write an
9 address on a piece of paper —
10   A.   Not on paper, put it in an
11 envelope.
12   Q.   With the address?
13   A.   That's how we do everything.
14 It's all delivery is go that way.  I mean,
15 all orders — it's a community that
16 everything is delivered.
17   Q.   The delivery person does not
18 speak English?
19   A.   Right.
20   Q.   So you put Exhibits 7 and 8 in
21 an envelope that had Mr. Yungreis's
22 address on it?
23   A.   Yes.
24   Q.   Correct?
25   A.   Right.

28 (Pages 106 - 109)

Page 110

1          Y. Salamon
2     Q.   And you handed it to the
3  delivery person, correct?
4     A.   Right.
5     Q.   And you did not verbally
6  communicate with him?
7     A.   No.  I sent with him sometimes
8  deposit to the bank.  I mean --
9     Q.   I want to know what you did in
10  this instance.
11    A.   Yes.
12    Q.   This instance, you took Exhibits .
13  7 and 8 and you put it in an envelope,
14  correct?
15    A.   Right.
16    Q.   You wrote Yungreis's address on
17  it, correct?
18    A.   Yes.
19    Q.   You gave it to the delivery
20  person?
21    A.   Yes.
22    Q.   And that was it?
23    A.   Right.
24    Q.   You didn't communicate verbally
25  with him because you don't speak his

Page 111

1          Y. Salamon
2  language?
3     A.   Right.
4     Q.   And he doesn't speak your
5  language, correct?
6     A.   Right.
7     Q.   Did you write Mr. Yungreis's
8  name on the envelope?
9     A.   I don't remember, but I'm sure
10  that yes.
11    Q.   Now, let's look at Exhibit 10,
12  which is the defendant's response for
13  identification of witnesses.  And this was
14  presented by your counsel, Mr. Levine, who
15  is sitting in the room.
16        Is the name of this delivery
17  person identified as a witness in this
18  case on Exhibit 10?
19        MR. LEVINE: Look at all the
20     names, please.
21        THE WITNESS: (Complying.)
22        MR. LEVINE: Just note my
23     objection to form.
24    A.   (Perusing.)
25        No.

Page 112

1          Y. Salamon
2        MR. FIVESON: Now, I'm going to
3  mark some documents here.  Mark this
4  document as Plaintiff's Exhibit 11,
5  and mark that as Plaintiff's Exhibit
6  12 for identification.
7        [The documents were hereby
8  marked as Plaintiff's Exhibits 11 and
9  12 for identification, as of this
10  date.]
11    Q.   Let me back up.  When you gave 7
12  and 8 to your delivery person, did it have
13  the signature of Mr. Yungreis's on either
14  document?
15    A.   No.
16    Q.   When was the next time you saw 7
17  and 8 prior to today?
18    A.   In the lawsuit.
19    Q.   Well, did you see 7 and 8 at the
20  closing?
21    A.   No.
22    Q.   And the first time you saw 7 and
23  8 is when Gorlitz sued you?
24    A.   Yes.
25    Q.   Claiming that Exhibits 7 and 8

Page 113

1          Y. Salamon
2  are forged?
3     A.   Yes.
4        MR. LEVINE: Claiming his
5     signature was forged.
6     Q.   Claiming that the signature of
7  Yungreis was forged?
8        MR. LEVINE: That's his claim.
9     Q.   You don't recall seeing 7 and 8
10  at the closing?
11    A.   I don't remember that.
12    Q.   Were there any discussions at
13  the closing, except between you and
14  Mr. Miller, outside the presence of
15  anybody regarding satisfying that
16  mortgage?
17    A.   No, maybe Muller spoke with --
18    Q.   I don't want Muller maybe.  I
19  want to know what you recall at that
20  closing.
21    A.   I don't remember anything.
22    Q.   So you went to the closing.
23  What was your understanding as to whether
24  or not Yungreis had signed the
25  satisfactions and got it to the closing?

29 (Pages 110 - 113)

Page 114

```
1            Y. Salamon
2    A.   Yes.
3    Q.   Why was that your understanding
4  if you didn't see either document at the
5  closing?
6    A.   Because Muller said he got it
7  from -- he got it from Yungreis.
8    Q.   Your lawyer said that?
9    A.   Yes.
10   Q.   He stated that at the closing?
11   A.   Yes.
12   Q.   But you didn't see the documents
13 at the closing?
14   A.   I don't remember seeing it.
15   Q.   Is Mr. Daniel Muller still in
16 practice?
17   A.   I believe so. I mean --
18   Q.   Referring back to Exhibit 10,
19 Mr. Muller is not identified as a witness
20 in this action on Exhibit 10. Do you see
21 that?
22       MR. LEVINE: As a witness in
23   this, the Galster action?
24       MR. FIVESON: Correct.
25       MR. LEVINE: (Perusing.)
```

Page 115

```
1            Y. Salamon
2    I agree with you. He is not
3  listed as a witness in this action.
4        MR. FIVESON: Right.
5    Q.   But just so we're clear, you did
6  not bring 7 and 8 to the closing --
7    A.   No.
8    Q.   -- Mr. Muller brought --
9        MR. LEVINE: Let him finish the
10   question.
11   Q.   Mr. Muller brought them to the
12 closing?
13   A.   I believe so.
14   Q.   How did Mr. Yungreis know to
15 send Exhibits 7 and 8 to Mr. Muller, to
16 your understanding?
17   A.   I gave them -- I send him all
18 the information where to send this, um,
19 the satisfaction.
20   Q.   When did you send that
21 information?
22   A.   It was together with the -- when
23 I sent him this.
24   Q.   7 and 8?
25   A.   Yes.
```

Page 116

```
1            Y. Salamon
2    Q.   So when you sent him 7 and 8 in
3  the envelope, correct?
4    A.   Right.
5    Q.   You also included a letter or
6  some note where to send it?
7    A.   Correct.
8    Q.   You did?
9    A.   Yes.
10   Q.   Do you have a copy of that note?
11 Did you make a copy of that?
12   A.   I should make a copy?
13       MR. LEVINE: It's yes or no
14   question.
15   A.   No.
16   Q.   And you had Mr. Muller's
17 address --
18   A.   I had it.
19   Q.   -- on the note, correct?
20   A.   Right.
21   Q.   But you don't know what the
22 address of Mr. Muller is today?
23   A.   No.
24   Q.   And Mr. Muller, his office was
25 in Manhattan?
```

Page 117

```
1            Y. Salamon
2    A.   I don't know.
3    Q.   Had you ever been to his office?
4    A.   No.
5    Q.   Did you pay Mr. Muller for his
6  services by check or cash?
7    A.   You asked me.
8    Q.   Was it by check?
9    A.   I don't remember.
10   Q.   I want to show you a two-page
11 document, it's an operating agreement,
12 Exhibit 11. Does your suggest appear on
13 the second page?
14       MR. LEVINE: Let me see it,
15   please?
16       MR. FIVESON: (Handing.)
17       MR. LEVINE: (Perusing.)
18       (Handing.)
19   A.   (Perusing.)
20       MR. LEVINE: The question is if
21   you recognize your signature on the
22   second page.
23       MR. FIVESON: Right.
24   A.   Looks like.
25   Q.   Do you recognize that document?
```

30 (Pages 114 - 117)

Page 118

1        Y. Salamon
2    A.   No.
3    Q.   What was the purpose of your
4  borrowing six-and-a-half million dollars
5  from Galster?
6    A.   Investment.
7    Q.   What was the investment that you
8  intended to use the money for?
9    A.   I had numerous things I was
10  looking to expand.
11    Q.   What were you looking at?
12    A.   I had a few things that I wanted
13  to do.
14    Q.   Well, what were they?
15    A.   Online, Amazon. Like to compete
16  with Amazon, different kinds of structure.
17  I was trying by Jet.
18    Q.   I don't know what you're saying,
19  sir. Jet what?
20    A.   Walmart owns a company Jet.
21    Q.   What were you going to do with
22  Jet?
23    A.   I was trying. I wanted to -- I
24  wanted to go over there. I was -- I
25  wanted to have first the money and then

Page 119

1        Y. Salamon
2  decide what I'm going to do exactly. I
3  had a few opportunities what to do, and if
4  you don't have the money, you can't do it.
5  You can't tell them, okay, I have
6  opportunity, now I'm waiting for having
7  the money. So I wanted to have the money
8  and then I'm going to see what -- I had a
9  few offers.
10    Q.   What were the offers you had?
11  You had Jet? What else?
12    A.   I don't remember everything that
13  I had.
14    Q.   I'm going to show you Exhibit
15  12, which is an affidavit of title. Does
16  your signature appear at the bottom of
17  that document?
18       MR. LEVINE: Let me see this
19  first, please.
20       MR. FIVESON: (Handing.)
21       MR. LEVINE: (Perusing.)
22       (Handing.)
23    A.   (Perusing.)
24       MR. LEVINE: He's asking is that
25  your signature.

Page 120

1        Y. Salamon
2    A.   Um, not really.
3       MR. LEVINE: What?
4    Q.   Not really?
5    A.   Could be, but not my normal
6  signature.
7    Q.   Do you recognize it as your
8  signature?
9    A.   No.
10       MR. FIVESON: Please mark this
11  as Plaintiff's Exhibit 13. It's a
12  two-page deposit agreement.
13       [The document was hereby marked
14  as Plaintiff's Exhibit 13 for
15  identification, as of this date.]
16    Q.   I'm going to show you a two-page
17  document marked as Exhibit 13, entitled,
18  Deposit Agreement. Does your signature
19  appear above the line signature of
20  depositor?
21       (Handing.)
22       MR. LEVIN: (Perusing.)
23       (Handing.)
24    A.   (Perusing.)
25       MR. LEVINE: The question is, is

Page 121

1        Y. Salamon
2  that your signature?
3       (Indicating.)
4    A.   It's not my signature, but it's
5  similar.
6    Q.   Let's look at this one.
7       (Indicating.)
8    A.   I didn't say I didn't sign it.
9  I —
10       MR. LEVINE: You don't have to
11  explain. Just answer the question.
12    Q.   Did you sign Exhibit 13?
13    A.   I don't know.
14       MR. FIVESON: Mark this one-page
15  letter as Plaintiff's 14 for
16  identification.
17       [The document was hereby marked
18  as Plaintiff's Exhibit 14 for
19  identification, as of this date.]
20    Q.   Did you sign Exhibit 14?
21       (Handing.)
22    A.   (Perusing.)
23       Looks like.
24       MR. FIVESON: Please mark this
25  as Exhibit 15. It's consent and

31 (Pages 118 - 121)

Page 122

Y. Salamon
1        Y. Salamon
2    appointment.
3        [The document was hereby marked
4    as Plaintiff's Exhibit 15 for
5    identification, as of this date.]
6    Q.   I want to show you Exhibit 15.
7    Did you sign this document?
8        (Handing.)
9    A.   (Perusing.)
10       Yes.
11       MR. FIVESON: It's 1:00. Let's
12   take a lunch break.
13       (Lunch recess was taken.)
14       [The documents were hereby
15   marked as Plaintiff's Exhibits 3L, 3M,
16   and 3N for identification, as of this
17   date.]
18       MR. FIVESON: Please mark this
19   as Plaintiff's Exhibit 16 for
20   identification. It's defendant's
21   first supplemental response to
22   plaintiff's demand for witnesses.
23       [The document was hereby marked
24   as Plaintiff's Exhibit 16 for
25   identification, as of this date.]

Page 123

1        Y. Salamon
2    Q.   I want to show you what is
3    marked as Exhibit 16, which is the
4    supplemental witness disclosure filed by
5    your attorney, Mr. Levine, in this action.
6    It's dated May 1, 2016. Is the name of
7    that employee to whom you delivered the
8    envelope containing Exhibits 7 and 8
9    identified in this witness disclosure,
10   Exhibit 16?
11       MR. LEVINE: Look at all the
12   names.
13   A.   (Perusing.)
14       I think yes.
15   Q.   Who is that?
16   A.   I'm not sure, but I think
17   it's --
18   Q.   You're pointing, if I may,
19   Victor Tambrulese (phonetic) Guarchaj, G U
20   A R C H A J, is that who you're referring
21   to?
22   A.   I think so.
23   Q.   You think he's the person; is
24   that correct?
25   A.   Yes.

Page 124

1        Y. Salamon
2    Q.   Is still employed by you?
3    A.   No.
4    Q.   When did he leave your
5    employment?
6    A.   I don't know.
7    Q.   Do you have employment records
8    of his last known address?
9    A.   I don't know. I don't know if
10   he was, um, on the books.
11   Q.   So you don't have his address,
12   correct?
13   A.   I don't know.
14   Q.   Well, it says here on this
15   disclosure, Exhibit 16, it says, Present
16   address unknown. Do you see that?
17   A.   Yes.
18   Q.   And he's listed under it.
19   A.   Okay.
20   Q.   Right?
21   A.   Right.
22   Q.   So that means you don't have his
23   address, correct?
24   A.   Yes.
25   Q.   That means you have no written

Page 125

1        Y. Salamon
2    record of him working for you?
3    A.   Right.
4    Q.   Well, do you have personal
5    knowledge that he delivered that envelope
6    to Mr. Yungreis?
7        MR. LEVINE: Objection to form.
8        You can answer.
9    A.   Yes.
10   Q.   How do you know that?
11   A.   Because he told me then. I
12   mean, the guy who -- the -- I wasn't sure
13   if it's him because afterwards when I
14   tried to come back, everybody says, not
15   me, not me. But original, the day I sent
16   it, I ask, it was delivered to him, yes.
17   Q.   He said "yes," is that your
18   testimony?
19   A.   Yes, but I'm not sure if it
20   was -- it was probably him because to the
21   best of my knowledge, but --
22   Q.   Did you ever call Mr. Yungreis
23   and did Yungreis tell you he got it from
24   this delivery person?
25   A.   Then.

32 (Pages 122 - 125)

Page 126

```
 1              Y. Salamon
 2     Q.   What do you mean "then"?
 3     A.   I believe so.
 4     Q.   My question is, after you gave
 5  the envelope to this employee --
 6     A.   To the best of my knowledge, I
 7  called him that he got it, called him or
 8  asked -- to best of my knowledge.
 9     Q.   So after you gave the envelope
10  to the employee, you called Mr. Yungreis
11  to confirm he received it?
12     A.   To the best of my knowledge.
13     Q.   Did you use a cell phone or did
14  you use a landline?
15     A.   I don't know.
16     Q.   Do you have a cell phone?
17     A.   Yes.
18     Q.   What's your cell phone number?
19     A.   718-473-5858.
20     Q.   Who was your servicer in August
21  of 2016; Verizon, AT&T, T-Mobile?
22     A.   I don't know.
23     Q.   You don't know who you paid your
24  cell phone bill to?
25     A.   On '16, I don't know.
```

Page 127

```
 1              Y. Salamon
 2     Q.   I'm talking about in August of
 3  2016.
 4     A.   That's what I am saying.  I
 5  don't know who paid then.
 6     Q.   Who do you pay today?
 7     A.   Today is Sprint.
 8     Q.   Sprint?
 9     A.   Yeah.
10     Q.   Did you change services from --
11     A.   I changed.
12     Q.   -- from since the closing till
13  today?
14     A.   I changed, but I don't know if
15  it changed services, plan.  I don't
16  remember.
17     Q.   Now, we also marked in your
18  absence Exhibits 3L, 3M, and 3N, which I
19  would like to go over with you.  I want to
20  show you 3L, which is identified as the
21  loan disbursement approval.  Does your
22  signature appear on that document?
23        (Handing.)
24     MR. LEVINE:  Hold on.
25        (Perusing.)
```

Page 128

```
 1              Y. Salamon
 2        (Handing.)
 3        You can answer.
 4     A.   (Perusing.)
 5        Yes.
 6     Q.   Was $6,095,068.80 wired to
 7  Yidel's Shopping Cart representing a
 8  portion of the loan proceeds?
 9     A.   Yes.
10     Q.   I want to show you 3M.  Had you
11  ever seen this document, which appears to
12  be a closing statement?
13        (Handing.)
14     A.   (Perusing.)
15     Q.   For the closing.
16     A.   (Perusing.)
17     MR. LEVINE:  The question is,
18  have you ever seen this before.
19     A.   I don't remember.
20     Q.   And I note it says, Present at
21  closing, Annmarie Kearney, K E A R N E Y -
22  Wood, Esquire; Daniel, D A N I E L,
23  Muller, M U L L E R; Yehuda Salamon; Ira
24  Neuman.  Do you see that over here?
25        (Indicating.)
```

Page 129

```
 1              Y. Salamon
 2     A.   (Perusing.)
 3        Yes.
 4     Q.   Does that refresh your
 5  recollection as to who your attorneys were
 6  at the closing?
 7     A.   It was Daniel Muller.
 8     Q.   Who was Annmarie Kearney-Wood?
 9     A.   No clue.
10     Q.   And who was Ira Neuman?
11     A.   I don't know.
12     Q.   There's also underneath is Judah
13  (phonetic) Tynauer, T Y N A U E R.  Who's
14  that?
15     A.   Nothing with me.
16     Q.   And going back to Exhibit 3L,
17  which you signed, were any of the monies
18  disbursed at the closing to pay your
19  lawyer or the law firm which he worked
20  for?
21     MR. LEVINE:  Are you asking him
22  if he remembers that or if it's
23  indicated on this document?
24     MR. FIVESON:  Whether he
25  remembers that or if it's indicated on
```

33 (Pages 126 - 129)

Page 130

1          Y. Salamon
2    the document.
3          MR. LEVINE: (Perusing.)
4          (Handing.)
5    A.    (Perusing.)
6          I don't know for which company
7    he works, so I don't know.
8    Q.    You don't know. There is a wire
9    to Szenberg, S Z E N B E R G & Okun, O K U
10   N, PLLC, for $6,250. Was that the law
11   firm which Mr. Muller worked for?
12   A.    I don't know.
13   Q.    And then there's a wire to Judah
14   Tynauer, T Y N A U E R, for $32,500. What
15   was that for?
16   A.    Not from me.
17   Q.    Not from you?
18   A.    Right.
19   Q.    Is that the mortgage broker?
20   A.    Could be.
21   Q.    Could be. The name doesn't
22   sound familiar to you?
23   A.    I know who he is, but I didn't
24   deal with him.
25   Q.    You know who he is?

Page 131

1          Y. Salamon
2    A.    Yes.
3    Q.    Who is he?
4    A.    From the bank -- from Galster,
5    not from me.
6    Q.    Did Judah Tynauer contact you
7    for this loan?
8    A.    No.
9    Q.    Now, was the first payment on
10   the note you gave to Galster due on
11   October 1, 2016?
12   A.    It's a question?
13   Q.    Yes.
14   A.    What was the question?
15   Q.    Let me go back. Let me back up.
16   Do you recall when the first monthly
17   payment was due on the note you gave
18   Galster for six-and-a-half million dollars
19   on August 30, 2016?
20   A.    No.
21   Q.    Was it due October 1, 2016?
22   A.    Maybe.
23   Q.    Did you make any payments to
24   Galster on that promissory note?
25   A.    Yes.

Page 132

1          Y. Salamon
2    Q.    How many payments did you make?
3    A.    We gave them post-dated checks.
4    Q.    How many post-dated checks did
5    you give them?
6    A.    I think 12.
7    Q.    And did those checks clear?
8    A.    No.
9    Q.    How many cleared?
10   A.    I don't know. They froze my
11   account, Galster. So if not for that, it
12   would have gone through.
13   Q.    Going back to Exhibit 3L, it
14   says that $6,095,068.80 was wired to
15   Yidel's. Do you recall that?
16   A.    Yes.
17   Q.    What bank did those monies go
18   into?
19   A.    I think Bank of America.
20   Q.    Or was it Signature Bank?
21   A.    I don't remember.
22   Q.    I want to show you Exhibit N.
23   Had you ever seen this document before?
24   A.    (Perusing.)
25         MR. LEVINE: What is this?

Page 133

1          Y. Salamon
2          MR. FIVESON: N is a wire
3    transfer advice. It's a report dated
4    November 16, 2016, for a wire that
5    occurred on August 13, 2016.
6    A.    August 13th?
7    Q.    August 30th. Coming from Stark,
8    Amron & Liner, of $6,085,068.80. Do you
9    see that? And did that go into the
10   Signature Bank?
11   A.    Okay. So what?
12   Q.    Well, did Yidel's have an
13   account at Signature Bank?
14   A.    Yes.
15   Q.    Now, let's go back to Exhibit 1,
16   which is your accounting.
17         MR. FIVESON: Can we have this
18   one marked as Exhibit 1B for
19   identification?
20         [The document was hereby marked
21   as Plaintiff's Exhibit 1B for
22   identification, as of this date.]
23   Q.    Before I get to Exhibit 1B.
24   Mr. Salmon, have you ever been known by
25   any other name other than Yehuda Salamon?

34 (Pages 130 - 133)

Page 134

1          Y. Salamon
2    A.   Yes.
3    Q.   What other names?
4    A.   Marty.
5    Q.   Marty what?
6    A.   Salamon.
7    Q.   Any other names?
8    A.   Um, yes, Yidel.
9    Q.   Yidel?
10   A.   Mm-hmm.
11   A.   Y I D D —
12   A.   Y I D E L.
13   Q.   Salamon?
14   A.   Mm-hmm.
15   Q.   That's a yes?
16        MR. LEVINE:  You have to say yes
17   or no.
18   A.   Yes.
19   Q.   Any other name?
20   A.   I can't recollect.
21   Q.   When do you use the name Marty
22   Salamon?
23   A.   Sometimes.
24   Q.   Any particular occasion?
25   A.   Depends.  Sometimes.

Page 135

1          Y. Salamon
2    Q.   Why do you use the name Marty
3    Salamon?
4    A.   Why, because when I don't want
5    to connect with Yidel.
6    Q.   What does that mean, you don't
7    want to connect with Yidel?
8    A.   If I don't want people to put me
9    together straight like in other
10   businesses, like this, I know sometimes
11   when someone calls me for what they call
12   me.
13   Q.   Why don't you want people to
14   know or connect you to Yidel's?  What
15   circumstances would that event occur?
16        MR. LEVINE:  Objection to form.
17        You can answer.
18   A.   In -- when I don't want to be
19   like a grocery.  I want to be like a
20   different business.
21   Q.   When do you go by the name Yidel
22   Salamon?
23   A.   Depends.  Personal, mostly.
24   Q.   Now, I want to show you Exhibit
25   1B, which is annexed to your accounting.

Page 136

1          Y. Salamon
2    And that appears to be a bank statement
3    drawn on the Signature Bank.  And the
4    account is Yidel's Shopping Cart, Inc.,
5    D/B/A Riverstone Group.  Do you see that?
6    A.   Yes.
7    Q.   Who is Riverstone Group?
8    A.   It's a corporation that -- it's
9    also I'm affiliated with it.
10   Q.   Well, what does Riverstone Group
11   do?
12   A.   Depends.
13   Q.   Well --
14   A.   It's -- it's -- if you use
15   Yidel's Grocery, then you know you're a
16   grocery store.  When you want to be
17   professional and make business
18   transactions, you have a different name.
19   Q.   The name is D/B/A Riverstone
20   Group?
21   A.   Yes.
22   Q.   Does Riverstone Group have an
23   office anywhere?
24   A.   Not now.
25   Q.   Well, let's talk about in August

Page 137

1          Y. Salamon
2    of 2016, did it have an office?
3    A.   I don't remember.
4    Q.   What about in 2017, did it have
5    an office?
6    A.   I don't know.
7    Q.   Exhibit 1B, that shows the loan
8    proceeds of $6,085,068.80 coming into this
9    Signature Bank account, correct?
10   A.   Yes.
11        MR. FIVESON:  Let's have 1C
12        marked, please.
13        [The document was hereby marked
14        as Plaintiff's Exhibit 1C for
15        identification, as of this date.]
16   Q.   I'm going to show you Exhibit
17   1C, which shows an outgoing wire from
18   Yidel's Shopping Cart, D/B/A Riverstone
19   Group account on Signature Bank, of 2.5
20   million dollars.  Do you see that?
21        (Indicating.)
22   A.   Yes.
23   Q.   Where did that money go?
24   A.   I don't remember.
25   Q.   Have you ever heard of the law

35 (Pages 134 - 137)

Page 138

1        Y. Salamon
2 firm Mintz Levin?
3        MR. LEVINE: Mintz Levin?
4        MR. FIVESON: Mintz Levin.
5        MR. LEVINE: I thought it was
6 Mintz Levin.
7        MR. FIVESON: Mintz Levin, Mintz
8 Levin.
9        MR. LEVINE: Can I see that,
10 please?
11        MR. FIVESON: Yes, by all means.
12 (Handing.)
13        MR. LEVINE: (Perusing.)
14    Q.  Using Exhibit C, you don't know
15 where that money went?
16        MR. LEVINE: By "that money,"
17 you mean --
18        MR. FIVESON: The 2.5 million
19 dollars.
20        MR. LEVINE: Objection. Asked
21 and answered.
22        You can answer it again.
23    A.  For what this went?
24    Q.  Where did it go? Who was it
25 wired to?

Page 139

1        Y. Salamon
2    A.  (Perusing.)
3        It doesn't say where.
4    Q.  But do you know?
5        MR. LEVINE: Do you remember?
6        THE WITNESS: No.
7    Q.  You don't remember?
8    A.  No.
9        MR. FIVESON: Please mark this
10 as Plaintiff's Exhibit 17 for
11 identification.
12        [The document was hereby marked
13 as Plaintiff's Exhibit 17 for
14 identification, as of this date.]
15        MR. FIVESON: I'm showing it to
16 Counsel.
17 (Handing.)
18        MR. LEVINE: (Perusing.)
19 (Handing.)
20    A.  (Perusing.)
21    Q.  Do you recognize what Exhibit 17
22 is?
23    A.  (Perusing.)
24        MR. LEVINE: You're asking about
25 the entire document including the

Page 140

1        Y. Salamon
2 certification?
3        MR. FIVESON: Well, let me back
4 up. I'll withdraw that question.
5        Please mark this as Plaintiff's
6 Exhibit 17A, which is the business
7 profile and account application for
8 the Yidel's Shopping Cart, Inc., D/B/A
9 Riverstone Group account.
10        [The document was hereby marked
11 as Plaintiff's Exhibit 17A for
12 identification, as of this date.]
13    Q.  I'm going to ask you if your
14 signature appears on this document?
15 (Handing.)
16        MR. LEVINE: (Perusing.)
17    A.  (Perusing.)
18 I think so.
19    Q.  What?
20        MR. LEVINE: He said, I think
21 so.
22    A.  I think so.
23    Q.  And on this document it says the
24 primary contact is Marty (Yehuda) Salamon,
25 Owner, and you gave an e-mail address of

Page 141

1        Y. Salamon
2 marty@ecommerce, E C O M M E R C E,
3 expand.com. Do you see that?
4    A.  Yes.
5    Q.  What is eCommerce?
6    A.  It was when I wanted to try the
7 Jet. I told you, Jet. So I was trying to
8 make a different kind of e-mail address.
9    Q.  Did eCommerce have a location
10 where it did business in 2016?
11    A.  No. I don't remember.
12        MR. FIVESON: Please mark this
13 as 17B for identification.
14        [The document was hereby marked
15 as Plaintiff's Exhibit 17B for
16 identification, as of this date.]
17    Q.  17B is the complete document of
18 the redacted page you previously looked
19 at, 1C. 17B is the complete document and
20 it shows 2.5 million being wired to Mintz
21 Levin Cohn Ferris Glovsky. Do you see
22 that?
23 (Handing.)
24    A.  (Perusing.)
25        MR. LEVINE: He's asking you

36 (Pages 138 - 141)

Page 142

1      Y. Salamon
2  about this right here.
3      (Indicating.)
4      MR. FIVESON:  Correct.
5   A.   Yes.
6   Q.   Who is that Mintz Levin firm?
7   A.   I don't know why it was.
8   Q.   Did they ever represent any of
9  your entities?
10  A.   I don't know.
11  Q.   Did you ever hear of the entity
12 R.S. Old Mill, LLC?
13  A.   Yes.
14  Q.   Were you ever a sole member of
15 that entity?
16  A.   Yes.
17  Q.   Did that money get wired to
18 Mintz Levin for the benefit of R.S. Old
19 Mill, LLC?
20  A.   I don't know.
21  Q.   Now, was that money, that 2.5
22 million, ever returned to you by Mintz
23 Levine?
24  A.   I don't remember.
25      MR. FIVESON:  Please mark these

Page 143

1      Y. Salamon
2  as Plaintiff's Exhibits 18 and 18A.
3      [The documents were hereby
4  marked as Plaintiff's Exhibits 18 and
5  18A for identification, as of this
6  date.]
7      MR. FIVESON:  Off the record.
8      [Discussion held off the
9  record.]
10  Q.   I want to show you Exhibit 18.
11 Do you recognize that bank statement?
12      (Handing.)
13  A.   (Perusing.)
14      MR. LEVINE:  Inclusive of 18A?
15      MR. FIVESON:  Yes, the whole
16 document.  It's one statement.
17      MR. LEVINE:  Go ahead.
18  A.   I don't remember.
19  Q.   And did Yidel's Shopping Cart
20 Inc., D/B/A Riverstone Group, have a
21 checking account at Bank of America in
22 November of 2016?
23  A.   I don't remember.
24  Q.   And this document, Exhibit 18,
25 doesn't refresh your recollection whether

Page 144

1      Y. Salamon
2  or not Yidel's had a bank account there?
3   A.   Right.
4   Q.   Do you see the entry on Exhibit
5  18A that shows a wire transfer into the
6  account originate from Mintz Levin Cohn of
7  2.5 million dollars on November 10, 2016?
8  Do you see that?
9   A.   I see it.
10  Q.   Was that money received by
11 Yidel's on that date?
12  A.   I don't know.
13  Q.   And was that 2.5 million
14 transferred by Yidel's on November 25,
15 2016, to two accounts?
16  A.   I don't remember.
17  Q.   A million five to an account
18 ending in 2350, and a million to an
19 account 2347.  Do you see that?
20  A.   I see that.  I don't remember.
21  Q.   You don't recall?
22  A.   No.
23  Q.   Now, do you know what entity had
24 accounts ending in 2350 and 2347 on
25 November 25, 2016?

Page 145

1      Y. Salamon
2   A.   No.
3   Q.   Do you know where that money is
4  today, the 2.5 million?
5   A.   No.
6      MR. FIVESON:  Please mark this
7  as Plaintiff's Exhibit 19 and
8  Plaintiff's Exhibit 20 for
9  identification.
10      [The documents were hereby
11 marked as Plaintiff's Exhibits 19 and
12 20 for identification, as of this
13 date.]
14  Q.   Let me show you Exhibit 19,
15 which is a business signature card form
16 for the Bank of America, account title,
17 Riverstone U.S.A.  Does your signature
18 appear on that document?
19      (Handing.)
20  A.   (Perusing.)
21      No recollection.
22  Q.   Do you know the name David
23 Salamon, S A L A M O N, who's here
24 director member of Riverstone U.S.A.?
25  A.   Yes.

37 (Pages 142 - 145)

Page 146

1      Y. Salamon
2    Q.   Who is that?
3    A.   My son.
4    Q.   Who?
5    A.   My son.
6    Q.   Your son?
7    A.   Yes.
8    Q.   How old is David Salamon?
9    A.   Twenty-five, about.
10   Q.   What's his date of birth?
11   A.   I don't know.
12   Q.   Where does he live?
13   A.   Rockland County.
14   Q.   I'm sorry?
15   A.   Rockland County.
16   Q.   Where in Rockland County?
17   A.   I don't remember the address.
18   Q.   Do you know the town?
19   A.   Monsey.
20   Q.   Is that your son's signature on
21   Exhibit 19?
22   A.   I don't know.
23   Q.   Did you sign Exhibit 19 as your
24   son?
25   A.   I don't remember.

Page 147

1      Y. Salamon
2    Q.   Now, if we go back to Exhibit
3    18, the Bank of America record is in
4    Yidel's Shopping Cart D/B/A Riverstone
5    Group, and Exhibit 19 seems to be a
6    document in the name of Riverstone U.S.A.
7    Do you see that?
8    A.   Yes.
9    Q.   Is there any connection between
10   Riverstone Group and Riverstone U.S.A.?
11       MR. LEVINE:  Objection to form.
12   You can answer.
13       MR. FIVESON:  That he knows of.
14   A.   I don't know.
15   Q.   Is there a separate entity
16   Riverstone U.S.A. separate from Riverstone
17   Group?
18   A.   I don't know.
19   Q.   I would like to show you Exhibit
20   20, which appears to be a Bank of America
21   statement for November of 2016, for
22   Riverstone U.S.A., LLC.  Do you see that?
23   A.   Yes.
24   Q.   And you see the address for
25   Riverstone U.S.A., LLC is 4921 12th

Page 148

1      Y. Salamon
2    Avenue?
3    A.   Yes.
4    Q.   That's your address, correct?
5    A.   Yes.
6    Q.   And did you get this bank
7    statement in your address?
8    A.   I don't remember.
9        MR. FIVESON:  Can we have this
10   marked as 20A for identification?
11       [The document was hereby marked
12   as Plaintiff's Exhibit 20A for
13   identification, as of this date.]
14   Q.   Does 20A show the receipt of 1.5
15   million dollars into this account on
16   November 25, 2016 handing?
17       MR. LEVINE:  (Perusing.)
18       Are you asking him to interpret
19   this document?
20       MR. FIVESON:  It's a bank
21   statement which apparently was issued
22   to him.  I want to know whether or not
23   it accurately shows receipt of that
24   money on that date.
25       MR. LEVINE:  Objection to your

Page 149

1      Y. Salamon
2    characterization of what this is.
3    However, if you're asking him if this
4    document reflects a 1.5 million
5    dollar —
6        MR. FIVESON:  Receipt into that
7    account.  I'll adopt that question,
8    Counselor.
9        MR. LEVINE:  Receipt into this
10   account?
11       MR. FIVESON:  Correct.
12       MR. LEVINE:  The account that's
13   reflected in 20A?
14       MR. FIVESON:  Correct.
15   A.   I have no clue.
16       MR. LEVINE:  No, he's asking you
17   what does it say.  Can you see what it
18   says?
19       THE WITNESS:  No.
20   Q.   Do you have a recollection of
21   receiving 1.5 million dollars in the
22   Riverstone U.S.A., LLC Bank of America
23   account ending in 2350, on November 25,
24   2016?
25   A.   No.

38 (Pages 146 - 149)

Page 150

1        Y. Salamon
2        MR. FIVESON: Can I have this
3    marked as Plaintiff's Exhibit 21?
4        [The document was hereby marked
5    as Plaintiff's Exhibit 21 for
6    identification, as of this date.]
7        MR. FIVESON: Exhibit 21 is a
8    four-page bank statement for Bank of
9    America to the Riverstone U.S.A., LLC,
10   for account ending in 2347, and it's
11   dated November of 2016.
12   Q.   I ask if you've ever received
13   that statement?
14       MR. LEVINE: If he personally?
15       MR. FIVESON: It's for a
16   different account, Counsel.
17       MR. LEVINE: Give me one second
18   here.
19       (Perusing.)
20       MR. LEVINE: The question is,
21   do you recall receiving this
22   statement?
23   A.   (Perusing.)
24       I don't remember.
25   Q.   Are you the owner of Riverstone

Page 151

1        Y. Salamon
2    U.S.A., LLC?
3    A.   I don't remember.
4    Q.   Do you know who is the owner?
5    A.   I don't know.
6    Q.   Is that LLC still in existence
7    today?
8    A.   I don't know.
9        MR. FIVESON: Can I please have
10   this marked as Plaintiff's Exhibit
11   21A.
12       [The document was hereby marked
13   as Plaintiff's Exhibit 21A for
14   identification, as of this date.]
15   Q.   This bank statement shows
16   receipt into this account 2347 of one
17   million dollars on November 25, 2016. I'm
18   referencing Exhibit 21A. Do you see that?
19       MR. LEVINE: Does he see that it
20   reflects such a deposit?
21       MR. FIVESON: Yes, wire transfer
22   in.
23   A.   If I see?
24   Q.   Yes.
25   A.   I see it, yes.

Page 152

1        Y. Salamon
2    Q.   Do you recall that --
3    A.   No.
4    Q.   -- receipt of monies?
5    A.   No.
6    Q.   This Exhibit 21A records wiring
7    out of the account 1.5 million dollars to
8    Commonwealth Land Title. Do you see that?
9    A.   (Perusing.)
10   Q.   On November 28th?
11   A.   (Perusing.)
12       I see it.
13   Q.   Was 1.5 million wired out on
14   that date to Commonwealth?
15   A.   That's what it says.
16   Q.   Well, do you recall that?
17   A.   No.
18   Q.   Do you deny that that's what
19   occurred?
20       MR. LEVINE: Objection to form.
21   A.   I don't know what it is.  I
22   don't remember.
23   Q.   Going back to Exhibit 20A, this
24   shows on November 25th, one million
25   dollars being wired to Commonwealth Land

Page 153

1        Y. Salamon
2    Title. Do you see that?
3    A.   (Perusing.)
4        Yes.
5    Q.   Did that occur?
6    A.   I don't know.
7    Q.   Well, do you know why
8    two-and-a-half million dollars would be
9    wired out of the Riverstone U.S.A., LCC
10   account on November 25, 2016, to go to
11   Commonwealth Land Title?
12   A.   I don't remember.
13   Q.   Did Commonwealth Land Title act
14   as the title agent for the purchase of a
15   property from Novartis Corporation by R.S.
16   Old Mill, LLC?
17   A.   I don't remember.
18   Q.   Was not Commonwealth Land Title
19   acting as an escrow agent on behalf of
20   R.S. Old Mill, LLC, to hold two-and-a-half
21   million dollars as an earnest money
22   deposit for the purchase of that property?
23   A.   I don't remember.
24   Q.   Do you recall being present at a
25   closing on September 1, 2017, where R.S.

39 (Pages 150 - 153)

Page 154

1      Y. Salamon
2  Old Mill, LLC, purchased from Novartis
3  Corporation a property up in Suffern, New
4  York, in the amount of 18 million dollars?
5      MR. LEVINE: Hold on. I've been
6  letting you get a great deal of
7  leeway. What does that have to do
8  with this case?
9      MR. FIVESON: Well, it has to do
10  with the accounting that he gave. He
11  gave an accounting as to where the
12  monies were and we never got the
13  accounting. He never disclosed in his
14  accounting where the monies went. And
15  now we have two-and-a-half million
16  dollars going into this property.
17      MR. LEVINE: No, you don't. And
18  what happened in a transaction in
19  November of 2017, approximately, has
20  nothing to do with this case. I'm
21  going to terminate this line of
22  inquiry now.
23      MR. FIVESON: Just so it's
24  clear, I don't want to argue on the
25  record, you were directing him not to

Page 155

1      Y. Salamon
2  answer any questions regarding the use
3  of the two-and-a-half million dollars,
4  which were loan proceeds wired into
5  the Signature Bank account to Mintz
6  Levin refunded to the Bank of America
7  account, then transferred to his
8  company, Riverstone Group, and then
9  into Commonwealth.
10      MR. LEVINE: I don't accept the
11  premise of your statement.
12      MR. FIVESON: Let's assume what
13  I'm saying is true --
14      MR. LEVINE: I can't assume
15  it's true, because it's not.
16      MR. FIVESON: So you're not
17  going to let him answer any questions
18  regarding --
19      MR. LEVINE: You're asking him a
20  question about a 2017 transaction that
21  has nothing to do with the pleadings
22  in this case. Your deposition is
23  limited to the pleadings in this case.
24  Therefore, the question itself is not
25  asking for relevant information or

Page 156

1      Y. Salamon
2  information that would lead to
3  relevant information.
4      MR. FIVESON: Just so it's
5  clear, I'm asking for the disposition
6  of two-and-a-half million dollars of
7  loan proceeds from my loan that now
8  have been transferred into -- traced
9  into the Commonwealth escrow account,
10  who was the escrow agent for the
11  purchase of that property. And I want
12  to know whether or not that property
13  was consummated and whether or not
14  those monies were used to pay for the
15  purchase of the property.
16      MR. LEVINE: I don't accept your
17  premise, number 1. And number 2, what
18  is the difference where the loan
19  proceeds went?
20      MR. FIVESON: Well, he was
21  ordered to give an accounting and we
22  never got the accounting and a motion
23  for contempt was denied without
24  prejudice to renew, because the judge
25  said, do discovery. He didn't give us

Page 157

1      Y. Salamon
2  an accounting.
3      So I'm not going to argue. If
4  you're going to instruct him not to
5  answer, I'll get a ruling and we'll
6  have a judge decide and we'll come
7  back, but I'm telling you where I'm
8  going. So you tell me what you want
9  to do.
10      MR. LEVINE: I'm telling you
11  that I will not allow him to answer
12  questions regarding a 2017 transaction
13  that has nothing to do with the
14  pleadings in this case.
15      MR. FIVESON: So I'm going to
16  reserve as to that.
17      And you're not going to let him
18  identify his signature on any
19  pleadings in connection with that
20  transaction? There was a --
21      MR. LEVIN: No, no. What do you
22  mean pleadings?
23      MR. FIVESON: Well, there was a
24  lawsuit filed in Rockland County by
25  Old Mill in connection with that

40 (Pages 154 - 157)

Page 158

1      Y. Salamon
2   transaction.
3      MR. LEVINE: You can ask him
4   about his signature on the document.
5   I have no problem with that.
6      MR. FIVESON: Fine.
7      So let's mark this as
8   Plaintiff's Exhibit 22 and Plaintiff's
9   Exhibit 22A for identification.
10     [The documents were hereby
11  marked as Plaintiff's Exhibits 22 and
12  22A for identification, as of this
13  date.]
14  Q.   I'm going to show you what's
15  been marked as Exhibit 22, which appears
16  to be a summons and complaint filed in
17  Rockland County, under index number
18  030713/2017. I'm going to ask you if you
19  can identify it. And then I'm going to
20  ask you about Exhibit 22A, whether that's
21  your signature.
22     MR. LEVINE: Can I see that,
23  please?
24     MR. FIVESON: (Handing.)
25     MR. LEVINE: (Perusing.)

Page 159

1      Y. Salamon
2   Okay.
3   (Handing.)
4   A.   (Perusing.)
5      MR. LEVINE: Do you recognize
6   the document is the first thing that
7   he's asking you?
8   Q.   Do you recognize the document?
9   A.   (No verbal response.)
10     MR. LEVINE: I think he's still
11  looking at it.
12     MR. FIVESON: I'm sorry.
13  A.   (Perusing.)
14     Yes.
15  Q.   What is the document?
16  A.   What do you mean?
17  Q.   It's a complaint filed by R.S.
18  Old Mill?
19  A.   Yes.
20  Q.   And did you sign Exhibit 22A,
21  which is the verification to that
22  document?
23     (Handing.)
24  A.   (Perusing.)
25     Probably.

Page 160

1      Y. Salamon
2   Q.   Well, does it look like your
3   signature?
4   A.   Yes.
5      MR. FIVESON: Let's have these
6   marked as Plaintiff's Exhibits 23 and
7   23A for identification.
8      [The documents were hereby
9   marked as Plaintiff's Exhibits 23 and
10  23A for identification, as of this
11  date.]
12  Q.   Is 23 your declaration filed in
13  the R. S. Old Mill bankruptcy, and is 23A
14  your signature?
15     (Handing.)
16  A.   (Perusing.)
17     MR. LEVINE: The yellow
18  highlighting does not appear on the
19  original --
20     MR. FIVESON: It doesn't matter.
21     MR. LEVIN: -- correct?
22     MR. FIVESON: Correct.
23     MR. LEVINE: (Perusing.)
24     (Handing.)
25     Is this your declaration and do

Page 161

1      Y. Salamon
2   you recognize the signature, are the
3   questions.
4   A.   (Perusing.)
5      The signature doesn't look like
6   mine. I don't know.
7   Q.   Do you deny that that's your
8   signature on 23A?
9   A.   I don't deny that's my
10  signature. It doesn't look like my
11  signature.
12  Q.   Well, do you recall signing that
13  document?
14  A.   (Perusing.)
15     I don't remember.
16     MR. FIVESON: Please mark these
17  as Plaintiff's Exhibits 24 and 24A.
18     [The documents were hereby
19  marked as Plaintiff's Exhibits 24 and
20  24A for identification, as of this
21  date.]
22     MR. FIVESON: Counsel.
23     (Handing.)
24     MR. LEVINE: (Perusing.)
25     And for the record, I'm allowing

41 (Pages 158 - 161)

Page 162

```
 1              Y. Salamon
 2  you to show him documents and identify
 3  his signature. I'm not waiving any
 4  objection to relevancy.
 5        MR. FIVESON: I agree with that.
 6        MR. LEVINE: (Handing.)
 7        That document is in front of the
 8  witness, Exhibit 24.
 9    Q.  Do you recognize 24?
10    A.  (Perusing.)
11        I don't remember.
12    Q.  I want to show you the signature
13  page, 24A. It's signed by a Yoel Kaufman.
14  Do you see that?
15    A.  Yes.
16    Q.  Is that your signature?
17    A.  No.
18    Q.  Are you known as Yoel Kaufman?
19    A.  No.
20    Q.  Do you know who that person is?
21    A.  Yes.
22    Q.  Who is he?
23    A.  He was involved with me.
24    Q.  Well, is he a member of R.S. Old
25  Mill?
```

Page 163

```
 1              Y. Salamon
 2    A.  I don't remember.
 3    Q.  Do you know his address?
 4    A.  No.
 5    Q.  How was he involved with you?
 6    A.  He helped me out.
 7    Q.  What did he do?
 8    A.  I don't remember.
 9        MR. FIVESON: Please mark this
10  as Exhibit 25 for identification.
11        [The document was hereby marked
12  as Plaintiff's Exhibit 25 for
13  identification, as of this date.]
14    Q.  I'm going to show you what's
15  been marked as Exhibit 25, which is a
16  monthly operating statement for R.S. Old
17  Mill, LLC. Do you recognize the document?
18        (Handing.)
19        MR. LEVINE: (Perusing.)
20        (Handing.)
21        Okay.
22    A.  (Perusing.)
23        Yes.
24    Q.  What is the document?
25    A.  What do you mean?
```

Page 164

```
 1              Y. Salamon
 2    Q.  Did you sign Exhibit 25?
 3        (Indicating.)
 4    A.  Looks like.
 5    Q.  And is this the statement of the
 6  monthly operating expenses for R.S. Old
 7  Mill for June of 2017?
 8        (Handing.)
 9    A.  (Perusing.)
10        That's what it says.
11        MR. FIVESON: Please mark these
12  as Plaintiff's Exhibits 26 and 26A for
13  identification.
14        [The documents were hereby
15  marked as Plaintiff's Exhibits 26 and
16  26A for identification, as of this
17  date.]
18    Q.  I want to show you Exhibit 26.
19  I'm going to ask if you recognize the
20  document and whether or not your signature
21  appears on 26A? 26 appears to be an
22  agreement, dated November 28, 2016 that
23  was Exhibit 26.
24        (Handing.)
25        MR. LEVINE: (Perusing.)
```

Page 165

```
 1              Y. Salamon
 2        (Handing.)
 3        So do you recognize the
 4  document, number 1?
 5        THE WITNESS: (Perusing.)
 6        I don't remember.
 7    Q.  Do you recognize your signature
 8  on page 26A?
 9    A.  Looks like my signature.
10        MR. FIVESON: With the questions
11  that I left open, I think there was
12  one subject you and I discussed about
13  the post closing transaction.
14        MR. LEVINE: What post — okay.
15        MR. FIVESON: We talked about a
16  closing in 2017 and you said you are
17  not going to let him answer any
18  questions about that transaction.
19        MR. LEVINE: On a separate
20  transaction.
21        MR. FIVESON: Right. Other than
22  that, and with regard to two other
23  items that he was instructed not to
24  answer, I'm done with this
25  examination.
```

42 (Pages 162 - 165)

Page 166

```
 1          Y. Salamon
 2          MR. LEVIN:  I don't have any
 3  cross-examination.
 4          Off the record.
 5          [Discussion held off the
 6  record.]
 7          [TIME NOTED:  3:00 p.m.]
 8  _____
 9          YEHUDA SALAMON
10  _____
11  Subscribed and sworn to
12  before me this _____
13  day of _____, 2018.
14  _____
        Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 167

```
 1
 2          I N D E X
 3
    WITNESS    EXAMINATION BY       PAGE
 4
 5  Y. SALAMON  MR. FIVESON         5
 6
 7  .
 8          E X H I B I T S
 9  PLAINTIFFS  DESCRIPTION        PAGE
10  Exhibit 1   Accounting document    23
11  Exhibit 1A  Signature page       23
12  Exhibit 1B  Signature Bank statement,
        8/31/2016         133
13
    Exhibit 1C  Document, 10/31/16    137
14
    Exhibit 2   Verified Answer in
15          Gorlitz action       29
16  Exhibit 2A  Signature page        29
17  Exhibit 2B  Signature page        29
18  Exhibit 3   Documents        33
19  Exhibit 3A  Cover page       33
20  Exhibit 3B  Signature page       33
21  Exhibit 3C  Signature page       35
22  Exhibit 3D  Signature page       36
23  Exhibit 3E  Forbearance agreement    38
24  Exhibit 3F  Cover page       40
25  (Continued on the following page.)
```

Page 168

```
 1
 2  INDEX: (continued)
 3  PLAINTIFFS  DESCRIPTION       PAGE
 4
 5  Exhibit 3G  Signature page       40
 6  Exhibit 3H  Mortgage note       43
 7  Exhibit 3I  Signature page      43
 8  Exhibit 3J  Restated note, 5/4/06    44
 9  Exhibit 3K  Signature page      44
10  Exhibit 3L  Loan disbursement
            approval         122
11  Exhibit 3M Mortgage closing statement 122
12  Exhibit 3N  Wire transfer advice from
            Capital One Bank     122
13
    Exhibit 4   Mortgage        47
14  Exhibit 4A  Signature page       47
15  Exhibit 4B  Signature page       47
16  Exhibit 5   Note, 8/30/16       47
17  Exhibit 5A  Signature page       47
18  Exhibit 6   Black & white photo    58
19  Exhibit 7   Satisfaction of mortgage 77
20  Exhibit 8   Discharge of record   77
21  Exhibit 9   Lost note affidavit    77
22  Exhibit 10  Defendant's Response to
            plaintiff's demand   108
23
24  Exhibit 11  2-page agreement      112
25  (Continued on the following page.)
```

Page 169

```
 1
 2  EXHIBITS: (continued)
 3  PLAINTIFFS  DESCRIPTION       PAGE
 4
 5  Exhibit 12  Affidavit of title,
            8/30/16        112
 6  Exhibit 13  2-page deposit agreement 120
 7  Exhibit 14  1-page letter      121
 8  Exhibit 15  Consent and appointment 122
 9  Exhibit 16  Defendant's first
            supplemental response to
10          plaintiff's demand for
            witnesses       122
11
    Exhibit 17  Signature Bank records 139
12
    Exhibit 17A  1-page document     140
13
    Exhibit 17B  1-page document     141
14
    Exhibit 18  Bank of America statement 143
15
    Exhibit 18A  1-page document     143
16
    Exhibit 19  1-page document     145
17
    Exhibit 20  4-page document      145
18
    Exhibit 20A  1-page document     148
19
    Exhibit 21  4-page document      150
20
    Exhibit 21A  Bank statement      151
21
    Exhibit 22  Document        158
22
    Exhibit 22A  Signature page      158
23
    Exhibit 23  Document        160
24
    Exhibit 23A  Signature page      160
25
    (Continued on the following page.)
```

43 (Pages 166 - 169)



Page 170

1
2 EXHIBITS: (continued)
3
PLAINTIFF'S DESCRIPTION    PAGE
4
Exhibit 24  Document    161
5
Exhibit 24A  Signature page    161
6
Exhibit 25  Document    163
7
Exhibit 26  Document    164
8
Exhibit 26A  Signature page    164
9
10 Attorney has retained all exhibits.
11
12
        INSERTIONS
13
    Page    Line
14
    10    22
15    17    12
16
17
        RULINGS
18
    Page    Line
19
    157    3
20    157    17
21
22
23
24
25

Page 172

1
2        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS
3
        CASE NAME: GALSTER FUNDING, LLC v SALAMON,
4  YIDEL'S SHOPPING CART, INC., et al.
        DATE OF DEPOSITION: July 2, 2018
5  WITNESS' NAME: YEHUDA SALAMON
6  PAGE/LINE(S)/  CHANGE    REASON
7    ___/___  _____  _____
8    ___/___  _____  _____
9    ___/___  _____  _____
10   ___/___  _____  _____
11   ___/___  _____  _____
12   ___/___  _____  _____
13   ___/___  _____  _____
14   ___/___  _____  _____
15   ___/___  _____  _____
16   ___/___  _____  _____
17   ___/___  _____  _____
18   ___/___  _____  _____
19
20      YEHUDA SALAMON
21  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS____DAY
22  OF_____, 2018.
23
    NOTARY PUBLIC
24
    MY COMMISSION EXPIRES_____
25

Page 171

1
2        CERTIFICATION
3
4    I, Shirley Nottes-Werner, a Notary
5  Public for and within the State of New
6  York, do hereby certify:
7    That the witness whose testimony as
8  herein set forth, was duly affirmed by me;
9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12    I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I am
15  in no way interested in the outcome of
16  this matter.
17    IN WITNESS WHEREOF, I have hereunto
18  set my hand this 13th day of July, 2018.
19
20
21
22  SHIRLEY NOTTES-WERNER
23
24
25

44 (Pages 170 - 172)

[& - 2347]                                                                                                    Page 1

**&**

**&**  2:3,10 130:9
133:8 168:18

**0**

**030713/2017**
158:18

**1**

**1**  23:13,15 24:4,10
24:11 32:7 123:6
131:11,21 133:15
153:25 156:17
165:4 167:10
169:7,12,13,15,16
169:18
**1.2**  93:13
**1.3.**  35:2 93:14
**1.5**  148:14 149:4
149:21 152:7,13
**1/16**  6:12
**10**  108:17,20
111:11,18 114:18
114:20 144:7
168:22 170:14
**10/31/16**  167:13
**10017**  2:5
**10583**  2:12
**108**  168:23
**10:00**  1:15
**11**  112:4,8 117:12
168:24
**112**  168:24 169:5
**11219**  5:10 7:15
**1152**  5:9,12
**12**  112:6,9 119:15
132:6 169:4
170:15
**120**  169:6
**121**  169:7
**122**  168:10,11,12
169:8,10

**12th**  1:8 7:9,11
9:22 21:19,23
22:7,12,24,25 26:7
27:2,4 28:13,21
30:11,16 31:7,19
34:4 35:3 40:20
45:2,6 48:9,22
49:4 50:4,12
52:16 54:16 55:14
77:24 79:17,20,21
79:22 80:10 81:12
147:25
**13**  15:8,10,13
120:11,14,17
121:12 133:5
169:6
**133**  167:12
**137**  167:13
**139**  169:11
**13th**  89:8 133:6
171:18
**14**  121:15,18,20
169:7
**140**  169:12
**141**  169:13
**143**  169:14,15
**145**  169:16,17
**148**  169:18
**14th**  15:2
**15**  2:11 121:25
122:4,6 169:8
**150**  169:19
**151**  169:20
**157**  170:19,20
**158**  169:21,22
**15th**  20:10 61:16
63:17
**16**  122:19,24 123:3
123:10 124:15
126:25 133:4
169:9

**160**  169:23,24
**161**  170:4,5
**163**  170:6
**164**  170:7,8
**16th**  19:22,23 20:2
**17**  139:10,13,21
169:11 170:15,20
**17a**  140:6,11
169:12
**17b**  141:13,15,17
141:19 169:13
**18**  16:10 143:2,4
143:10,24 147:3
154:4 169:14
**18a**  143:2,5,14
144:5 169:15
**19**  145:7,11,14
146:21,23 147:5
169:16
**1:00**  122:11
**1a**  23:13,16 25:4
167:11
**1b**  133:18,21,23
135:25 137:7
167:12
**1c**  137:11,14,17
141:19 167:13

**2**

**2**  1:14 28:24 29:3
29:7 39:5,15
156:17 167:14
168:24 169:6
172:4
**2.5**  137:19 138:18
141:20 142:21
144:7,13 145:4
**20**  145:8,12 147:20
169:17
**2006**  34:5 43:16
44:12

**2010**  37:5
**2016**  40:21 46:9,19
47:24 48:5 49:6
49:18 50:12 52:14
53:5 54:8,22 56:9
60:25 65:4,12
66:5,16 81:12
82:11,16 89:22
90:14 94:6,7
102:5 123:6
126:21 127:3
131:11,19,21
133:4,5 137:2
141:10 143:22
144:7,15,25
147:21 148:16
149:24 150:11
151:17 153:10
164:22
**2017**  29:11 137:4
153:25 154:19
155:20 157:12
164:7 165:16
**2018**  1:14 166:13
171:18 172:4,22
**20a**  148:10,12,14
149:13 152:23
169:18
**21**  150:3,5,7
169:19
**21a**  151:11,13,18
152:6 169:20
**22**  158:8,11,15
169:21 170:14
**22a**  158:9,12,20
159:20 169:22
**23**  160:6,9,12
167:10,11 169:23
**2347**  144:19,24
150:10 151:16

[2350 - 8]                                                                 Page 2

**2350**  144:18,24
   149:23
**23a**  160:7,10,13
   161:8 169:24
**24**  84:2 161:17,19
   162:8,9 170:4
**24a**  161:17,20
   162:13 170:5
**25**  89:22,25 90:14
   92:16 98:7,14
   102:5 144:14,25
   148:16 149:23
   151:17 153:10
   163:10,12,15
   164:2 170:6
**25th**  90:4 96:13
   97:2 152:24
**26**  164:12,15,18,21
   164:23 170:7
**26a**  164:12,16,21
   165:8 170:8
**28**  164:22
**28th**  152:10
**29**  167:15,16,17
**2a**  28:24 29:3,24
   167:16
**2b**  28:25 29:4 30:5
   167:17

| | 3 | |

**3**  33:23 39:5 44:5
   167:18 170:19
**30**  40:21 46:9,19
   47:24 48:5 49:6
   49:18 50:11 52:14
   53:4 54:8,22 56:9
   60:25 65:4,12
   66:5,15 67:24
   68:13 76:16 82:18
   85:9,12,22 94:6,6
   96:10 131:19

**30th**  76:3 96:8
   133:7
**32,500**  130:14
**33**  167:18,19,20
**35**  167:21
**36**  167:22
**3696-06265**  2:6
**38**  167:23
**39th**  12:17
**3:00**  166:7
**3a**  33:23 34:2,8,14
   34:14 167:19
**3b**  33:24 34:6,8,9
   34:12,13,15,17
   167:20
**3c**  35:12,14,17
   167:21
**3d**  36:21,24 37:3
   39:7,11 167:22
**3e**  38:8,12,22 39:4
   39:15 167:23
**3f**  40:9,11,15,19
   41:23 167:24
**3g**  40:9,12,16 43:2
   168:4
**3h**  43:8,11,15,18
   168:5
**3i**  43:8,12,25
   168:6
**3j**  44:5,7,11,15
   168:7
**3k**  44:8,13,21
   168:8
**3l**  122:15 127:18
   127:20 129:16
   132:13 168:9
**3m**  122:15 127:18
   128:10 168:11
**3n**  122:16 127:18
   168:12

| | 4 | |

**4**  34:5 39:5 43:15
   44:12 47:3,6
   50:10,16 54:13
   168:13 169:17,19
**4,000**  81:14
**4/7/71**  6:10
**40**  67:24 167:24
   168:4
**42nd**  61:16 63:17
**43**  168:5,6
**44**  168:7,8
**45th**  2:4
**47**  168:13,14,15,16
   168:17
**49-12**  79:17
**4913**  21:23
**4917**  30:11,16 31:7
   54:16
**4921**  1:8 7:11 9:22
   21:19 22:7,12,24
   22:25 26:7 27:2,4
   28:12,20 31:19
   34:3 35:3 40:20
   45:2,6 48:9,22
   49:4 50:4,12
   52:16 55:13 77:24
   79:18,20 80:10
   81:11 147:25
**4a**  47:3,6 50:13
   51:18 52:3 168:14
**4b**  47:3,7 50:14
   51:18 168:15

| | 5 | |

**5**  39:5 47:10,12
   52:13,17,19 167:5
   168:16
**5/4/06**  168:7
**50**  1:13

**51**  89:8,13,14
**520434/2016**  1:3
**53rd**  5:9,12 14:24
**5424**  20:2
**55th**  19:24
**58**  168:18
**5a**  47:10,13 52:17
   52:24 168:17

| | 6 | |

**6**  29:11 39:6 58:8
   58:10,13 168:18
**6,085,068.80**  137:8
**6,085,068.80.**
   133:8
**6,095,068.80**  128:6
   132:14
**6,250**  130:10

| | 7 | |

**7**  39:6 76:24 77:4
   77:7 86:6 88:19
   92:23 94:18 95:16
   96:2,6 98:13,19
   99:13,13 100:23
   102:11 105:17
   106:5 109:20
   110:13 112:11,16
   112:19,22,25
   113:9 115:6,15,24
   116:2 123:8
   168:19
**718-473-5858**
   126:19
**72**  6:12
**77**  168:19,20,21

| | 8 | |

**8**  39:6 76:25 77:4
   93:5 94:13,14,18
   94:25 95:16,24
   96:25 97:7 98:3,7
   98:11 99:13,22

**[8 - approximately]**    Page 3

100:24 102:11
105:17 106:5
109:20 110:13
112:12,17,19,23
112:25 113:9
115:6,15,24 116:2
123:8 168:20
**8/30/16** 168:16
169:5
**8/31/2016** 167:12

**9**

**9** 2:4 39:7,12,13
76:25 77:4 99:3
100:8,9,19 168:21
**99** 87:19

**a**

**a.m.** 1:15
**abramowitz** 20:17
20:23 21:4,8
65:21
**absence** 127:18
**academy** 14:4,5,7
14:21 15:10
**accept** 155:10
156:16
**account** 90:6
132:11 133:13
136:4 137:9,19
140:7,9 143:21
144:2,6,17,19
145:16 148:15
149:7,10,12,23
150:10,16 151:16
152:7 153:10
155:5,7 156:9
**accountant** 8:21
8:23 9:5 11:14,24
28:7 105:5,6
**accountants** 10:6

**accounting** 24:5
133:16 135:25
154:10,11,13,14
156:21,22 157:2
167:10
**accounts** 144:15
144:24
**accurately** 148:23
**acknowledge**
73:25 93:2
**acknowledged**
89:18 91:22 92:23
**act** 153:13
**acting** 153:19
**action** 1:19 9:15
24:5 29:10 50:3
114:20,23 115:3
123:5 167:15
171:14
**address** 7:10
10:19,23 16:23,24
17:5 19:25 21:19
21:21 46:2 48:7
48:14 89:10
102:21,22 103:19
108:7,10 109:9,12
109:22 110:16
116:17,22 124:8
124:11,16,23
140:25 141:8
146:17 147:24
148:4,7 163:3
**adopt** 149:7
**advice** 133:3
168:12
**advisement** 10:21
17:11
**affidavit** 99:5
119:15 168:21
169:4

**affiliated** 136:9
**affiliation** 26:19
**affirmed** 3:3 171:8
**afraid** 107:17
**agent** 53:20
153:14,19 156:10
**ago** 59:12,13,13,15
**agree** 33:18 61:8
115:2 162:5
**agreement** 37:5
38:10,15 117:11
120:12,18 164:22
167:23 168:24
169:6
**ahead** 42:14 51:22
93:22 104:13
143:17
**al** 172:4
**alive** 16:21 19:11
**allow** 157:11
**allowing** 161:25
**amazon** 118:15,16
**america** 132:19
143:21 145:16
147:3,20 149:22
150:9 155:6
169:14
**amount** 34:24
154:4
**amron** 133:8
**annexed** 135:25
**annmarie** 128:21
129:8
**answer** 4:2,3,8,9
4:17,19 7:21 12:8
17:7,16 18:8,13
29:8 30:19 32:10
32:21 34:20 35:9
39:20 43:22 51:7
51:11 98:24
104:11 106:18

121:11 125:8
128:3 135:17
138:22 147:12
155:2,17 157:5,11
165:17,24 167:14
**answered** 68:18
138:21
**answering** 106:7
**answers** 42:23
**anybody** 8:12
20:14 53:19 62:12
68:12 76:15 81:7
99:19 100:5,15
113:15
**apparently** 148:21
**appear** 38:23 39:8
39:14 40:3 43:24
50:14 51:17 94:13
94:21 97:24
117:12 119:16
120:19 127:22
145:18 160:18
**appearances** 2:2
**appears** 29:8 34:2
37:4,6 43:15,17
44:11,14 50:11
52:14 77:8 89:21
128:11 136:2
140:14 147:20
158:15 164:21,21
**application** 140:7
**appointment**
122:2 169:8
**appreciate** 33:15
**approval** 127:21
168:10
**approximate**
68:13
**approximately**
5:17 154:19

[approximation - business]                                                      Page 4

| | | | |
|---|---|---|---|
| **approximation** | 65:4,12 66:5,15 | 132:13 133:15 | 126:8,12 |
| 18:16 | 76:3 81:12 82:11 | 140:3 147:2 | **big** 81:13 |
| **argue** 154:24 | 82:16 89:22 90:14 | 152:23 157:7 | **bill** 126:24 |
| 157:3 | 94:6,6 96:8 102:5 | **bank** 1:10 89:6,17 | **birth** 6:5,9,11 |
| **arrive** 53:7,8 | 126:20 127:2 | 90:7,10,14 95:13 | 146:10 |
| **arrived** 54:8 | 131:19 133:5,6,7 | 95:15 110:8 131:4 | **bit** 23:25 |
| **asked** 11:21 29:20 | 136:25 | 132:17,19,20 | **black** 58:7 168:18 |
| 41:2 42:8 49:19 | **available** 45:8 | 133:10,13 136:2,3 | **blank** 17:10 91:13 |
| 49:21 59:6 117:7 | 48:24 | 137:9,19 143:11 | **block** 65:21,22 |
| 126:8 138:20 | **avenue** 1:8 7:9,11 | 143:21 144:2 | 86:22,23 97:15 |
| **asking** 4:5 5:16 | 9:22 15:2 19:22 | 145:16 147:3,20 | 100:10 |
| 25:19 42:10 53:13 | 19:23 20:10 21:19 | 148:6,20 149:22 | **blocks** 87:25 96:19 |
| 56:11,15 57:7,9 | 21:23 22:12,24,25 | 150:8,8 151:15 | **blood** 171:14 |
| 61:6 73:7 82:10 | 26:8 28:13,21 | 155:5,6 167:12 | **boilerplate** 77:15 |
| 106:16 119:24 | 30:12,16 31:8,19 | 168:12 169:11,14 | 78:7 |
| 129:21 139:24 | 34:4 35:3 40:20 | 169:20 | **books** 124:10 |
| 141:25 148:18 | 45:2,6 48:9,23 | **bankruptcy** | **borrow** 35:3 |
| 149:3,16 155:19 | 49:4 50:4,12 | 160:13 | **borrowing** 118:4 |
| 155:25 156:5 | 52:16 54:16 55:14 | **barclay** 2:11 | **bottom** 38:21 |
| 159:7 | 61:16 63:18 77:24 | **beard** 58:20 | 39:23 88:6 119:16 |
| **assistant** 87:14,15 | 79:21,22 80:10 | **bedroom** 62:24 | **break** 4:23,25 5:2 |
| **associates** 2:10 | 81:12 89:8 148:2 | **behalf** 48:18 56:2 | 23:19,21,21 46:24 |
| **assume** 3:25 4:13 | **aware** 44:24 45:7 | 83:12 153:19 | 50:10 122:12 |
| 77:14 155:12,14 | 54:9 | **beis** 29:9 31:21 | **bring** 71:24 72:2 |
| **assumed** 108:13 | | 32:19 34:4 86:17 | 104:18 115:6 |
| **at&t** 126:21 | **b** | 88:2 96:18 99:13 | **broker** 45:10,11 |
| **attached** 33:4 | **b** 31:21 36:4 37:21 | 99:23 100:9 | 45:12,20,23 46:3,6 |
| **attachment** 33:3 | 99:14,24 100:11 | **believe** 7:23,24 | 46:9,13,18 47:16 |
| **attempt** 83:3 | 130:9 136:5,19 | 10:11,13 27:17 | 47:19 53:18 |
| 85:16,24 | 137:18 140:8 | 28:4,16,19 36:19 | 130:19 |
| **attorney** 13:10 | 143:20 147:4 | 52:2 78:21 80:18 | **brokers** 45:15 |
| 54:5 56:18 59:24 | 167:8 | 90:5 93:19 97:9 | **brooklyn** 1:13 5:9 |
| 106:10,24 123:5 | **back** 17:18 18:6 | 105:2,8,19 114:17 | 7:7,8,12 12:15,16 |
| 170:10 | 33:9 63:5,12 | 115:13 126:3 | 14:22,23 |
| **attorneys** 2:4,11 | 67:16 68:25 70:13 | **bell** 67:4 80:23 | **brought** 78:21,25 |
| 129:5 | 71:15 73:6 80:13 | **belong** 64:21 65:3 | 115:8,11 |
| **august** 40:21 46:9 | 80:14,17 88:14 | **beneficial** 33:16 | **building** 34:3,25 |
| 46:19 47:24 48:5 | 91:23 92:2,14 | **benefit** 142:18 | 63:23 64:7 80:2 |
| 49:6,18 50:11 | 96:6 98:13 99:12 | **best** 8:2 41:8 74:11 | **busier** 104:17 |
| 52:14 53:4 54:8 | 100:23 112:11 | 79:7 87:18 92:20 | **business** 6:21 7:3 |
| 54:22 56:9 60:25 | 114:18 125:14 | 97:9 125:21 126:6 | 12:20,22 16:16 |
| | 129:16 131:15,15 | | |

[business - connect]　　　　　　　　　　　　　　　　　Page 5

18:10 21:15,22
22:6,12 26:25
27:4 28:12,20
48:19 82:14,17
103:17 135:20
136:17 140:6
141:10 145:15
**businesses** 135:10
**butler** 2:3
**buzz** 66:19,21
**buzzed** 66:22

**c**

**c** 29:10 31:21 36:4
89:2 123:20
138:14 141:2,2
**c1** 30:11,15 31:7
54:15
**call** 9:9 61:20
65:15 125:22
135:11
**called** 62:5 126:7,7
126:10
**calling** 46:15
**calls** 135:11
**camera** 67:4 84:15
85:4,19
**cameras** 67:3
83:19,21,25 84:5,8
**capital** 168:12
**caption** 7:18,20
25:12
**card** 145:15
**care** 59:24,25
69:20,24 70:4
73:2,4,15
**carry** 33:19
**cart** 1:8,10 6:22
7:2,16 8:4,8 9:24
10:10 11:21 12:4
13:4,11,16 19:18
21:15 26:7,13

28:9 50:4,7
104:22,25 105:3
105:10 128:7
136:4 137:18
140:8 143:19
147:4 172:4
**carves** 107:6
**case** 32:3,4,6
111:18 154:8,20
155:22,23 157:14
172:3
**cash** 102:2,3
104:19 105:11,13
105:20 117:6
**cashier** 81:20,24
**cause** 33:3
**cell** 126:13,16,18
126:24
**certain** 3:13
**certification** 25:5
140:2 171:2
**certify** 171:6,12
**change** 127:10
172:6
**changed** 127:11
127:14,15
**changing** 103:24
**characterization**
149:2
**chasidei** 29:9
31:21 32:19 34:4
86:18 88:2 96:19
99:14,23 100:9
**check** 10:12 49:8
103:20 117:6,8
**checking** 143:21
**checks** 132:3,4,7
**circumstances**
135:15
**city** 60:20

**claim** 113:8
**claiming** 112:25
113:4,6
**clarify** 56:20
**clarifying** 78:6
**clean** 3:15
**clear** 17:14 38:18
41:7,11 72:7,21
75:25 86:14 98:4
105:16 107:2
115:5 132:7
154:24 156:5
**cleared** 132:9
**close** 48:5
**closed** 69:16
**closing** 35:6 47:20
47:21 48:10,18,23
49:12,16,18 51:25
52:3,11 53:3,7,13
53:20,22 54:8,22
55:3 56:9,17,22
57:11 59:21 60:12
60:25 66:5,15
70:5 73:16,18
74:24 75:4 76:2
79:12 94:5 112:20
113:10,13,20,22
113:25 114:5,10
114:13 115:6,12
127:12 128:12,15
128:21 129:6,18
153:25 165:13,16
168:11
**clue** 129:9 149:15
**code** 7:14
**cohn** 141:21 144:6
**collectively** 32:25
**come** 16:25 17:18
18:5 80:11 104:14
125:14 157:6

**coming** 61:21,22
61:25 82:21 133:7
137:8
**commenced**
102:25
**commission**
172:24
**commonwealth**
152:8,14,25
153:11,13,18
155:9 156:9
**communicate** 4:18
57:22 108:5 110:6
110:24
**communications**
53:12,15,21 54:2
56:3,8 106:9,19
**community**
109:15
**companies** 31:6
**company** 26:20
118:20 130:6
155:8
**compete** 118:15
**complaint** 158:16
159:17
**complete** 141:17
141:19
**complying** 111:21
**computers** 73:11
**concerned** 104:10
**condition** 55:6
**condominium**
30:11,15,17,25
54:15
**condominiums**
31:8
**confirm** 103:3
126:11
**connect** 135:5,7,14

**connection** 11:20 12:3 13:3 45:14 147:9 157:19,25
**consent** 121:25 169:8
**conservative** 65:17
**consolidated** 44:12
**constantly** 46:15
**consummated** 156:13
**contact** 131:6 140:24
**containing** 123:8
**contempt** 156:23
**content** 53:13
**continue** 60:4
**continued** 167:25 168:2,25 169:2,25 170:2
**conversation** 57:10
**copies** 33:11 49:11
**copy** 50:11 116:10 116:11,12
**corner** 38:22 39:10,23
**corporation** 7:22 7:25 8:7 11:22 23:2 136:8 153:15 154:3
**corporations** 21:17 26:24 27:21
**correct** 21:12 22:9 26:13 28:21 34:18 47:23 50:7,21 54:16,19 55:3,11 55:24 56:24 57:2 57:4 64:16 65:2 65:19 69:9 75:9

76:3 78:17 81:17 85:7 87:4,22 95:17 96:14,20,23 97:2,8,15,25 106:11 109:24 110:3,14,17 111:5 114:24 116:3,7,19 123:24 124:12,23 137:9 142:4 148:4 149:11,14 160:21 160:22
**corrected** 79:19
**correctly** 35:23
**counsel** 1:23 17:17 29:12 32:6 33:8 48:10,12 49:16 106:22 107:4 111:14 139:16 150:16 161:22
**counselor** 9:20 93:23 149:8
**county** 1:3 146:13 146:15,16 157:24 158:17
**courier** 78:3
**course** 17:17
**court** 1:2,13,22
**cover** 34:14 38:9 41:23 42:8 50:21 101:13 167:19,24
**cross** 166:3
**customarily** 82:2 82:13
**customer** 90:16

**d**

**d** 3:2 29:10 31:21 128:22 134:11,11 134:12 136:5,19 137:18 140:8 143:20 147:4 167:2

**daniel** 48:13,22 114:15 128:22 129:7
**database** 84:9,17 84:24
**date** 6:5,9,11 23:17 29:5 33:25 35:15 36:25 38:13 40:13 43:13 44:9 47:8,14 48:24 58:11 65:8 77:5 96:7 108:21 112:10 120:15 121:19 122:5,17 122:25 133:22 137:15 139:14 140:12 141:16 143:6 144:11 145:13 146:10 148:13,24 150:6 151:14 152:14 158:13 160:11 161:21 163:13 164:17 172:4
**dated** 34:5 96:8 123:6 132:3,4 133:3 150:11 164:22
**daughter** 62:11
**david** 2:6 3:7 145:22 146:8
**day** 8:16,16 56:25 57:3 61:17 66:4,8 66:12 76:13 79:15 81:5 83:6,14 84:2 85:20 89:19 90:15 96:8 104:17 125:15 166:13 171:18 172:21
**days** 59:20,22 60:11,25 66:14

70:5 79:11 85:9 85:10,12,23 104:17
**deal** 130:24 154:6
**dealt** 45:18,21,23
**decide** 119:2 157:6
**deciding** 18:3
**decisions** 8:16
**declaration** 160:12,25
**defendant** 1:18 26:4,7,8,15 27:23 28:10
**defendant's** 111:12 122:20 168:22 169:9
**defendants** 1:11 2:11 9:15,18 25:11,16,20 31:25 32:2,3,5,7,20 50:3
**deletes** 85:14
**deliver** 49:15
**delivered** 74:18 85:21 86:15 87:6 87:20,24 88:11 95:20 103:3 105:17 106:5 108:14 109:16 123:7 125:5,16
**delivery** 101:12,24 102:4,9,16 103:2 103:10,13,19,21 103:25 105:13,19 106:4 107:12,25 108:24 109:14,17 110:3,19 111:16 112:12 125:24
**demand** 122:22 168:23 169:10
**denied** 156:23

**deny** 152:18 161:7
161:9
**depends** 134:25
135:23 136:12
**depicted** 58:12,24
84:7
**deposed** 3:10
**deposit** 110:8
120:12,18 151:20
153:22 169:6
**deposition** 17:15
33:17 155:22
172:4
**depositor** 120:20
**describe** 67:22
81:10 87:10 101:9
**described** 41:23
42:7
**description** 167:9
168:3 169:3 170:3
**determine** 53:25
**determined** 86:2
**differ** 27:8
**difference** 156:18
**different** 39:19
57:3 93:12,16
103:7,8 118:16
135:20 136:18
141:8 150:16
**differentiate** 27:11
**digital** 85:7
**dimensions** 81:11
**directing** 154:25
**director** 145:24
**disbursed** 129:18
**disbursement**
127:21 168:9
**discharge** 168:20
**disclose** 106:9,19
**disclosed** 154:13

**disclosure** 123:4,9
124:15
**discoverable** 18:4
**discovery** 17:6
156:25
**discuss** 57:3 61:25
62:20 63:16 66:6
71:2 75:20
**discussed** 62:23
69:18 71:21 72:5
72:14 165:12
**discussing** 94:17
94:18 98:3
**discussion** 14:19
59:16 69:21 70:7
75:18 107:2 143:8
166:5
**discussions** 113:12
**disposition** 156:5
**distance** 67:20
**document** 24:15
25:6 29:18,21
32:25 33:7 35:13
35:18 36:23 38:4
38:11 40:18,25
41:13,18 42:5,12
43:3 50:16 51:24
77:16,21 78:2,11
78:12,15,19 79:5
79:13 80:25 83:7
83:15,15 85:19
86:9,15 87:7,22
88:3,11,18 89:16
89:21 91:23 92:14
93:6 94:22 95:5
96:17 99:20 100:6
100:18 101:2,14
108:19 112:4,14
114:4 117:11,25
119:17 120:13,17
121:17 122:3,7,23

127:22 128:11
129:23 130:2
132:23 133:20
137:13 139:12,25
140:10,14,23
141:14,17,19
143:16,24 145:18
147:6 148:11,19
149:4 150:4
151:12 158:4
159:6,8,15,22
161:13 162:7
163:11,17,24
164:20 165:4
167:10,13 169:12
169:13,15,16,17
169:18,19,21,23
170:4,6,7
**documents** 23:14
24:18,28:24 29:2
33:19,22 40:10
43:10 44:6 46:5
47:5,11 49:11,17
77:3 90:9 92:25
93:16 94:3 95:20
95:21 100:24
103:16,108:3,11
112:3,7 114:12
122:14 143:3
145:10 158:10
160:8 161:18
162:2 164:14
167:18
**doing** 22:11 82:14
**dollar** 149:5
**dollars** 52:16 55:7
118:4 131:18
137:20 138:19
144:7 148:15
149:21 151:17
152:7,25 153:8,21

154:4,16 155:3
156:6
**door** 59:10 69:15
80:19,22
**download** 84:11
84:23
**downloaded** 84:8
84:17
**drawn** 136:3
**due** 131:10,17,21
**duly** 171:8

**e**

**e** 3:2 5:25 19:8
29:10 31:21,21
33:11 36:4 53:11
53:15,21 54:2
57:22 61:21 78:3
89:2 128:21,21,22
128:23 129:13
130:9,14 134:12
140:25 141:2,2,2,8
167:2,8
**earnest** 153:21
**east** 2:4
**ecommerce** 141:2
141:5,9
**education** 13:19
16:4
**effort** 106:17
107:12,14
**efforts** 106:3
**eighteen** 16:2
**either** 53:18 55:8
75:8 78:24 85:18
106:20 112:13
114:4
**electronic** 16:15
18:10
**ely** 19:6,9,10,11,14
19:21

employed 6:14
103:22 124:2
employee 21:5,6
104:21 105:18
107:13 123:7
126:5,10
employees 82:6,15
82:19 83:4,13
employment 16:7
16:10 19:3,14
20:8 103:18 124:5
124:7
ends 39:6
engage 27:4
english 4:16,18
107:15 108:2
109:18
enter 67:2 83:22
entered 68:4
entire 33:7 42:4,11
86:12 139:25
entities 9:14 10:2
31:17 48:19 49:5
142:9
entitled 1:18
120:17
entity 23:5,6 31:20
31:24 45:23 46:3
46:6,8 104:24
142:11,15 144:23
147:15
entrance 63:25
64:11,14 66:17
67:19 68:9 81:18
entrances 81:15
entry 144:4
envelope 101:15
109:11,21 110:13
111:8 116:3 123:8
125:5 126:5,9

errata 172:2
errors 3:16
escrow 153:19
156:9,10
esq 2:6,13
esquire 128:22
estimate 74:11,15
102:7
et 172:4
etty 1:8 5:24 26:3
37:13
etty's 6:5
event 135:15
events 72:6 84:7
84:15
everybody 107:20
107:21 125:14
exactly 5:15,16
12:24 119:2
examination 1:17
5:4 165:25 166:3
167:3
examined 3:4
exchanged 49:12
excluding 17:16
excuse 79:19
exhibit 23:13 24:4
25:4 28:24 29:7
29:24 32:7 33:2
33:12 35:12,14,16
36:21,24 37:3
38:8,12,22 39:7,7
39:12,15 40:15,18
43:2 44:11 47:3
50:10,16 52:13,18
52:24 54:13 58:8
58:10,13 76:24,25
76:25 77:7 86:6
88:19 92:23 93:5
94:13,14,18,18,25
95:24 96:2,6,25

97:7 98:3,7,11,13
98:19 99:3,13,22
100:8,9,19 108:17
108:20 111:11,18
112:4,5 114:18,20
117:12 119:14
120:11,14,17
121:12,18,20,25
122:4,6,19,24
123:3,10 124:15
129:16 132:13,22
133:15,18,21,23
135:24 137:7,14
137:16 138:14
139:10,13,21
140:6,11 141:15
143:10,24 144:4
145:7,8,14 146:21
146:23 147:2,5,19
148:12 150:3,5,7
151:10,13,18
152:6,23 158:8,9
158:15,20 159:20
162:8 163:10,12
163:15 164:2,18
164:23 167:10,11
167:12,13,14,16
167:17,18,19,20
167:21,22,23,24
168:4,5,6,7,8,9,11
168:12,13,14,15
168:16,17,18,19
168:20,21,22,24
169:4,6,7,8,9,11
169:12,13,14,15
169:16,17,18,19
169:20,21,22,23
169:24 170:4,5,6,7
170:8
exhibits 23:15
29:3 33:4,5,23

34:8 40:9,11 43:8
43:11 44:5,7 47:6
47:10,12 50:13
52:17 77:4 99:13
100:23 102:11
105:17 106:5
109:20 110:12
112:8,25 115:15
122:15 123:8
127:18 143:2,4
145:11 158:11
160:6,9 161:17,19
164:12,15 169:2
170:2,10
existence 151:6
exit 76:12,16
81:17,19,21
expand 118:10
expand.com.
141:3
expedite 3:17
expenses 164:6
expires 172:24
explain 121:11
express 78:2

**f**

face 58:2,2,3,3
59:18,18
fact 83:16
facts 92:11
faith 64:22
familiar 30:10,14
31:3 130:22
far 67:17
father 16:13,14
18:10 19:2
father's 16:17
february 37:5
federal 78:2
feels 41:19

[feet - glovsky]                                                           Page 9

feet  67:21,22,24
  67:25 68:13 76:16
  81:14
ferris  141:21
fifth  63:6,7
file  2:6
filed  24:5 29:9
  123:4 157:24
  158:16 159:17
  160:12
files  49:14 53:24
filled  88:8
film  84:15
filmed  85:18
filming  85:5,6
find  107:23
fine  158:6
finish  15:6,7 66:11
  86:11 115:9
finished  15:24
firm  48:25 129:19
  130:11 138:2
  142:6
first  3:3,18 9:8
  16:12 20:18 21:22
  25:10 34:12 40:16
  45:6 50:15 55:14
  55:17,21 63:8,9,10
  63:11,14,19,20,21
  64:2,15 68:3,9,16
  71:11 72:12 77:20
  78:11,14,20 79:6
  79:13 80:11 81:2
  89:16 94:12,24
  95:4 112:22
  118:25 119:19
  122:21 131:9,16
  159:6 169:9
fitzgerald  2:3
five  5:19 15:23
  20:7 21:2 22:4

59:14 66:14 74:10
  144:17 146:9
fiveson  2:3,6 3:6,7
  3:13,24 4:7,12,15
  4:22 5:5 6:7 9:19
  10:17 14:12,18
  17:4,13,22 18:2,19
  23:12,20,23 24:2,8
  24:11 25:21 28:23
  29:6 31:5 32:5,24
  33:18 34:13,19
  35:11 36:8,20
  38:7 39:13 40:8
  41:17,25 42:6,13
  42:21 43:7 44:4
  45:5 46:23 47:2,9
  47:23 50:22 56:24
  57:2 58:6 65:2
  70:12 71:8 76:23
  82:12 85:8 89:9
  93:22 99:8 104:13
  106:11,13,21,25
  107:9 108:16
  112:2 114:24
  115:4 117:16,23
  119:20 120:10
  121:14,24 122:11
  122:18 129:24
  133:2,17 137:11
  138:4,7,11,18
  139:9,15 140:3
  141:12 142:4,25
  143:7,15 145:6
  147:13 148:9,20
  149:6,11,14 150:2
  150:7,15 151:9,21
  154:9,23 155:12
  155:16 156:4,20
  157:15,23 158:6
  158:24 159:12
  160:5,20,22

161:16,22 162:5
  163:9 164:11
  165:10,15,21
  167:5
floor  63:6,7,8,9,10
  63:11,12,13,14,19
  63:20,21,22 64:2,4
  64:6,9,12,15 66:17
  67:12,13,15,18
  68:5,10,17 76:13
floors  64:19
flowers  6:6
focussed  83:22
follow  3:14
following  167:25
  168:25 169:25
follows  3:5
food  1:9,9 9:23,24
  26:16,22 27:7,14
  27:19,22 28:3
  50:5,6
forbearance  37:5
  38:9,14 167:23
forged  113:2,5,7
form  11:25 12:5,7
  30:18 35:8 43:21
  44:17 66:10
  105:23 111:23
  125:7 135:16
  145:15 147:11
  152:20
formal  16:3
forth  171:8
forty  67:24
four  150:8
frequented  65:11
frequently  90:13
  101:16 103:24
fresh  1:9 9:23
  26:16,22 27:7,14
  27:19 50:5

friends  104:18
front  29:22 162:7
froze  132:10
full  33:13
funding  1:5 3:9
  35:4 40:21 44:25
  46:20 48:4 50:13
  51:6 52:17,20
  53:19,20 54:15
  172:3
further  171:12

g

g  31:22 36:4
  123:19 130:9
gained  68:9
galster  1:5 3:8
  35:4 40:20 44:25
  45:7 46:10,20
  47:22 48:4 50:13
  51:5,15 52:16,19
  53:19,19 54:14
  55:6,14 60:12
  76:3 114:23 118:5
  131:4,10,18,24
  132:11 172:3
generated  49:11
gentleman  58:22
getting  56:18
  57:23 66:6 92:10
  95:21 98:13
  100:23 105:20
gi  43:17
give  10:14 18:15
  46:21 49:10 71:18
  91:4 102:7,9
  132:5 150:17
  156:21,25
given  67:2 171:10
giving  61:22
glovsky  141:21

**[go - hour]**

go  4:23 13:21,23
  15:8,12,15,19
  23:21 33:9 35:6
  42:14 51:22 52:13
  62:19 68:25 69:6
  71:14 88:13 89:17
  93:22 94:12 99:3
  102:25 104:13,19
  109:14 118:24
  127:19 131:15
  132:17 133:9,15
  135:21 137:23
  138:24 143:17
  147:2 153:10
goes  85:13
going  11:11 17:14
  17:18 23:23 24:3
  24:12 29:6 32:24
  33:5,9,10,13 34:8
  35:16 40:14 43:14
  44:10 51:10 54:21
  69:23 70:4,9,10
  71:3,15,16,24
  72:11,15,18,22
  73:2,4,6,14,15,18
  74:17,23,25 75:3,9
  75:13,24 76:7
  77:6 88:14 96:6
  107:18 112:2
  118:21 119:2,8,14
  120:16 129:16
  132:13 137:16
  140:13 152:23
  154:16,21 155:17
  157:3,4,8,15,17
  158:14,18,19
  163:14 164:19
  165:17
good  3:6
gorlitz  29:10
  31:22 32:4,19

34:4 36:16,17,18
  38:19 43:16 44:13
  54:10,24 56:3,19
  57:19 59:19 60:3
  60:7 61:2 73:23
  83:2 86:18 88:2
  96:19 99:14,23
  100:9 102:25
  112:23 167:15
gorlitz's  64:24
  65:7
graduate  15:3,5
grandfather  19:4
  19:14,21 20:4,9
grandfather's
  19:5
granted  40:20
  52:19 54:10,24
granting  55:14
grants  54:14
great  154:6
groceries  101:25
grocery  1:10 6:17
  6:18,19,24 7:4
  9:25 19:15 20:12
  28:17 50:7 79:23
  80:6,12 81:11
  82:7,16 83:19
  135:19 136:15,16
grossberger  89:2
  90:11 91:21 92:24
  95:25 97:2,6 98:6
  98:9,14,17
group  12:9 136:5
  136:7,10,20,22
  137:19 140:9
  143:20 147:5,10
  147:17 155:8
groups  13:2
guarchaj  123:19

guess  3:25 4:13
guy  87:12 125:12
guys  101:12

**h**

h  3:2 29:10 31:21
  89:2 123:20 167:8
half  52:15 55:7
  118:4 131:18
  153:8,20 154:15
  155:3 156:6
hallway  62:24
hand  29:11 38:21
  39:9,23 79:13
  85:21 86:15 87:6
  91:22,25 171:18
handed  79:5 80:16
  80:25 82:22 86:5
  108:2 110:2
handing  24:8 25:7
  29:13,15 30:2,7
  32:8 34:10 35:19
  40:22 43:4,20
  50:17 51:19 52:21
  58:14 77:10,12
  93:7 99:8 117:16
  117:18 119:20,22
  120:21,23 121:21
  122:8 127:23
  128:2,13 130:4
  138:12 139:17,19
  140:15 141:23
  143:12 145:19
  148:16 158:24
  159:3,23 160:15
  160:24 161:23
  162:6 163:18,20
  164:8,24 165:2
handwriting  40:3
  77:15 78:12,15
  86:9 87:4,21 90:2
  91:12,17 94:25

96:11 97:7,10,14
  97:24
handwritings
  91:16 100:16
handwritten  86:7
  88:22
happened  72:6
  154:18
happens  85:12
hard  41:6,14
  95:11 107:17,21
hasidic  102:17
head  4:20
hear  13:6 14:13,14
  22:17 142:11
heard  31:20
  137:25
held  1:19 14:19
  143:8 166:5
help  12:19,21
helped  16:13,13
  19:16 87:12 163:6
helper  87:9,17
hereunto  171:17
highest  13:18
highlighting
  160:18
hirschfeld  8:24,25
  9:6 10:6,9 11:14
  12:6 105:7
hmm  107:8 134:10
  134:14
hold  8:3 35:25
  46:24 127:24
  153:20 154:5
home  61:14,15
  62:9,9,15,16,20,23
  63:14 76:2
honest  4:3,9
hour  74:10

| | | | |
|---|---|---|---|
| hours 84:2 | indicated 129:23 | involved 45:16 | keep 14:9,12 17:14 |
| house 72:24 73:3 | 129:25 | 162:23 163:5 | keeps 103:23 |
| huh 4:19 90:18 | indicating 25:13 | ira 52:4 128:23 | kind 32:12 141:8 |
| **i** | 25:17 36:10 37:8 | 129:10 | kinds 118:16 |
| identification | 37:23 38:25 39:16 | isaac 92:19 98:18 | kings 1:3 |
| 23:16 28:25 29:4 | 41:12 52:6 59:11 | 99:14 100:11 | kisco 15:16,17 |
| 33:24 35:15 36:22 | 83:8 88:17 89:23 | issac 36:3 37:21 | kitchen 62:24 |
| 36:25 38:13 40:12 | 93:11,17 94:16 | 91:14 99:24 | knew 55:2 59:22 |
| 43:9,12 44:8 47:4 | 121:3,7 128:25 | issue 18:3 61:25 | 67:5 69:20 90:21 |
| 47:7,13 58:11 | 137:21 142:3 | 75:6 | knock 80:22 |
| 77:2,5 90:24 | 164:3 | issued 148:21 | know 3:25 4:3,7,9 |
| 108:18,21 111:13 | individually 33:6 | issues 70:8 | 4:16 8:20 9:4,9 |
| 112:6,9 120:15 | 37:14 | items 165:23 | 10:8,23 13:15 |
| 121:16,19 122:5 | information 84:23 | **j** | 17:5 21:16,17 |
| 122:16,20,25 | 85:17 115:18,21 | j 123:20 | 22:22 24:19,21,22 |
| 133:19,22 137:15 | 155:25 156:2,3 | january 29:11 | 27:5,6,8,10 28:6 |
| 139:11,14 140:12 | initial 39:18 | jet 118:17,19,20 | 30:9,23,24 31:3 |
| 141:13,16 143:5 | initials 38:22,23 | 118:22 119:11 | 36:11 38:3 39:24 |
| 145:9,12 148:10 | 38:24 39:8,14,22 | 141:7,7 | 40:5,6 41:18 |
| 148:13 150:6 | 39:24 40:2,4 | job 16:12 | 45:14 46:2,7 48:7 |
| 151:14 158:9,12 | inquiry 70:19,22 | judah 129:12 | 48:15 49:2 50:24 |
| 160:7,10 161:20 | 95:19 154:22 | 130:13 131:6 | 51:2 53:14 56:16 |
| 163:10,13 164:13 | insert 10:22 17:12 | judge 156:24 | 59:5,7 62:5,18 |
| 164:16 | insertions 170:12 | 157:6 | 66:8 68:25 69:17 |
| identified 111:17 | instance 110:10,12 | july 1:14 171:18 | 72:4,23 73:11 |
| 114:19 123:9 | institution 15:4 | 172:4 | 79:4 84:9 87:16 |
| 127:20 | instruct 17:16 | jump 99:12 | 91:9,10,19 92:9,12 |
| identify 33:5 46:6 | 157:4 | june 164:7 | 92:12,17 95:23 |
| 83:4 103:18 106:4 | instructed 165:23 | jurat 88:5 89:20 | 96:15 98:20 |
| 107:12 157:18 | instructions | 91:11 92:19 97:7 | 101:21 102:8,19 |
| 158:19 162:2 | 102:10,12 | 97:11,25 98:7,11 | 103:12,20 104:16 |
| immediate 67:19 | intend 42:4 | 98:15,19 | 105:14,24,25 |
| included 116:5 | intended 118:8 | **k** | 106:2,14 107:4 |
| including 50:3 | interest 23:4,5,8 | k 44:5 128:21 | 108:23 109:3,5,6 |
| 53:18 85:7 139:25 | interested 171:15 | 130:9 | 110:9 113:19 |
| inclusive 143:14 | interpret 148:18 | kaufman 162:13 | 115:14 116:21 |
| incorporated 7:17 | introduced 46:12 | 162:18 | 117:2 118:18 |
| 13:16 | investment 118:6 | kearney 128:21 | 121:13 124:6,9,9 |
| index 1:3 158:17 | 118:7 | 129:8 | 124:13 125:10 |
| 168:2 | invoice 10:14 | | 126:15,22,23,25 |
| | | | 127:5,14 129:11 |

130:6,7,8,12,23,25
132:10 135:10,14
136:15 137:6
138:14 139:4
142:7,10,20
144:12,23 145:3
145:22 146:11,18
146:22 147:14,18
148:22 151:4,5,8
152:21 153:6,7
156:12 161:6
162:20 163:3
**knowledge** 8:2
79:7 82:20 83:11
87:18 91:7 92:20
103:9 125:5,21
126:6,8,12
**known** 124:8
133:24 162:18
**knows** 9:17 147:13

**l**

**l** 3:2 6:3 19:8,8
31:22 128:22,23
128:23 134:12
145:23
**lady** 4:15
**land** 152:8,25
153:11,13,18
**landline** 126:14
**landlord** 22:22
**language** 111:2,5
**late** 85:22 86:3
**law** 129:19 130:10
137:25
**lawsuit** 83:3
102:24 112:18
157:24
**lawyer** 18:20
53:18 54:4 56:12
57:8 60:13 70:10
70:17,20 71:17

75:2,8,22 76:9,22
88:16 103:5,7,8
114:8 129:19
**lcc** 153:9
**lead** 156:2
**learned** 60:12
**lease** 22:14,19
**leases** 26:12
**leave** 10:17 17:10
124:4
**leeway** 154:7
**left** 74:16 165:11
**legal** 172:2
**letter** 101:13
116:5 121:15
169:7
**letting** 154:6
**level** 13:18 67:19
**levin** 24:14 34:11
36:6 120:22 138:2
138:3,4,6,7,8
141:21 142:6,18
144:6 155:6
157:21 160:21
166:2
**levine** 2:10,13 7:19
9:16,21 10:20
11:25 12:5,7,13:7
14:10 16:25 17:7
17:20,24 18:7,13
18:22 22:20 24:6
24:9,24 25:19,24
29:14,20 30:18
31:2 32:2,21
33:15,20 34:16,20
35:8,25 39:11,20
41:2,8,15,22 42:3
42:10,14 43:21
44:17 45:3,9
46:21 47:21 49:16
50:19 51:7,11,14

51:21 56:20,25
57:5,9 59:6 64:23
66:10 77:11 78:8
82:10 85:6 86:11
87:14 93:21,24
94:8,15 99:6,9
104:4,7,10,14
105:22 106:7,12
106:15,23 107:3
107:22 111:14,19
111:22 113:4,8
114:22,25 115:9
116:13 117:14,17
117:20 119:18,21
119:24 120:3,25
121:10 123:5,11
125:7 127:24
128:17 129:21
130:3 132:25
134:16 135:16
138:3,5,9,13,16,20
139:5,18,24
140:16,20 141:25
142:23 143:14,17
147:11 148:17,25
149:9,12,16
150:14,17,20
151:19 152:20
154:5,17 155:10
155:14,19 156:16
157:10 158:3,22
158:25 159:5,10
160:17,23 161:24
162:6 163:19
164:25 165:14,19
**limited** 155:23
**line** 10:17 57:3
86:16,17 120:19
154:21 170:13,18
172:6

**liner** 133:8
**lines** 37:7
**list** 25:20
**listed** 25:11 26:4
32:7 115:3 124:18
**little** 23:25
**live** 146:12
**lived** 5:18
**lives** 31:14 64:18
**llc** 1:5,8,9,9 3:9
22:25 23:3 26:8
26:16,23 27:14,19
27:23 31:19 34:4
35:4 40:21 48:5
50:5,6,12 142:12
142:19 147:22,25
149:22 150:9
151:2,6 153:16,20
154:2 163:17
172:3
**llcs** 27:11
**loan** 31:24 32:14
34:3,25 44:25
45:8,17 46:9,19
47:22 48:5 127:21
128:8 131:7 137:7
155:4 156:7,7,18
168:9
**loaned** 32:19
**loaning** 55:6
**locate** 103:2
106:17
**located** 12:14
30:16 63:4 67:14
80:11
**location** 7:3 19:20
21:25 22:5 141:9
**long** 5:11,13,14
11:13 12:25 18:9
20:3,22 21:14,24
22:11 51:10 53:3

58:20 74:6 85:4
**look** 25:10 29:12
  34:7,13 37:16,24
  39:4 61:22 89:20
  91:11 94:2 101:11
  111:11,19 121:6
  123:11 160:2
  161:5,10
**looked** 141:18
**looking** 34:11
  118:10,11 159:11
**looks** 25:9 30:4
  34:23 35:21 36:3
  39:18 43:6 44:19
  51:4,16,23 52:23
  53:2 77:19 117:24
  121:23 164:4
  165:9
**lost** 99:4 168:21
**lot** 33:19,20
**loud** 14:17
**lower** 39:9
**lunch** 122:12,13

**m**

**m** 3:2 6:3 19:8
  128:23 141:2,2
  145:23
**mail** 33:11 53:11
  53:15,21 54:2
  57:22 61:21 78:2
  78:3 140:25 141:8
**maintain** 105:4
**maintains** 105:9
**manhattan** 48:6
  53:4 116:25
**manner** 101:18
**marathon** 4:24
**mark** 28:23 33:6
  35:11 36:20 38:7
  40:8 43:7 44:4
  47:2,9 58:6 76:23

112:3,3,5 120:10
121:14,24 122:18
139:9 140:5
141:12 142:25
145:6 158:7
161:16 163:9
164:11
**marked** 23:13,15
  24:4,9,11 25:4
  29:3,7 32:25
  33:23 34:2,5
  35:13 36:23 37:3
  38:11 40:11,15,18
  43:11 44:7 47:6
  47:12 50:10 58:10
  77:3,7 93:5
  108:17,19 112:8
  120:13,17 121:17
  122:3,15,23 123:3
  127:17 133:18,20
  137:12,13 139:12
  140:10 141:14
  143:4 145:11
  148:10,11 150:3,4
  151:10,12 158:11
  158:15 160:6,9
  161:19 163:11,15
  164:15
**marketing** 12:9
**marriage** 171:14
**marty** 134:4,5,21
  135:2 140:24
  141:2
**matter** 62:20,23
  160:20 171:16
**matters** 17:25
**mccarthy** 2:3
**mean** 6:19 8:6
  14:3 15:5,7 24:23
  30:23 36:17 39:12
  42:4 45:3 46:16

50:20,24 56:22
62:17 64:24 66:12
70:2 82:24,25
83:9 86:4 92:8
95:14 101:10,20
109:14 110:8
114:17 125:12
126:2 135:6
138:17 157:22
159:16 163:25
**meaning** 49:3
**means** 14:2 31:4
  124:22,25 138:11
**medical** 14:5,6
**meet** 61:12,17
**meeting** 73:13
  74:6
**member** 27:13
  142:14 145:24
  162:24
**men's** 4:23
**messed** 107:18
**met** 60:24 62:8
  67:8 75:25
**metropolitan** 89:6
  89:17 90:7
**mezuzah** 59:10
**michael** 2:13
**mill** 142:12,19
  153:16,20 154:2
  157:25 159:18
  160:13 162:25
  163:17 164:7
**miller** 113:14
**million** 43:16
  44:13 52:15 55:7
  118:4 131:18
  137:20 138:18
  141:20 142:22
  144:7,13,17,18
  145:4 148:15

149:4,21 151:17
152:7,13,24 153:8
153:21 154:4,15
155:3 156:6
**mine** 23:9 43:6
  97:13 161:6
**mintz** 138:2,3,4,6
  138:7,7 141:20
  142:6,18,22 144:6
  155:5
**minute** 95:22
**minutes** 74:10
**mm** 107:8 134:10
  134:14
**mobile** 126:21
**money** 32:14,18
  118:8,25 119:4,7,7
  137:23 138:15,16
  142:17,21 144:10
  145:3 148:24
  153:21
**monies** 31:24 35:4
  44:25 45:7,8
  129:17 132:17
  152:4 154:12,14
  156:14
**monitors** 84:5
**monsey** 146:19
**month** 59:12
**monthly** 131:16
  163:16 164:6
**months** 59:20
  79:12
**morning** 3:6
**mortgage** 34:3,6
  34:15,25 35:7
  40:18,19 42:2,9
  46:16 50:12,16,20
  50:20 51:3,15
  52:15,19 54:10,14
  54:14,23 55:8,15

**[mortgage - opportunities]**                                        Page 14

55:18,21 56:4,19
57:24 59:19 60:4
60:13,19 61:3
76:19 77:9 113:16
130:19 168:5,11
168:13,19
**mortgages** 55:23
**moshe** 16:18,19
**motion** 156:22
**mount** 15:16,17
**move** 17:18
**muller** 48:13,17
48:22,25 49:3,5,10
56:13,18 59:24
71:17 113:17,18
114:6,15,19 115:8
115:11,15 116:22
116:24 117:5
128:23 129:7
130:11
**muller's** 48:14
116:16
**multiple** 33:4 65:5

**n**

**n** 3:2 6:3 15:20
19:8 36:4 89:2
128:21,22 129:13
130:9,10,14
132:22 133:2
145:23 167:2
**name** 3:7 5:6,23
9:8 16:17 19:5
20:18 37:21 45:19
45:22 97:17 98:18
99:14,24 100:11
103:13,19 111:8
111:16 123:6
130:21 133:25
134:19,21 135:2
135:21 136:18,19
145:22 147:6

172:3,5
**named** 9:14
**names** 111:20
123:12 134:3,7
**necessary** 17:21
17:23
**need** 4:22,25 9:16
16:24 60:2 70:5
**needed** 69:19
71:14
**neighbor** 62:11
**neuman** 128:24
129:10
**never** 100:21
154:12,13 156:22
**new** 1:2,13,21 2:5
2:5,12 5:9 7:24
11:22 154:3 171:5
**newman** 52:4,8
**nitra** 15:20,22,24
16:4,9
**nod** 4:20
**normal** 120:5
**notarize** 71:14,16
88:13,15
**notarized** 90:10
95:14,16
**notary** 1:21 3:4
52:4,10 89:5
100:25 166:14
171:4 172:23
**note** 43:16,19
44:12,16 52:15,19
60:6 73:23,25
99:4 111:22 116:6
116:10,19 128:20
131:10,17,24
168:5,7,16,21
**noted** 166:7
**nottes** 1:20 171:4
171:22

**novartis** 153:15
154:2
**november** 133:4
143:22 144:7,14
144:25 147:21
148:16 149:23
150:11 151:17
152:10,24 153:10
154:19 164:22
**number** 89:25
92:16 96:10 98:7
126:18 156:17,17
158:17 165:4
**numerous** 118:9

**o**

**o** 3:2 6:3 19:8
31:22 130:9 141:2
145:23
**objection** 11:25
12:5,7 17:2 30:18
35:8 43:21 44:17
66:10 105:22
111:23 125:7
135:16 138:20
147:11 148:25
152:20 162:4
**obtain** 83:12
**obtained** 103:11
**obtaining** 56:4
59:18
**occasion** 62:10
66:13,15 68:3
69:13 71:19 82:21
134:24
**occasions** 65:11
101:19
**occur** 59:18 73:18
74:6 135:15 153:5
**occurred** 133:5
152:19

**october** 131:11,21
**offering** 46:15
**offers** 119:9,10
**office** 8:3,5 11:2,4
11:8,11 33:9 53:4
60:20 77:22 78:16
79:17,25 80:5,10
80:17,20,24 81:8
83:16 103:17
116:24 117:3
136:23 137:2,5
**okay** 3:22 4:4,10
4:13,20 14:14
24:14 25:24 45:9
57:8 66:16 92:13
93:25 94:19,20
99:9 107:6 119:5
124:19 133:11
159:2 163:21
165:14
**okun** 130:9
**old** 15:8,24 142:12
142:18 146:8
153:16,20 154:2
157:25 159:18
160:13 162:24
163:16 164:6
**older** 58:22
**once** 96:3
**online** 1:9 9:23
27:22 28:3 50:6
118:15
**open** 17:15 82:14
82:17 165:11
**operate** 21:21
**operating** 21:19
117:11 163:16
164:6
**operative** 92:11
**opportunities**
119:3

[opportunity - please]                                                      Page 15

opportunity 119:6
order 1:22 33:2
  60:3
ordered 156:21
orders 109:15
organize 13:11
organized 21:10
original 125:15
  160:19
originate 144:6
outcome 171:15
outgoing 137:17
outside 18:22
  104:14 113:14
overnight 71:17
owner 19:17 26:11
  27:16,18 28:2,15
  28:18 140:25
  150:25 151:4
owns 31:17 118:20

**p**

p.m. 166:7
page 24:12 25:5,11
  34:6,14,15 37:4
  38:9 39:5,5,5,5,6,6
  39:6,13,14,18
  40:16 41:24 42:7
  42:8 43:18 44:14
  52:18 88:6 100:8
  117:10,13,22
  120:12,16 121:14
  141:18 150:8
  162:13 165:8
  167:3,9,11,16,17
  167:19,20,21,22
  167:24,25 168:3,4
  168:6,8,14,15,17
  168:24,25 169:3,6
  169:7,12,13,15,16
  169:17,18,19,22
  169:24,25 170:3,5

170:8,13,18 172:6
pages 39:9 50:14
  51:18 93:19,20
paid 55:9 59:23
  60:7 73:22 74:2
  104:19 105:11,13
  105:20 126:23
  127:5
paper 109:9,10
papers 102:2
part 64:22
particular 79:25
  134:24
parties 171:13
partner 21:3
pay 10:12 49:3,5
  117:5 127:6
  129:18 156:14
payment 131:9,17
payments 131:23
  132:2
payroll 104:2,20
  105:4,9,21 109:4
pending 94:8
people 46:15
  62:15 81:23 82:2
  83:22 104:17
  135:8,13
percent 87:19
period 84:18
permission 67:2
person 57:25
  58:19,24 87:11,20
  87:24 88:10 95:20
  101:11 105:16,19
  106:4,17 107:13
  107:25 108:24
  109:17 110:3,20
  111:17 112:12
  123:23 125:24
  162:20

personal 50:2 80:3
  125:4 135:23
personally 71:3
  80:2 150:14
persons 69:12
perusing 24:17
  25:8,25 29:14
  30:3,8 32:9 34:22
  35:20 36:2 37:9
  38:16 39:2,17
  40:23 41:5,21
  42:15 43:5 44:2
  44:18,22 50:18,23
  51:13,20 52:22
  58:15 77:11,13,18
  93:8,24 94:4
  111:24 114:25
  117:17,19 119:21
  119:23 120:22,24
  121:22 122:9
  123:13 127:25
  128:4,14,16 129:2
  130:3,5 132:24
  138:13 139:2,18
  139:20,23 140:16
  140:17 141:24
  143:13 145:20
  148:17 150:19,23
  152:9,11 153:3
  158:25 159:4,13
  159:24 160:16,23
  161:4,14,24
  162:10 163:19,22
  164:9,25 165:5
phone 57:21
  126:13,16,18,24
phonetic 8:24
  123:19 129:13
photo 58:7 90:23
  168:18

photocopy 91:6
photograph 58:9
  58:13,25 59:3
piece 109:9
pigeon 78:3
place 1:19
placing 45:16
plaintiff 1:6 2:4
  3:8
plaintiff's 23:15
  28:24 29:3 33:23
  35:12,14 36:21,24
  37:3 38:8,12 40:9
  40:11,15 43:8,11
  44:5,7 47:3,6,10
  47:12 58:7,10
  76:24,24,25 77:4,7
  108:17,20 112:4,5
  112:8 120:11,14
  121:15,18 122:4
  122:15,19,22,24
  133:21 137:14
  139:10,13 140:5
  140:11 141:15
  143:2,4 145:7,8,11
  148:12 150:3,5
  151:10,13 158:8,8
  158:11 160:6,9
  161:17,19 163:12
  164:12,15 167:9
  168:3,23 169:3,10
  170:3
plan 127:15
pleadings 155:21
  155:23 157:14,19
  157:22
please 4:17 14:12
  19:7 24:7 28:23
  35:11 36:20 38:7
  40:8 42:23 43:7
  44:4 47:2,9 58:6

**[please - receipt]**

70:13 76:23 93:21
99:7 108:16
111:20 117:15
119:19 120:10
121:24 122:18
137:12 138:10
139:9 140:5
141:12 142:25
145:6 151:9
158:23 161:16
163:9 164:11
**pllc** 130:10
**point** 56:22 76:18
**pointing** 123:18
**portion** 3:20 42:24
70:14 89:11 94:10
128:8
**possession** 49:17
53:25 71:3 78:20
89:16 92:15 94:24
95:5
**post** 132:3,4
165:13,14
**practice** 114:16
**prayed** 65:6,20,23
**prejudice** 156:24
**premise** 155:11
156:17
**premises** 22:15,23
26:12 30:15 54:11
56:6 83:23
**prepare** 10:9
70:10,23 71:22
72:8 74:17 75:13
75:14,15 76:7
**prepared** 75:22
**presence** 36:9 38:5
92:4 113:14
**present** 47:19 48:2
52:11 62:15 63:17
83:5 85:20 90:13

124:15 128:20
153:24
**presented** 111:14
**president** 8:4,5
36:18
**pretty** 70:6
**previously** 54:24
94:17 101:23
141:18
**primary** 140:24
**prior** 46:9,19
48:17 49:14 53:22
54:9,21 55:7,23
56:9 59:20 65:7
65:11 66:4 79:12
90:14 101:18
102:4 106:3,21,23
107:3 112:17
**privilege** 17:17
104:8
**probably** 10:16
13:12 59:14 67:3
67:25 69:3,5
80:23 82:23 92:5
96:4 125:20
159:25
**problem** 12:23
107:14 158:5
**proceeds** 128:8
137:8 155:4 156:7
156:19
**professional** 13:2
136:17
**professionals** 8:21
11:20,24 12:2
28:7
**profile** 140:7
**promissory**
131:24
**promptly** 70:23

**property** 54:23
153:15,22 154:3
154:16 156:11,12
156:15
**provided** 54:3
**ptx** 12:11,13
**public** 1:21 3:4
166:14 171:5
172:23
**purchase** 153:14
153:22 156:11,15
**purchased** 154:2
**purports** 40:19
**purpose** 11:10
17:2 27:3 32:13
32:17 118:3
**pursuant** 1:22
**put** 59:10 98:6
101:15 109:10,20
110:13 135:8

**q**

**question** 3:19,21
4:2,8,17 17:8,9
18:8 24:25 30:21
32:10,15,16 34:16
34:21 36:7 39:21
40:17 41:16 42:3
43:22 46:24 51:8
51:12,14 54:12
66:11 84:14 86:12
94:9 104:11 106:8
106:15,18 107:5
107:11,22 115:10
116:14 117:20
120:25 121:11
126:4 128:17
131:12,14 140:4
149:7 150:20
155:20,24
**questioning** 57:4

**questions** 6:8
17:15 32:11 42:22
155:2,17 157:12
161:3 165:10,18
**quiet** 18:8
**quite** 84:10

**r**

**r** 15:20 31:22 36:4
89:2 123:20
128:21,23 129:13
130:9,14 141:2
160:13
**r.s.** 142:12,18
153:15,20,25
159:17 162:24
163:16 164:6
**r1** 30:11,15 31:7
54:16
**rabbi** 102:14,20
**raise** 14:11
**rang** 67:4 80:23
**read** 25:23 40:24
41:3,6,11,14,19,20
42:22,25 70:12,15
89:12 94:11
**reading** 35:23
41:13 42:2
**really** 120:2,4
**reason** 172:6
**recall** 13:13 24:20
34:24 52:8,10
59:4 62:6,22
66:24 79:5,11
81:5 113:9,19
131:16 132:15
144:21 150:21
152:2,16 153:24
161:12
**receipt** 148:14,23
149:6,9 151:16
152:4

| | | | |
|---|---|---|---|
| received 77:16,21 77:25 78:11,14 126:11 144:10 150:12 | records 49:22 50:2 85:5 103:17,18 105:4,9,21 124:7 152:6 169:11 | 75:2 76:17 81:6 82:23,24 92:6,7,10 93:18 95:6,7,7,11 96:15 97:3 98:8 | 76:20 91:8 111:12 122:21 159:9 168:22 169:9 |
| receiving 149:21 150:21 | redacted 141:18 referencing | 98:12,16,20,23 100:22 101:7,8,20 | responsive 49:23 restated 44:12,16 168:7 |
| recess 18:24 23:22 46:25 104:15 122:13 | 151:18 referring 114:18 123:20 | 101:22 102:6 103:15,23 105:14 111:9 113:11,21 | retained 170:10 returned 142:22 returns 9:10,13 |
| recognize 36:12 38:14,19 40:17,25 41:3,4,10 42:16 | reflected 149:13 reflects 149:4 151:20 | 114:14 117:9 119:12 127:16 128:19 132:21 | 10:2,10 review 85:16 right 14:7 16:9 |
| 43:18 44:15,20,23 50:15,24 52:18 58:12 93:6 117:21 | refresh 129:4 143:25 refunded 155:6 | 137:3,24 139:5,7 141:11 142:24 143:18,23 144:16 | 27:12 31:5 34:12 38:21 39:9,23 42:2 45:25 60:15 |
| 117:25 120:7 139:21 143:11 159:5,8 161:2 | regard 165:22 regarding 49:18 53:12 56:3 57:23 | 144:20 146:17,25 148:8 150:24 151:3 152:22 | 61:4 65:20 70:25 75:7 76:10 85:2,3 85:8,15 87:5 |
| 162:9 163:17 164:19 165:3,7 | 59:18 113:15 155:2,18 157:12 | 153:12,17,23 161:15 162:11 163:2,8 165:6 | 96:21,24 97:22 98:2,24 107:24 109:2,5,19,25 |
| recognizes 41:18 42:9,11 | registrar's 60:20 regular 65:25 | remembers 22:21 84:10 129:22,25 | 110:4,15,23 111:3 111:6 115:4 116:4 |
| recollect 134:20 recollection 129:5 143:25 145:21 | 90:16 related 171:13 relevancy 162:4 | rendered 49:6 renew 156:24 rephrase 3:22 | 116:20 117:23 124:20,21 125:3 130:18 142:2 |
| 149:20 record 3:15 14:18 14:20 41:22 42:25 | relevant 17:25 18:3 155:25 156:3 remember 5:15 | 84:14 report 133:3 represent 3:8 | 144:3 165:21 riverstone 136:5,7 136:10,19,22 |
| 60:14,18 70:15 89:12 94:11 125:2 143:7,9 147:3 | 11:6,12 12:24 13:5,8,9 18:14 22:13,16,18 29:23 | 48:22 142:8 represented 48:9 representing | 137:18 140:9 143:20 145:17,24 147:4,6,10,10,16 |
| 154:25 161:25 166:4,6 168:20 171:10 | 31:16 36:11,14 37:10 38:6,20 45:19,22 46:17 | 128:7 requested 42:24 70:14 89:11 94:10 | 147:16,22,25 149:22 150:9,25 153:9 155:8 |
| recorded 54:10,23 55:23 56:5 60:19 85:18 | 47:15,16 49:9,13 49:20 52:12 53:6 53:23 61:19 62:3 | reserve 157:16 reside 5:8,20 resided 5:11 | road 2:11 rockland 146:13 146:15,16 157:24 |
| recording 50:21 84:16 85:7 | 62:6,13,14,17 68:7 68:11,12,15,19,23 | residence 64:5,10 response 18:11 | 158:17 room 4:23 63:2,3 |
| recordings 85:17 | 68:24 69:6,7 70:21 73:7 74:9 | 25:14,18 42:18 | 80:6 111:15 |

**[rule - sent]**                                                                                             Page 18

| | | | |
|---|---|---|---|
| **rule** 3:18 | 86:1,17 87:1 88:1 | 77:8 82:22 96:7 | **security** 83:18,21 |
| **rules** 3:14 14:15 | 88:2,22,23 89:1 | 101:18 103:4 | 83:25 84:4,8,15 |
| **ruling** 157:5 | 90:1 91:1,13 92:1 | 115:19 168:19 | **see** 7:17 24:6 |
| **rulings** 170:17 | 92:18,21 93:1 | **satisfactions** 95:10 | 25:12,22 26:3,8,17 |
| **run** 84:2 | 94:1 95:1 96:1,18 | 113:25 | 27:24 28:10 37:14 |
| **runs** 8:7,12,14,15 | 97:1,11,15,17 98:1 | **satisfied** 55:8 | 41:4,11 52:4 |
| | 98:10,18 99:1 | **satisfying** 113:15 | 62:18 76:15 86:22 |
| **s** | 100:1 101:1 102:1 | **save** 84:17 85:4 | 87:4 89:22 91:12 |
| **s** 3:2 6:3 19:8 | 103:1 104:1 105:1 | **saved** 84:19 | 91:14 96:7 98:6,9 |
| 29:10 31:21,21 | 106:1 107:1 108:1 | **saves** 84:20 | 98:14,17 99:6,15 |
| 36:3,4 89:2·130:9 | 109:1 110:1 111:1 | **saw** 24:18,21 | 99:19,25 100:5,11 |
| 145:23 160:13 | 112:1 113:1 114:1 | 29:21 62:9 67:4 | 100:15 112:19 |
| 167:8 172:6 | 115:1 116:1 117:1 | 68:3,16 98:22 | 114:4,12,20 |
| **salamon** 1:8,8,18 | 118:1 119:1 120:1 | 112:16,22 | 117:14 119:8,18 |
| 3:7 5:7 6:1 7:1 8:1 | 121:1 122:1 123:1 | **saying** 63:16 66:25 | 124:16 128:24 |
| 9:1 10:1 11:1 12:1 | 124:1 125:1 126:1 | 118:18 127:4 | 133:9 136:5 |
| 13:1 14:1 15:1 | 127:1 128:1,23 | 155:13 | 137:20 138:9 |
| 16:1,19 17:1 18:1 | 129:1 130:1 131:1 | **says** 91:13,13 | 141:3,21 144:4,8,9 |
| 19:1,6,9,10,11,14 | 132:1 133:1,25 | 107:20,21 124:14· | 144:19,20 147:7 |
| 19:21 20:1 21:1 | 134:1,6,13,22 | 124:15 125:14 | 147:22,24 149:17 |
| 22:1 23:1 24:1 | 135:1,3,22 136:1 | 128:20 132:14 | 151:18,19,23,25 |
| 25:1 26:1,3 27:1 | 137:1 138:1 139:1 | 140:23 149:18 | 152:8,12 153:2 |
| 28:1 29:1 30:1 | 140:1,24 141:1 | 152:15 164:10 | 158:22 162:14 |
| 31:1 32:1 33:1 | 142:1 143:1 144:1 | **scan** 33:10 | **seeing** 62:14 68:12 |
| 34:1 35:1 36:1 | 145:1,23 146:1,8 | **scarsdale** 2:12 | 113:9 114:14 |
| 37:1,7,13 38:1 | 147:1 148:1 149:1 | **schner** 88:25 | **seen** 24:15 29:17 |
| 39:1 40:1 41:1 | 150:1 151:1 152:1 | 90:10 91:21 95:25 | 99:4,5,10 100:18 |
| 42:1 43:1,14 44:1 | 153:1 154:1 155:1 | 97:2 | 128:11,18 132:23 |
| 44:10 45:1 46:1 | 156:1 157:1 158:1 | **school** 13:21,23 | **sees** 25:20 |
| 47:1 48:1 49:1 | 159:1 160:1 161:1 | 15:12 | **selected** 48:21 |
| 50:1 51:1 52:1 | 162:1 163:1 164:1 | **search** 49:14 | **send** 6:6 71:15 |
| 53:1 54:1 55:1 | 165:1 166:1,8 | 53:24 | 72:2 74:25 75:3 |
| 56:1 57:1 58:1 | 167:5 172:3,5,20 | **searched** 49:22,25 | 81:7 88:14,15 |
| 59:1 60:1 61:1 | **salmon** 133:24 | **second** 18:23 | 101:4 115:15,17 |
| 62:1 63:1 64:1 | **satisfaction** 56:4 | 35:25 46:22 63:11 | 115:18,20 116:6 |
| 65:1 66:1 67:1 | 56:19 57:23 59:19 | · 63:13,22 64:4,15 | **sense** 92:8 |
| 68:1 69:1 70:1 | 60:3 61:2 66:7 | 64:18 66:17 67:11 | **sent** 78:25 79:2 |
| 71:1 72:1·73:1 | 69:19 70:11,24 | 67:13,15,18 68:5 | 101:3,16,17,21,24 |
| 74:1 75:1 76:1 | 71:4,13,18,22 | 68:10,17 71:11 | 102:3 110:7 |
| 77:1 78:1 79:1 | 72:16,23 74:18,22 | 76:12 93:21 100:8 | 115:23 116:2 |
| 80:1 81:1 82:1 | 75:19 76:7,19,21 | 117:13,22 150:17 | 125:15 |
| 83:1 84:1 85:1 | | | |

**[separate - store]**    Page 19

separate  63:25
  64:11 80:6,6
  81:17 147:15,16
  165:19
september  153:25
service  84:4
servicer  126:20
services  10:15
  49:5 117:6 127:10
  127:15
set  33:13 171:8,18
shareholders
  11:23
sheet  50:21 172:2
shirley  1:20 171:4
  171:22
shopping  1:8,9
  6:22 7:2,16 8:4,8
  9:24 10:10 11:21
  12:3 13:4,11,16
  19:18 21:14 26:6
  26:12 28:9 50:4,6
  104:22,25 105:3
  105:10 128:7
  136:4 137:18
  140:8 143:19
  147:4 172:4
short  18:24 23:22
  46:25 104:15
shoulders  4:20
show  24:3 25:3
  29:6,24 30:5 33:3
  35:16 37:2 40:14
  43:14 44:10 50:9
  77:6 93:4 117:10
  119:14 120:16
  122:6 123:2
  127:20 128:10
  132:22 135:24
  137:16 143:10
  145:14 147:19

148:14 158:14
  162:2,12 163:14
  164:18
showed  37:17
showing  25:16
  43:2 139:15
shows  137:7,17
  141:20 144:5
  148:23 151:15
  152:24
shrug  4:19
sign  36:8 51:24
  71:14,16 72:12,17
  72:19 75:12,17,23
  88:13,15,18,25
  90:4 92:4 95:24
  99:17 100:3,5
  121:8,12,20 122:7
  146:23 159:20
  164:2
signature  1:10
  24:12 25:6,9
  29:25 30:4,6 34:6
  34:15,17 35:17,24
  36:5,12 37:4,6,11
  37:14,15,18,20,22
  40:16 43:3,17,24
  44:14,20 50:14
  51:17 52:18,25
  86:16,17 87:25
  88:21 89:18 91:22
  94:13,21 96:19
  97:15 99:15,23
  100:10,10 112:13
  113:5,6 117:21
  119:16,25 120:6,8
  120:18,19 121:2,4
  127:22 132:20
  133:10,13 136:3
  137:9,19 140:14
  145:15,17 146:20

155:5 157:18
  158:4,21 160:3,14
  161:2,5,8,10,11
  162:3,12,16
  164:20 165:7,9
  167:11,12,16,17
  167:20,21,22
  168:4,6,8,14,15,17
  169:11,22,24
  170:5,8 171:21
signatures  38:2
  78:9,10
signed  34:9 38:4
  39:25 52:3 89:4
  89:21 92:15 95:13
  96:2,4,13,22,25
  97:4,5,6 100:24
  101:17 113:24
  129:17 162:13
signing  75:18
  161:12
similar  37:12,19
  44:3,19,23 121:5
sir  6:11 22:17
  35:17 118:19
sitting  111:15
six  52:15 55:7
  118:4 131:18
sole  8:18 142:14
solutions  172:2
son  146:3,5,6,24
son's  146:20
soon  70:6 89:15
sorry  31:10 42:19
  42:21 46:22 67:8
  84:12 89:9 91:25
  146:14 159:12
sound  130:22
speak  18:19 57:17
  108:2 109:18
  110:25 111:4

speaking  66:24,25
specify  9:17
spell  9:3 12:12
  19:7
spend  15:21
spoke  56:12,16
  57:7,15 106:14
  113:17
sprint  127:7,8
square  81:14
stand  23:24 24:2
  79:19
stark  133:7
start  16:6
started  21:22 62:7
  83:2
state  1:2,21 69:25
  88:11 171:5
stated  114:10
statement  103:3
  103:10,11 128:12
  136:2 143:11,16
  147:21 148:7,21
  150:8,13,22
  151:15 155:11
  163:16 164:5
  167:12 168:11
  169:14,20
statements  83:13
station  1:9,9 9:23
  9:24 26:16,23
  27:7,14,19,23 28:3
  50:5,6
step  18:22
stick  17:24
stipulations  1:22
stockholder  8:18
store  6:19,24 7:4
  62:4 65:22 72:3
  79:23 80:4,7,12
  81:11 82:7,16,21

**[store - transaction]**

82:25 83:6,19
  85:20 136:16
**straight** 135:9
**street** 1:13 2:4 5:9
  5:12 11:5 12:17
  14:24 19:24 61:16
  79:17,20 89:14
**structure** 28:8
  32:12 63:17
  118:16
**structured** 8:22
**study** 62:25 63:2,3
  67:9,20 68:4,8,14
  68:20,21 69:2,11
  69:12,15,18 71:19
  72:5,8 73:20 74:4
  74:7,16 75:25
  76:16
**stuff** 19:15 101:16
  101:21,23
**subject** 165:12
**subscribed** 166:11
  172:21
**substance** 73:12
  76:5
**sued** 112:23
**suffern** 154:3
**suggest** 117:12
**suggesting** 70:6
**suggestion** 61:23
**sum** 73:11 76:5
**summons** 158:16
**supplemental**
  122:21 123:4
  169:9
**supreme** 1:2
**sure** 3:15 9:17
  46:23 87:8 106:8
  108:22 111:9
  123:16 125:12,19

**swear** 98:23
**sworn** 166:11
  172:21
**synagogue** 63:11
  63:18,19 64:2,21
  64:24,25 65:3,7,7
  65:10,14,15,19
  66:2
**synagogues** 65:18
**szenberg** 130:9

**t**

**t** 5:25,25 15:20
  31:22 126:21
  129:13 130:14
  167:8
**tabs** 33:12
**take** 4:16,23,25,25
  10:20 17:11 23:18
  23:20,21 34:7
  46:16,23 51:10
  53:3 60:2 71:12
  84:22 93:23 94:2
  102:14 104:17
  122:12
**taken** 1:20 18:24
  23:22 46:25 59:3
  59:7,12,24,25
  60:14 69:20,24
  70:4 73:2,4,15
  104:15 122:13
**takes** 71:9 104:19
**talk** 18:18 107:15
  136:25
**talked** 165:15
**talking** 14:17 78:5
  81:4 82:13 127:2
**talmud** 14:5,7,21
  15:9
**talmudic** 14:4
**tambrulese** 123:19

**tax** 9:10,13,25
  10:10
**tell** 3:21 4:9,24
  5:17 10:18 39:8
  45:15 51:9 61:20
  61:24 70:16 72:11
  72:13,18,20 73:17
  80:9 92:6,12
  119:5 125:23
  157:8
**telling** 33:8 61:6
  61:23 157:7,10
**ten** 11:18 59:13,14
**terminate** 154:21
**testified** 3:4
**testifying** 49:15
**testimony** 108:23
  125:18 171:7,10
**thank** 9:19 17:23
  32:6 34:19
**thereof** 40:16
**thing** 28:11 41:3
  56:21 85:13 93:9
  99:22 159:6
**things** 118:9,12
**think** 9:16 11:9
  14:16 17:21,23
  23:3 39:3 41:23
  46:17 47:17,25
  53:16 56:13 71:8
  71:10 75:16 78:13
  79:15 83:9,17
  98:21 123:14,16
  123:22,23 132:6
  132:19 140:18,20
  140:22 159:10
  165:11
**thinking** 46:14
**third** 64:6,9,12,18
  67:12

**thirty** 85:10
**thought** 75:5
  138:5
**three** 44:13 66:14
  82:5
**till** 104:19 127:12
**time** 1:19 5:13,14
  11:7 12:25 33:21
  54:7 56:23 57:6
  57:10 61:17 71:12
  76:18 78:20 79:6
  79:14 81:2,25
  84:10,18 89:17
  93:23 94:2 95:16
  95:25 96:5 104:19
  112:16,22 166:7
**title** 53:20 88:22
  97:18,20 119:15
  145:16 152:8
  153:2,11,13,14,18
  169:4
**today** 5:21 6:13
  16:21 22:8 49:15
  103:9,22 106:4
  108:25 112:17
  116:22 127:6,7,13
  145:4 151:7
**told** 46:14,17
  59:25 60:5 69:5
  71:25 72:7,15,21
  72:25,25 73:13,14
  73:22 75:11,22
  125:11 141:7
**tough** 32:10
**town** 146:18
**traced** 156:8
**transaction**
  154:18 155:20
  157:12,20 158:2
  165:13,18,20

**transactions** 48:18
  136:18
**transcript** 10:18
  17:10 171:9
**transfer** 133:3
  144:5 151:21
  168:12
**transferred**
  144:14 155:7
  156:8
**trial** 1:17
**tried** 125:14
**true** 155:13,15
  171:9
**truth** 61:10 98:25
  99:2
**try** 107:23 141:6
**trying** 46:16 47:17
  71:10 118:17,23
  141:7
**twenty** 5:19 82:18
  146:9
**two** 18:17 19:2
  31:12,14 42:22
  43:16 55:15 56:5
  66:13 79:15 93:19
  93:20 95:7,8,9,9
  95:21,23 107:4
  117:10 120:12,16
  144:15 153:8,20
  154:15 155:3
  156:6 165:22
**tynauer** 129:13
  130:14 131:6
**type** 70:7,7

**u**

**u** 3:2 36:4 123:19
  128:23 129:13
  130:9,14
**u.s.a.** 145:17,24
  147:6,10,16,22,25

149:22·150:9
  151:2 153:9
**uh** 4:19
**um** 5:15 16:15
  20:19 46:14
  115:18 120:2
  124:10 134:8
**unannounced**
  66:20·
**underneath**
  129:12·
**understand** 3:20
  3:22 13:20 25:15
  30:13,20,22 54:12
  55:5,17 57:5
  60:16,19,22 61:5
  63:15 73:10 84:13
  84:25 86:25
  106:12,24 107:7
  108:23
**understanding**
  55:20 60:9 74:21
  113:23 114:3
  115:16
**understood** 45:16
  54:18 55:11,13
  60:6 73:12 74:16
  76:6
**unit** 55:24
**united** 14:4,5,7,21
  15:9
**units** 30:11,15
  31:7,12,14,18
  54:15 55:15
**unknown** 124:16
**upstairs** 66:20
  67:6
**use** 11:20 12:3
  13:10 66:17 118:8
  126:13,14 134:21
  135:2 136:14

**155:2**
**usually** 81:3,6
**uta** 13:24,25

**v**

**v** 172:3
**verbal** 18:11 25:14
  25:18 42:18 76:20
  91:8 159:9·
**verbally** 110:5,24
**verification**
  159:21
**verified** 29:8
  167:14
**veritext** 172:2
**verizon** 126:21
**vice** 8:5
**vicinity** 81:21
**victor** 123:19
**voice** 14:11,13

**w**

**w** 14:15
**wait** 39:11 51:21
**waiting** 119:6
**waiving** 162:3
**walk** 66:20 67:18
  68:8
**walked** 68:13,20
  68:22
**walmart** 118:20·
**want** 3:24 4:12 6:6
  17:5 18:18,19
  23:20 25:3 29:24
  30:5 37:2 41:15
  41:17 50:9 53:14
  56:16 72:4,7,21
  73:11 79:4 92:9
  93:4 99:3 104:3,4
  106:13 107:4
  110:9 113:18,19
  117:10 122:6

123:2 127:19
  128:10 132:22
  135:4,7,8,13,18,19
  135:24 136:16
  143:10 148:22
  154:24 156:11
  157:8 162:12
  164:18
**wanted** 75:17
  118:12,23,24,25
  119:7 141:6
**way** 39:19 63:5
  67:16 76:14 80:13
  80:17 109:14
  171:15
**weeks** 79:12
**welcome** 9:21
**went** 15:9 21:9
  45:13 55:3 56:17
  56:21 57:11 66:4
  66:16 67:6 69:4
  92:22 95:12,15
  101:14 108:13
  113:22 138:15,23
  154:14 156:19
**werner** 1:20 171:4
  171:22
**whereof** 171:17
**white** 58:7 168:18
**wife** 5:22 27:18
  62:11 69:5
**wife's** 5:23 30:6
  37:15,18
**williamsburg** 9:7
  10:7,19
**wire** 130:8,13
  133:2,4 137:17
  144:5 151:21
  168:12
**wired** 128:6
  132:14 138:25

**[wired - yungreis]**

141:20 142:17
152:13,25 153:9
155:4
**wiring** 152:6
**withdraw** 41:16
140:4
**witness** 3:2,12,23
4:5,11,14,21 5:3
14:16 17:5 18:5
18:12,18,21 23:18
23:25 29:16,19
51:9 82:20 86:13
99:11 104:3,6,9,12
107:8,10,24
111:17,21 114:19
114:22 115:3
123:4,9 139:6
149:19 162:8
165:5 167:3 171:7
171:11,17 172:5
**witnessed** 83:5
**witnesses** 111:13
122:22 169:10
**wolf** 20:19,20,23
**wood** 128:22
129:8
**word** 31:3 41:19
41:20 61:24,24
72:25 73:7 97:20
**words** 100:6
**work** 6:13 18:9
20:3,16,22
**worked** 18:25 19:4
19:21 65:21,23
81:23 129:19
130:11
**worker** 101:6,9
102:4,10,16 103:2
103:10,14,19,21
103:25 104:23
105:12

**workers** 101:5,24
**working** 79:3 82:3
82:7,15 83:14
104:21,24 108:24
125:2
**works** 130:7
**write** 98:10,14,18
99:19 100:6,13,15
108:7 109:8 111:7
**written** 83:12
92:19 103:11
124:25
**wrote** 91:19
108:10 110:16

---

**x**

**x** 1:4,12 167:2,8

**y**

**y** 3:2 5:25 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1,8 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1,4 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1

75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1,11 98:1
98:10 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1,21 129:1,13
130:1,14 131:1
132:1 133:1 134:1
134:11,12 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:5
**yeah** 8:11 54:6
81:9 86:4 102:23
127:9
**year** 11:9 59:13
**years** 5:17 11:15
15:8,21 18:16,17
19:2 20:5,24 22:2
59:13,14,20

**yehuda** 1:8,17 5:7
37:7 86:16 87:25
88:22,23 91:13
92:18,21 96:18
97:15,17 98:18
128:23 133:25
140:24 166:8
172:5,20
**yellow** 160:17
**yeshiva** 15:18,19
**yesterday** 82:25
**yidel** 134:8,9
135:5,7,21
**yidel's** 1:8,10 6:21
7:2,16 8:4,8,16,19
9:11,23,23,25
10:10 11:21 12:3
13:3,11,15 19:17
21:9,10,14 22:14
26:6,12,16,22 27:6
27:13,18,22 28:2
28:17 50:4,5,5,7
104:22,25 105:3
105:10,18 108:25
128:7 132:15
133:12 135:14
136:4,15 137:18
140:8 143:19
144:2,11,14 147:4
172:4
**yidels** 1:9,9
**yoel** 162:13,18
**york** 1:2,13,21 2:5
2:5,12 5:10 7:24
11:22 154:4 171:6
**yungreis** 35:22
36:4,13,15 37:21
38:5 57:18,19
58:18,19 59:17
60:5,7,24 61:13
66:6,16 68:2 74:8

| |
|---|
| 74:17 76:6 77:17 |
| 78:23,24,25 79:9 |
| 82:20 83:5,14 |
| 85:19 86:5 87:17 |
| 87:19 91:14 92:19 |
| 97:12 98:10,19 |
| 99:15,24 100:11 |
| 101:3,4,17 102:4 |
| 103:4 105:18 |
| 106:6 108:14 |
| 113:7,24 114:7 |
| 115:14 125:6,22 |
| 125:23 126:10 |
| **yungreis's**   37:22 |
| 109:21 110:16 |
| 111:7 112:13 |

**z**

**z**   31:22 130:9
**zip**   7:14

212-267-6868                                                                516-608-2400

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.